IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| Jeffrey  Snyder, D.O.,<br>an individual,<br>　　　Plaintiff,<br><br>v.<br><br>(1)　　Board of Regents for the Oklahoma<br>Agricultural & Mechanical Colleges, *ex rel.*,<br>Oklahoma State University Center for Health<br>Sciences;<br><br>(2)　　Oklahoma State University Medical<br>Center, managed by Mercy Health System,<br>a public-private partnership<br><br>(3)　　Lora Cotton, D.O., in her individual and<br>official capacity;<br><br>(4)　　Jenny Alexopulos, D.O., in her individual<br>and official capacity;<br><br>(5)　　Deborah Nottingham, in her individual<br>and official capacity;<br><br>(6)　　Sunny Benjamin, in her individual and<br>official capacity;<br><br>(7)　　Community Care HMO, Inc., d/b/a<br>Community Care of Oklahoma;<br><br>(8)　　Jessica Heavin, in her individual and<br>official capacity;<br><br>(9)　　Steve Stewart, in his individual and<br>official capacity; | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br>Case No.: CIV-16-384-F<br><br><br>**JURY TRIAL<br>DEMANDED** |

(10)   Leslie Barnes, Ph.D., in her individual    )
and official capacity;                            )
                                                  )
(11)   Mercy Health Oklahoma Communities,         )
Inc., d/b/a Mercy Health System, an Oklahoma      )
Non-profit Corporation;                           )
                                                  )
(12)   Mercy Health, a foreign Non-Profit         )
corporation;                                      )
                                                  )
(13)   Oklahoma State University                  )
Medical Authority, a State agency;                )
                                                  )
(14)   Oklahoma State University Medical          )
Trust, a public trust;                            )
                                                  )
(15)   OSUMC Professional Services, LLC,          )
an Oklahoma Limited Liability Company;            )
                                                  )
       Defendants.                                )

## AMENDED COMPLAINT

1.     This jury action seeks redress for Defendants' violations of the laws of the United States and State of Oklahoma in connection with Plaintiff's employment and participation in a medical residency program.  This action specifically seeks to enforce rights created under federal and state statutes and the U.S. Constitution.  As redress for the claims against Defendants herein, Plaintiff prays for and demands declaratory relief, legal and equitable relief, including injunctive relief, back pay, reinstatement or, in the

alternative, front pay, damages as set forth herein, and to the extent available punitive damages, and attorney's fees and costs.

## PARTIES, JURISDICTION, AND VENUE

2.     This Court has jurisdiction over Plaintiff's claims herein brought under federal law and this suit is authorized and instituted pursuant to the Federal Rehabilitation Act, 29 U.S.C. § 794; the American Disabilities Act, 42 U.S.C. 12111, *et seq.*; Title VII of the Civil Right Act, 42 U.S.C. §§ 2000e-2, 2000e-3(a), Consolidated Omnibus Budget Reconciliation Act of 1986, ("COBRA"), 29 U.S.C. § 1161 *et seq.*; Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*; 42 U.S.C. § 1983; and 42 U.S.C. § 1985.  Jurisdiction is invoked pursuant to 28 U.S.C. §§ 1331, 1343.  Declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201, 2202, and Fed. R. Civ. P. 57.  This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 to hear the state claims identified herein.

3.     Plaintiff, Jeffrey Snyder, D.O., ("Dr. Snyder"), is an adult citizen of the State of Oklahoma.  He is currently a resident of Edmond, Oklahoma County, Oklahoma.

4.     Defendant, Board of Regents for the Oklahoma Agricultural & Mechanical Colleges is a state entity; the Oklahoma State University Center

for Health Sciences is operated by and through the Board of Regents. The legal situs of the Board of Regents for the Oklahoma Agricultural & Mechanical Colleges is Stillwater, Payne County, Oklahoma, which is within the judicial district of this Court. Defendant, Board of Regents shall be referred to as OSU-CHS herein. At all times material and as set forth herein, OSU-CHS administered and supervised the OSU Family Medicine Residency Program ("Residency Program") at OSU Medical Center.

5.     Defendant, Mercy Health Oklahoma Communities, Inc. d/b/a Mercy Health System is an Oklahoma not for profit corporation.

6.     Defendant, Mercy Health, is a foreign not for profit corporation.

7.     Defendant, Oklahoma State University Medical Center is managed by Mercy Health System, a public-private partnership. Oklahoma State University Medical Center is owned in part by the OSU Medical Authority, a state agency, and it is managed by Mercy Health System and/or Mercy Health, a private for-profit corporation. Mercy Health System and/or Mercy Health are liable for the management actions taken at issue herein. Defendant Oklahoma State University Medical Center managed by Mercy Health System and/or Mercy Health shall be referred herein as OSU Medical

4

Center.  At all times material and as set forth herein, OSU Medical Center was Dr. Snyder's employer.

8.      Venue is proper in the Western District of Oklahoma, pursuant to 28 U.S.C. § 1391, because Plaintiff resides within the judicial district of this Court and because Defendants conduct business within the Western District of Oklahoma.

9.      Defendant, Lora Cotton, D.O., ("Dr. Cotton") is sued in her individual and official capacity.  At all times material to this action, Dr. Cotton served as the Program Director of the OSU Family Medicine Residency Program. Dr. Cotton served as Dr. Snyder's first-line supervisor at all times material herein.  Dr. Cotton is a joint employee of OSU-CHS and OSU Medical Center.

10.     Defendant, Jenny Alexopulos, D.O., ("Dr. Alexopulos") is sued in her individual and official capacity.  At all times material to this action, Dr. Alexopulos served as the Director of Medical Education of all the Graduate Medical Education ("OGME") programs at OSU Medical Center.  Dr. Alexopulos served as Dr. Cotton's direct supervisor and also as a second level supervisor to Dr. Snyder at all times material herein.  Dr. Alexopulos is a joint employee of OSU-CHS and OSU Medical Center.

11.     Defendant, Deborah Nottingham ("Nottingham") is sued in her individual and official capacity.  At all times material to this action, Nottingham served as a Senior Human Resources Representative for the OSU Medical Center.

12.     Defendant, Sunny Benjamin ("Benjamin") is sued in her individual and official capacity.  At all times material to this action, Benjamin served as Chief Human Resources Officer and Executive Director of Human Resources for the OSU Medical Center.

13.     Defendant, Community Care HMO, Inc., d/b/a Community Care of Oklahoma, at all times material to this action, was the Employee Assistance Program provider ("the EAP").

14.     Defendant, Jessica Heavin is sued in her individual and official capacity.  At all times material to this action, Heavin served as the EAP Counselor.

15.     Defendant, Steve Stewart is sued in his individual and official capacity. At all times material to this action, Stewart served as the EAP Supervisor.

16.     Defendant, Leslie Barnes, Ph.D., is sued in her individual and official capacity. At all times material to this action, Dr. Barnes served as the referral provided by the EAP.

6

17.     Defendants Oklahoma State University Medical Authority, a state agency; Oklahoma State University Medical Trust, a public Trust, and OSUMC Professional Services, LLC, an Oklahoma Limited Liability Company at all times material herein acted in concert with OSU-CHS and the OSU Medical Center.  For purposes of this Complaint, the Defendants identified in this paragraph are included and encompassed with having taken the same actions as OSU-CHS and OSU Medical Center as asserted herein; thus, references to OSU-CHS and/or OSU Medical Center, include the Defendants listed within this paragraph.

18.     At all relevant times, the individually-named Defendants, Drs. Cotton and Alexopulos, acted under color of state law and custom and with the power and authority granted to them by the laws of the State of Oklahoma.

19.     At all relevant times, Dr. Snyder took direction from and control from the directors, physicians, and managers of OSU-CHS and OSU Medical Center, including, but not limited to Drs. Cotton and Alexopulos, Benjamin, and Nottingham.  OSU-CHS, Residency Program, and OSU Medical Center maintain and operate from the same principal office and utilize and/or share the same staff.  OSU-CHS and OSU Medical Center, collectively, are an

integrated enterprise or "joint" employers or each served as the "single" employers of Dr. Snyder.

20.     OSU-CHS and OSU Medical Center receive federal funds.

21.     All conditions precedent to Dr. Snyder's entitlement to relief in this action have been fulfilled and satisfied, including the exhaustion of administrative remedies.

## BACKGROUND FACTS

22.     Dr. Snyder graduated from Oklahoma State University, College of Osteopathic Medicine, receiving his Doctor of Osteopathic medicine on May 17, 2013.

23.     Dr. Snyder was selected for the OSU Family Medicine Residency Program ("Residency Program") at OSU Medical Center in February of 2013 and began the Residency Program in July of 2013.  The Residency Program is a 3-year program.

24.     In July of 2013, when Dr. Snyder began his Residency Program, he also began his employment with OSU Medical Center, which sponsors and implements the Residency Program.  The Residency Program is administered through OSU-CHS and is an opportunity to further learn through practice, while supervised by attending and teaching physicians.

25.     Dr. Snyder and OSU Medical Center entered into an Osteopathic Graduate Medical Education Resident/Fellow Staff Agreement ("Agreement") with an effective date of July 1, 2013.   In the Agreement, OSU Medical Center agreed to several terms, including, but not limited to compensation and benefits.

26.     OSU-CHS by and through the Residency Program and in connection with OSU Medical Center, provided Dr. Snyder with a Residency Program Handbook, which provided the policies, procedures, expectations, and process that would govern participation, discipline, and other related issues to the Residency Program.

27.     On December 19, 2013, after having taken his last licensure board examination, Dr. Snyder had passed all three levels of the required board exams to obtain his medical license through the Oklahoma State Board of Osteopathic Examiners ("Board").

28.     After passing all required board exams the next step in obtaining a medical license is to complete the Board's medical license application.

29.     On or about March 3, 2014, Dr. Snyder began the application process and began securing the requisite information needed to complete his medical license application so that he would be able to obtain his medical license.

30.     A required component of the medical license application is a two-page Postgraduate Training Verification ("Verification") that is to be completed by the director of the residency program; it is the responsibility of the director to complete and submit the Verification to the Board.

31.     The Verification is a relatively simple form; it requires that the director verify the postgraduate training that the applicant has received to date of submission of the form.  With regard to whether a candidate has successfully completed the requisite postgraduate training, the form provides three options:  yes; no; in progress.  If the training is "in progress" the director is to indicate the expected completion date.

32.     In March of 2014, Dr. Snyder submitted his medical license application to the Board and in the same time frame Dr. Cotton was given the Verification to complete and submit to the Board with regard to Dr. Snyder.

