## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

1. JEFFREY SNYDER, D.O.,   )
            )
   Plaintiff,     )
            )
            )
v.            )
            )
1. BOARD OF REGENTS FOR THE )
 OKLAHOMA AGRICULTURAL & )  CIV-16-384-F
 MECHANICAL COLLEGES, *ex rel.*, )
 OKLAHOMA STATE UNIVERSITY )
 CENTER FOR HEALTH SCIENCES, )
            )
2. OKLAHOMA STATE UNIVERSITY )
 MEDICAL TRUST, a public trust, )
  d/b/a OSU Medical Center, )
            )
3. MERCY HEALTH,    )
            )
4. MERCY HEALTH OKLAHOMA )
 COMMUNITIES, INC.  d/b/a )
 MERCY HEALTH SYSTEM, )
            )
5. OKLAHOMA STATE UNIVERSITY )
 MEDICAL AUTHORITY, a state agency, )
            )
6. OSUMC PROFESSIONAL SERVICES, )
 LLC,       )
            )
7. DR. LORA COTTON, in her official and )
 individual capacities;   )
            )
8. DR. JENNY ALEXOPULOS, in her )
 official and individual capacities, )
            )
9.  DR. LESLIE E. BARNES, individually )
 and in her official capacity, )
            )
10. COMMUNITY CARE HMO, INC. d/b/a )
 COMMUNITY CARE OF OKLAHOMA; )

Defendants.                    )

## THIRD AMENDED COMPLAINT

**COMES NOW THE PLAINTIFF,** and pursuant to this Court's order of August 20, 2018

[Dkt 196], hereby amends his complaint as follows:

## PARTIES

1.    The Plaintiff is Jeffrey Snyder, an adult, male resident of Oklahoma County, Oklahoma.

2.    The Defendants are:

   A.    Board of Regents for the Oklahoma Agricultural & Mechanical Colleges, *ex rel.*, Oklahoma State University Center for Health Sciences, a state agency;

   B.    Oklahoma State University Medical Trust, a public trust d/b/a OSU Medical Center managed by Mercy;

   C.    Mercy Health, a foreign corporation doing business in Oklahoma;

   D.    Mercy Health Oklahoma Communities, Inc., d/b/a Mercy Health System, an Oklahoma Non-profit Corporation;

   E.    Oklahoma State University Medical Authority, a state agency;

   F.    OSUMC Professional Services, LLC, a domestic limited liability company;

   G.    Dr. Lora Cotton, in her official and individual capacities, who was, at all times, acting under color of state law and custom with the power and authority granted to her by the laws of the State of Oklahoma;

H.      Dr. Jenny Alexopulos, in her official and individual capacities, who was, at all times, acting under color of state law and custom with the power and authority granted to her by the laws of the State of Oklahoma;

I.      Dr. Leslie Barnes, individually and in an official capacity, an individual doing business in Tulsa County; and

J.      Community Care HMO, Inc., d/b/a Community Care of Oklahoma, a domestic for-profit corporation.

## JURISDICTION AND VENUE

3.   Plaintiff's claims are for:

A.      Discrimination and retaliation (including unpaid suspension and termination from employment and as a student of the Residency Program) in violation of the Federal Rehabilitation Act (29 U.S.C. § 794) and Titles I, II and V of the ADA (prohibiting public entities from discriminating and retaliating against persons on the basis of a disability in the provision of programs and benefits);

B.      Retaliation (a form of discrimination) (including retaliatory suspension and termination) in violation of Title VII of the Civil Rights Act of 1964, as amended;

C.      Violation of Plaintiff's procedural due process rights under 42 U.S.C. § 1983;

D.      Denial of Plaintiff's right to equal protection under the laws, actionable under 42 U.S.C. § 1983;

E.      Breach of contract;

F.      Conspiracy under 42 U.S.C. § 1985(3);

3

G.     Breach of Professional Duty; and

H.     Wrongful Denial of Personal Health Information.[1]

4.     Jurisdiction over the federal claims is vested in this Court under 28 U.S.C. § 1331. Because the state law claims arise out of the same core of facts, jurisdiction over the state claims is vested in this Court under 28 U.S.C. § 1367(a).  Defendant Board of Regents is a state entity located in and operating out of Payne County, a county within the Western District of Oklahoma, such that venue is appropriate in the Western District of Oklahoma.

## STATEMENT OF FACTS[2]

5.     Defendants Board of Regents, OSU Medical Trust, Oklahoma State University Medical Center and OSU Medical Authority are public entities subject to liability as employers under Title VII and the Americans with Disabilities Act.  Defendants Mercy Health, Mercy Health Oklahoma Communities, Inc., and OSUMC Professional Services, LLC., to Plaintiff's knowledge and belief, employed at least fifteen employees during at least twenty or more weeks of the current or proceeding calendar year.  Accordingly, all of the above-named defendants were subject to the provisions of Title VII and the ADA.  Defendants identified in this paragraph receive federal funds and are subject to the Rehabilitation Act.

---

[1] Per the Court's order on May 12, 2017, the Plaintiff requests relief by way of court order on the claim of denial of personal health information.
[2] Some facts (as opposed to legal claims) from prior pleadings are omitted from the Third Amended Complaint purely for the sake of brevity.  Omission does not indicate repudiation of previously pled facts.

6.    Plaintiff was employed by multiple entities as either joint employers and/or an integrated enterprise(s) in that, to Plaintiff's knowledge and belief:

    A.    Plaintiff's pay stubs identify him as an employee of OSU Medical Trust and the Trust owns and operates OSU Medical Center by the supporting of the teaching and training of physicians, including the Plaintiff;

    B.    Plaintiff's W-2 forms identify his employer as OSU Medical Center, which is the same entity as OSU Medical Trust;

    C.    Plaintiff's termination letter states it is from OSU Medical Center Managed by Mercy.  Mercy identifies itself as managing and being a part of the same entity as OSU Medical Center (which is a d/b/a of OSU Medical Trust);

    D.    Plaintiff's Residency/Fellow Staff Agreement is between Plaintiff and OSU Medical Center (which is a d/b/a of OSU Medical Trust), and signed by Diane Rafferty who identifies herself as the Chief Executive Officer of OSU Medical Center;