33.     On March 19, 2014, Dr. Alexopulos, submitted a letter in support of Dr. Snyder's application for medical licensure to the Board, wherein she recommended Dr. Snyder without any reservation and affirmed that Dr. Snyder exhibits proper and professional character and that he is in good standing with the OSU Medical Center.

10

34.    On April 18, 2014, Dr. Snyder submitted a reimbursement request for the costs associated with submitting his application.  On April 18, 2014, Dr. Snyder's request for reimbursement was approved by Dr. Cotton, and subsequently by Dr. Alexopulos.

35.    On or about April 18, 2014, Dr. Snyder learned that Dr. Cotton had not submitted the Verification to the Board.  The Verification is the only portion of Dr. Snyder's application that is lacking.  To date, Dr. Cotton has not submitted the Verification to the Board.

36.    As a result of Dr. Cotton's failure and refusal to submit the completed Verification to the Board, Dr. Snyder is unable to receive his medical license and is delayed in pursuing his medical career.  Dr. Snyder has fulfilled all required components and obligations necessary to obtain his medical license.  Yet, Dr. Cotton has held Dr. Snyder's medical license and career hostage and has done so without any meritorious reason or basis.

37.    On or about April 18, 2014, Dr. Cotton unexpectedly advised Dr. Snyder that he would be placed on a three (3) month academic probation beginning May 1, 2014 through July 31, 2014.  Dr. Snyder was advised that he would meet with a resident advisory council to determine his residency status based upon his level of clinical performance near the end of the 3-

11

month probationary period. Further, he was advised that at the conclusion of the 3-month probationary period, he would either be released from probation; his probation continued; or termination of his residency training contract. To date Dr. Snyder has not been afforded an opportunity to meet with a resident advisory council.

38.    The probation included a probationary plan with which Dr. Snyder was expected to comply. While Dr. Snyder disputed the need for probation and a probationary plan, he complied with both.

39.    The purported basis for the probation were based on events occurred and were allegedly observed by Dr. Cotton over the course of three (3) days and that had occurred well over a month prior to the issuance of the probation and probationary plan.

40.    As part of the probationary plan, Dr. Cotton demanded that Dr. Snyder "undergo neuropsychiatric testing to assess for a component of a behavioral health, auditory processing or other neurologic disorder that could be impairing [Dr. Snyder's] ability to attain the level of competence required for progression in residency training." While mandating that Dr. Snyder undergo extensive and unwarranted testing, Dr. Cotton also required that Dr. Snyder make all arrangements, including pay for all of the associated

costs.   Dr. Cotton failed to explain to Dr. Snyder the need, rationale, or justification for ordering him to engage in this testing.

41.   The neurologic testing that Dr. Cotton mandated that Dr. Snyder undergo is generally given to individuals who have suffered from a stroke, head trauma, dementia, seizures, diagnosed neurologic disorder, or brain damage.   Dr. Snyder suffered from none of these medical conditions. Additionally, the neurologic testing that Dr. Cotton required of Dr. Snyder would cost Dr. Snyder at least, if not more than $3,000.  Moreover, medical insurance would not pay for the testing because it was not medically necessary.

42.   There was no legitimate business purpose to require Dr. Snyder to undergo the extensive medical examination that was requested.

43.   On April 28, 2014, Dr. Snyder advised Dr. Cotton that he could not afford the required neurologic testing and requested that she reconsider her mandate.   As a result, Dr. Cotton amended Dr. Snyder's probation plan to modify the requirement of neuropsychiatric testing to the requirement that Dr. Snyder participate in the OSU Medical Center Employee Assistance Program per guidelines from OSU Medical Center Human Resources Department.

44.    Dr. Cotton made the referral to the EAP based on the advice and assistance of Nottingham and Benjamin.

45.    The EAP by and through Heavin advised Nottingham and Benjamin that the assistance requested could not be given.  Heavin thought that Benjamin and Nottingham were requesting a fitness for duty examination, but advised that the EAP does not perform fitness for duty assessments. However, Heavin was willing to "think outside the box" to assist Benjamin and Nottingham in accomplishing their objectives.

46.    Ultimately, the EAP by and through Heavin recommended a fitness for duty exam for Dr. Snyder, even though that was not the request made of the EAP and it was outside of the services the EAP provided.

47.    Drs. Cotton, Alexopulos, Benjamin, and Nottingham failed to discuss the need, rationale, or justification for mandating Dr. Snyder to engage in a fitness for duty examination.  At no time prior to the EAP and/or Heavin was there a discussion of a need for a fitness for duty examination.

48.    There was no legitimate business purpose to require Dr. Snyder to undergo the requested medical examination by Drs. Cotton and Alexopulos, Benjamin, and Nottingham; moreover, there was no legitimate business purpose to require Dr. Snyder to undergo a Fitness for Duty examination.

49.   Despite Dr. Snyder's dispute that any assessment or the EAP was necessary, needed, or warranted, Dr. Snyder made efforts to comply with the unreasonable demands placed upon him.  During this time frame, Dr. Snyder was not provided written documentation of any new or recurring probationary concerns during the months of May and June of 2014. Additionally, progress, improvement, and some positive evaluations that involved probationary concerns were given to Dr. Snyder during this timeframe.  By the end of June 2014, Dr. Snyder had successfully completed all the requisite monthly rotations to be completed to move on to his second-year of the Residency Program.

50.   The EAP referred Dr. Snyder to Dr. Barnes, a licensed psychologist, to perform the Fitness for Duty examination.

51.   During this time, Defendants Drs. Cotton and Alexopulos, Nottingham, and Benjamin, communicated regularly with regard to the substance of Dr. Snyder's appointments with the EAP and the EAP referral, Dr. Barnes.  Dr. Snyder's highly confidential and personal information was shared amongst each other and with Heavin, Stewart, Dr. Barnes. and others.  The exchange of information with Drs. Cotton and Alexopulos, Nottingham, Benjamin,

Heavin, Stewart, Dr. Barnes, and others far exceeded the limited disclosure that Dr. Snyder had authorized.

52.    No proper fitness for duty examination was given to Dr. Snyder.  Dr. Barnes did not have the requisite information necessary to perform a fitness for duty examination, including, but not limited to a description of Dr. Snyder's job duties and what those duties entail to properly evaluate his fitness for duty.

53.    After Dr. Snyder concluded all of his visits to Dr. Barnes, Dr. Snyder was pressured repeatedly by Drs. Cotton, Alexopulos, Benjamin, Nottingham, Heavin, and Stewart to sign a release of information that far exceeded the minimal amount of information needed by Dr. Snyder's employers, OSU-CHS and OSU Medical Center; the actions taken were in violation of the Federal Rehabilitation Act and the American Disability Act and other privacy protections.

54.    On or about June 23, 2014, Dr. Barnes submitted a report to the EAP with regard to Dr. Snyder; the report was shared with Drs. Cotton and Alexopulos, Benjamin, and Nottingham.  The report did not indicate that Dr. Snyder was unfit for duty.  Additionally, it appeared to be a complete and final report.

16

55.     While Dr. Snyder did not execute any additional authorizations or releases of information, Drs. Cotton and Alexopulos, Benjamin, and Nottingham shared additional information with Dr. Barnes about Dr. Snyder.   It appeared that the additional information was shared in a continued effort by OSU-CHS and OSU Medical Center by and through Drs. Cotton and Alexopulos, Benjamin, and Nottingham to manipulate the findings of the report.

56.     On or about June 29, 2014, Dr. Barnes issued an addendum to the report that she had issued on June 23, 2014.  The addendum did not indicate that Dr. Snyder was unfit for duty.

57.     After receipt of the addendum, Drs. Cotton and Alexopulos, by and through Nottingham and Benjamin, requested that the EAP, specifically Steven Stewart and Jessica Heavin, contact Dr. Barnes for a more express statement of fitness, specifically requesting a determination of "Fit" or "Not Fit" with regard to Dr. Snyder.

58.     Prior to having received any additional information from Dr. Barnes, Drs. Cotton and Alexopulos, Benjamin, and Nottingham determined that Dr. Snyder should be forced to participate in counseling; placed upon a paid leave

of absence; and removed from patient contact.  There was no basis for this determination.

59.    In response to the request made for a more express statement of fitness, Dr. Barnes advised that she needed even more additional information from Dr. Cotton on how Dr. Snyder had been performing since the EAP referral and to determine "if he could now safely see patients under supervision."

60.    Dr. Cotton, Benjamin, and Nottingham provided "raw documentation" that pertained to Dr. Snyder to Dr. Barnes via Heavin and Stewart in an effort to cause Dr. Barnes to again alter her report in hopes that Dr. Barnes would find Dr. Snyder unfit for duty.  Dr. Snyder was not informed of the additional information that was provided to Dr. Barnes and he was not given any opportunity to respond to the additional information.

61.    On or about July 2, 2014, Dr. Barnes submitted a second addendum to her report, after having received direct unauthorized communications with Benjamin, Nottingham, and Drs. Cotton and Alexopulos, wherein it was strongly suggested and encouraged that Dr. Barnes amend her report based upon the additional and unauthorized information that they provided to her.

The second addendum was submitted to Nottingham and was shared with Drs. Cotton and Alexopulos.

62.    Dr. Barnes relied on the narratives of Dr. Snyder's supervisors, Drs. Cotton and Alexopulos, and the narratives of Benjamin and Nottingham – not the case summary prepared by Heavin, in the preparation of her report and addenda.  The assessment that Dr. Barnes rendered was tailored to the objectives of Drs. Cotton and Alexopulos, Benjamin, and Nottingham and lacked any objectivity toward Dr. Snyder.

63.    On July 3, 2014, Drs. Alexopulos and Cotton, Benjamin, and Nottingham removed Dr. Snyder from program duties by placing him on a three (3) month paid leave of absence; there was no legitimate business purpose for the leave of absence.

64.    As part of the leave of absence, Dr. Snyder was required to participate in counseling, because Dr. Cotton declared that Dr. Snyder was not "fit for duty" as a result of a "summative" assessment.  No one would provide Dr. Snyder with the justification, rationale, and the basis for the not "fit for duty" assessment or the mandated counseling.  Dr. Snyder was advised that near the conclusion of the three (3) -month period his progress would be re-assessed by the EAP and a decision would be made regarding his continued

participation in the Residency Program.  He was not given any opportunity to appeal or challenge the decision.