    E.    Plaintiff was directly supervised by Dr. Lora Cotton, who identifies herself as the Associate Professor of Family Medicine for the Oklahoma State University Center for Health Sciences and uses emails identifying herself as both an employee of Oklahoma State University Medical Center (email address ending "osumc") and the Board of Regents (email address ending "okstate");

    F.    Oklahoma State University Medical Authority owns the property and other assets used by Oklahoma State University Medical Trust and Oklahoma State

University Medical Center to carry on functions such as patient care and resident training;

G.     Defendants Mercy Health and Mercy Health Oklahoma Communities, Inc., d/b/a Mercy Health System, during all time identified in the complaint, maintained a written "public-private partnership" agreement with OSU Medical Trust and/or OSU Medical Authority to manage and operate OSU Medical Center, including management of physicians and residents;

H.     OSU Medical Authority provides funding for the graduate medical program with the Board of Regents and for training facilities for medical residents such as the Plaintiff;

I.     Defendant OSUMC Professional Services, LLC, whose sole corporate member is OSU Medical Trust, employs physicians, including the Plaintiff and/or his supervisors;

J.     Sunny Benjamin, who acted as the HR Manager with respect to suspending and terminating Plaintiff's employment, is identified in her emails as "Chief Human Resources Officer" of "OSU Medical Center – Managed by Mercy").

K.     The above-mentioned Defendants maintain and operate from the same principal office and utilize and/or share the same staff; and

L.     Defendant Alexopulos is the Director of Medical Education for OSU Medical Center, is Dr. Cotton's direct supervisor, and supervises the education of residents (such as Plaintiff) at Family Medicine Residency Program at OSU Medical Center.

7.    For reasons, including those set out in para. 6, above, the following Defendants employed the Plaintiff in a joint employer and/or integrated enterprise capacity: Defendant Board of Regents for the Oklahoma Agricultural & Mechanical Colleges, *ex rel*., Oklahoma State University Center for Health Sciences; Defendant Oklahoma State University Medical Trust d/b/a OSU Medical Center; Defendant Mercy Health; Defendant Mercy Health Oklahoma Communities, Inc. d/b/a/ Mercy Health System; Oklahoma State University Medical Authority; and OSUMC Professional Services, LLC.

8.    The Defendants identified in para. 7, *supra*, were also responsible for carrying out the educational responsibilities related to Plaintiff's education and training as a student-resident.   Accordingly, the Defendants identified in para. 7, *supra*, are individually and/or jointly liable for the claims asserted by Plaintiff for discrimination in allowing Plaintiff to access his educational opportunities.

9.    For brevity, and unless otherwise indicated, Plaintiff will refer to the Defendants identified in para. 7 as the "Employers/School" Defendants to indicate they are being identified as an integrated/enterprise and/or joint employers of the Plaintiff, in addition to jointly and/or severally liable for the claims asserted by Plaintiff as a resident-student.

10.    The Plaintiff is an adult male who received his Doctorate of Osteopathic Medicine around May 17, 2013.

11.   Around February 2013, the Plaintiff was selected as a Resident for the OSU Family Medicine Residency Program (Residency Program), a three-year program where he would perform his duties and undergo training with Defendants Employers/School.

12.   To practice Osteopathic medicine, Oklahoma law requires, among other things:

   A.   Plaintiff to complete one year of postgraduate training, such as the first year of the Residency Program; and

   B.    A post-graduate training certificate for internship and residency.

13.   Defendant Lora Cotton, Director of the Residency Program, is required to complete and submit a "Postgraduate Training Verification" (Verification) to the Oklahoma State Board of Osteopathic Examiners.

14.   Plaintiff is required to have a medical license prior to beginning his second year of the Medical Residency program.

15.   Successful completion of the first year of the Residency Program satisfies the "one year of postgraduate training" required for Plaintiff to obtain his medical license.

16.   Around March 13, 2013, the Plaintiff entered into a written contract entitled, "Osteopathic Graduate Medical Education Resident/Fellow Staff Agreement" (Contract).

17.   The Contract was between "Oklahoma State University Medical Center ("Hospital")" and the Plaintiff.   The Contract provided in part:

   A.   Satisfactory completion of one year of osteopathic graduate medical education is necessary for Plaintiff to receive his diploma or advance to the next level of the graduate education program;

8

B.     Plaintiff would receive an annual stipend of $44,411.00, with withholdings including federal and state taxes "and other withholdings as is customary for Hospital Employees";

C.     Plaintiff would be provided graduate medical training at a hospital affiliated with OSU Medical Center;

D.     Plaintiff will receive "benefits of employment" including health and workers' compensation insurance; and

E.     Restrictions on the reasons OSU Medical Center can terminate the Plaintiff's Contract.

18.     The Contract prohibits termination of Plaintiff's employment/residency without cause unless Plaintiff is given at least sixty days prior written notice.  Termination with cause can only be carried out under certain circumstances which did not apply in this case.

19.     The Contract went into effect around July 1, 2013, and, at that time, the Plaintiff began as a first-year medical resident, also known as "OGME 1."

20.     During each, or nearly each, month of the Contract, the Plaintiff was required to successfully complete a different "rotation" for a total of twelve months' of rotation in the first year of his Residency Program.

21.     As a medical resident, Plaintiff was provided with a handbook entitled, "Oklahoma State University Family Medicine Residency" which provided rules and procedures for the 2013-2014 residency program.  The handbook, an implied contract, provided in pertinent part:

A.    A right to appeal a decision placing Plaintiff on probation;

B.    A requirement that the Employers/School Defendants automatically investigate, for no more than two weeks, any suspension of the Plaintiff from the residency program; and

C.    There are procedural limitations governing probation, suspension and/or termination of the Plaintiff, including procedural appeal rights.

22.    Plaintiff was supervised by Dr. Lora Cotton (female), Program Director for the OSU Family Medicine Residency Program.

23.    The Plaintiff was qualified to perform as a resident and performed satisfactorily during all times of his first-year residency program.

24.    Around March 3, 2014, the Plaintiff began the application process to obtain his medical license from the State of Oklahoma, which included submission of a letter by Defendant Alexopulos stating Plaintiff "is serving and will successfully complete" his first-year residency program and that Plaintiff "exhibits proper and professional character and is in good standing" with the medical center.   Dr Alexopulos stated that she recommended Plaintiff for licensure "without any reservation."