65.    On July 9, 2014, Dr. Barnes, advised Dr. Snyder that she had not reported to OSU Medical Center or OSU-CHS that he was unfit for duty. However, neither Dr. Barnes, Dr. Cotton, Dr. Alexopulos, Nottingham, Benjamin, nor the EAP would provide Dr. Snyder with copies of any reports, assessments, or any of his personal health information that related to him, including the assessments and reports with regard to his fitness for duty.

66.    Throughout the time that Dr. Snyder was involved with the EAP Process, Benjamin, Nottingham, and Drs. Cotton and Alexopulos interfered with and manipulated the EAP, the EAP process, and the EAP referral and assessment, including, but not limited to requesting that the actual documents prepared by Dr. Cotton be provided to Dr. Barnes instead of relying on the case summary as is standard practice; by exceeding the scope of the authorizations executed by Dr. Snyder; and directly communicating with Dr. Barnes, including pressuring Dr. Barnes to render numerous addenda to her report in an effort to alter Dr. Barnes's assessment.

67.    The EAP, Heavin, and Stewart consistently exceeded the scope of the limited consents executed by Dr. Snyder.  The EAP, Heavin, and Stewart also

20

interfered and manipulated the EAP referral and assessment at the request of Benjamin, Nottingham, and Drs. Cotton and Alexopulos.

68.   Throughout the EAP process, Dr. Barnes communicated with Dr. Cotton, Benjamin, and Nottingham with regard to Dr. Snyder without proper authorization or permission from Dr. Snyder.

69.   Despite repeated requests by Dr. Snyder and subsequently by Dr. Snyder's attorney, Drs. Cotton, and Alexopulos, Nottingham, Benjamin, and Dr. Barnes continued their absolute refusal to give any of the information, reports, assessments, with regard to his personal health information, including, but not limited to the fitness for duty assessment that formed the basis for his forced leave of absence.  There was no finding or determination that would disqualify Dr. Snyder from receiving his own personal health information.

70.   There was no legitimate basis to deprive him of his own personal health information which had been used as a basis for OSU-CHS and OSU Medical Center to force Dr. Snyder into a leave of absence.

71.   To date Dr. Snyder still has not received any of the information, reports, assessments, and addendums from Dr. Barnes with regard to his personal health information, including, but not limited to the report that he

purportedly was not fit for duty.  Moreover, Dr. Barnes refused to provide it to Dr. Snyder, claiming that it was the property of OSU, because OSU had paid for the report.

72.   The information learned by OSU-CHS and OSU Medical Center, by and through, Drs. Cotton, Alexopulos, Benjamin, and Nottingham and others, through the EAP and Dr. Barnes exceeded the permissible scope of the ADA and the Federal Rehabilitation Act and other privacy protections; additionally, the information learned was used for purposes inconsistent with the ADA and the Federal Rehabilitation Act.

73.   On or about July 22, 2014, Dr. Snyder made an internal complaint with regard to the unlawful discrimination that he was suffering, including, but not limited to sex discrimination and disability discrimination.

74.   On July 30, 2014, Dr. Snyder appealed his probation and probation plan; he also submitted a request for a neutral and detached investigation into the decisions to place him on probation and remove him from program duties; however, his appeal and the requested investigations were not conducted, considered, or heard.

75.   Almost immediately thereafter, during the first week of August of 2014, Dr. Snyder was removed from an email listserv that distributed information

about the Residency Program and educational emails. There was no justification for the removal of Dr. Snyder from the email listserv.

76. On August 18, 2014, Dr. Cotton improperly denied Dr. Snyder's request for an appeal and failed to address the requested investigation; both actions by Dr. Cotton were in violation of the Residency Program Handbook. Moreover, Dr. Cotton suggested that Dr. Snyder was in violation of his probation, because he had exercised his rights under federal and state law with regard to the release of his personal health information.

77. Dr. Snyder made every effort to cooperate with the inappropriate, harassing, and demeaning demands made upon him in hopes that the situation would resolve itself and he could continue without any further disruption in his pursuit of his medical license and career. Yet, Drs. Alexopulos and Cotton, Benjamin, and Nottingham were relentless in their pursuit to eliminate Dr. Snyder from the Residency Program as highlighted by their actions, including, but not limited to: regarding Dr. Snyder as having a disability; forcing Dr. Snyder into the EAP program; mandating a fitness for duty examination that was unwarranted; interfering and manipulating with the assessment provided by Dr. Barnes, the EAP referral; forcing Dr. Snyder on administrative leave; failing to follow the policies and procedures

23

set forth in the Resident Handbook; removing Dr. Snyder from an educational email listserv; refusing to provide Dr. Snyder copies of the records that were the alleged basis for placing him on leave; placing him on inactive status and cancelling his pay and benefits; and terminating him from the Residency Program and from his employment with OSU Medical Center.

78.     On or about September 5, 2014, Dr. Snyder submitted a second internal complaint of discrimination, which included, but was not to limited to complaints of sex discrimination and disability discrimination, since his initial complaint did not receive any meaningful response.  Again, he received no meaningful response to the second internal complaint of discrimination.

79.     In an effort to expedite his return to the Residency Program, Dr. Snyder continued to comply with the terms of his forced leave of absence, including attending counseling sessions with a licensed psychologist; the mandatory counseling and the forced leave of absence were unjustly required of Dr. Snyder.   On or about September 17, 2014, Dr. Snyder provided documentation of his compliance with the terms of the forced leave of absence to OSU-CHS and OSU Medical Center.  Yet, this report was ignored.

80.     In November of 2014, Dr. Cotton advised that Dr. Snyder could resume the Residency Program, if she received a written statement from a clinical psychologist stating that he is fit-for-duty; waived any complaints or appeals that he may have; and agree to be on Academic Probation with one month of active rotation remaining.  The other two options given to Dr. Snyder were resignation or dismissal from the Residency Program.

81.     Dr. Snyder refused to withdraw his complaints, because he wanted to ensure that the unlawful discrimination would cease; Dr. Snyder also wanted to preserve his appeal rights, because he had been unjustly disciplined.

82.     On or about January 6, 2015, another letter from Dr. Snyder's treating licensed psychologist was provided to OSU Medical Center and OSU-CHS; the letter provided the information that had been requested, specifically that Dr. Snyder was fit to continue his work at the OSU Medical Center. Moreover, the licensed psychologist indicated that Dr. Snyder had been seen for an initial consultation and for subsequent psychotherapy counseling sessions.

83.     However, because Dr. Snyder refused to withdraw his complaints of discrimination and refuse to waive his right to appeals, the information provided from the licensed psychologist was ignored.

84.    In a letter dated February 2, 2015, Dr. Snyder was notified that effective immediately he was placed on inactive status and that his final paycheck was January 30, 2015, and that his health insurance benefits will end on February 28, 2015.

85.    Despite advising Dr. Snyder that his benefits were terminated, he did not receive the required COBRA notice.

86.    At some point prior to May of 2015, Dr. Snyder's profile, including his name and photo, was removed from the Residency Program's website

87.    On or about August 5, 2015, Dr. Snyder was notified via letter that he was dismissed from the Residency Program, because he refused to withdraw his complaints of discrimination and his appeal rights.  Because of his refusal to withdraw his complaints of discrimination and his appeal rights and because of his forced leave of absence, OSU-CHS determined that Dr. Snyder had abandoned his position in the Residency Program.

88.    On or about August 10, 2015, Dr. Snyder was notified via letter from OSU Medical Center that as a result of his dismissal from the Residency Program, he was no longer eligible for employment as a Resident and that his termination was effective August 5, 2015.

89.     In a letter dated August 14, 2015, Dr. Snyder received a COBRA notice, advising him that his coverage would end August 31, 2015.

90.     Dr. Snyder has timely exhausted all pertinent and required administrative remedies.

## CAUSES OF ACTION

## COUNT ONE
## UNLAWFUL DISCRIMINATION IN VIOLATION OF THE FEDERAL REHABILITATION ACT

91.     Plaintiff incorporates by reference all preceding allegations as if fully set forth herein.

92.     Defendants, OSU-CHS and OSU Medical Center receive federal financial assistance and are subject to the Federal Rehabilitation Act.

93.     Defendants, OSU-CHS and OSU Medical Center, perceived Dr. Snyder as being an individual with a disability that substantially limits a major life activity within the meaning of the Federal Rehabilitation Act.

94.     Dr. Snyder was and continues to be qualified for his position as a resident and to participate in his position as a resident in the Residency Program.

95.    Defendants, OSU-CHS and OSU Medical Center, have discriminated against Dr. Snyder by creating a hostile work environment as a result of an animus related to a perceived disability.

96.    The discriminatory acts of OSU-CHS and OSU Medical Center by and through Drs. Cotton and Alexopulos, Nottingham and Benjamin are on-going and include but are not limited to:   refusing to complete and submit the Verification to the Board; subjecting Dr. Snyder to increased scrutiny unlike similarly situated residents; placing Dr. Snyder on probation and the probation plan; forcing him into the EAP program; mandating that he undergo unnecessary medical evaluations and fitness for duty examinations; mandating that he undergo unnecessary counseling; failing to provide Dr. Snyder with copies of his own personal health information, including the reports and assessments with regard to his fitness for duty; regarding him as disabled; forcing him to take a leave of absence for a perceived disability; removing him from his duties; terminating his benefits and pay; and causing Dr. Snyder to be terminated from both the Residency Program and from OSU Medical Center.

97.    OSU-CHS and OSU Medical Center violated the Federal Rehabilitation Act by requiring a medical examination;

98.    OSU-CHS and OSU Medical Center violated the Federal Rehabilitation Act for mandating disclosure of Dr. Snyder's confidential personal health information.

99.    These actions were motivated by a discriminatory animus based on the perception that Dr. Snyder was disabled.  Based upon statements made by and the actions taken by OSU-CHS and OSU Medical Center by and through Drs. Cotton, Alexopulos, Benjamin, and Nottingham, and others that they believed Dr. Snyder suffered from a disability, specifically having made references to a belief that Dr. Snyder suffers from a "mood or neurologic impairment" or "auditory processing or other neurologic disorder".

100.   The hostile work environment was sufficiently severe and pervasive to alter the terms, conditions, and/or privilege of Dr. Snyder's employment and created an intimidating, hostile, abusive, and or offensive work environment in violation of the Federal Rehabilitation Act.

101. Dr. Snyder engaged in protected opposition to the disability discrimination that he experienced, including, but not limited to when he complained to Drs. Cotton and Alexopulos, Benjamin, and Nottingham about being subjected to improper medical examinations, including a fit for duty

examination, being placed on forced leave, and when he made his internal complaints of disability discrimination.