25.    During Plaintiff's Residency Program, Dr. Cotton made comments and engaged in conduct indicating to the Plaintiff that she (Dr. Cotton) perceived Plaintiff as having a mental disability.   A non-exhaustive list of such comments/conduct include:

A.    Around April-May 2014, Defendant Cotton, along with Defendant Alexopulos, forced Plaintiff onto academic probation for reasons including

Plaintiff's level of skills such as "judgment" and "maturity" which require cognitive functions to carry out the identified skills.

B.     Around April 2014, Dr. Cotton made comments indicating Plaintiff needed "counseling/testing" related to having a "mood or neurologic impairment," that Dr. Snyder had other cognitive impairments, and that Plaintiff should "undergo neuropsychiatric testing to assess for a component of a behavioral health, auditory processing or other neurologic disorder."

26.   Around April 22, 2014, Dr. Cotton gave Plaintiff a letter placing him on academic probation for "a period of 3 months, beginning May 1, 2014, and ending July 31, 2014." As part of the probation, Dr. Cotton instructed Plaintiff to "undergo neuropsychiatric testing to assess . . . a behavioral health, auditory processing or other neurologic disorder." The letter was copied to Dr. Alexopulos.

27.   As part of the academic probation, Dr. Cotton told Plaintiff he was required to "meet once weekly with Dr. Cotton to discuss [Plaintiff's] progress" in meeting the requirements set out in the academic probation letter of April 22, 2014. However,

A.     Although Plaintiff attempted to meet with Dr. Cotton at least once weekly, Dr. Cotton on multiple occasions refused to meet with the Plaintiff and/or refused to discuss Plaintiff's progress; and

B.     Plaintiff repeatedly requested feedback from Dr. Cotton about his performance, but Dr. Cotton often refused to provide feedback on Plaintiff's performance as a resident.

28.   Additionally, throughout Plaintiff's probationary period, Dr. Cotton made comments to Plaintiff indicating his satisfactory performance. These include comments indicating Plaintiff was satisfactorily completing his job duties, such as telling Plaintiff he was doing a good job.

29.   Around April 30, 2014, Dr. Cotton instructed Plaintiff to "participate in [the] OSUMC Employee Assistance Program," a program provided by Community Care HMO, doing business as Community Care of Oklahoma (Community Care).

30.   Community Care maintains an agreement with OSU Medical Center (a d/b/a of OSU Medical Trust) to coordinate medical and/or counseling services to medical residents, including the Plaintiff. To Plaintiff's knowledge and belief, Defendant Community Care maintained copies of Plaintiff's health records, including the psychological evaluation conducted by Dr. Barnes (discussed *infra*), and communications between Dr. Barnes, Dr. Cotton and others.

31.   Jessica Heavin, Employee Assistance Program Assessor/Licensed Professional Counselor (LPC) for Community Care, assigned Plaintiff for testing and/or counseling with Dr. Leslie Barnes, a licensed psychologist. Further, the Plaintiff entered into an April 30, 2014, signed "Statement of Professional Disclosure" agreement with Ms. Heavin, who was identified as a Licensed Professional Counselor (LPC). This agreement disclosed information pertaining to Ms. Heavin's and Community Care's professional obligations to the Plaintiff including, but not limited to, Ms. Heavin's "professional training", "techniques", and "law and regulations" governing her license.

12

32.   Around April 30, 2014, Plaintiff entered into an agreement titled, "Employee Assistance Program Confidentiality Statement of Understanding and Program Description" with Community Care which, in exchange for Plaintiff's agreement to proceed in the Employee Assistance program, Community Care would provide only that information which Plaintiff consented to be provided.  The agreement made the following statements, "Your EAP counselor will not share information about you or with any person without your written authorization".

33.   Around May 6, 2014, Plaintiff signed an agreement titled "Authorization to Obtain, Use or Disclose Protected Health Information" (hereinafter "EAP Authorization").

34.   Plaintiff reached an agreement with Jessica Heavin, representative of Community Care, that the only information that would be produced from Community Care was the information Dr. Snyder consented to be disclosed, which was limited to:

A.     As shown from the May 6, 2014, agreement, information that could be communicated by Community Care to Dr. Barnes was limited to the EAP assessment and referral information; and

B.     Information that could be communicated by Community Care to Deby Nottingham was limited to the information identified beside the check marks in the "Consent for Disclosure of Information between Community Care EAP and Company Contact Personnel for Supervisory Referral".  This agreement was signed by Plaintiff on April 30, 2014.

35.   Community Care and Plaintiff are both parties capable of entering into valid contracts.  Additionally, Community Care had a professional duty to, including but

not limited to, maintain Plaintiff's confidences, not violate the authorizations and to act in a manner consistent with the Plaintiff's confidentiality and protect Plaintiff from possible harm.

36. In response to the consideration provided by Community Care, Plaintiff agreed to, and did, cooperate with Community Care in participating in the Employee Assistance Program.

37. The EAP Supervisory referral was submitted to Defendant Community Care on April 29, 2014, via fax and consisted of seven (7) pages.

38. The EAP assessment and referral information (also contained in the "case summary") was faxed to Dr. Barnes around May 14, 2014.

39. Jessica Heavin, as a representative of Defendant Community Care, represented to the Plaintiff that the only information concerning the Plaintiff that would be communicated by Community Care to Dr. Barnes was the EAP supervisory referral (provided to Community Care on April 29, 2014) and the EAP assessment and referral information (provided to Dr. Barnes around May 14, 2014). This agreement was memorialized in writing on May 6, 2014, and signed by the Plaintiff.

40. Ms. Heavin represented to Plaintiff that the only information which would be communicated by Community Care to Ms. Nottingham was the information identified beside the check marks in the "Consent for Disclosure of Protected Information between Community Care EAP and Company Contact Personnel for Supervisory Referral". This agreement was memorialized in writing on April 30, 2014, and signed by the Plaintiff.

41.     In reliance on Ms. Heavin's agreement that no other information about the Plaintiff, including, but not limited to, Plaintiff's conduct and/or performance, would be communicated to any other party by Community Care, Plaintiff agreed to participate, and did participate, in Defendant Community Care's Employee Assistance Program.