102.   Defendants, OSU-CHS and OSU Medical Center, unlawfully retaliated against Dr. Snyder for his assertion of protected rights under the Federal Rehabilitation Act.

103.   Dr. Snyder was subjected to increased scrutiny unlike similarly situated resident physicians who were not perceived as disabled.

104.   To the extent that it is determined that Dr. Snyder has a disability, OSU-CHS and OSU Medical Center failed to engage in the interactive process to find a reasonable accommodation for Dr. Snyder.

105.   As a result of the actions of OSU-CHS and OSU Medical Center, Dr. Snyder has been injured and suffered and continues to suffer damages as a result of the injuries.

106.   To the extent that punitive damages are available, Dr. Snyder seeks an award of punitive damages.

## COUNT TWO
## VIOLATIONS OF THE AMERICAN DISABILITIES ACT (as Amended by the ADA AMENDMENTS ACT of 2008)("ADA")

107.   Plaintiff incorporates by reference all preceding allegations as if fully set forth herein.

108.  Defendants Drs. Cotton and Alexopulos, in their official capacities, and OSU Medical Center, perceived Dr. Snyder as being an individual with a disability that substantially limits a major life activity within the meaning of the ADA.

109.  Dr. Snyder was and continues to be qualified for his position as a resident and to participate in his position as a resident in the Residency Program.

110.  Defendants, Drs. Cotton and Alexopulos, in their official capacities, and OSU Medical Center, have discriminated against Dr. Snyder by creating a hostile work environment as a result of an animus related to a perceived disability.

111.  The discriminatory acts of Drs. Cotton and Alexopulos, in their official capacities, and OSU Medical Center by and through Drs. Cotton and Alexopulos, Nottingham and Benjamin are on-going and include but are not limited to:  refusing to complete and submit the Verification to the Board; subjecting Dr. Snyder to increased scrutiny unlike similarly situated residents; placing Dr. Snyder on probation and the probation plan; forcing him into the EAP program; mandating that he undergo unnecessary medical evaluations and fitness for duty examinations; mandating that he undergo

31

unnecessary counseling; failing to provide Dr. Snyder with copies of his own personal health information, including the reports and assessments with regard to his fitness for duty; regarding him as disabled; forcing him to take a leave of absence for a perceived disability; removing him from his duties; terminating his benefits and pay; and causing Dr. Snyder to be terminated from both the Residency Program and from OSU Medical Center.

112.   Drs. Cotton and Alexopulos, in their official capacities, and OSU Medical Center violated the ADA;

113.   Drs. Cotton and Alexopulos, in their official capacities, and OSU Medical Center violated the ADA for mandating disclosure of Dr. Snyder's confidential personal health information.

114.   These actions were motivated by a discriminatory animus based on the perception that Dr. Snyder was disabled.  Based upon statements made by and the actions taken by Drs. Cotton and Alexopulos, in their official capacities, and OSU Medical Center by and through Drs. Cotton, Alexopulos, Benjamin, and Nottingham, and others it was apparent that they believed Dr. Snyder suffered from a disability, specifically having made references to a belief that Dr. Snyder suffers from a "mood or neurologic impairment" or "auditory processing or other neurologic disorder".

32

115.   The hostile work environment was sufficiently severe and pervasive to alter the terms, conditions, and/or privilege of Dr. Snyder's employment and created an intimidating, hostile, abusive, and or offensive work environment in violation of the ADA.

116.   Dr. Snyder engaged in protected opposition to the disability discrimination that he experienced, including, but not limited to when he complained to Drs. Cotton and Alexopulos, Benjamin, and Nottingham about being subjected to improper medical examinations, including a fit for duty examination, being placed on forced leave, and when he made his internal complaints of disability discrimination.

117.   Defendants, Drs. Cotton and Alexopulos, in their official capacities, and OSU Medical Center, unlawfully retaliated against Dr. Snyder for his assertion of protected rights under the ADA.

118.   Dr. Snyder was subjected to increased scrutiny unlike similarly situated resident physicians who were not perceived as disabled.

119.   To the extent that it is determined that Dr. Snyder has a disability, Drs. Cotton and Alexopulos, in their official capacities, and OSU Medical Center failed to engage in the interactive process to find a reasonable accommodation for Dr. Snyder.

120.   As a result of the actions of Drs. Cotton and Alexopulos, in their official capacities, and OSU Medical Center, Dr. Snyder has been injured and suffered and continues to suffer damages as a result of the injuries.

121.   As a result of the actions of Drs. Cotton and Alexopulos, in their official capacities, Dr. Snyder seeks prospective injunctive relief as requested herein.

122.   As a result of the actions of OSU Medical Center, including, but not limited to the actions taken on behalf of OSU Medical Center by and through Drs. Cotton and Alexopulos, and Benjamin and Nottingham, Dr. Snyder seeks all damages available to him

123.   To the extent that punitive damages are available, Dr. Snyder seeks an award of punitive damages.

## COUNT THREE
## VIOLATIONS OF FMLA

124.   Plaintiff incorporates by reference all preceding allegations as if fully set forth herein.

125.   Dr. Snyder worked for Defendants OSU-CHS, Drs. Cotton and Alexopulos, in their official capacities, and OSU Medical Center at least 12 months and Defendants OSU-CHS, Drs. Cotton and Alexopulos, in their

official capacities, and OSU Medical Center have continuously employed and do employ fifty or more employees with the meaning of 29 U.S.C. § 2611(2).

126.   At all times material to this action, Defendants Drs. Cotton and Alexopulos, in their individual and official capacities, OSU Medical Center, Nottingham, and Benjamin, in their individual and official capacities, have retaliated and/or interfered with, restrained, and denied to Dr. Snyder the proper exercise of and forced exercise of rights under §2615(a)(1) and (a)(2) of the FMLA by the actions and omissions of Defendants, Drs. Cotton and Alexopulos, in their individual and official capacities, OSU Medical Center, Nottingham, and Benjamin, in their individual capacities, by including, but not limited to: forcing Dr. Snyder to be on FMLA leave; requiring that he be subjected to additional examinations upon his return from forced FMLA Leave; failing to provide the requisite notices required by the FMLA, including, but not limited to eligibility and designation notices; and terminating Dr. Snyder's employment and participation in the Residency Program, because he was on forced FMLA leave.

127.   Defendants, Drs. Cotton and Alexopulos, in their individual and official capacities, OSU Medical Center, Nottingham, and Benjamin, in their

individual capacities, denied to Dr. Snyder the rights afforded under FMLA as a result of his forced leave of absence that qualified as FMLA leave.

128.  Defendants Drs. Cotton and Alexopulos, in their individual and official capacities, OSU Medical Center, Nottingham and Benjamin, in their individual capacities, refused to allow Dr. Snyder to return to the Residency Program, despite Dr. Snyder having provided the requested fitness for duty statement.

129. At all times material to this action, Defendants Drs. Cotton and Alexopulos, in their individual and official capacities, OSU Medical Center, Nottingham and Benjamin, in their individual capacities, have retaliated and/or interfered with, restrained, and denied to Dr. Snyder the exercise of rights under Section 2615(a) of the FMLA by the actions and omissions of Defendants Drs. Cotton and Alexopulos, in their individual and official capacities, OSU Medical Center, Nottingham and Benjamin, in their individual capacities, including but not limited to the following:

a.    Failing to notify Dr. Snyder of FMLA qualified leave pursuant to 29 C.F.R. § 825.301(a);

b.    Forcing Dr. Snyder to be on FMLA qualified leave;

c.    Terminating Dr. Snyder's employment at the end of the FMLA qualified leave and by failing to rehire or reinstate Dr. Snyder to his position with all benefits upon his return to work after his FMLA qualified leave of absence.

130.  Defendants Drs. Cotton and Alexopulos, in their official capacities, OSU Medical Center, Nottingham and Benjamin, in their individual capacities, interfered, restrained, and denied to Dr. Snyder the rights and benefits afforded by the FMLA for his forced leave of absence which qualified as FMLA leave by dictating the treatment that Dr. Snyder was to receive during his forced leave.

131.  As a direct and proximate result of the violation of the FMLA by Defendants Drs. Cotton and Alexopulos, in their individual and official capacities, OSU Medical Center, Nottingham and Benjamin, in their individual capacities, Dr. Snyder has been damaged by the loss of his employment and the loss of participation in the Residency Program, including salary/wages and employee benefits, he would have received as an employee of OSU Medical Center and a participant in the Residency Program had his rights under the FMLA not been interfered with, restrained, denied, or been retaliated against for his forced exercise of FMLA rights.

132.   In violating the FMLA, Defendants Drs. Cotton and Alexopulos, in their individual and official capacities, OSU Medical Center, Nottingham and Benjamin, in their individual capacities, acted with malice and with reckless indifference to the federally protected rights of Dr. Snyder within the meaning of 29 U.S.C. § 2617(a)(1)(A)(iii) of the FMLA.

133.   As a direct and proximate cause of the violations of the FMLA, Dr. Snyder also suffered other pecuniary losses, the type and amount of which will be established at the trial of this cause.

134.   As a result of the actions of Drs. Cotton and Alexopulos, in their individual capacities, OSU Medical Center, Nottingham and Benjamin, in their individual capacities, Dr. Snyder has been injured and suffered and continues to suffer damages as a result of the injuries.

135.   As a result of the actions of Drs. Cotton and Alexopulos, in their official capacities, Dr. Snyder seeks prospective injunctive relief by and through Drs. Cotton and Alexopulos.

136.   To the extent that punitive damages are available, Dr. Snyder seeks punitive damages.

**COUNT FOUR**
**TITLE VII – SEX DISCRIMINATION**

137.   Plaintiff incorporates by reference all preceding allegations as if fully set forth herein.

138.   Dr. Snyder suffered and continues to suffer adverse employment actions, including, but not limited to the receipt of probation and probation plan; forced leave; invasive and unnecessary medical evaluations; interference and manipulation with forced medical treatment; termination of pay and benefits; and ultimate termination from Residency Program and from employment as a Resident.

139.   All of the individuals involved with the adverse employment actions taken with regard to Dr. Snyder, including, but not limited to his termination as a Resident from the Residency Program were female.

140.   Dr. Snyder received disparate treatment among similarly situated employees; the disparate treatment was a result of discriminatory animus based upon Dr. Snyder's sex, including an anti-male bias.