42.     Thereafter, Defendant Community Care breached the contract created between Plaintiff and Community Care, including (but not limited to) by disclosing additional information to Dr. Barnes about the Plaintiff which the Plaintiff did not agree could be provided, including (but not limited to) a document created around June 30, 2014, which discussed Plaintiff's job performance.

43.     Additionally, Defendant Community Care breached its contract(s) with Plaintiff by disclosing information about the Plaintiff to Sunny Benjamin, to whom Community Care was not authorized to disclose Plaintiff's information, and others.  Such communication occurred at various times including around July 1, 2014. Furthermore, Community Care breached its contractual agreements with the Plaintiff by obtaining/receiving unauthorized communications pertaining to the Plaintiff, without the Plaintiff's consent or agreement including, but not limited to, from Ms. Nottingham, Ms. Benjamin, Dr. Barnes and/or Dr. Cotton including (but not limited to) June 30, 2014 and July 1, 2014.

44.     As Plaintiff's assigned psychologist, Dr. Barnes was considered Plaintiff's evaluating and/or treating physician and maintained a physician-psychotherapist/patient relationship with the Plaintiff.

15

45.     Because of this physician/psychotherapist-patient relationship, Dr. Barnes:

    A.     Consulted with, examined and/or interviewed the Plaintiff as part of this relationship;

    B.     Maintained a duty to maintain confidentiality in her communications regarding the Plaintiff;

    C.     Maintained a duty not to disclose Plaintiff's health information without Plaintiff's consent;

    D.     Maintained a duty to provide Plaintiff access to his own health information upon request;

    E.     Maintained a duty to conduct an independent and medically competent evaluation of the Plaintiff; and

    F.     Maintained a duty to conduct an independent evaluation of the Plaintiff without interference from third parties, such as Defendant Cotton and the Employers/School Defendants.

46.     Defendant Barnes held three sessions with the Plaintiff, around May 20, 2014, June 5, 2014, and June 12, 2014.  During these sessions, Dr. Barnes interviewed the Plaintiff, consulted with him, and conducted a psychological examination of the Plaintiff.

47.     Around May 27, 2014, Defendant Cotton evaluated Plaintiff's performance as a medical resident through feedback and a written performance evaluation.  As part of the evaluation:

A.     Dr. Cotton was required to identify "deficiencies."  Dr. Cotton identified "None";

B.     Dr. Cotton was required to identify "Disciplinary Issues" and "Plans for Improvement." Dr. Cotton referred to the academic probation documentation given to Plaintiff in the April 22, 2014, probationary letter; and

C.     Dr. Cotton did not identify any deficiencies (including disciplinary issues) occurring after April 22, 2014, nor did Dr. Cotton indicate Plaintiff's current job performance and conduct was less than satisfactory.

48.    Around June 12, 2014, Dr. Barnes required Plaintiff to execute two documents.  The first document was an "Informed Consent" and the second was an "Authorization to Release Patient Information" (HIPAA Form).

49.    The "Informed Consent" provided:

A.     consent to Dr. Barnes to conduct a psychological evaluation on the Plaintiff consisting of a clinical interview and written psychological testing;

B.     that the results of the evaluation will be in the form of a written report which will be provided to one "designated individual" in the human resources department of the "OSU medical school";

C.     that Dr. Barnes maintains a contract with "OSU medical school" to provide the evaluation of the Plaintiff; and

D.     that the information obtained in the evaluation is under the "primary control of the OSU medical school."

50.    The HIPAA form allowed only the following:

17

A.   Communication about the Plaintiff only between Dr. Barnes and Deby Nottingham (Senior Human Resources Representative for OSU Medical Center)(female);

B.   The only information that could be released by Dr. Barnes is the Plaintiff's "Evaluation results and report"; and

C.   The only information that could be given to Dr. Barnes was in the form of verbal communication.

51.   During Plaintiff's June 12, 2014, session with Dr. Barnes, Dr. Barnes indicated to Plaintiff that he did not need counseling.

52.   Around June 13, 2014, Dr. Alexopulos agreed to provide an evaluation for Plaintiff's June 2014, rotation, a requirement for Plaintiff's completion of his residency program.  Dr. Alexopulos agreed to provide such an evaluation, which would have been due no later than July 31, 2014. However, after Plaintiff made a complaint of discrimination, discussed *infra*, Dr. Alexopulos would not evaluate the Plaintiff.

53.   Around June 23, 2014, Dr. Barnes provided Nottingham with the completed psychological evaluation of the Plaintiff.  The evaluation provided that Plaintiff has "no indications of somatic, cognitive, emotional, thought, behavioral or interpersonal dysfunction."

54.   By the end of June 2014, Plaintiff had successfully completed all requisite monthly rotations necessary to move on to his second year of the Residency Program.

55.     Around July 2, 2014, Dr. Barnes submitted a letter (second addendum) to Nottingham at OSU Medical Center which indicated Plaintiff was not fit to continue his duties as a resident.  According to the letter, Dr. Barnes relied on information provided around July 1, 2014, which was during the period Plaintiff was working directly with Dr. Cotton.  It was strongly implied to Dr. Barnes from Dr. Cotton, Dr. Alexopulos and others that Dr. Barnes amend her assessment to reflect that Plaintiff was not fit for duty as a Resident.

56.     To Plaintiff's knowledge and belief, around the last week of June 2014, Dr. Cotton provided additional and false information to, and communicated with, Dr. Barnes regarding Plaintiff's performance as a resident and Dr. Barnes used this information to determine Plaintiff was not fit to continue his duties as a medical resident.  Such communication exceeded the scope of the medical authorizations discussed above.

57.     Around July 3, 2014, Plaintiff attended a meeting with Dr. Cotton (female), Dr. Jenny Alexopulos (female), Sunny Benjamin (Chief Human Resources Officer/Executive Director of Human Resources)(female), and Deby Nottingham (female).  During the meeting:

A.      Dr. Cotton read aloud a letter she authored stating Plaintiff was not "fit for duty" as the result of a "summative assessment" provided by the Employee Assistance Program, which was the evaluations and assessments provided by Dr. Barnes;

B.      Dr. Cotton placed Plaintiff on a "3-month paid leave of absence"; and

C.    Dr. Cotton, as a condition of Plaintiff's employment, instructed Plaintiff to participate in counseling sessions as directed by the Employee Assistance Program.