141.   The acts complained of are in violation of Title VII of the Civil Rights Act of 1964.

142.   As a result of being subjected to the discriminatory disparate treatment, Dr. Snyder was harmed and continues to be harmed and suffered and continues to suffer damages as a result of the acts of Dr. Snyder's

managers, supervisors, and Benjamin and Nottingham by and through OSU-CHS and OSU Medical Center.

143.   The discriminatory acts of Dr. Cotton, Dr. Alexopulos, and Benjamin and Nottingham include, but are not limited to:  subjecting Dr. Snyder to increased scrutiny unlike similarly situated residents; placing him on probation and the probation plan improperly; removing him from his duties; terminating his benefits and pay; and causing Dr. Snyder to be terminated from both the Residency Program and from OSU Medical Center.

144.   These actions were motivated by a discriminatory animus based on Dr. Snyder's sex and an anti-male bias.

145.   As a result of the actions of OSU-CHS and OSU Medical Center, Dr. Snyder has been injured and suffered and continues to suffer damages as a result of the injuries.

146.   To the extent that punitive damages are available, Dr. Snyder seeks punitive damages.

## COUNT FIVE
## TITLE VII – RETALIATION DISCRIMINATION

147.   Plaintiff, Dr. Snyder, incorporates by reference all preceding allegations as if fully set forth herein.

148. Dr. Snyder engaged in protected opposition to discrimination by complaining of illegal discrimination and initiating internal complaints of discrimination, which included complaints of sex discrimination. Dr. Snyder also filed timely complaints of discrimination with the Office of Civil Rights with the Attorney General's Office for the State of Oklahoma, which was subsequently transferred to the EEOC under the workshare agreement.

149. As a result of Dr. Snyder having engaged and participated in protected activities, Dr. Snyder suffered adverse actions by OSU-CHS and OSU Medical Center that a reasonable employee would consider materially adverse, including, but not limited to: subjecting Dr. Snyder to increased scrutiny unlike similarly situated residents; placing him on probation and the probation plan; failing to provide copies of his own personal health information to him, including the reports and assessments with regard to his fitness for duty; removing him from his duties; terminating his benefits and pay; and causing Dr. Snyder to be terminated from both the Residency Program and from OSU Medical Center.

150. The acts complained of are in violation of Title VII of the Civil Rights Act of 1964 as amended.

151.   A causal nexus exists between Dr. Snyder's protected activity and the adverse actions taken by his supervisors, Drs. Cotton and Alexopulos, Benjamin and Nottingham, and OSU-CHS and OSU Medical Center.

152.   As a result of being subjected to retaliation, Dr. Snyder was harmed and has suffered and continues to suffer damages.

153.   As a result of the actions taken, Dr. Snyder has been injured and suffered and continues to suffer damages as a result of the injuries.

154.   To the extent that punitive damages are available, Dr. Snyder seeks punitive damages.

## COUNT SIX
## VIOLATION OF COBRA

155.   Plaintiff incorporates by reference all preceding allegations as if fully set forth herein.

156.   As part of Dr. Snyder's employment as a Resident with OSU Medical Center and OSU-CHS, Dr. Snyder received employment-related group health care plan.

157.   In February of 2015, Dr. Snyder received notice from OSU-CHS and OSU Medical Center that his pay was terminated effective January 30, 2015,

and that his health insurance benefits would be terminated on February 28, 2015.

158.   The notice that Dr. Snyder received contained no information about options under the Consolidated Omnibus Budget Reconciliation Act of 1986 ("COBRA"), 29 U.S.C. § 1161 *et seq.*

159.   The February 2015, notice is a qualifying event under COBRA, triggering COBRA notification.   The COBRA notice is compulsory and cannot be waived.

160.   Dr. Snyder did not receive COBRA notification until August of 2015.

161.   As joint employers, Defendants OSU-CHS and OSU Medical Center, and their administrators failed to provide the required COBRA notification in a timely manner.

162.   Defendants OSU-CHS and OSU Medical Center, and their administrators acted with malice and bad faith.

163.   As a result of the actions of Defendants OSU-CHS and OSU Medical Center and their administrators, Dr. Snyder has been injured and is entitled to damages, statutory civil penalties, and attorney's fees and costs.

164.   To the extent that punitive damages are available, Dr. Snyder seeks punitive damages.

43

## COUNT SEVEN
## VIOLATION OF 42 U.S.C. § 1983 – FIRST AMENDMENT

165.   Plaintiff incorporates by reference all preceding allegations as if fully set forth herein.

166.   This action is brought against Drs. Alexopulos and Cotton, in their individual and official capacities.

167.   Dr. Snyder by presenting evidence of wrong-doing and complaining about unlawful discrimination to OSU-CHS, Dr. Snyder engaged in conduct protected by the First Amendment to the Constitution of the United States. Dr. Snyder's speech and conduct was a matter of public concern.

168.   Defendants, Drs. Alexopulos and Cotton, in their individual and official capacities, violated Dr. Snyder's rights guaranteed by the First and Fourteenth Amendments to the Constitution of the United States, by refusing to reinstate Dr. Snyder to his position unless he agreed to withdraw all complaints he had and waive his appeal rights.

169.   Also Defendants, Drs. Alexopulos and Cotton, retaliated against Dr. Snyder, for the following acts, including, but not limited to:   refusing to withdraw his complaints; refusing to waive his appeal rights; having obtained an attorney to assist in the vindication of his rights.

170. As a result of Dr. Snyder having engaged in First Amendment protected conduct and in retaliation for having engaged in First Amendment conduct, Defendants Drs. Alexopulos and Cotton, in their individual and official capacities, refused to allow Dr. Snyder to return to his position as a Resident; caused his pay and benefits to be cancelled; and terminated Dr. Snyder from the Residency Program and OSU Medical Center.

171. The actions taken by Defendants, Drs. Alexopulos and Cotton, in their individual and official capacities, were designed to chill Dr. Snyder and others from making similar reports of wrongdoing.

172. The acts and conduct of Drs. Alexopulos and Cotton, in their individual and official capacities, were under color of law and taken in bad faith and willfully with conscious disregard for Plaintiff's rights.

173. As a result of the acts of Drs. Alexopulos and Cotton, in their individual capacities, Dr. Snyder suffered pecuniary loss, pain, suffering, humiliation, and emotional distress for which he is entitled to recover damages from Drs. Alexopulos and Cotton, individually and jointly.

174. The acts of Drs. Alexopulos and Cotton, in their individual capacities, were willful, malicious, and entitle Dr. Snyder to recover punitive damages against them individually and jointly.

175.  Dr. Snyder is entitled to injunctive relief from Drs. Alexopulos and Cotton in their official capacities for having violated his First Amendment rights.

176.  To the extent that punitive damages are available, Dr. Snyder seeks punitive damages.

## COUNT EIGHT
## VIOLATIONS OF 42 U.S.C. § 1983
## DENIAL OF PROCEDURAL DUE PROCESS (PROPERTY INTEREST)

177.  Plaintiff incorporates by reference all preceding allegations as if fully set forth herein.

178.  This action is brought against Drs. Alexopulos and Cotton, in their individual and official capacities.

179.  The Residency Program Handbook created an implied contract and created procedural processes for which a resident was entitled to receive prior to and after the imposition of discipline; prior to and after the removal of duties; and removal from a program.   This implied contract and the Residency Handbook created a property interest in the Residency Program and a reasonable expectation of procedural due process prior to deprivation of the property interest.   Moreover, the Residency Handbook created a reasonable expectation that Dr. Snyder would not be removed from his

duties, disciplined, or discharged, except in accord with the Residency Handbook. The Residency Handbook and implied contract created a reasonable expectation and property interest that Dr. Snyder's appeal and request for an impartial investigation would be honored and the procedural processes set forth in the Residency Handbook would be followed.

180. Dr. Snyder also has a property interest in his medical license.

181. Dr. Cotton improperly interfered with Dr. Snyder obtaining his medical license.

182. Drs. Cotton and Alexopulos violated Dr. Snyder's right to procedural due process guaranteed by the Fourteenth Amendment by depriving Dr. Snyder of the following, including, but not limited to: his property interest in his medical career and his continued participation in the Residency Program by failing to provide the processes set forth in the Residency Handbook; by failing to honor Dr. Snyder's request for an appeal and an impartial investigation; removing him from his duties without due process; and ultimately terminating Dr. Snyder without due process.

183. Dr. Snyder was denied the procedural processes set forth in the Residency Handbook. No advance notice or an opportunity to be heard was provided in depriving Dr. Snyder of his property interests. Drs. Cotton and

Alexopulos failed to provide any procedural due process that was owed to Dr. Snyder.

184. Dr. Cotton also failed to provide Dr. Snyder with procedural process prior to denying his ability to obtain his medical license.

185. Dr. Cotton's refusal to complete and submit the Verification deprived Dr. Snyder of an opportunity for him to obtain employment and pursue his medical career.

186. The failure to afford Dr. Snyder the process due to him has resulted in an ongoing violation of federal law.

187. The acts and conduct of Drs. Alexopulos and Cotton, in their individual and official capacities, were under color of law and taken in bad faith and willfully with conscious disregard for Plaintiff's rights.

188. As a result of the acts of Drs. Alexopulos and Cotton, in their individual capacities, Dr. Snyder suffered pecuniary loss, pain, suffering, humiliation, and emotional distress for which he is entitled to recover damages from Drs. Alexopulos and Cotton, individually and jointly.

189. The acts of Drs. Alexopulos and Cotton, in their individual capacities, were willful, malicious, and entitle Dr. Snyder to recover punitive damages against them individually and jointly.

190. Dr. Snyder is entitled to prospective injunctive relief from Drs. Alexopulos and Cotton in their official capacities for having violated his procedural due process rights guaranteed by the Fourteenth Amendment.

191. To the extent that punitive damages are available, Dr. Snyder seeks punitive damages.

## COUNT NINE
## VIOLATIONS OF 42 U.S.C. § 1983
## DENIAL OF PROCEDURAL DUE PROCESS (LIBERTY INTEREST)

192. Plaintiff incorporates by reference all preceding allegations as if fully set forth herein.

193. This action is brought against Drs. Alexopulos and Cotton, in their individual and official capacities.

194. Dr. Snyder enjoyed a liberty interest in his right to free speech.

195. Dr. Snyder enjoyed a liberty interest in pursuing his medical license.

196. Dr. Snyder enjoyed a liberty interest in his right to enjoy employment opportunities in his chosen field.

197. Dr. Snyder enjoyed a liberty interest in accessing his personal health information.

198. Drs. Cotton and Alexopulos deprived Dr. Snyder of his liberty interests by, including, but not limited to:   refusing to complete and submit the

Verification to the Board; improperly placing him on probation and the probation plan; forcing him into an EAP program; regarding him as disabled; forcing him to take leave for a perceived disability; removing him from his duties; denying him access to his personal health information; terminating his benefits and pay; and ultimately causing Dr. Snyder to be terminated from both the Residency Program and from OSU Medical Center.