58.    At this time and several times thereafter, Plaintiff requested from Dr. Barnes, Dr. Alexopulos, Dr. Cotton, Community Care and others, a copy of his health information, including the correspondence regarding Plaintiff's health, as well as Plaintiff's health/counseling records (including assessments and information relied on in making such assessments) provide to and/or received from Dr. Barnes. Plaintiff's requests were denied. This includes (but is not limited to) requests to Dr. Barnes around June 22, 2014, to OSU Medical Center around July 2, 2014, and to Community Care around July 3, 2014.

59.    Although Plaintiff was required to go through the Employee Assistance Program to locate a counselor, he Plaintiff was not successfully assigned a counselor until around August 27, 2016.

60.    Around July 9, 2014, Plaintiff attended a meeting with Dr. Barnes to discuss Dr. Barnes' assessment and recommendations regarding the Plaintiff.  During the meeting, Dr. Barnes made statements indicating that her evaluation and assessment were not independent, but were made at the behest and to satisfy, Dr. Cotton and OSU Medical Center.  Examples include, but are not limited to, Dr. Barnes' statements to Plaintiff that her evaluation was "not my own independent evaluation," that Dr. Cotton, Dr. Alexopulos, and/or OSU Medical Center are

"making decisions for me," that Dr. Barnes was "working for" OSU Medical Center, Dr. Alexopulos and Dr. Cotton and "providing a service to them."

61.   The statements made by Defendant Barnes, in addition to the continued modification of the assessment:

A.   indicate a conspiracy among Defendants Community Care, Dr. Cotton, Dr. Alexopulos and Dr. Barnes to manipulate the evaluation of the Plaintiff and to give the impression and form the inaccurate conclusion that Plaintiff was not fit to perform his job; and

B.   indicate that Dr. Barnes was not fulfilling her professional obligation to conduct an independent assessment but was rather manipulating the evaluation of Plaintiff to carry out the unlawful ends sought by Dr. Cotton, Dr. Alexopulos and the Employers/School Defendants.

62.   Additionally, Dr. Barnes repeatedly violated the scope of the medical release forms discussed *supra*, by, among other things, exchanging and communicating information with Ms. Heavin, Community Care (the EAP program), Defendant Cotton, Defendant Alexopulos, Sunny Benjamin and others.

63.   Plaintiff's second year of the Residency Program should have begun around July 1, 2014.  However, Dr. Cotton refused to allow Plaintiff to begin the second year of his Residency Program due to his leave of absence.

64.   Jessica Heavin, through the Employee Assistance Program, was responsible for assigning Plaintiff to a counselor so that Plaintiff could complete the terms of his leave of absence.

65. Around July 22, 2014, Plaintiff submitted a complaint of discrimination that included complaints of sex/gender and disability discrimination.

66. Plaintiff believed sex/gender discrimination was occurring in part to Plaintiff's perception that Dr. Cotton (female) and Dr. Alexopulos (female), and the two HR Representatives (Ms. Nottingham and Ms. Benjamin) were targeting the Plaintiff (male) by participating in the suspension and other discriminatory treatment of the Plaintiff as a medical resident.

67. Plaintiff believed he was being discriminated against on the basis of a perceived disability in part because of the conduct and statements by Dr. Cotton, as discussed, *supra*.

68. Around July 30, 2014, Plaintiff attempted to appeal the probation he was placed on by Drs. Cotton and Alexopulos. In addition, Plaintiff submitted a request for a neutral investigation into the discriminatory conduct of Drs. Cotton and Alexopulos.

69. Plaintiff's requests were consistent with Plaintiff's implied contract arising out of the handbook which specifically provides a right to appeal probationary decisions and requires an investigation after removal of program duties.

70. Around August 18, 2014, Dr. Cotton denied Plaintiff's request for an appeal of his probation. Further, no independent investigation was conducted by Drs. Cotton and Alexopulos.

71. Around September 5, 2014, Plaintiff made a second complaint of discrimination on the basis of sex/gender and a perceived disability.

72.   Around November 13, 2014, Dr. Cotton stated via letter (cc'd to Dr. Alexopulos) that Plaintiff could only return to the residency program if he withdrew his previously filed appeals and complaints of discrimination.   According to Dr. Cotton's November 13, 2014, letter:

A.   The **only** way Plaintiff could return as an active Resident is if he "**waive[d] any complaints or appeals**" (bold supplied) which would have included Plaintiff's two complaints of sex and disability discrimination.  Additionally, Plaintiff would only be credited with successfully completing eleven (11) months of his first year of the Residency Program.

B.   If Plaintiff voluntarily resigned, he would be identified as "having successfully completed 12 months of OGME 1 rotation training from June 1, 2013, through June 30, 2014."

C.   A third "option" would result in Plaintiff being dismissed from the Residency Program but having his Residency history show he had completed his 12 months of the residency program.

73.   In other words, Dr. Cotton and Dr. Alexopulos:

A.   Conditioned allowing Plaintiff to return to the Residency Program with Plaintiff withdrawing his protected complaints of discrimination; and

B.   Gave Plaintiff only two options if he refused to withdraw his protected complaints: resignation or involuntary termination.

74.   Plaintiff refused to withdraw his protected complaints of discrimination.

75.   After Plaintiff refused to withdraw his protected complaints of discrimination, he was not allowed to return to the Residency Program and continued on a leave-of-absence.

76.   Around January 6, 2015, Plaintiff provided Dr. Cotton with a note from a psychologist (not Defendant Barnes) stating he was fit for duty.  However, Plaintiff was not allowed to return to the Residency Program.

77.   Around February 2, 2015, Plaintiff was placed on "inactive status" and notified that his wages and benefits would be cancelled.

78.   Plaintiff was suspended without pay after being placed on "inactive status."

79.   Around August 5, 2015, Plaintiff was involuntarily terminated from the Residency Program.

80.   Prior to his termination, the Plaintiff maintained a property interest through his employment contract and through the implied contract (employee handbook), both of which provided restrictions on disciplining and/or terminating the Plaintiff.

81.   Dr. Cotton, Dr. Alexopulos and the Employers/School Defendants refused to provide:

   A.   confirmation that Plaintiff successfully completed any portion of the first year Residency Program;

   B.   the Oklahoma Board of Osteopathic Examiners two-page Postgraduate Training Verification Dr. Cotton was required to submit in order for Plaintiff to obtain his medical license.