199.  The deprivations of Dr. Snyder's U.S. Constitutional rights and federal statutory rights have resulted in ongoing violations of federal law.

200.  Drs. Cotton and Alexopulos deprived Dr. Snyder of his liberty to engage in free speech by forcing him to waive all complaints of discrimination to be reinstated, which was designed to chill Dr. Snyder's exercise of free speech.

201.  The statements made and actions taken by Drs. Cotton and Alexopulos foreclosed other employment opportunities for Dr. Snyder.

202.  The acts and conduct of Drs. Alexopulos and Cotton, in their individual and official capacities, were under color of law and taken in bad faith and willfully with conscious disregard for Plaintiff's rights.

203.  As a result of the acts of Drs. Alexopulos and Cotton, in their individual capacities, Dr. Snyder suffered pecuniary loss, pain, suffering, humiliation,

and emotional distress for which he is entitled to recover damages from Drs. Alexopulos and Cotton, individually and jointly.

204.   The acts of Drs. Alexopulos and Cotton, in their individual capacities, were willful, malicious, and entitle Dr. Snyder to recover punitive damages against them individually and jointly.

205.   Dr. Snyder is entitled to injunctive relief from Drs. Alexopulos and Cotton in their official capacities for having violated his liberty interest and due process rights guaranteed by the Fourteenth Amendment.

206.   To the extent that punitive damages are available, Dr. Snyder seeks punitive damages.

**COUNT TEN**
**VIOLATIONS OF 42 U.S.C. § 1983**
**DENIAL OF PROCEDURAL DUE PROCESS**
**(LIBERTY INTEREST)**

207.   Plaintiff incorporates by reference all preceding allegations as if fully set forth herein.

208.   This action is brought against Drs. Alexopulos and Cotton, in their individual and official capacities.

209.   Dr. Snyder enjoyed a liberty interest in his good name, reputation, honor, integrity, and standing in the community.

210.   Drs. Cotton and Alexopulos deprived Dr. Snyder of his good name, reputation, honor, integrity, and standing in the community without affording Dr. Snyder procedural due process by the stigmatizing and unwarranted manner in which they treated Dr. Snyder, including, but not limited to:   refusing to ever complete and submit the Verification to the Board; improperly placing him on probation and the probation plan; forcing him into an EAP program; regarding him as disabled; forcing him to take leave for a perceived disability; removing him from his duties; terminating his benefits and pay; and ultimately causing Dr. Snyder to be terminated from both the Residency Program and from OSU Medical Center.

211.   The statements made and actions taken by Drs. Cotton and Alexopulos impugn the good name, reputation, honor, integrity, and standing in the community of Dr. Snyder.

212.   The statements made and the actions taken by Drs. Cotton and Alexopulos were false and unwarranted.

213.   The statements made and actions taken by Drs. Cotton and Alexopulos foreclosed other employment opportunities for Dr. Snyder.

214.   The statements made and actions taken by Drs. Cotton and Alexopulos were published and/or publicly disclosed.

215.  The acts and conduct of Drs. Alexopulos and Cotton, in their individual and official capacities, were under color of law and taken in bad faith and willfully with conscious disregard for Plaintiff's rights.

216.  The deprivations of Dr. Snyder's U.S. Constitutional rights and federal statutory rights have resulted in ongoing violations of federal law.

217.  As a result of the acts of Drs. Alexopulos and Cotton, in their individual capacities, Dr. Snyder suffered pecuniary loss, pain, suffering, humiliation, and emotional distress for which he is entitled to recover damages from Drs. Alexopulos and Cotton, individually and jointly.

218.  The acts of Drs. Alexopulos and Cotton, in their individual capacities, were willful, malicious, and entitle Dr. Snyder to recover punitive damages against them individually and jointly.

219.  Dr. Snyder is entitled to injunctive relief from Drs. Alexopulos and Cotton in their official capacities for having violated his liberty interest and due process rights guaranteed by the Fourteenth Amendment.

220.  To the extent that punitive damages are available, Dr. Snyder seeks punitive damages.

**COUNT ELEVEN**
**VIOLATIONS OF 42 U.S.C. § 1983**
**DENIAL OF EQUAL PROTECTION**

221. Plaintiff incorporates by reference all preceding allegations as if fully set forth herein.

222. This action is brought against Drs. Alexopulos and Cotton, in their individual and official capacities.

223. Drs. Alexopulos and Cotton purposefully and intentionally discriminated against Dr. Snyder on the basis of: a perceived disability; his sex; his exercise of free speech by complaining of unlawful discrimination; his exercise of FMLA rights; the purposeful and intentional discrimination and denial of rights under federal statues by Drs. Alexopulos and Cotton, are in violation of the equal protection clause of the Fourteenth Amendment.

224. Drs. Alexopulos and Cotton purposefully and intentionally discriminated against Dr. Snyder in retaliation for his exercise of free speech when he instituted complaints of unlawful discrimination in violation of the equal protection clause of the Fourteenth Amendment of the U.S. Constitution.

225. Additionally, Drs. Alexopulos and Cotton purposefully and intentionally discriminated by denying him an equal opportunity to be treated as similarly situated residents, by including, but not limited to:

failing to complete the Verification necessary for Dr. Snyder to have an opportunity to pursue his medical license, despite having recommended him for licensure without hesitation; placing him on probation and providing a probation plan; forcing him to undergo invasive medical testing; manipulating the results of the medical testing; forcing him on FMLA leave; forcing him to continue "treatment" to return to work; refusing to accept a medical provider's statement that Dr. Snyder was fit for duty; refusing to allow him to return to the Residency program unless he withdrew all of his complaints of discrimination; suspending his pay and benefits; and terminating him from the Residency Program, which thereby caused him to be terminated from OSU Medical Center.

226.   Drs. Cotton and Alexopulos deprived Dr. Snyder of equal protection in violation of the Fourteenth Amendment of the U.S. Constitution.

227.   The deprivations of Dr. Snyder's U.S. Constitutional rights and federal statutory rights have resulted in ongoing violations of federal law.

228.   The acts and conduct of Drs. Alexopulos and Cotton, in their individual and official capacities, were under color of law and taken in bad faith and willfully with conscious disregard for Plaintiff's rights.

229.   As a result of the acts of Drs. Alexopulos and Cotton, in their individual capacities, Dr. Snyder suffered pecuniary loss, pain, suffering, humiliation, and emotional distress for which he is entitled to recover damages from Drs. Alexopulos and Cotton, individually and jointly.

230.   The acts of Drs. Alexopulos and Cotton, in their individual capacities, were willful, malicious, and entitle Dr. Snyder to recover punitive damages against them individually and jointly.

231.   Dr. Snyder is entitled to injunctive relief from Drs. Alexopulos and Cotton in their official capacities for having violated his equal protection rights guaranteed by the Fourteenth Amendment.

232.   To the extent that punitive damages are available, Dr. Snyder seeks punitive damages.

## COUNT TWELVE
## VIOLATIONS OF 42 U.S.C. § 1983
## VIOLATION OF CONSTITUTIONALLY PROTECTED RIGHT OF PRIVACY

233.   Plaintiff incorporates by reference all preceding allegations as if fully set forth herein.

234.   This action is brought against Drs. Alexopulos and Cotton, in their individual and official capacities.

56

235. Drs. Alexopulos and Cotton purposefully and intentionally intruded upon, interfered with, and violated Dr. Snyder's constitutionally protected privacy.

236. Dr. Snyder has an interest in avoiding disclosure of personal matters that are highly personal and intimate, including, but not limited to Dr. Snyder's medical and mental health treatment; the information and related records of his participation in the EAP process, including the EAP referral, Dr. Barnes and her assessment.

237. Additionally, Drs. Cotton and Alexopulos interfered with the treatment of Dr. Snyder through the EAP program and manipulated the EAP, the EAP Counselor, Heavin, and the EAP referral, Dr. Barnes and the reports, including addenda, provided by Dr. Barnes.

238. There is no compelling state interest justifying the disclosures, the manner of the disclosures, the extent of the disclosures that were made, and the interference and manipulation of the treatment and the information provided through the treatment provider.

239. The disclosures were not made in the least intrusive manner.

240.   Further, the information from Dr. Snyder's treatment and related records were intentionally and maliciously withheld from Dr. Snyder by Drs. Cotton and Alexopulos, but shared with others.

241.   Moreover, there is no legitimate reason to deny Dr. Snyder access to his personal health information.

242.   The information from Dr. Snyder's treatment and related records that Drs. Cotton and Alexopulos obtained without a valid reason, including, but not limited to: as a result of an unlawful campaign of harassment and discrimination based upon a perceived disability and as part of unlawful discrimination based upon Dr. Snyder's sex.

243.   Drs. Cotton and Alexopulos deprived and interfered with Dr. Snyder's constitutionally-protected expectation of privacy in violation of the Fourteenth Amendment of the U.S. Constitution.

244.   The deprivations of Dr. Snyder's U.S. Constitutional rights and federal statutory rights have resulted in ongoing violations of federal law.

245.   The acts and conduct of Drs. Alexopulos and Cotton, in their individual and official capacities, were under color of law and taken in bad faith and willfully with conscious disregard for Plaintiff's rights.

246.   As a result of the acts of Drs. Alexopulos and Cotton, in their individual capacities, Dr. Snyder suffered pecuniary loss, pain, suffering, humiliation, and emotional distress for which he is entitled to recover damages from Drs. Alexopulos and Cotton, individually and jointly.

247.   The acts of Drs. Alexopulos and Cotton, in their individual capacities, were willful, malicious, and entitle Dr. Snyder to recover punitive damages against them individually and jointly.

248.   Dr. Snyder is entitled to injunctive relief from Drs. Alexopulos and Cotton in their official capacities for having violated his constitutionally-protected expectation of privacy in violation of the U.S. Constitution.