82.   On April 18, 2016, Plaintiff filed a federal lawsuit alleging disability discrimination and retaliation.

83.   Around August 23, 2016, Dr. Cotton submitted a letter stating that Plaintiff had only satisfactorily completed eleven months of rotation (rather than the twelve successfully completed months of rotation she would credit Plaintiff prior to him filing a federal lawsuit).

84.   On September 1, 2016, Dr. Cotton again refused to credit the Plaintiff with having successfully completed twelve monthly rotations, claiming that Dr. Cotton intentionally listed just eleven (11) rotation[s] as having been successfully completed by the Plaintiff.

85.   Defendants' refusal to credit Plaintiff the twelve-monthly rotations he successfully completed has caused injury including in the form of interference with Plaintiff's ability to obtain his medical license and proceed to the second year of a residency program.

86.   As a direct result of the Defendants' conduct the Plaintiff has suffered, and continues to suffer, lost wages (including back, present and front pay along with the value of benefits associated with such wages), and emotional distress/dignitary harm including frustration, worry, embarrassment and similarly unpleasant emotions.

87.   At the least, motivating factors in the decisions to discriminate and retaliate against the Plaintiff (including by disciplining him, forcing him into an EAP program, manipulating his medical evaluation, terminating him from the Residency Program, and refusing to submit the proper paperwork so Plaintiff could obtain his medical

license) was because Plaintiff was perceived as disabled and/or because Plaintiff complained of gender and/or disability discrimination.

88.   Plaintiff filed a charge of discrimination for sex and disability discrimination (including retaliation after Plaintiff complained of such discrimination) against OSU Medical Center on February 11, 2015.  The charge was filed with the Office of Civil Rights Enforcement (OCRE) who, thereafter, transferred Plaintiff's charge and file to the Equal Employment Opportunity Commission (EEOC) for investigation.

89.   Around January 19, 2016, Plaintiff amended his charge to include Mercy Health System, OSU Medical Center managed by Mercy, the Board of Regents of the Oklahoma Agricultural and Mechanical College, *ex rel* Oklahoma State University Center for Health Sciences, Oklahoma State University Medical Authority, Oklahoma State University Medical Trust, and OSUMC Professional Services, LLC.

90.   Such amendment, although made, was not required in order to exhaust Plaintiff's administrative remedies against the entities identified in the amended charge as such entities are liable as joint employers of, or an integrated enterprise with, OSU Medical Center.

91.    The EEOC issued Plaintiff his right to sue letter on January 20, 2016, and Plaintiff received such letter thereafter.  Plaintiff timely filed his claims in the first Complaint on April 18, 2016, within ninety (90) days of receipt of his right to sue letter.

## COUNT I

### Rehabilitation Act

Plaintiff incorporates the above allegations and further alleges:

92.　　This Count applies only to the Employers/School Defendants.

93.　　Discrimination (including retaliation) on the basis of a perceived disability, and retaliation for Plaintiff's complaints of disability discrimination, are contrary to the Federal Rehabilitation Act.

94.　　Under this Count, Plaintiff is entitled to his wage loss (including back, present and front pay along with the value of benefits associated with such wages), emotional distress damages, and/or equitable relief such as reinstatement to the same or a comparable position and crediting Plaintiff as having successfully completed twelve monthly rotations as a first-year resident.

## COUNT II

### Americans with Disabilities Act

Plaintiff incorporates the above allegations and further alleges:

95.　　This Count applies only to the Employers/School Defendants.

96.　　Discrimination (including retaliation) on the basis of a perceived disability, including retaliation for Plaintiff's complaints of disability discrimination, are contrary to Title I of the ADA (protecting Plaintiff as an employee), Title II of the ADA (protecting Plaintiff as a student/resident) and Title V of the ADA (prohibiting retaliation).

97.   Under this Count, Plaintiff is entitled to his wage loss (including back, present and front pay along with the value of benefits associated with such wages) and emotional distress damages, and/or equitable relief such as reinstatement to the same or a comparable position and crediting Plaintiff as having successfully completed twelve monthly rotations as a first-year resident.

98.   Plaintiff seeks punitive damages against the private employers (Mercy Defendants).

## COUNT III

### Title VII (Retaliation)

Plaintiff incorporates the above allegations and further alleges:

99.   This Count applies only to the Employers/School Defendants.

100.  Retaliation (a form of discrimination) against the Plaintiff (including his suspension and subsequent termination) for his complaints of gender discrimination is a violation of Title VII of the Civil Rights Act of 1964, as amended.

101.  Under this Count, the Plaintiff is entitled to his wage loss (including past, present and future wages along with the value of benefits associated with such wages), and his emotional distress/dignitary harm damages.   Plaintiff also seeks equitable relief such as reinstatement to the same or a comparable position.  Plaintiff seeks punitive damages to the extent it is available against the Mercy Defendants.

## COUNT IV

### Procedural Due Process – 42 U.S.C. § 1983 (Property Interest)

Plaintiff incorporates the above allegations and further alleges:

102.   This Count applies only to Defendants Cotton and Alexopulos, in their official and individual capacities.

103.   The Residency Program Handbook created an implied contract and property interest by creating procedural processes for which a resident was entitled to receive prior to and after the imposition of discipline, suspension and/or termination from the Residency Program.

104.   The Residency Handbook created an implied contract and created a reasonable expectation of a property interest in that Plaintiff's appeal of his probation and request for investigation of his discipline would be granted and the procedural processes set forth in the Residency handbook – including, but not limited to, the rights to appeal probation, his request for an impartial investigation, and his right to meet with Dr. Cotton to review Plaintiff's performance – would be honored.

105.   Additionally, Plaintiff had a property interest in receiving his medical license.

106.    Drs. Cotton and/or Alexopulos improperly interfered with Dr. Snyder obtaining his medical license and, additionally, denied Plaintiff's procedural rights and right to obtain his medical license for the following (non-exhaustive) list of reasons:

   A.   denying Plaintiffs' right to appeal being placed on probation;

   B.   denying Plaintiff his right to obtain his medical license through the refusal of Drs. Cotton and Alexopulos to provide the required paperwork to the Oklahoma Board charged with granting such license; and

   C.   suspending and terminating Plaintiff from the Residency Program.

29

107.    These actions, among others, are ongoing and denied (and continue to deny) Plaintiff his right to procedural due process guaranteed by the Fourteenth Amendment.