249.   To the extent that punitive damages are available, Dr. Snyder seeks punitive damages.

## COUNT THIRTEEN
## BREACH OF CONTRACT

250.   Plaintiff incorporates by reference all preceding allegations as if fully set forth herein.

251.   Dr. Snyder and OSU Medical Center entered into an express contract, the Agreement, in March of 2013, with an effective date of July 1, 2013.

252.   The Agreement set forth several terms of employment, which included, but were not limited to compensation and benefits.  The Agreement also set forth the terms to be followed in the event of termination.

253.   Neither OSU-CHS nor OSU Medical Center complied with the terms set forth in the Agreement, including, but not limited to the terms with regard to termination.

254.  Dr. Snyder had an implied contract with OSU-CHS, created by the Residency Handbook.

255.   Dr. Snyder and OSU-CHS entered into a contract on or about July 1, 2013, via the Resident Handbook and by and through acceptance into the Residency Program.

256.  Defendants, OSU-CHS and OSU Medical Center, individually and collectively, breached the contract of employment by their actions by, including, but not limited to: placing Dr. Snyder on probation and the probation plan improperly; forcing participation in the EAP program; interfering with the EAP program; interfering with the EAP referral; violating the probation and suspension procedures; denying his appeals and requests for investigations with regard to the disciplinary actions taken against him; withholding documents necessary for Dr. Snyder to receive his

medical license; ignoring his complaints of discrimination; restricting and interfering with Dr. Snyder's ability to perform his duties; and terminating Dr. Snyder.

257.  Defendants, OSU-CHS and OSU Medical Center, continue to breach the contract by continuing to fail and refuse to allow Dr. Snyder to perform his duties as a resident in the Resident Program.

258.  As a breach of contract claim, this claim is not subject to either the doctrine of sovereign immunity and/or the requirements of the Oklahoma Tort Claims Act.

259.  As a proximate cause of the actions of Defendants, OSU-CHS and OSU Medical Center, Dr. Snyder has been and continues to be injured and has suffered damages as a result of the injuries.

260.  Defendants OSU-CHS and OSU Medical Center breached the terms of the contract when each failed to comply with the terms set forth in the respective agreements.

261.  As a result of the actions identified herein, Dr. Snyder has been injured and suffered and continues to suffer damages as a result of the injuries.

262.  To the extent that punitive damages are available, Dr. Snyder seeks punitive damages.

## COUNT FOURTEEN
## BREACH OF LIMITED RELEASES OF CONFIDENTIAL
## INFORMATION AUTHORIZATION

263.   Plaintiff incorporates by reference all preceding allegations as if fully set forth herein.

264.   Dr. Snyder executed a limited authorization to release confidential personal health information from the EAP to Nottingham as the representative and official of OSU Medical Center.

265.   Dr. Snyder executed a limited authorization to release his confidential personal health information from the EAP to Dr. Barnes.

266.   The EAP, Heavin, Stewart, and Dr. Barnes exceeded the scope of the limited authorization to release Dr. Snyder's confidential personal health information.

267.    Neither the EAP, Heavin, Stewart, nor Dr. Barnes complied with the terms set forth in the limited authorization of confidential personal health information.

268.   Defendants, the EAP, Heavin, Stewart, and Dr. Barnes, individually and collectively, breached the terms of the limited authorization of confidential personal information.

269. The EAP, Heavin, Stewart, and Dr. Barnes had a duty to honor the limited authorization to release Dr. Snyder's confidential personal health information.

270. The EAP, Heavin, Stewart, and Dr. Barnes breached their duty to honor the limited authorization to release Dr. Snyder's confidential personal health information.

271. The EAP, Heavin, Stewart, and Dr. Barnes far exceeded the scope of disclosures of Dr. Snyder's personal health information that he had in the limited authorization that he had executed.

272. As a proximate cause of the actions of the EAP, Heavin, Stewart, and Dr. Barnes, Dr. Snyder has been and continues to be injured and has suffered damages as a result of the injuries.

273. Dr. Snyder has suffered and continues to suffer damages as direct result of the breaches by the EAP, Heavin, Stewart, and Dr. Barnes.

274. To the extent that punitive damages are available, Dr. Snyder seeks punitive damages.

## COUNT FIFTEEN
## CONSPIRACY UNDER 42 U.S.C. § 1985(3)

275.   Plaintiff incorporates by reference all preceding allegations as if fully set forth herein.

276.   Drs. Cotton and Alexopulos, Nottingham, Benjamin, in their individual and official capacities, OSU Medical Center, EAP, Heavin, Stewart and Dr. Barnes, engaged in a conspiracy to deprive Dr. Snyder of equal protection and/or equal privileges and immunities.

277. In furtherance of the conspiracy, Drs. Cotton and Alexopulos, Nottingham, Benjamin, OSU-CHS, OSU Medical Center, the EAP, Heavin, Stewart, and Dr. Barnes took the following overt acts to deprive Dr. Snyder of equal protection and/or equal privileges and immunities, including, but not limited to:  refusing to complete and submit the Verification to the Board; subjecting Dr. Snyder to increased scrutiny unlike similarly situated residents; placing Dr. Snyder on probation and the probation plan improperly; forcing Dr. Snyder into an EAP program; mandating that Dr. Snyder undergo unnecessary medical evaluations and fitness for duty examinations; interfering and manipulating the EAP referral assessment; violating the probation and suspension procedures set forth in the Residency Program Handbook; failing to provide copies of Dr. Snyder's own personal health information, including the reports and assessments with regard to his

64

fitness for duty, to him; regarding Dr. Snyder as disabled; forcing Dr. Snyder to take a leave of absence for a perceived disability; causing Dr. Snyder to be removed from his duties; causing Dr. Snyder to have his benefits and pay terminated; and causing Dr. Snyder to be terminated from both the Residency Program and from OSU Medical Center.

278.    The conspiratorial interferences with the rights of Dr. Snyder were motived by class-based invidiously discriminatory animus, including, but not limited to: the perceived disability of Dr. Snyder, his sex, and/or his forced use of FMLA leave.

279.    The conspiratorial interferences were aimed at interfering with rights protected against private and official encroachment.

280.    The conspiratorial interferences were intentional.

281.    As a result of these actions, Dr. Snyder has been injured and a deprivation of federally-protected rights and continues to be injured and suffers damages as a result thereof.

282.    To the extent that punitive damages are available, Dr. Snyder seeks punitive damages.

**COUNT SIXTEEN**
**CONSPIRACY UNDER 42 U.S.C. § 1985(3)**

283.   Plaintiff incorporates by reference all preceding allegations as if fully set forth herein.

284.   Drs. Cotton and Alexopulos, in their individual and official capacities, engaged in a conspiracy to deprive Dr. Snyder of equal protection and/or equal privileges and immunities.

285.   In furtherance of the conspiracy, Drs. Cotton and Alexopulos took the following overt acts to deprive Dr. Snyder of equal protection and/or equal privileges and immunities, including, but not limited to:  refusing to reinstate Dr. Snyder unless he dismissed his complaints of discrimination.

286.   The conspiratorial interferences with the rights of Dr. Snyder were motivated by Dr. Snyder's exercise of his First Amendment rights and in retaliation for Dr. Snyder having exercised his First Amendment rights and refusing to withdraw his complaints of discrimination.   The conspiratorial interferences also were motivated by the desire to deprive Dr. Snyder of equal protection under the Fourteenth Amendment by denying him to be treated as similarly situated resident physicians who were not stigmatized with a perceived disability.

287.   The conspiratorial interferences are state action and the state action was taken by Drs. Cotton and Alexopulos in their official and individual capacities.

288.   The conspiratorial interferences were intentional.

289.   As a result of these actions, Dr. Snyder has been injured and continues to be injured and suffers damages as a result thereof.

290.   To the extent that punitive damages are available, Dr. Snyder seeks punitive damages.

## COUNT SEVENTEEN
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

291.   Plaintiff incorporates by reference all preceding allegations as if fully set forth herein.

292.   Drs. Alexopulos and Cotton, in their individual capacities, OSU Medical Center, Benjamin, Nottingham, Heavin, Stewart, the EAP, and Dr. Barnes acted intentionally and/or recklessly by, including, but not limited to: refusing to complete and submit the Verification to the Board; subjecting Dr. Snyder to increased scrutiny unlike similarly situated residents; placing Dr. Snyder on probation and the probation plan improperly; forcing Dr. Snyder into an EAP program; mandating that Dr. Snyder undergo unnecessary

67

medical evaluations and fitness for duty examinations; interfering with and manipulating the EAP, the EAP process, and the EAP referral and assessment; violating the probation and suspension procedures; failing to provide copies of Dr. Snyder's  personal health information to him, including the reports and assessments with regard to his fitness for duty; regarding Dr. Snyder as disabled; forcing Dr. Snyder to take a leave of absence for a perceived disability; causing Dr. Snyder to be removed from his duties; causing Dr. Snyder to have his benefits and pay terminated; and causing Dr. Snyder to be terminated from both the Residency Program and from OSU Medical Center.

293. The conduct of Drs. Alexopulos and Cotton, in their individual capacities, OSU Medical Center, Benjamin, Nottingham, Heavin, Stewart, the EAP, and Dr. Barnes was extreme and outrageous;

294.  Dr. Snyder's emotional distress was severe as a result of the conduct of Drs. Alexopulos and Cotton, in their individual capacities, OSU Medical Center, Benjamin, Nottingham, Heavin, Stewart, the EAP, and Dr. Barnes.

295. As a result of the conduct of Drs. Alexopulos and Cotton, in their individual capacities, OSU Medical Center, Benjamin, Nottingham, Heavin,

Stewart, the EAP, and Dr. Barnes Dr. Snyder was injured and continues to be injured and has suffered and continues to suffer damages as result thereof.

296.  To the extent that punitive damages are available, Dr. Snyder seeks punitive damages.

**COUNT EIGHTEEN**
**TORTIOUS INTERFERENCE WITH CONTRACT AND BUSINESS RELATIONS**

297.  Plaintiff incorporates by reference all preceding allegations as if fully set forth herein.

298.  Dr. Snyder had business and contractual rights as set forth in the Residency Handbook and the Agreement with OSU Medical Center.