108.    The Plaintiff was not given advance notice or an opportunity to be heard prior to being denied his property interests.

109.    Under this Count, Plaintiff is entitled to compensatory damages including emotional distress damages, against Defendants Cotton and Alexopulos in their individual capacities.

110.    Because the actions taken by Defendants Cotton and Alexopulos were willful or, at the least, in reckless disregard of the Plaintiff's rights, entitling Plaintiff to an award of punitive damages against Defendants Cotton and Alexopulos in their individual capacities.

111.    Plaintiff is entitled to prospective injunctive relief against Defendants Cotton and Alexopulos in their official capacities including remedying the ongoing violation of Plaintiff's due process rights.

112.    Plaintiff also seeks equitable relief such as reinstatement to the same or a comparable position.

## COUNT V

### Procedural Due Process – 42 U.S.C. § 1983 (Liberty Interest)

Plaintiff incorporates the above allegations and further alleges:

113.    This Count applies only to Defendants Cotton and Alexopulos, in their official and individual capacities.

114. Plaintiff enjoyed a liberty interest in pursuing his medical license, his good name and reputation, in pursuing his employment opportunities and/or in accessing his personal health information.

115. Defendants Cotton and Alexopulos deprived Plaintiff of his liberty interests by refusing to complete and submit the proper documentation necessary for Plaintiff to obtain his medical license, by improperly placing him on probation and refusing to allow him to advance his medical training and obtain his license, by removing him from his duties and terminating him from the Residency Program, among other actions.

116. Such deprivations are continuing and have resulted in ongoing violations of federal law and have foreclosed other employment, licensing and educational opportunities.

117. The actions taken by Defendants Cotton and Alexopulos were taken in their individual and official capacities, were under the color of law, taken in bad faith and taken with a willful and conscious disregard of Plaintiff's rights.

118. Under this Count, the Plaintiff is entitled to recover his emotional distress damages and other pecuniary losses, in addition to punitive damages against the Defendants individually.

119. Under this Count, Plaintiff is entitled to injunctive relief against Defendants Cotton and Alexopulos in their official capacities.

120. Plaintiff also seeks equitable relief such as reinstatement to the same or a comparable position.

## COUNT VI

### Denial of Equal Protection - 42 U.S.C. § 1983

Plaintiff incorporates the above allegations and further alleges:

121.    This Count applies only to Defendants Cotton and Alexopulos.

122.    The discriminatory and retaliatory actions (including refusing to complete required paperwork, suspending and terminating the Plaintiff from the Residency Program, among others) by Defendants Cotton and Alexopulos, were based on gender discrimination and violate Plaintiff's rights under the Equal Protection Clause.

123.    Under this Count, Plaintiff is entitled to compensation for his wage loss and emotional distress/dignitary harm damages.

124.    Because the actions of Defendants Cotton and Alexopulos were willful, reckless and made in bad faith, Plaintiff is entitled to an award of punitive damages against these Defendants in their individual capacities.

125.    The deprivation of Plaintiff's rights is ongoing, such that Plaintiff is entitled to injunctive relief against Defendants Cotton and Alexopulos in their official capacities.

126.    Plaintiff also seeks equitable relief such as reinstatement to the same or a comparable position.

## COUNT VII

### Breach of Contract by Employer/School Defendants

Plaintiff incorporates the above allegations and further alleges:

127.    This Count applies only to the Employers/School Defendants.

128.  Plaintiff entered into both an express and an implied contract to be part of the Residency Program.  These express and implied contracts provided limitations on the conduct of these Defendants, including limitations on the manner in which Plaintiff could be terminated, prohibited discriminating against the Plaintiff, and granted him certain rights of appeal.

129.  As a result of the Defendants' breach of the express and implied contracts, the Plaintiff has suffered wage and benefit loss to which he is entitled compensation. Also, as a result, the Plaintiff has lost employment and educational opportunities, including his placement in the Residency Program.

130.  The violations of Plaintiff's express and implied contracts are ongoing such that Plaintiff seeks an injunction against the continuing violations.

131.  Plaintiff also seeks equitable relief such as reinstatement to the same or a comparable position.

## **COUNT VIII**

### **Conspiracy under 42 U.S.C. § 1985(3)**

Plaintiff incorporates the above allegations and further alleges:

132.  This Count applies only Defendants Cotton and Alexopulos, in their individual capacities, OSU Medical Center, the Community Care (EAP), and Dr. Barnes.

133.  The Defendants, identified in the paragraph above, acted in agreement and in furtherance of a conspiracy to intentionally injure the Plaintiff and deprive him of his rights under the Equal Protection Clause on the basis of a perceived disability and in retaliation for his complaints of gender and disability discrimination.

134.   In furtherance of the conspiracy, Defendants Cotton and Alexopulos acted to deprive Plaintiff of his equal protection rights by conditioning Plaintiff's return to work on his withdraw of the complaints of discrimination, by suspending and terminating him from the Residency Program.

135.   Under this Count, Plaintiff is entitled to emotional distress/dignitary harm damages and punitive damages against the individual Defendants and Community Care.

## COUNT IX

### Breach of Professional Duty

Plaintiff incorporates the above allegations and further alleges:

136.   This Count applies only to Defendant Barnes.

137.   A psycho-therapist/physician-patient relationship existed between the Plaintiff and Defendant Barnes.

138.   Dr. Barnes breached her professional duty to the Plaintiff by acting negligently in evaluating the Plaintiff, including by failing to exercise independent judgment in her evaluation of the Plaintiff; by creating a false and inaccurate assessment of the Plaintiff, including modifications to the assessment, to comply with the requests of Dr. Cotton, OSU Medical Center and others; by refusing to provide Plaintiff with copies of his medical records; by conspiring with Dr. Cotton and others to create an inaccurate assessment requested by Dr. Cotton, OSU Medical Center and others to discriminate against the Plaintiff on the basis of a perceived disability, among other reasons.

139.    Under this Count, Plaintiff is entitled to emotional distress and other compensatory damages, and punitive damages for the willful and reckless treatment of the Plaintiff.