299.  Dr. Snyder's business and contractual rights were interfered with by Benjamin, Nottingham, Drs. Alexopulos and Cotton, in their individual capacities, Heavin, Stewart, the EAP, and Dr. Barnes by including, but not limited to:  refusing to complete and submit the Verification to the Board; placing Dr. Snyder on probation and the probation plan improperly; forcing him into an EAP program; mandating that Dr. Snyder undergo unnecessary medical evaluations; proposing that Dr. Snyder undergo fitness for duty examinations, when that was not originally requested; forcing Dr. Snyder to undergo fitness for duty examinations unnecessarily; exceeding the scope of

the purpose of engaging in the EAP program; exceeding the scope of the limited consent for releases of information; failing to provide copies to Dr. Snyder of his own personal health information, including, but not limited to the reports and assessments with regard to his fitness for duty; regarding him as disabled; forcing him to take a leave of absence for a perceived disability; causing him to be removed  him from his duties; causing his benefits and pay to be terminated; and causing Dr. Snyder to be terminated from both the Residency Program and from OSU Medical Center.

300.   The interference with the business and contractual rights was wrongful, malicious, and not justified, privileged, or excusable.

301.   The interference with the business and contractual rights proximately caused Dr. Snyder's damages.

302.   As a result of the actions set forth herein, Dr. Snyder has been injured and suffered and continues to suffer damages as a result of the injuries.

303.   To the extent that punitive damages are available, Dr. Snyder seeks punitive damages.

**COUNT NINETEEN**
**NEGLIGENT SUPERVISION**

304.   Plaintiff incorporates by reference all preceding allegations as if fully set forth herein.

305.   Dr. Snyder was harmed as an employee of the OSU Medical Center by the actions of Drs. Cotton and Alexopulos, Benjamin, and Nottingham.

306.   The actions of Drs. Cotton and Alexopulos, Benjamin, and Nottingham, included, but was not limited to the following acts:  violating Dr. Snyder's rights under the ADA and the Federal Rehabilitation Act; placing Dr. Snyder on probation and the probation plan improperly; forcing him into the EAP program; mandating that Dr. Snyder undergo unnecessary medical evaluations; forcing Dr. Snyder to undergo fitness for duty examinations unnecessarily; exceeding the scope of the purpose of engaging in the EAP program; exceeding the scope of the limited consent for releases of information; failing to provide copies to Dr. Snyder of his own personal health information, including, but not limited to the reports and assessments with regard to his fitness for duty; regarding him as disabled; forcing him to take a leave of absence for a perceived disability; causing him to be removed  him from his duties; causing his benefits and pay to be terminated; and causing Dr. Snyder to be terminated from both the Residency Program and from OSU Medical Center.

307.   The actions of Drs. Cotton and Alexopulos, Benjamin, and Nottingham caused Dr. Snyder's rights under the Federal Rehabilitation Act, ADA, and Title VII to be violated.

308.   OSU Medical Center had a duty to its employees to ensure that its employees would not be unlawfully discriminated against.

309.   OSU Medical Center failed to ensure that the anti-discrimination policies and procedures were in place, followed, and that the requisite training provided to its employees, including, but not limited to:  Drs. Cotton and Alexopulos, Benjamin, and Nottingham.

310.   As a result, OSU Medical Center had reason to believe and/or should have known that that Drs. Cotton and Alexopulos, Benjamin, and Nottingham would create an undue risk of harm to others, including Dr. Snyder.

311.   As a proximate cause of OSU Medical Center's negligent supervision, Dr. Snyder has been harmed and suffered injuries as a result of the harm.

312.   As a result of the actions herein, Dr. Snyder has been injured and suffered and continues to suffer damages as a result of the injuries.

313.   To the extent that punitive damages are available, Dr. Snyder seeks punitive damages.

## COUNT TWENTY
## BREACH OF PROFESSIONAL DUTY

314.   Plaintiff incorporates by reference all preceding allegations as if fully set forth herein.

315.   A therapist/doctor-patient relationship existed between Dr. Barnes and Dr. Snyder.

316.   A therapist/doctor-patient relationship existed between the EAP, the EAP's counselor, Heavin, and Dr. Snyder.

317.   A breach of the duty arising from each of the relationships occurred from the following actions taken by the EAP, Heavin, and Dr. Barnes including, but not limited to:  proposing that Dr. Snyder undergo fitness for duty examinations, when that was not originally requested; forcing Dr. Snyder to undergo fitness for duty examinations unnecessarily; exceeding the scope of the purpose of engaging in the EAP program; exceeding the scope of the limited consent for releases of information; failing to provide copies to Dr. Snyder of his own personal health information, including, but not limited to the reports and assessments with regard to his fitness for duty; regarding him as disabled; forcing him to take a leave of absence for a perceived disability for which there was no objective basis; causing him to be removed

73

him from his duties; causing his benefits and pay to be terminated; and causing Dr. Snyder to be terminated from both the Residency Program and from OSU Medical Center.

318.  Dr. Snyder was and continues to be injured.  The injuries Dr. Snyder suffers is proximately caused by the breach from each of these relationships.

319.  As a result of the actions herein, Dr. Snyder has been injured and suffered and continues to suffer damages as a result of the injuries.

320.  To the extent that punitive damages are available, Dr. Snyder seeks punitive damages.

### COUNT TWENTY-ONE
### WRONGFUL DENIAL OF PERSONAL HEALTH INFORMATION/IMPROPER WITHHOLDING OF PERSONAL HEALTH INFORMATION

321.  Plaintiff incorporates by reference all preceding allegations as if fully set forth herein.

322.  Defendants OSU-CHS, OSU Medical Center, Drs. Cotton and Alexopulos, Benjamin, Nottingham, the EAP, Heavin, Stewart, and Dr. Barnes possessed personal health information of Dr. Snyder.

323.  Defendants OSU-CHS, OSU Medical Center, Drs. Cotton and Alexopulos, Benjamin, Nottingham, the EAP, Heavin, Stewart, and Dr.

Barnes refused to provide Dr. Snyder with his own personal health information.

324.  Dr. Snyder requested numerous times for copies of his personal health information from Defendants OSU-CHS, OSU Medical Center, Drs. Cotton and Alexopulos, Benjamin, Nottingham, the EAP, Heavin, Stewart, and Dr. Barnes.

325.  Adverse employment actions were taken against Dr. Snyder based upon his personal health information that was within the possession of Drs. Cotton and Alexopulos, Benjamin, Nottingham, the EAP, Heavin, Stewart, and Dr. Barnes.

326.  Despite Dr. Snyder's numerous requests that he made, he was denied copies of his personal health information for a significant period of time.  No basis for the denial was given.  No finding was made that it would be harmful to Dr. Snyder to receive copies of his personal health information. Additionally, Dr. Snyder was not notified of any right to have the denial reviewed by another physician.

327.  Dr. Snyder was forced to obtain counsel to assist in obtaining copies of his personal health information; however, to date, he still has not received a complete copy of his personal health information in the possession of Drs.

Cotton and Alexopulos, Benjamin, Nottingham, the EAP, Stewart, and Dr. Barnes.

328.   There was no legitimate basis for withholding Dr. Snyder's personal health information from him.

329.   As a result of the actions herein, Dr. Snyder has been injured and suffered and continues to suffer damages as a result of the injuries.

330.   To the extent that punitive damages are available, Dr. Snyder seeks punitive damages.

## COUNT TWENTY-TWO
## VIOLATION OF ARTICLE 2, SECTION 22 OF THE CONSTITUTION OF OKLAHOMA

331.   Plaintiff incorporates by reference all preceding allegations as if fully set forth herein.

332.   Article II, Section 22, of the Oklahoma Constitution provides greater protections to speech than the First Amendment of the United States Constitution.

333.   Defendants Drs. Alexopulos and Cotton, in their individual and official capacities, have taken actions that were and continue to be in violation of Article 2, Section 22 of the Oklahoma Constitution.

76

334.  By forcing Dr. Snyder to waive his rights to appeal all disciplinary actions taken, including his forced leave of absence, and his complaints of unlawful discrimination, if he wanted to return to his position in the Residency Program, Drs. Alexopulos and Cotton punished activity protected by Article 2, Section 22 of the Oklahoma Constitution.

335.  The actions taken by Drs. Alexopulos and Cotton, have deprived and continue to deprive, Dr. Snyder of his rights secured by Article 2, Section 22 of the Oklahoma Constitution.   Moreover, the actions taken by Drs. Alexopulos were willful, malicious, and deliberately indifferent.

336.  As a result of the actions taken by Drs. Alexopulos and Cotton, Dr. Snyder seeks actual and compensatory damages, declaratory relief, prospective injunctive relief, and all other relief available.

337.  As a result of the actions herein, Dr. Snyder has been injured and suffered and continues to suffer damages as a result of the injuries.

338.  To the extent that punitive damages are available, Dr. Snyder seeks punitive damages.

## RELIEF REQUESTED

Based on the foregoing, Plaintiff, Dr. Snyder, respectfully requests that he be granted a trial by jury for all issues so triable; a declaratory

judgment/injunction prohibiting Defendants from continuing to engage in discriminatory practices; judgment against all Defendants and in favor of Dr. Snyder on all counts; an award of money damages to Dr. Snyder for his lost wages, back pay, civil penalties, liquidated damages, all actual and compensatory damages, including pain and suffering endured, as well as emotional trauma and stress, and any other costs and damages to which Dr. Snyder is entitled by law; injunctive relief in the form of reinstatement into the Residency Program or comparable position;  the award of attorneys' fees and costs for bringing and maintaining this action; and that Dr. Snyder be awarded any other such relief that is available under the laws of the United States and the State of Oklahoma that the Court may deem just and proper. Plaintiff, Dr. Snyder, also seeks the following relief:

A. Declaring that Defendants violated the federal and state statutory provisions and violated the U.S. and Oklahoma Constitutions as set forth herein;

B. Granting prospective injunctive relief, and such other equitable relief, including, but not limited to: directing reinstatement of Plaintiff as a Resident; ensuring complete expungement of records and information related to the unlawful actions taken by Defendants; directing the

78

submission of the completed Verification to the Board, indicating that Plaintiff completed his first year of Residency training; payment of back pay; an injunction prohibiting Defendants from disclosing information related to the unlawful actions taken by Defendants to third parties regarding the alleged violations.

C. Awarding Plaintiff punitive damages where permitted by law;

D. Awarding such other relief as the Court deems appropriate.

This Amended Complaint relates back to the date of the original filing, April 18, 2016.

Respectfully Submitted,

s/ Tina L. Izadi
Tina L. Izadi, OBA #17978
Attorney for Plaintiff
Employers Legal Resource Center
6307 Waterford Blvd., Suite 250
Oklahoma City, OK 73118
Phone:  405-702-9797
Fax: 405-576-3956
Email: tizadi@okemployerlaw.com
Email:mainoffice@okemployerlaw.com