## COUNT X

### Wrongful Denial of Personal Health Information

Plaintiff incorporates the above allegations and further alleges:

140.    This Count applies only to Dr. Barnes, Community Care, and OSU Medical Center.

141.    Plaintiff has a statutory right to his health information under HIPAA and 43A. Okla. St. § 1-109(A)(3).

142.    Defendants' refusal to provide Plaintiff's medical information to him was a violation of HIPAA and 43A. Okla. St. § 1-109(A)(3).

143.    Plaintiff seeks relief in the form of a court order compelling production of Plaintiff's personal health information and all remedies allowed under law.

## COUNT XI

### Breach of Contract/Breach of Professional Duty by Community Care

Plaintiff incorporates the above allegations and further alleges:

144.    This Count applies only to Defendant Community Care.

145.    Community Care entered into valid contracts with the Plaintiff which were memorialized in writing.

146.    Defendant Community Care breached such written contract(s) and such breach, in addition or alternatively, also gives rise to a claim for breach contract and/or of professional duty.

147.   As a result of Defendant Community Care's conduct, the Plaintiff has suffered damages including the harm arising from the modification of Plaintiff's assessment to inaccurately reflect he was not fit for duty and which resulted in significant emotional distress and/or dignitary harm.  Further, Defendant's conduct was willful or, at the least, in reckless disregard of the Plaintiff's rights, entitling Plaintiff to an award of punitive damages arising from the breach of professional duty.

148.   Plaintiff seeks all damages suffered and to which he is entitled under law.

## PRAYER

**WHEREFORE**, Plaintiff respectfully requests this Court enter judgment in his favor and against the Defendants and grant him all compensatory damages suffered together with all damages, liquidated damages, equitable relief, attorneys' fees, costs and interest and such other legal and equitable relief as this Court deems just and proper.

**RESPECTFULLY SUBMITTED THIS 22nd DAY OF AUGUST, 2018**.

HAMMONS, GOWENS, HURST
& ASSOCIATES

s/Amber L. Hurst_____
Mark E. Hammons, OBA No. 3784
Amber L. Hurst OBA No. 21231
325 Dean A. McGee Avenue
Oklahoma City, Oklahoma 73102
Telephone: (405) 235-6100
Facsimile: (405) 235-6111
Email: Amber@hammonslaw.com
*Counsel for Plaintiff*
JURY TRIAL DEMANDED
ATTORNEY LIEN CLAIMED

## **CERTIFICATE OF SERVICE**

A true copy of the foregoing was filed and served by use of this Court's ECF system of filing and service to the opposing counsel below listed on this 22nd day of AUGUST, 2018.

Lauren J. Ray, OBA # 22694
Kari Hawkins, OBA # 19824
Assistant Attorney General
Oklahoma Attorney General's Office
Litigation Division
313 NE 21st Street
Oklahoma City, OK 73105
Telephone: (405) 521-4274
Facsimile: (405) 521-4518
Email: lauren.ray@oag.ok.gov
          kari.hawkins@oag.ok.gov
*ATTORNEY FOR DEFENDANT,*
Oklahoma State University
Medical Authority

Mitchell D. Blackburn, OBA #12217
Connor & Winters, LLP
119 N. Robinson, Suite 1700
Oklahoma City, OK 73102
(405) 272-5711
mblackburn@cwlaw.com

and

Hilary L. Velandia, OBA #21854
Connor & Winters, LLP
mailto:mblackburn@cwlaw.com4000 One
Williams Center
Tulsa, OK 74172
hvelandia@cwlaw.com
*ATTORNEYS FOR DEFENDANT,*
CommunityCare HMO, Inc.

James K. Secrest III, OBA No. 8049
Edward J. Main, OBA No. 11912
Secrest Hill Butler & Secrest
7134 S. Yale Ave., Suite 900
Tulsa, Oklahoma 74136
Email:
mailto:jsecrest@secresthill.comjsecrest3
@secresthill.com
emain@secresthill.com
Telephone: (918) 494-5905
Facsimile: (918) 494-2847
*ATTORNEYS FOR DEFENDANT,*
Leslie Barnes, PhD.

Adam W. Childers, OBA No. 18673
Allen Hutson, OBA No. 30118
Crowe & Dunlevy
Braniff Building
324 N. Robinson Ave., Ste. 100
Oklahoma City, OK 73102
Telephone: (405) 235-7700
Facsimile: (405) 239-6651
Email: adam.childers@crowedunlevy.com
          allen.hutson@crowedunlevy.com
*ATTORNEYS FOR DEFENDANTS*
JENNY ALEXOPULOS AND LORA
COTTON

Nathan Whatley, OBA No. 14601
Philip R. Bruce, OBA No. 30504
Mike Lauderdale, OBA No. 14265
Kristin M. Simpsen, OBA No. 22302
McAFEE & TAFT
A Professional Corporation
10th Floor, Two Leadership Square
211 North Robinson
Oklahoma City, OK 73102
Telephone: (405) 235-9621
Facsimile: (405) 235-0439
Email: Nathan.whatley@mcafeetaft.com
Philip.bruce@mcafeetaft.com
Mike.lauderdale@mcafeetaft.com
kristin.simpsen@mcafeetaft.com
*ATTORNEYS FOR DEFENDANTS,*
Oklahoma State University Medical
Center, Deborah Nottingham, Sunny
Benjamin, Mercy Health Oklahoma
Communities, Inc., Mercy Health,
Oklahoma State University Medical
Trust and OSUMC Professional
Services, LLC

Stephen R. Stephens, OBA # 10479
Michael Scott Fern
Clinton W. Pratt
Board of Regents for the Oklahoma
Agricultural and Mechanical Colleges
5th Floor, Student Union Building
Oklahoma State University
Stillwater, OK 74078-7044
(405) 744-6494; Fax: (405) 744-7998
steve.stephens@okstate.edu
msfern@okstate.edu
clint.pratt@okstate.edu
*ATTORNEYS FOR DEFENDANTS*
Board of Regents for the Oklahoma
Agricultural & Mechanical Colleges, *ex
rel.,*Oklahoma State University Center
for Health Sciences, Lora Cotton, D.O.,
and Jenny Alexopulos, D.O.

s/Amber L. Hurst