IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA


JEFFREY SNYDER, D.O.,          )
an individual,                 )
                               )
          Plaintiff,           )
                               )
vs.                            ) NO. CIV-16-384-F
                               )
                               )
BOARD OF REGENTS FOR THE       )
OKLAHOMA AGRICULTURAL &        )
MECHANICAL COLLEGES, ex rel.,)
OKLAHOMA STATE UNIVERSITY      )
CENTER FOR HEALTH              )
SCIENCES, et al.,              )
                               )
          Defendants.          )




TRANSCRIPT OF RECORDED MEETING

BETWEEN DR. COTTON, DR. THURMAN,

SANDY COOPER, DR. SNYDER AND LINDA SNYDER




TRANSCRIBED BY:  JANA C. HAZELBAKER, CSR

EXHIBIT 51

Transcription of Audio                    September 10, 2019

Page 2

1           DR. COTTON:  Hello.

2           DR. SNYDER:  Hello.

3           DR. COTTON:  Dr. Snyder.

4           DR. SNYDER:  It's good to see you.

5           DR. COTTON:  It's good to see you.

6           DR. THURMAN:  Hello.

7           DR. SNYDER:  Hi, Dr. Thurman.

8           LINDA SNYDER:  I'm Linda, and I'm Jeffrey's

9    mom.

10          DR. COTTON:  Oh, nice to meet you.

11          LINDA SNYDER:  Nice to meet you.

12          DR. THURMAN:  Chuck Thurman.  How are you

13   doing?

14          LINDA SNYDER:  Hi, Chuck, nice to meet you.

15          DR. COTTON:  Hi, I'm Lora Cotton.  Good to

16   meet you.

17          LINDA SNYDER:  Hi, Lora Cotton, nice to

18   meet you.

19          DR. COTTON:  Linda, you said?

20          LINDA SNYDER:  Linda.

21          DR. COTTON:  Linda Snyder?

22          LINDA SNYDER:  Yes.

23          DR. THURMAN:  Sorry for the room

24   temperature.  We can never get this conference room

25   the correct temperature --

Transcription of Audio                    September 10, 2019

Page 3

1           LINDA SNYDER:  It's no problem.

2           DR. THURMAN:  -- obviously.  Chilly.

3           MS. COOPER:  I'm Sandy Cooper.  I don't

4      know if I --

5           LINDA SNYDER:  Nice --

6           MS. COOPER:  -- said that.

7           Nice to meet you.

8           LINDA SNYDER:  Nice to meet you.

9           DR. COTTON:  Well, thanks for coming up.

10     We're glad to have the meeting with you and kind of

11     chat.

12           So the -- my purpose in -- in -- in having

13     you come up was because there's been a real period of

14     us not really communicating directly, and so I wanted

15     to do that and kind of get a sense of what you're

16     thinking, and options, what you see as outcomes, and

17     then what you think about those outcomes, and just

18     see where you are.  And then I'll jump in where that

19     is and then we can talk from there.

20           DR. SNYDER:  Okay.

21           DR. COTTON:  So --

22           DR. SNYDER:  What's the specific question?

23     Is there a specific question you have?

24           DR. COTTON:  Yes.

25           DR. SNYDER:  Okay.

Transcription of Audio                    September 10, 2019

Page 4

1                DR. COTTON:  Basically, you know, the --

2       you're -- you've been in this academic probationary

3       period, and so now we -- we're at a -- a point where

4       a decision has to be made.  I have to make a

5       decision.

6                And so I need some input from you, as far

7       as what you're thinking about, about how things have

8       gone, how you see things going.

9                DR. SNYDER:  Okay.  I mean, the -- I've

10      been out of work for four months, as -- as you know,

11      and I haven't heard anything from anyone here at this

12      residence -- I mean, you sent a letter to me.  I

13      swore I was going to hear something at the end of

14      September, and I haven't heard anything since then.

15               LINDA SNYDER:  It's been a long time.

16               DR. COTTON:  Uh-huh.  Uh-huh.

17               LINDA SNYDER:  Any -- we still --

18               DR. SNYDER:  I mean, I --

19               LINDA SNYDER:  -- don't even hardly know

20      his status.

21               DR. SNYDER:  I don't even know my status

22      here.  I don't understand why I haven't heard

23      anything.  Is there anything -- can you tell me my

24      status?

25               DR. COTTON:  Uh-huh.  Well, right now,

Page 5

1    you're still in that probationary period.

2            DR. SNYDER:  I'm in a probationary period

3    right now?

4            DR. COTTON:  Uh-huh.  Well, the -- at the

5    end of -- when I last communicated with you, there

6    was a letter, and then I sent an e-mail, too.  It's,

7    like, I need to hear something, as far as your

8    participation in the requirements of the probation.

9            DR. SNYDER:  So I'm still under probation

10   right now?

11           DR. COTTON:  Yes.

12           DR. SNYDER:  Okay.  It says in the handbook

13   that a suspension is when someone is removed from

14   program duties.

15           Is that not accurate?

16           DR. COTTON:  No.  I don't think that this

17   is really going in a direction that's very helpful.

18           DR. SNYDER:  It's just a question.

19           DR. COTTON:  No.  It's okay to ask

20   questions --

21           DR. SNYDER:  Okay.

22           DR. COTTON:  -- but -- but the -- we're not

23   here to argue that part of it.  Okay?

24           DR. SNYDER:  Okay.  Well, I --

25           LINDA SNYDER:  He gets confused.

Transcription of Audio                    September 10, 2019

Page 6

1          DR. SNYDER:  It's -- it's --

2          DR. COTTON:  Right.

3          DR. SNYDER:  It doesn't --

4          LINDA SNYDER:  -- after he's been removed.

5          DR. SNYDER:  Let me just say --

6          DR. COTTON:  Right.

7          DR. SNYDER:  I will say I disagree with

8    that.  I think it's clear that there is -- I'm not

9    under probation right now.  I am -- have been

10   suspended, leave of absence, whatever you want to

11   call it.  It's certainly not a probation, according

12   to the handbook.

13          DR. COTTON:  Uh-huh.  Uh-huh.

14          DR. SNYDER:  Okay.

15          DR. COTTON:  The -- go ahead, please.

16          MS. COOPER:  I think the -- the better

17   question maybe --

18          DR. COTTON:  Okay.

19          MS. COOPER:  -- is we want to move forward

20   and kind of -- what are some different options that

21   you see to do that.  There's -- there's obvious

22   ones --

23          DR. COTTON:  Uh-huh.

24          MS. COOPER:  -- but because there's been a

25   lack of communication, because there's a lack of

Transcription of Audio                            September 10, 2019

Page 7

1    understanding of what -- what's going on, to just

2    flip a switch at this point would be awkward.  And --

3    you know, and so we need to start dialoguing about

4    how -- how do we move forward from here.

5            DR. SNYDER:  Well, I would say that the

6    ball is certainly in you all's court.  You all have

7    decisions to make.  I don't understand why no

8    decisions have been made.

9            I was told I was going to hear something

10   after the end of September, and now we're in November

11   and I'm -- still been out of work.  And I think

12   that's, to me, in my opinion, very inappropriate for

13   me to be put out of work this long --

14           LINDA SNYDER:  Right.

15           DR. SNYDER:  -- being put in this position,

16   you know, just with uncertainly.  That's not fair for

17   me.

18           Is that fair?  What do you think?

19           DR. COTTON:  Well, at the end of September,

20   I had nothing in hand to -- at that point, with no --

21   nothing in hand, as far as the participation in the

22   requirements that you were put on for during the

23   leave of absence.

24           The decision -- if I had to make a decision

25   right there, it would have been for dismissal, and

Transcription of Audio                    September 10, 2019

Page 8

1   that's the worst thing for your long-term outcome.

2           DR. SNYDER:  Well, I'm still waiting on the

3   decision, and if you want to make that decision --

4           DR. COTTON:  Yes.

5           DR. SNYDER:  -- that's up to you.

6           DR. COTTON:  Right.

7           DR. SNYDER:  So I'm still waiting on the

8   decision.  It's not fair for me --

9           DR. COTTON:  I would like --

10          DR. SNYDER:  -- to be put in limbo like

11  that.

12          DR. COTTON:  -- for -- my goal is to help

13  you get to your goal, which is to finish residency,

14  correct?

15          DR. SNYDER:  That's correct.

16          DR. COTTON:  Okay.  So I'm trying to look

17  out for your long-term career decision.  If that

18  outcome is the -- the least beneficial to you

19  long-term, and so other options are better.

20          DR. SNYDER:  And let me say, if you said

21  that you were waiting on hearing about the counseling

22  or anything --

23          DR. COTTON:  Uh-huh.

24          DR. SNYDER:  -- that -- according to that,

25  I think it would be appropriate to discuss that with

Transcription of Audio                    September 10, 2019

Page 9

1    Mr. Price because he has discussed that with my team
2    of attorneys.
3              DR. COTTON:  Uh-huh.
4              LINDA SNYDER:  That's very true.  You know,
5    he's been relaying everything through the attorneys,
6    and -- and he's been corresponding with Mr. Price.
7              DR. COTTON:  Uh-huh.
8              DR. SNYDER:  So have you talked to
9    Mr. Price about that, Dr. Cotton?
10             DR. COTTON:  I received -- on October 31st,
11   you had -- you -- I had not received anything until
12   that time, as far as --
13             DR. SNYDER:  Okay.
14             DR. COTTON:  -- what you had done during
15   that time.
16             DR. SNYDER:  And that would be up to you if
17   you wanted to make any decisions prior to that point
18   in time, or you could have talked to Mr. Price prior
19   to that point in time.  It wasn't me delaying that.
20             I discussed everything through my attorneys
21   at the appropriate time, and I complied and attended
22   with all of my counseling sessions, did everything I
23   was asked to do.
24             DR. COTTON:  Uh-huh.  You had not given
25   permission for the attorneys to share that letter

Transcription of Audio                    September 10, 2019

                                                    Page 10

1    with me?

2            DR. SNYDER:  I did not say that at all.

3            DR. COTTON:  Yeah.  Well, they assume that

4    you had not given permission to do that.

5            DR. SNYDER:  Well, has -- did -- did you

6    receive a letter, you said?

7            DR. COTTON:  Yeah.  It's a copy of -- from

8    your psychol- -- it's the -- it's a general letter

9    that says you saw -- I think her name is

10   Dr. Allbright.

11           DR. SNYDER:  So where did you hear

12   something that says that I did not give you

13   permission to receive that letter?

14           DR. COTTON:  No, just that they needed

15   permission for you to -- that's -- that's protected

16   information that you would have to give permission

17   for me to have.

18           DR. SNYDER:  Well, like I said, you -- you

19   do have it, you said, right?

20           DR. COTTON:  I got it on October 31st.

21           DR. SNYDER:  Okay.  And I didn't sign any

22   authorizations or releases to permit you to receive

23   that information.  It was delivered directly to my

24   attorneys, who are -- have been -- who have been

25   talking on multiple occasions with Mr. Price about

Transcription of Audio                              September 10, 2019

Page 11

1    this.

2              DR. COTTON:  Well --

3              DR. SNYDER:  So --

4              DR. COTTON:  Well, Mr. Price said he asked

5    your attorney for permission to share that one letter

6    with the data.

7              DR. SNYDER:  If he wants to ask my attorney

8    permission, that's up to him.  And my attorney

9    apparently provided it to him, so --

10             DR. COTTON:  Right.  Right.  To -- to give

11   to me.

12             DR. SNYDER:  That's fine.

13             DR. COTTON:  All right.

14             LINDA SNYDER:  Right.

15             DR. COTTON:  So at that -- so at the

16   time -- at the end of September, I didn't have --

17             DR. THURMAN:  We didn't have --

18             DR. COTTON:  -- anything.

19             DR. SNYDER:  Well, I mean, I can't help it.

20   You should have maybe --

21             DR. COTTON:  Well, no, it's up to you --

22   it's up to you --

23             DR. SNYDER:  No.  No.  You should've

24   contact- --

25             DR. COTTON:  -- to communicate with me as

Transcription of Audio                         September 10, 2019

Page 12

1    your program director.

2          DR. SNYDER:  Okay.  Well, you know what?

3    You'll obviously have time lines and decisions you

4    have to make as well, do you not?

5          DR. COTTON:  Uh-huh.  Uh-huh.

6          DR. SNYDER:  Or am I just supposed to be

7    just hanging out, you know, just doing whatever?

8          DR. THURMAN:  That's kind of what this

9    meeting is about.  So if I -- just from --

10         DR. COTTON:  Right.

11         DR. THURMAN:  -- from my perspective, if --

12   we'll get further along with what both of you want,

13   which is to have a pathway for you if we don't focus

14   on what -- whose attorney didn't release something

15   else to whose attorney.

16         DR. SNYDER:  Well, I provided the

17   documentation --

18         DR. THURMAN:  But if we can --

19         DR. SNYDER:  -- to my attorneys.

20         DR. THURMAN:  Okay.

21         DR. SNYDER:  Okay.

22         DR. THURMAN:  But if we can at least agree

23   on my -- my statement that I just made, we'll get

24   further along.

25         You want the -- you want to see the end of

Transcription of Audio                     September 10, 2019

Page 13

1    this.

2              LINDA SNYDER:  Yes --

3              DR. THURMAN:  You want to see --

4              LINDA SNYDER:  -- he definitely does.  He

5    would.  You know --

6              DR. THURMAN:  Yes.  And I -- and we want

7    the --

8              LINDA SNYDER:  -- he's waiting.

9              DR. THURMAN:  And we want the same.

10             LINDA SNYDER:  Right.

11             DR. THURMAN:  So can we not agree to talk

12   about the future from here on out?

13             LINDA SNYDER:  That's fine.

14             DR. SNYDER:  That'd be perfectly fine.

15             LINDA SNYDER:  That sounds great.

16             DR. THURMAN:  And so the future exists with

17   one pathway that she just mentioned is the least --

18   that she doesn't want to do, which is dismissal.

19   That's one choice that can happen in the future.

20             Let's talk about other choices.

21             DR. SNYDER:  Right.

22             DR. THURMAN:  And if you --

23             DR. SNYDER:  Okay.

24             DR. THURMAN:  Do you have any other choices

25   for how this can be resolved on future decisions?

Transcription of Audio                     September 10, 2019

Page 14

1             DR. SNYDER:  When -- okay.  My -- my

2      question is in regards to one of the options would be

3      dismissal, you said.

4             Can you tell me why I'd be -- would be

5      dismissed from this residency program?

6             LINDA SNYDER:  Uh-huh.

7             DR. COTTON:  Well, no, that was the option

8      then.  That is one outcome.  There are three.  There

9      are three.

10            DR. SNYDER:  I understand that.  You just

11     mentioned one --

12            DR. COTTON:  Yes.  Right.

13            DR. SNYDER:  -- one of the outcomes is

14     dismissal --

15            DR. COTTON:  Right.

16            DR. SNYDER:  -- and we don't want to go

17     down that route, you said.

18            DR. COTTON:  Right.

19            DR. SNYDER:  Could you please tell me why

20     that would even be an option?

21            DR. COTTON:  Uh-huh.  The -- during your

22     leave of absence, the counseling that you would go

23     through needed to be led by the concerns that were

24     brought up, the whole reason for the academic

25     probation and --

Transcription of Audio                                September 10, 2019

Page 15

1            DR. SNYDER:  Would you like to tell me

2    those concerns?

3            DR. COTTON:  Yes.  Well, they were listed

4    in the first academic probation document.

5            DR. SNYDER:  No.  This counseling was

6    initiated due to Dr. Barnes' psychology report.

7            DR. COTTON:  No, the -- no, the

8    counseling --

9            DR. SNYDER:  Yes, it was.

10           DR. COTTON:  That was initiated from the

11   original thing from the EAP.

12           DR. SNYDER:  That was the EAP.

13           DR. COTTON:  This was to be involved in the

14   EAP for counseling.  Okay?  And so --

15           DR. SNYDER:  That's not true.

16           DR. COTTON:  And then it's found that there

17   was a not -- there was not-fit -- the

18   not-fit-for-duty finding, which brings us into a

19   patient safety situation where it's, like, counseling

20   was required.

21           And then I need fit for duty in order for

22   you to be back in for patient safety purposes.

23           DR. SNYDER:  So do you feel I'm not --

24           DR. COTTON:  And so --

25           DR. SNYDER:  -- fit for duty at this time?

Transcription of Audio                September 10, 2019

Page 16

1           DR. COTTON:  -- I'm not -- I wasn't the one

2    who did the assessment to start with, and it's not

3    really my position as program director to assess you

4    in the -- in that way.  That's not my role.

5           DR. SNYDER:  Did you have any involvement

6    in the fit-for-duty written evaluation report?

7           DR. COTTON:  No.

8           DR. SNYDER:  Not at all?  No --

9           DR. COTTON:  Well --

10          DR. SNYDER:  -- way whatsoever?

11          DR. COTTON:  Well, but -- now, they did

12   have the documentation of the behaviors of -- that

13   were of concern, the clinical judgment issues.  They

14   had that whole --

15          DR. SNYDER:  Did you supply any further

16   documentation?

17          DR. COTTON:  As far as examples of -- of

18   ongoing things, yes, I did.

19          DR. SNYDER:  So you did collaborate and --

20          DR. COTTON:  Oh, Lord.

21          DR. SNYDER:  -- work with these people to

22   create a desired result.

23          DR. COTTON:  Oh --

24          DR. SNYDER:  There were several

25   addendums --

Transcription of Audio                     September 10, 2019

Page 17

1            DR. COTTON:  -- Jeffrey.

2            DR. SNYDER:  -- to the fit-for-duty report

3     and you know it.

4            DR. COTTON:  Yeah.  What?  I'm sorry.

5            DR. SNYDER:  There were several addendums

6     to the fit-for-duty evaluation.

7            DR. COTTON:  No, I don't know about that.

8     That's unfamiliar to me.

9            DR. SNYDER:  Okay.

10           LINDA SNYDER:  Yeah, there's --

11           DR. SNYDER:  Well, if it's unfamiliar to

12    her, I can't help that.  I think --

13           LINDA SNYDER:  No.

14           DR. SNYDER:  -- there's several individuals

15    that work in OSU human resources that were involved

16    in this quite a lot, but if we don't want to discuss

17    that any further, that's fine.

18           DR. THURMAN:  Well, how about -- okay.

19    So -- so we have one -- we have one -- one report

20    from a -- from a professional that says "not fit for

21    duty."

22           LINDA SNYDER:  And that's all you have?

23           DR. THURMAN:  That -- that's the one that

24    we -- that's the initial Barnes report.

25           DR. COTTON:  Right.  He's -- he says we

Transcription of Audio                    September 10, 2019

Page 18

1   have -- we have that.

2           DR. THURMAN:  We have that.

3           DR. COTTON:  There is that.

4           DR. THURMAN:  And then --

5           LINDA SNYDER:  And was there addendums that

6   you have, as well, to that report?

7           DR. COTTON:  No.

8   LINDA SNYDER:  No.

9           DR. THURMAN:  Well, they stopped --

10          DR. SNYDER:  No.

11          DR. THURMAN:  -- sharing any information to

12  us.  I mean, they were the ones that got --

13          DR. COTTON:  I have one letter.  I have one

14  letter from Dr. Barnes.  I have one.  The reports

15  and --

16          MS. COOPER:  I don't have anything else

17  that's not been shared with -- with any of us.

18          DR. THURMAN:  Yeah, that -- that's when the

19  attorneys and all that stuff started going back and

20  forth.

21          DR. SNYDER:  All right.  Let me just say

22  one quick thing then, because this whole entire --

23  and I -- I won't talk any more about that, but the

24  entire psychological evaluation was handled extremely

25  inappropriately.

Transcription of Audio                    September 10, 2019

Page 19

1          I have received a copy of the entire

2    evaluation, which was hidden from me and kept from me

3    this entire time period from multiple places, from

4    OSU, from the Employee Assistance Program, and

5    Dr. Barnes herself.  It was extremely inappropriate

6    that I was not provided that documentation --

7          LINDA SNYDER:  No one --

8          DR. SNYDER:  -- at all.

9          LINDA SNYDER:  No one gave it to him.

10         DR. SNYDER:  There was a direct effort to

11   prevent me from having it.

12         I now have it.  I have analyzed it very

13   thoroughly.  It's an extremely inappropriate

14   evaluation, unprofessionally done, unethically done.

15         There was a lot of collaboration and

16   collusion amongst individuals to -- to reach a

17   desired result.  Whether you want to admit that or

18   know it or not, I can't help that.

19         As far as the Employee Assistance Program,

20   when we first started with that there was no mention

21   of me even doing counseling when I was -- when that

22   was mentioned as far as the probation.  All that was

23   said was for me to participate in the Employee

24   Assistance Program.  There was no mention of me doing

25   counseling, as you just previously stated.

Transcription of Audio                     September 10, 2019

                                                      Page 20

 1              So I participated in the Employee

 2   Assistance Program, did not do counseling at the

 3   Employee Assistance Program, and then I got

 4   transferred over to do this fit-for-duty

 5   psychological evaluation.

 6              At that point in time, apparently I was

 7   recommended to undergo counseling, which I was never

 8   provided any documentation of that from the actual

 9   provider, Dr. Barnes.  I never was given reasons for

10   the counseling.

11              I even met with Dr. Barnes about a week

12   after being placed on leave of absence, just thrown

13   out of the hospital immediately.  I'm gone, I'm on

14   leave of absence, I'm not fit for duty.  And

15   Dr. Barnes even mentioned the word "counseling" to me

16   in my meeting with her.  Whether y'all can help that,

17   no, you all cannot.

18              But that is kind of, just on the surface,

19   how this has gone.  But I --

20              LINDA SNYDER:  That's where he's coming

21   from.

22              DR. THURMAN:  No, and I --

23              DR. COTTON:  And I hear -- I hear that.

24              DR. THURMAN:  And let me say that you have

25   a reason to -- for these feelings, and nobody is --

Page 21

1    nobody sitting at this table says that you don't have

2    a reason to --

3                LINDA SNYDER:  Which it's fact.

4                DR. SNYDER:  I'm just -- I'm just making

5    it --

6                LINDA SNYDER:  It's the facts of what

7    happened.

8                DR. SNYDER:  I'm just making --

9                DR. THURMAN:  We can hear -- full agreement

10   with that.

11               DR. SNYDER:  Okay.  I'm just making a

12   few -- few points because, to me, throughout this

13   process there were a variety of wrongdoings done --

14               DR. THURMAN:  Uh-huh.

15               DR. SNYDER:  -- and was handled extremely

16   inappropriately.

17               DR. THURMAN:  That's --

18               DR. SNYDER:  From the beginning, from the

19   probation implementation, to the leave of absence --

20               LINDA SNYDER:  I agree.

21               DR. SNYDER:  -- to this fit-for-duty

22   report, not fit for duty, extremely inappropriately.

23               LINDA SNYDER:  Not done by the handbook.

24               DR. SNYDER:  And I -- and I could sit here

25   and talk to people for hours about this.  I have an

Transcription of Audio                      September 10, 2019

Page 22

1    entire -- I've got hundreds of pages of

2    documentation.  I've got -- I've analyzed this very

3    thoroughly, very thoroughly, and I have an

4    explanation for all of this.  Okay?

5              So I don't know what your thoughts are on

6    it.  Do y'all feel like it was handled very -- very

7    appropriately?

8              MS. COOPER:  Uh-huh.

9              DR. COTTON:  Medical education -- I have to

10   balance education and residents with patient safety.

11             DR. THURMAN:  Yeah.

12             DR. COTTON:  And so that -- that's why we

13   are where we are right now.

14             Now, again, I'm going to mention that -- I

15   can tell -- I -- I can see that you're very angry

16   about the way things have gone and you're not in

17   agreement.

18             DR. SNYDER:  I think --

19             LINDA SNYDER:  He's not angry.

20             DR. SNYDER:  I think -- I think --

21             LINDA SNYDER:  He's just stating the facts.

22             DR. COTTON:  Right.

23             DR. SNYDER:  -- I have every right to be

24   upset with the way this has gone down.

25             DR. COTTON:  And -- and I -- and I'm

Transcription of Audio                    September 10, 2019

Page 23

```
 1   recognizing that you are -- that you're feeling that
 2   way, but --
 3              DR. SNYDER:  I have every right to feel
 4   that way.
 5              DR. COTTON:  Yes.  That's fine.
 6              DR. SNYDER:  Okay.
 7              DR. COTTON:  But we still have to move
 8   forward here.  Okay?
 9              And for your long-term -- long-term, being
10   dismissed from the program looks the worst, as far as
11   outcome.  Okay?
12              DR. SNYDER:  And that is your choice.
13              DR. COTTON:  It's true, but --
14              DR. SNYDER:  That's true.
15              DR. COTTON:  -- I'm here to tell you about
16   the -- the -- what -- what else is effective.
17              DR. THURMAN:  There's more palatable
18   outcomes.
19              DR. COTTON:  Okay?
20              DR. SNYDER:  I understand that, but if you
21   want to make -- you have a decision to make, and
22   that's kind of up to you, so I will leave that up to
23   you.
24              DR. COTTON:  No, you have some -- you have
25   some power here, too.
```

Transcription of Audio                     September 10, 2019

Page 24

1          DR. THURMAN:  Yeah.  You have some say in
2    your pathway.
3          DR. SNYDER:  Okay.
4          DR. THURMAN:  So you need to -- you need to
5    exercise that and listen -- or we -- we hope that you
6    would come with some options that you would like
7    to --
8          DR. SNYDER:  And, see, the whole
9    unfortunate thing is, is I've had to, like you said,
10   try to develop a pathway, or move forward an outcome,
11   or resolution --
12         LINDA SNYDER:  Uh-huh.  He's had to seek
13   legal --
14         DR. SNYDER:  -- unfortunately, through the
15   help of attorneys.
16         LINDA SNYDER:  Uh-huh.
17         DR. SNYDER:  Do I want to go down that
18   route?
19         No, I did not.
20         LINDA SNYDER:  No.
21         DR. SNYDER:  Not at all.
22         LINDA SNYDER:  No.
23         DR. SNYDER:  It's too -- I didn't want to
24   do that.  There's been completely -- there's been
25   many opportunities that y'all could have had to have

Page 25

1   met with me and thought through this a little

2   further, but that wasn't the way it went down.

3            It was, we went through one step, one step,

4   one step, kept moving forward.  Okay?

5            LINDA SNYDER:  We recommended -- you know,

6   we thought -- you know, before the probation even

7   ended we thought he would be taken off of it, you

8   know, or, you know, at the end we're going to hear a

9   positive outcome.

10           We told him, "Go ahead.  Go through the

11   process.  Do as you're told."

12           And we were shocked, you know, because he

13   told us what was going on during that time frame.

14   And really surprised with the outcome.  And so, you

15   know --

16           DR. COTTON:  The --

17           LINDA SNYDER:  -- we have the --

18           DR. COTTON:  -- the probation --

19           LINDA SNYDER:  -- right evidence began to

20   do with --

21           DR. COTTON:  Right.

22           And so the -- in order to return to

23   training at this location, I'm going to need -- is

24   there -- what would be needed is -- is someone,

25   again, to -- to look at the issues that -- that

Transcription of Audio                    September 10, 2019

Page 26

1    brought about the probation to start with, that list

2    of concerns that I had on the original probationary

3    document.  Take that into consideration regarding the

4    counseling or -- or whatever interaction you had --

5    or could be someone else, Dr. Allbright or whomever,

6    and -- I don't know that she even knew the concerns

7    that we were trying to work on.  So --

8              DR. SNYDER:  I was told to just go see a

9    counselor and undergo counseling.

10             DR. COTTON:  Yeah.

11             DR. SNYDER:  So --

12             DR. COTTON:  Yeah.  And so physician fit

13   for duty is outside the resident handbook because

14   it's not part of the normal residency training.

15             DR. SNYDER:  Yeah.

16             DR. COTTON:  So it's -- it's outside of it,

17   but you're a physician prac- -- you know, practicing

18   in a hospital, so it's part of the deal.

19             So that -- that is something that I would

20   need to comfortably re-admit you to resi- -- or

21   consider it.

22             DR. SNYDER:  What would you need again?

23   Tell me again what you would need.

24             DR. THURMAN:  Recommendation by a

25   different --

Transcription of Audio                    September 10, 2019

Page 27

1          DR. COTTON:  That -- that you're now --

2          DR. THURMAN:  -- psychologist.

3          DR. COTTON:  -- fit for duty.

4          DR. SNYDER:  Okay.

5          DR. THURMAN:  It doesn't have to be Barnes.

6          DR. COTTON:  No.  Absolutely.

7          DR. SNYDER:  You -- you did say something

8     about you would need someone to look into this about

9     the probation.

10          DR. COTTON:  Well, they need to know --

11          DR. SNYDER:  Are you talking about --

12          DR. COTTON:  They need to know the concerns

13     that -- that we're looking at, as far as the --

14          DR. SNYDER:  Are you talking about a

15     psychologist, or what are you referring to?

16          DR. COTTON:  Yes.

17          DR. SNYDER:  Okay.

18          DR. THURMAN:  Yeah.

19          DR. COTTON:  Yeah.

20          DR. THURMAN:  I mean, you've been going to

21     a different one here recently.

22          DR. COTTON:  Uh-huh.

23          DR. THURMAN:  You went to --

24          DR. SNYDER:  That's correct.

25          DR. THURMAN:  Okay.  So could we share

Transcription of Audio                           September 10, 2019

Page 28

1    that -- that -- that initial probationary itemization
2    with them and then have them --
3                DR. COTTON:  From April.
4                DR. THURMAN:  -- write a letter that says,
5    "Well, these concerns are -- are not valid.  At this
6    point, I believe he is fit for duty"?
7                DR. SNYDER:  So let me ask a -- a quick
8    question.  So do y'all believe that the findings were
9    rational in Dr. Barnes' report?
10               I know you haven't seen it, but you all
11   have ways, you said -- I mean -- let me say this.
12               Y'all have not read the report, correct?
13               DR. COTTON:  Right.
14               DR. THURMAN:  Huh-uh.
15               DR. SNYDER:  Okay.  But there are
16   individuals at OSU who have read the report.
17               DR. COTTON:  Uh-huh.
18               DR. SNYDER:  Okay.  Do you think they
19   believe that the report was done appropriately?
20               And maybe you do not know the answer to
21   that question.
22               DR. COTTON:  Yeah, I can't really --
23               DR. SNYDER:  Okay.  Well --
24               DR. COTTON:  -- answer for them.
25               DR. THURMAN:  That is -- I -- I think it's

Transcription of Audio                        September 10, 2019

Page 29

1    worth you realizing that we don't -- this isn't tied

2    to what Dr. -- only Dr. Barnes.

3              I mean, you've been going to Dr. Allbright,

4    or this other --

5              DR. COTTON:  Uh-huh.

6              DR. THURMAN:  -- this other professional.

7    You know, if they could see that initial -- the

8    probationary concerns that you have, you would have

9    already met with this person and then they could, in

10   their opinion, render their opinion, which you feel

11   might be more fair than the way Dr. Barnes handles

12   it, that is a pathway to be able to get back --

13             DR. COTTON:  To be considered for -- for

14   continuing training.

15             DR. THURMAN:  That's what's held this up, I

16   think.  I mean, that -- not having -- not having a

17   minority, or a second opinion, or any other opinion

18   from a professional after having that first one, it's

19   really hard.  That's kind of like a halting point, if

20   there was one.  That's what's caused us to not be

21   able to kind of move beyond.

22             So that would be very easy -- that's one

23   pathway of getting back in and finishing out the

24   probationary period in this program.

25             You would still need to prove --

Transcription of Audio                          September 10, 2019

Page 30

 1               DR. COTTON:  On --

 2               DR. THURMAN:  -- competency with --

 3               DR. COTTON:  Yeah.

 4               DR. THURMAN:  -- these concerns that she

 5     initially had about stuff with the hospital and --

 6     you still have to -- you'd still be in a probationary

 7     period, but you could kind of work your way through

 8     that and --

 9               DR. SNYDER:  And so --

10               DR. THURMAN:  -- do it on the job.

11               DR. SNYDER:  -- to clarify again,

12     Dr. Thurman, what you just said, I would still be on

13     probation if I came back here to the hospital?

14               DR. COTTON:  Yes.

15               DR. SNYDER:  Yeah, because you never

16     finished your probation because it was put on halt.

17               DR. COTTON:  Right.

18               DR. SNYDER:  It was put on halt in what

19     way?  I mean --

20               DR. COTTON:  No.  No.  No.  It wasn't -- I

21     wouldn't describe it -- it wasn't put on --

22               DR. THURMAN:  Well, there's no way for you

23     to actually finish your probation.

24               DR. SNYDER:  Let me say this.  The

25     probation --

Transcription of Audio                    September 10, 2019

Page 31

1            LINDA SNYDER:  Because you were put on

2     leave of absence.

3            DR. COTTON:  Because you --

4            DR. THURMAN:  Yeah.

5            DR. COTTON:  Right.  Well, no, it -- I

6     would describe it even differently.  And I don't mean

7     to --

8            DR. THURMAN:  Yeah.

9            DR. COTTON:  -- to encounter that, but

10    the -- the continuation of probation is because I

11    have to see that you have -- in behav- -- in

12    behaviors and decisions, I have to see that you are

13    doing better on these things to -- before I can take

14    you off probation.

15           DR. SNYDER:  Okay.  That makes perfect

16    sense, but I -- I think what would be -- to me, what

17    would be fair would be to communicate that really --

18    really directly and straightforward with me, which

19    has not been done.  Because I would tell you that

20    July 3rd, which is the last time I've seen you --

21           DR. COTTON:  Uh-huh.

22           DR. SNYDER:  -- I was taken off probation

23    and I was suspended.

24           DR. COTTON:  No, you weren't taken off

25    probation.

Transcription of Audio                    September 10, 2019

Page 32

```
 1              DR. SNYDER:  Well, I -- according to the
 2   handbook, suspension is when you're removed from
 3   program duties.  Okay?  We can disagree about that,
 4   but I know what the handbook says.  Okay?
 5              So whether you want to call it suspension,
 6   or leave of absence, or whatever, also at no point in
 7   time was I said (sic) that my probation was magically
 8   extended.
 9              If you want to assume that I think that or
10   assume that's just understood, I shouldn't have to
11   make that guess.
12              My probation was never extended.  According
13   to all the documentation that I have, my probation
14   was to end -- was to end July 31st.  That's what all
15   my documentation says.
16              DR. COTTON:  July 31st?
17              LINDA SNYDER:  Exactly.
18              DR. SNYDER:  July 31st.  Three months of
19   probation starting May 1st.
20              DR. COTTON:  Yeah.
21              DR. SNYDER:  July 31st is when my probation
22   was set to end, and then my probation was stopped and
23   I was suspended.  I was granted a leave of absence.
24   Okay?  So that's all the documentation and wording
25   that I was provided --
```

Transcription of Audio                     September 10, 2019

Page 33

1                    DR. COTTON:  Okay.

2                    DR. SNYDER:  -- throughout this time

3       period.

4                    LINDA SNYDER:  There's really no reason --

5       you know, when he was wanting to ask questions, "Why

6       the leave of absence now," he had no answers at that

7       meeting.

8                    DR. COTTON:  Uh-huh.  Well, it was related

9       to the not fit for duty and that you needed to work

10      on those issues --

11                   DR. SNYDER:  Well, that's perfectly fine.

12                   DR. COTTON:  -- before you could be back at

13      the -- back in the clinical educational arena.

14                   DR. SNYDER:  And I understand the vague

15      talk that everyone uses, "these issues."  I can -- I

16      can clearly -- Dr. Thurman, you were not there in

17      this meeting, but I can tell you that I

18      specifically -- I don't know what -- why

19      Dr. Alexopoulos is not here today, but that's okay.

20                   I clearly remember in that meeting asking

21      Dr. Alexopoulos -- when she said there was some

22      concerns with patient safety.

23                   And then I asked her, "What are the

24      concerns with patient safety, Dr. Alexopoulos?"

25                   And she couldn't give me an answer.

Transcription of Audio                        September 10, 2019

Page 34

1           LINDA SNYDER:  No examples.

2           DR. SNYDER:  And then immediately you --

3           DR. COTTON:  But these examples have

4    already been given in the original documentation when

5    this started.

6           DR. SNYDER:  I'm just saying this is just a

7    lack of communication, I think --

8           DR. COTTON:  Yeah.

9           DR. SNYDER:  -- when we have

10   Dr. Alexopoulos making statements about me, telling

11   me there's concerns with patient safety, and she

12   can't cite anything.

13          And then you immediately tell me we're not

14   going to discuss that here today.

15          DR. COTTON:  Uh-huh.  Well, those had

16   already been shared with you and that wasn't the

17   point of that meeting.  It was to communicate the

18   things that we talked about.

19          DR. SNYDER:  The point of the meeting was

20   to tell me I'm on leave of absence --

21          DR. COTTON:  Right.

22          DR. SNYDER:  -- I was suspended, I was

23   found not fit for duty, and there's really nothing

24   more we're going to talk about this.

25          LINDA SNYDER:  Exactly.

Transcription of Audio                            September 10, 2019

Page 35

```
1              DR. COTTON:  Yes, you're right.

2              DR. THURMAN:  So --

3              DR. COTTON:  Not -- not the suspension.  It

4    wasn't --

5              DR. THURMAN:  Yeah.

6              DR. COTTON:  -- we weren't putting you on

7    suspension, it was the --

8              DR. SNYDER:  Well, let's just say --

9              LINDA SNYDER:  A leave of absence --

10             DR. SNYDER:  Let's just say --

11             LINDA SNYDER:  -- or suspension --

12             DR. THURMAN:  I mean, this is --

13             LINDA SNYDER:  -- whatever you want to call

14   it --

15             DR. THURMAN:  Well, it's semantics --

16             LINDA SNYDER:  -- you know.

17             DR. THURMAN:  -- that unless -- that unless

18   your goal, again, is something other than moving

19   forward, it's -- it doesn't make sense in going back

20   and re-hashing the semantics of it again, Jeffrey.

21             DR. SNYDER:  I'm just trying to --

22             DR. THURMAN:  I know, but just --

23             DR. SNYDER:  -- make it very clear how I

24   feel about this --

25             DR. THURMAN:  Okay.  Yes.
```

Transcription of Audio                      September 10, 2019

Page 36

1              DR. SNYDER:  -- and I think there should be
2    some understanding on the other side as well.
3              DR. THURMAN:  Yes.  And over time, you
4    know, whether you finish your residency here, or you
5    finish it somewhere else, or whatever happens, you
6    know, I am interested in pathways that we can kind of
7    get moved on.
8              Because it doesn't do us any good to have
9    this position in limbo, either, and not know if --
10   what -- what's going to happen with you.  You know,
11   it doesn't -- it's difficult on this program as well.
12   So it's -- it's affecting both of us.
13             LINDA SNYDER:  That's the reason he's
14   trying to work through --
15             DR. THURMAN:  Yeah.
16             LINDA SNYDER:  -- the attorney to let
17   them -- you know, the team of attorneys he has, to be
18   informed on these type of issues --
19             DR. THURMAN:  Yeah.
20             LINDA SNYDER:  -- so we can move forward --
21             MS. COOPER:  Right.
22             LINDA SNYDER:  -- and get this over with.
23             DR. COTTON:  Those types of things -- of
24   course, the attorneys don't really know how medical
25   education works, you know, the -- how it really

Transcription of Audio                          September 10, 2019

Page 37

1    proceeds, so it's difficult for them to give you

2    advice on --

3              DR. SNYDER:  I think there's a --

4              DR. COTTON:  -- how medical education --

5              DR. SNYDER:  I will say I think there's a

6    lot of things that they understand have been handled

7    extremely inappropriately throughout this entire

8    process.  The entire process.  And if you give me

9    just about 15 seconds, I'll tell you a few of them.

10             I think everything from the probation --

11   I'm not going to get into the -- a lot of details

12   here, but the probation to the leave of absence, the

13   not-fit-for-duty report.

14             I think there's been a number of

15   mischaracterizations made about me through this

16   entire -- entire time period.  There's been, in -- in

17   my opinion, damage to my reputation done, defamation

18   of my character.

19             There's been many contractual violations

20   done towards me.

21             There has been, in my opinion,

22   collaboration and collusion, working together to

23   achieve a desired result that is damaging to my

24   career.

25             There has been a multitude of violations

Transcription of Audio                    September 10, 2019

                                                    Page 38
 1   and negli- -- negligence towards my privacy, and on

 2   many occasions my due process has been violated.

 3   Okay?

 4           And I've discussed all this very clearly

 5   with my attorneys.  I've had many meetings with them

 6   and they are in communication on this with Mr. Price.

 7           LINDA SNYDER:  Exactly.

 8           DR. COTTON:  Uh-huh.  Oh, I'm aware that

 9   you have those concerns.

10           LINDA SNYDER:  And that's what we want,

11   too.  We want to, you know, resolve -- you know, to

12   move forward.

13           DR. COTTON:  So what would be considered

14   res- -- resolution?

15           LINDA SNYDER:  Well, that's what he's

16   informing you of.

17           DR. SNYDER:  Well, I'm looking for

18   fairness, honesty and justice.

19           Now, what to you would be a just

20   resolution?

21           DR. COTTON:  Well, I'm not the one that

22   feels hurt, so my concept of justice doesn't seem to

23   be at issue here.

24           DR. SNYDER:  What is your concept of

25   justice?

Transcription of Audio                              September 10, 2019

Page 39

 1              DR. COTTON:  I don't need a concept of

 2    justice in this -- in this situation.  I'm looking

 3    out for your long-term career goal and balancing that

 4    with patient safety.

 5              DR. SNYDER:  So do you --

 6              DR. COTTON:  So --

 7              LINDA SNYDER:  What is -- what is justice

 8    to Jeffrey?

 9              DR. COTTON:  Right.

10              LINDA SNYDER:  That's his question.

11              DR. COTTON:  What is --

12              DR. THURMAN:  Yeah, that's -- that's the --

13              DR. COTTON:  No, what -- what is justice?

14              DR. THURMAN:  That's the -- that's the real

15    question.  It does no good for Jeffrey to ask

16    Dr. Cotton.  She's the program director.  She just

17    said she wants to educate residents, of course,

18    and -- and not release them on humanity when they're

19    not ready.  That's just a simple --

20              DR. COTTON:  Right.

21              DR. THURMAN:  -- fundamental goal.

22              DR. COTTON:  Right.

23              DR. THURMAN:  That's nothing -- that --

24    that -- there's nothing evil about that.

25              DR. COTTON:  Right.

Transcription of Audio                    September 10, 2019

```
                                                Page 40
     1              LINDA SNYDER:  No, there's not.

     2              DR. SNYDER:  Well --

     3              DR. THURMAN:  That's a simple goal.

     4              DR. SNYDER:  -- the thing is, though --

     5              DR. COTTON:  What justice -- what -- what

     6   are you looking for in justice?

     7              DR. THURMAN:  Yeah.  It's more important --

     8              DR. COTTON:  What does that mean to you?

     9   How will you feel --

    10              DR. THURMAN:  -- you telling us what you

    11   need --

    12              DR. SNYDER:  Well --

    13              DR. THURMAN:  -- in order to feel --

    14              DR. COTTON:  What would it take for you to

    15   walk away from this --

    16              DR. THURMAN:  Yeah.

    17              DR. COTTON:  -- and be, like, "Okay, I can

    18   move on."

    19              DR. SNYDER:  Let me explain.  This -- this

    20   entire circumstance, though, involves many

    21   individuals and various entities.  Okay?

    22              DR. COTTON:  Uh-huh.

    23              DR. SNYDER:  This doesn't just involve me.

    24   This isn't just about what's for me.  This is

    25   involving many other people.  Okay?
```

Transcription of Audio                          September 10, 2019

Page 41

1              Now, in terms of resolution, things you're

2    discussing, you know, that is a private and personal

3    issue.  Those are topics of discussion that are

4    private and personal between my attorneys, who are

5    representing me and discussing that with Mr. Price.

6    Okay?

7              But, you know, I'm here today, though, and

8    I'm more than happy to listen to whatever you all

9    have as options, though.  So that's why I'm here.

10             DR. COTTON:  How comfortable do you feel

11   with this reprimand?

12             DR. SNYDER:  I -- I think I've been -- I

13   think there's been many -- many times where I've had

14   many concerns about things.  I am open to any options

15   that you all have.

16             DR. COTTON:  Uh-huh.

17             DR. SNYDER:  I mean, how comfortable are

18   you with me in this program?

19             DR. COTTON:  It doesn't matter how

20   comfortable I feel with you in the program.

21             DR. SNYDER:  It doesn't matter?

22             DR. COTTON:  Well, my feelings about you

23   don't matter.  I have to just document competency.

24   My -- I don't have to personally --

25             DR. SNYDER:  You don't have any feelings

Transcription of Audio                    September 10, 2019

Page 42

```
 1    towards me?
 2               DR. COTTON:  I don't need to express
 3    personal --
 4               DR. SNYDER:  Okay.
 5               DR. COTTON:  -- feelings about you.  You
 6    know, I have to educate residents and I have to
 7    document competency, so that's my role as program
 8    director.
 9               DR. THURMAN:  I think the operative
10    question is --
11               DR. COTTON:  Yeah.
12               DR. THURMAN:  -- would -- would she still
13    be willing to train you after all is said and done.
14               DR. COTTON:  Right.
15               DR. THURMAN:  And I think the answer is,
16    obviously --
17               DR. COTTON:  Yeah.
18               DR. SNYDER:  Okay.
19               DR. COTTON:  I could do it.
20               LINDA SNYDER:  That's what he's trying to
21    ask.
22               DR. COTTON:  Would it be difficult?
23               DR. THURMAN:  Yeah.
24               DR. COTTON:  Yeah, I mean --
25               DR. THURMAN:  But that's not the same
```

Transcription of Audio                      September 10, 2019

                                                      Page 43

 1    question as, "What are your feelings for me," you

 2    know.

 3                DR. COTTON:  Yeah.  Yeah.

 4                DR. THURMAN:  They're different.

 5                DR. COTTON:  Right.

 6                LINDA SNYDER:  Right.  Right.

 7                DR. THURMAN:  Those are different --

 8                LINDA SNYDER:  But you -- at least you

 9    should --

10                DR. SNYDER:  Well, she kind of asked me if

11    I was comfortable in the -- in the program --

12                DR. THURMAN:  So --

13                LINDA SNYDER:  Right.

14                DR. SNYDER:  -- so I kind of was asking her

15    the same question --

16                LINDA SNYDER:  Yeah.

17                DR. SNYDER:  -- in response.

18                LINDA SNYDER:  And it -- it was the same

19    kind of question --

20                DR. THURMAN:  So she has --

21                LINDA SNYDER:  -- related to Jeffrey.

22                DR. THURMAN:  She has to be willing to be

23    able to see through this and know that they're going

24    to come to an agreement to go ahead and train him.

25                He has to be willing to do the same thing

Transcription of Audio                     September 10, 2019

Page 44

1    about this program --

2              DR. SNYDER:  And I'm completely --

3              DR. THURMAN:  -- to be feeling like he can

4    drop anything that's going on and continue on with --

5              DR. COTTON:  Right.

6              DR. THURMAN:  -- us training him, and that

7    will include continuing to -- giving him feedback in

8    the future about how he's doing and him accepting

9    that feedback and criticisms.

10             DR. COTTON:  Right.

11             LINDA SNYDER:  I just know that he is a

12   very cooperative person --

13             DR. THURMAN:  Yeah.

14             LINDA SNYDER:  -- you know, over the years

15   and all through --

16             DR. THURMAN:  So if you're willing to do

17   that, that's one --

18             LINDA SNYDER:  He's always been very --

19             DR. THURMAN:  -- that's one of the

20   pathways.  She just outlined that.  That's one of the

21   options in coming back.

22             We need a fit-for-duty report from whoever

23   you choose that is a -- that is a psychol- --

24   psychologist.

25             DR. COTTON:  Uh-huh.

Transcription of Audio                    September 10, 2019

Page 45

1            DR. THURMAN:  That gets you back into

2    working in patient care in -- in this program, and

3    then fulfilling the rest of the requirements of the

4    probation.

5            DR. SNYDER:  Which over- --

6            LINDA SNYDER:  How long is that going to

7    last?  The probation.

8            DR. SNYDER:  What are the requirements of

9    my probation?

10           LINDA SNYDER:  When --

11           DR. COTTON:  That has to be something

12   that -- if -- if we end up at a place.  It actually

13   isn't a continuation of the last probation, you would

14   be starting --

15           LINDA SNYDER:  A new probation?

16           DR. COTTON:  -- a new probation.  And it

17   cannot be more than three months because that's --

18   that's by the handbook.

19           DR. SNYDER:  But you are saying, though,

20   I'm still on probation right now?

21           DR. COTTON:  Yeah.

22           DR. THURMAN:  Well, you would be when

23   you -- you -- you would start back --

24           DR. COTTON:  You're not --

25           DR. THURMAN:  -- because you never

Transcription of Audio                    September 10, 2019

Page 46

 1   really --

 2           DR. COTTON:  You're not not on probation,

 3   so --

 4           DR. THURMAN:  You never really --

 5           DR. COTTON:  -- you're on probation.

 6           DR. THURMAN:  You never really completed

 7   it.

 8           DR. COTTON:  Right.

 9           DR. THURMAN:  And it's not -- probation

10   isn't --

11           DR. SNYDER:  But she just said that I'd

12   have to start a new probation --

13           DR. THURMAN:  Yeah.

14           LINDA SNYDER:  Yeah.

15           DR. SNYDER:  -- because you're telling me I

16   didn't complete it.

17           LINDA SNYDER:  That's confusing.

18           DR. SNYDER:  It sounds -- sounds kind of

19   confusing.

20           DR. THURMAN:  But you were gone and you

21   were- -- you weren't able to demonstrate competency

22   during your probationary period.

23           DR. COTTON:  Right.

24           DR. THURMAN:  That's what was required.

25           DR. COTTON:  Right.

Transcription of Audio                    September 10, 2019

Page 47

```
 1             LINDA SNYDER:  So why would --
 2             DR. THURMAN:  So --
 3             LINDA SNYDER:  -- he not get to continue
 4   what he'd previously already done through probation?
 5             DR. THURMAN:  He would get to continue --
 6   he -- well, he could start back --
 7             LINDA SNYDER:  You know, because there was
 8   a certain amount of time that he was on probation
 9   previously.
10             DR. THURMAN:  Yeah.
11             DR. COTTON:  Right.
12             LINDA SNYDER:  So why would that not be
13   counted towards the 90 days?
14             DR. COTTON:  Right.  Well, because
15   probations can be extended because I gave -- I gave a
16   certain amount of time, but at the end of that
17   there's a reconsideration and you can be -- you can
18   be dismissed from the program, you can be -- continue
19   on probation --
20             DR. THURMAN:  Or released.
21             DR. COTTON:  -- or be released from
22   probation.
23             And under this circumstance, you would
24   need -- because of the types of concerns that brought
25   about the probation to start with, you would have to
```

Transcription of Audio                      September 10, 2019

Page 48

1   still be on probation so that -- you know, because we

2   need to show that those issues are -- are -- we can

3   see evidence that those things have been overcome.

4              DR. SNYDER:  And you just said --

5              DR. THURMAN:  If he can demonstrate that

6   evidence.

7              DR. COTTON:  Right.

8              DR. THURMAN:  If he can -- if he

9   did came -- come back and --

10             DR. COTTON:  Right.

11             DR. THURMAN:  -- start working in rotations

12   and studying again.

13             DR. SNYDER:  You just said that my

14   probation could be extended; is that correct?

15             DR. COTTON:  Yeah.

16             DR. SNYDER:  Okay.  And you also said my

17   probation -- or I know that my probation was supposed

18   to end July 31st.  It was my opinion it ended

19   July 3rd.  I wasn't provided any sort of

20   documentation that said it was extended.

21             And you said I'm still on probation right

22   now, though?

23             DR. COTTON:  Well, you're still on

24   probationary status in that you're not -- you're

25   not -- you're not in good standing with the program

Transcription of Audio                    September 10, 2019

Page 49

1  at this point.

2          The leave of absence did make things muddy.

3  I will --

4          DR. THURMAN:  Yeah.

5          DR. COTTON:  It is.  It's muddy.  I will --

6  I am totally there.  It's very unusual, the

7  not-fit-for-duty thing.  Highly unusual.  So that

8  muddies it.  It does.

9          But the reason that was there was in the

10  interest of patient care, patient safety.  Okay?  So

11  there's that muddy part.

12          Now, we're looking backwards again.  I find

13  ourselves looking backwards again.  And you want --

14  I'm seeing you want some clarification, some --

15  something clear about how all that went.  There is a

16  muddy period there.  And I don't know that any amount

17  of talking together will somehow bring clarity to

18  that -- that paid leave of absence period.  Okay?

19          However, the not fit for duty, put that

20  into that arena.

21          DR. SNYDER:  So am I on probation right

22  now, or leave of absence, or suspension?  Just to be

23  clear of my status right now.

24          DR. COTTON:  Uh-huh.  You're on a leave of

25  absence.

Transcription of Audio                    September 10, 2019

Page 50

1          LINDA SNYDER:  While ago it was a

2     probation.

3          DR. COTTON:  You are -- you can be more

4     than one thing.  You're --

5          LINDA SNYDER:  Oh, is that right?

6          DR. THURMAN:  Yeah.

7          DR. COTTON:  Well, sure.  You can --

8          LINDA SNYDER:  You can be on both at the

9     same time?

10         DR. COTTON:  Yeah.

11         DR. SNYDER:  And is my leave of absence --

12    my leave of absence is in no way similar to a

13    suspension?

14         DR. COTTON:  No.

15         DR. SNYDER:  It's not?

16         DR. COTTON:  It's different.  It's

17    different.  Because the intent of it was not -- the

18    intent of a leave of absence is to give someone time

19    to work on something.

20         DR. SNYDER:  I have been --

21         DR. COTTON:  The suspension is -- is -- the

22    purpose is completely different.

23         DR. SNYDER:  I have been removed from

24    program duties.

25         DR. COTTON:  Uh-huh.

(800)771-1500 / depo@drreporting.com

Transcription of Audio                    September 10, 2019

Page 51

1           DR. SNYDER:  I'm not working in -- at the

2     clinic right now, or at the hospital.

3           DR. COTTON:  Uh-huh.

4           DR. SNYDER:  That is what a suspension is.

5           LINDA SNYDER:  Exactly.  That's according

6     to the handbook, you know.

7           DR. COTTON:  Your not-fit-for-duty letter

8     made it necessary to provide you an opportunity to

9     work on something.

10          If I had -- if I had put you on suspension

11    and there had been a review at that point, whether to

12    keep you or let you go, what do you think would have

13    happened at that point?

14          DR. SNYDER:  I really don't know.  And that

15    would be your decision to make, right?

16          DR. COTTON:  No, it wouldn't be.  That --

17          DR. SNYDER:  Yes, it would.

18          DR. COTTON:  It would be a committee's

19    decision.

20          DR. SNYDER:  Okay.  Well, committee --

21          DR. COTTON:  Right.  You would have been

22    dismissed, and that doesn't get you to your goal of

23    finishing.

24          DR. SNYDER:  There's always --

25          DR. COTTON:  So I was trying to --

D&R REPORTING & VIDEO, INC.
(800)771-1500 / depo@drreporting.com

Transcription of Audio                    September 10, 2019

Page 52

1            DR. SNYDER:  There's always --

2            DR. COTTON:  -- provide an opportunity for

3    you to work on that.

4            You were going to say "there's always"

5    what?

6            DR. SNYDER:  There's always resolutions

7    past actions that are taken by individuals.  There is

8    al- -- always other procedures that can be -- and

9    protocols that can be followed.  So even though --

10           DR. COTTON:  In this circumstance, what do

11   you mean by that?

12           DR. SNYDER:  Even though you say that

13   there's a committee that would have dismissed me,

14   there's always other things that can be taken and

15   move forward.  So whether that be the decision that

16   people make, I still have other routes.

17           DR. COTTON:  Uh-huh.  Like what?

18           DR. SNYDER:  I'm not going to get into any

19   details here today.

20           LINDA SNYDER:  We're just trying to do the

21   right thing in life, you know.

22           DR. COTTON:  Uh-huh.

23           LINDA SNYDER:  And that's true for any

24   time.

25           DR. THURMAN:  Okay.  The fact that we're

Page 53

1    characterizing it as a "leave of absence" and you are

2    demanding that we call it a "suspension" does not

3    help us with this conversation.

4            Does everybody agree?

5            DR. SNYDER:  I would --

6            LINDA SNYDER:  Agree.

7            DR. SNYDER:  I would agree.

8            LINDA SNYDER:  We agree.

9            DR. THURMAN:  I'm -- she's the only one

10   agreeing with me, so --

11           LINDA SNYDER:  He said -- he said he

12   agrees, too.

13           DR. THURMAN:  Okay.

14           DR. SNYDER:  I would like to let me have my

15   opportunity to even answer.  I'd like to answer that

16   question.

17           DR. THURMAN:  Okay.  Do you agree?

18           DR. SNYDER:  Okay.  I would agree that

19   there -- we need to move forward towards a

20   resolution, but I think it's awfully odd and -- and

21   is inappropriate the way things are handled, the way

22   we're even calling things, the way we're -- the way

23   actions were taken.

24           I'm only making a point that things are not

25   followed appropriately.

Transcription of Audio                    September 10, 2019

Page 54

 1              LINDA SNYDER:  We're not even following

 2       the --

 3              DR. SNYDER:  I'm not --

 4              LINDA SNYDER:  -- handbook --

 5              DR. SNYDER:  I'm not --

 6              LINDA SNYDER:  -- you know.

 7              DR. SNYDER:  I'm not trying to sit here and

 8       just say, "Oh, it's dismissed, it's suspension, leave

 9       of absence, not probation."  I'm only saying that as

10       an example.  That is an example of many examples.

11              So does that help resolve something?  I'm

12       just making a point.  Okay?  That's it.

13              DR. THURMAN:  Okay.  And your point is --

14       does not fall on deaf ears.  I completely understand

15       and validate your point.

16              That being said, let's take a deep breath

17       and think about moving forward.

18              Now, whether it seems good to you that when

19       you -- that after -- let's talk about the fit for

20       duty.  I think that that step could be done easily.

21              Entering back in.  It's our contention that

22       you're still under probationary status, so entering

23       back in, seeing patients again -- let me finish.

24              DR. SNYDER:  I'm ready.

25              DR. THURMAN:  -- you have -- you will earn

Transcription of Audio                        September 10, 2019

Page 55

1   your right through competency to be released from

2   probation.  You will show that you're doing all the

3   things right that -- that satisfy all the concerns

4   that Dr. Cotton had.  And in doing that, you will --

5   having done that, you will then be released from

6   probation once you start back, if you choose to come

7   back and start back.

8              Once that goes on, you will continue on

9   with the remainder of your residency and you will

10  still get quarterly evaluations and the whole

11  nine yards.  And you'll still get different rotations

12  that you're on.

13             And if there's no problems in the future,

14  there won't be any further probationary problems,

15  there won't be any further anything.  That is one of

16  the options.

17             Okay.  So getting the fit for duty, coming

18  back on probation for that period to be able to be

19  released from it after you're doing good, once

20  you're -- once you're back, which I think is fair

21  since we've had so much out -- out of time and all

22  that happen, and then finish out your residency.

23             Now, there -- there is another op- -- there

24  is another pathway, but I want to make sure we keep

25  the -- the discussion moving.

Transcription of Audio                    September 10, 2019

Page 56

 1              There's a third pathway that involves --

 2    this is -- this -- this would be utilized if you

 3    were -- just wanted to be in a different program and

 4    just felt like you'd be more fairly treated just in a

 5    completely different program.  If you wanted to

 6    transfer to a different residency.

 7              Do you want to discuss --

 8              DR. COTTON:  Uh-huh.

 9              DR. THURMAN:  -- how that would go down?

10              DR. COTTON:  Because that -- the nature of

11    our relationship has -- it's not positive at this

12    point.  You're feeling angry toward the situation.

13              LINDA SNYDER:  He's unhappy.

14              DR. COTTON:  Yeah.

15              LINDA SNYDER:  He wanted --

16              DR. COTTON:  Right.  And we can -- yeah.

17              LINDA SNYDER:  Not angry, unhappy.

18              DR. COTTON:  Yeah.  Okay.  You have less

19    than positive feelings about how things have gone.

20    You may not -- you may not want to have to deal with

21    this program anymore.  You could choose that.

22              DR. THURMAN:  And in doing so, what would

23    happen -- if that -- if that is the pathway that --

24    that you choose, there would be some agreement on how

25    this whole situation was characterized to the next

Transcription of Audio                                September 10, 2019

Page 57

1    program director at whatever program you chose that

2    would be an agreed on -- basically, the discussion

3    between you so that you would know exactly if they --

4    if they asked Dr. Cotton --

5             DR. COTTON:  "Describe" --

6             DR. THURMAN:  -- "Describe what happened

7    during this."

8             DR. COTTON:  -- "that period of time."

9             DR. THURMAN:  It would be a stated

10   statement that was agreed upon by you so you'd know

11   that --

12            DR. COTTON:  Yeah, so you wouldn't have

13   to --

14            DR. THURMAN:  -- nothing --

15            DR. COTTON:  -- worry what that looked

16   like.

17            DR. THURMAN:  You would not be

18   characterized in any weird way with this other

19   program that you're trying to get into or something,

20   it would be, you know --

21            DR. COTTON:  Something that you would --

22            DR. THURMAN:  -- something that you would

23   approve of.

24            DR. COTTON:  Which this period of time in

25   your training career will be -- will have to be

Transcription of Audio                    September 10, 2019

Page 58

1    described by me from time to time as -- so that's

2    something that I'm -- you probably have had thoughts

3    or concerns about.

4              And so -- so that description is there,

5    kind of -- kind of regardless of which direction this

6    goes.  The only difference in the way that

7    description is, is that -- how the end of it is

8    described.

9              So what do you think about that?

10             DR. SNYDER:  That is something that I'm

11   going to have to discuss with my attorneys about and

12   they will discuss it with Mr. Price.

13             DR. COTTON:  Okay.

14             DR. THURMAN:  So dismissal, which nobody

15   wants.

16             Coming back under the terms that we talked

17   about with the fit for duty and then finishing out a

18   new probationary period, just to make sure

19   everything's hunky dory between everybody as being

20   released on -- on a probation after that period was

21   done and finishing residency here.

22             Or us assisting your wishes to find a

23   different program and portraying that -- help --

24   helping that transition to the best of your -- you

25   know, to -- to be more successful.

Transcription of Audio                          September 10, 2019

Page 59

1            And -- and that's the three main kind of
2    pathways that I see.
3            There might be another one that you guys
4    have thought of, and we're -- and we're all ears if
5    there is.  We're -- we're -- we're very open to try
6    to get some kind of thing moving forward, as -- as I
7    think I've tried to portray.
8            So if there is, we're -- we're -- we're
9    willing to -- to hear a fourth pathway if you
10   could -- if you guys have thought of one.
11           DR. SNYDER:  No.
12           DR. THURMAN:  But, definitely, one of the
13   first three, we're willing -- again, the choice is
14   ultimately yours in which one you'd rather do.
15           DR. SNYDER:  You -- I mean, like I said,
16   this -- this -- I mean, you all have decisions to
17   make as well.
18           DR. COTTON:  Uh-huh.
19           DR. SNYDER:  I mean, this isn't --
20           DR. COTTON:  I get a --
21           DR. SNYDER:  -- just on me.
22           DR. COTTON:  It's true -- well, I can make
23   a decision, but I get a -- and please correct me if
24   I'm wrong here, but I get a sense that you kind of
25   are looking for me to dismiss you.

Transcription of Audio                    September 10, 2019

Page 60

```
 1            DR. SNYDER:  I don't know why you would say
 2    that.
 3            DR. COTTON:  Well --
 4            DR. THURMAN:  Well, because you just keep
 5    saying stuff like, "Well, you have a decision to
 6    make.  You should" --
 7            DR. COTTON:  Right.
 8            DR. THURMAN:  I mean, I'm --
 9            DR. SNYDER:  What I'm saying is --
10            LINDA SNYDER:  So I guess when she brought
11    it up --
12            DR. COTTON:  So -- so correct me if I'm --
13    so correct me if I'm wrong, but -- but the -- but
14    the -- I get a -- I get a sense of that, just in
15    that -- just talking about, you know, "I have other
16    pathways.  I have other things."  There's a lot of --
17    kind of --
18            LINDA SNYDER:  I guess because you
19    mentioned it.
20            DR. COTTON:  -- general term --
21            LINDA SNYDER:  You mentioned it --
22            DR. COTTON:  -- speech.
23            Well, the -- well, it's real.  I mean --
24            LINDA SNYDER:  -- first, you know, to him.
25            DR. COTTON:  -- to be real.  Well, I did
```

Page 61

1   because I --

2           LINDA SNYDER:  And that's when he said,

3   "Well, that's your decision," you know --

4           DR. COTTON:  Well, ultimately, it would be.

5           LINDA SNYDER:  -- and that's the only

6   reason he came back with that response --

7           DR. COTTON:  Ultimately, it would be,

8   but --

9           LINDA SNYDER:  -- you know, so that's the

10  reason the topic --

11          DR. COTTON:  -- that the long-term --

12          LINDA SNYDER:  Yeah.

13          DR. COTTON:  -- the way that looks

14  long-term to future employers and all the things that

15  you'll ever do, that's the least --

16          DR. THURMAN:  The -- yeah.

17          DR. COTTON:  -- the least positive --

18          DR. THURMAN:  Yeah.

19          DR. COTTON:  -- way of -- of looking at all

20  of this.

21          DR. THURMAN:  The other --

22          DR. SNYDER:  Well, I --

23          DR. THURMAN:  The other pathways are

24  better.

25          DR. SNYDER:  Let me -- let me see --

Transcription of Audio                    September 10, 2019

Page 62

1           DR. COTTON:  They look better.

2           DR. SNYDER:  Let me see if I can clarify

3    this.

4           I never said anything about you dismissing

5    me --

6           DR. COTTON:  Uh-huh.

7           DR. SNYDER:  -- at all.

8           LINDA SNYDER:  That's correct.

9           DR. SNYDER:  I only said that you have

10   decisions and choices that you can make as well

11   throughout this process, just as you have done all

12   throughout this process so far.

13          So, yes, you do have decisions to make as

14   well.  Okay?

15          In regards to another option, which I'm

16   assuming that you do not mention this because it is

17   not an option, but the handbook also does mention

18   that my probation could be removed as another option,

19   but y'all have already mentioned that it would not be

20   removed, so I guess we'll move past that.

21          LINDA SNYDER:  Yeah.

22          DR. COTTON:  Yeah, I wouldn't -- that --

23   that's -- based on the nature of the clinical

24   decision-making concern, starting back not on

25   probation is -- I would not make that decision.

Transcription of Audio                          September 10, 2019

Page 63

1                    DR. SNYDER:  Okay.

2                    DR. COTTON:  You're correct.

3                    DR. THURMAN:  But that being said, because

4      of the time out and the fact that you haven't been

5      going through continuously patient care --

6                    DR. COTTON:  Uh-huh.

7                    DR. THURMAN:  -- I mean, we -- we would

8      want to watch anybody that was coming back in --

9                    DR. COTTON:  Yeah.

10                    DR. THURMAN:  -- closer.  And whether you

11     call that -- I mean, even if it's for -- for our

12     own -- for the concerns that initiated it, some of

13     the things -- the decisions about on-call and some of

14     those things, we want to see that that is not a -- an

15     ongoing concern before we --

16                    DR. SNYDER:  But you wouldn't --

17                    DR. THURMAN:  -- completely took somebody

18     off probation.  And I --

19                    DR. SNYDER:  But you would need to --

20                    DR. THURMAN:  -- think that's implied, that

21     from a residency training standpoint, that's the

22     better decision, even though you're probably -- as a

23     matter of fact, in your case you'd rather just not be

24     on any kind of --

25                    LINDA SNYDER:  Well, that was --

Transcription of Audio                    September 10, 2019

Page 64

1              DR. THURMAN:   -- probation.  I understand
2     that.

3              LINDA SNYDER:  You know, it was the --

4              DR. THURMAN:  Yeah.

5              LINDA SNYDER:  -- you know, the

6     university's -- or Dr. Cotton's call to have him

7     leave, you know, the residency, you know, on the

8     leave of absence or pro- -- longer probation, you

9     know, that you speak of.  So, you know, that's the

10    reason for that, you know.  But, you know, it just --

11             DR. SNYDER:  And you just said that --

12    that -- whether you call it "probation" or not, I

13    mean -- I mean, like I said, that's something that

14    y'all could decide upon, whether you call it a

15    "probation" or not.

16             I mean, I know y'all are definitely aware

17    of this, that OSU is a learning institution.  It's a

18    place that you should train and educate doctors to

19    learn from their experiences.

20             Personally, I do not feel that that has --

21    that has been the opportunity for me.  I feel like

22    there has -- there has been instances.  There has

23    been instances where obviously I have learned a

24    tremendous amount, but there has been other

25    opportunities where I think that that has not been

Transcription of Audio                      September 10, 2019

Page 65

1   followed.

2            LINDA SNYDER:  What others are doing here,

3   you know.  There's major circumstances, you know,

4   that Jeffrey knows, and nothing's been done to those

5   residents.

6            But with him, with something minor, you

7   know, all this has taken place.

8            But, like you said, you know, it's a

9   learning environment and, you know, if -- it's -- you

10  know, it's a place to make them all become better

11  doctors and not pick on someone that's, you know,

12  done something, you know, very, very, you know, minor

13  of anything, you know, where someone else has done

14  some major things and they're not called on the

15  carpet, you know, to be told anything.

16            DR. COTTON:  Well, the -- I think that the

17  definition of "major" and "minor" probably belongs

18  within the realm of the medical educators, so --

19            LINDA SNYDER:  Well, it's not like he, you

20  know, tried to hurt some indi- -- patient.

21            DR. COTTON:  Uh-huh.  Uh-huh.

22            LINDA SNYDER:  There's nothing that -- on

23  record of that.  Or, you know, almost caused someone

24  to die, you know.  I mean -- but, you know --

25            DR. COTTON:  Well --

Transcription of Audio                          September 10, 2019

Page 66

1               LINDA SNYDER:  -- we're --

2               DR. COTTON:  -- looking at --

3               LINDA SNYDER:  -- I meant, you know --

4               DR. COTTON:  Yeah.  The --

5               LINDA SNYDER:  -- pulling someone out of,

6    you know, training, you know, for what reasons.

7               DR. COTTON:  Uh-huh.

8               LINDA SNYDER:  And that's what we're

9    looking at.

10              DR. COTTON:  I have examples of reasons of

11   the concerns that were brought to me by myself, as

12   well as other people in the department --

13              LINDA SNYDER:  Uh-huh.

14              DR. COTTON:  -- that were concerning enough

15   to put you on academic probation.

16              DR. SNYDER:  And they were probationary

17   concerns -- just to clarify this -- that were

18   documented only by you throughout this process.

19              DR. COTTON:  I did take time to document

20   several examples.

21              DR. SNYDER:  Okay.  You were the only one

22   who documented probationary concerns throughout this

23   process.

24              DR. COTTON:  No.

25              DR. THURMAN:  No.

Transcription of Audio                    September 10, 2019

Page 67

1              DR. SNYDER:  That is the only probationary

2    concerns that I have received that are referring to

3    probationary --

4              DR. THURMAN:  But it's the -- it's the

5    medical program director to -- to be a -- a

6    clearinghouse for all those concerns that --

7              DR. COTTON:  Uh-huh.

8              DR. THURMAN:  -- that other faculty bring.

9    And then that is -- gets documented whenever you get

10   put on probation by the program director.  But

11   that -- Dr. Cotton is not the only one with

12   concerns --

13             DR. SNYDER:  Let me explain.  Okay?

14             DR. THURMAN:  -- about your competence,

15   Jeffrey.

16             DR. SNYDER:  Let me explain this very

17   clearly.

18             The documentation that I have received from

19   Dr. Cotton April 23rd or April 22nd had concerns only

20   listed by her.  I just wanted to make that clear.

21             DR. COTTON:  That's true.  Those are

22   examples --

23             DR. SNYDER:  Okay.

24             DR. COTTON:  -- that I, myself, witnessed

25   that week.

Page 68

```
 1            DR. SNYDER:  If there were any other
 2   examples --
 3            DR. COTTON:  Uh-huh.
 4            DR. SNYDER:  -- then they should have been
 5   provided to me.  That would be, I think -- why not?
 6            LINDA SNYDER:  When -- when he's being put
 7   on probation --
 8            DR. SNYDER:  Why would they not be provided
 9   to me?
10            LINDA SNYDER:  -- and they're not provided?
11            DR. THURMAN:  Now, the program director --
12            DR. COTTON:  Those are all educational
13   things that happen all the time --
14            DR. THURMAN:  Yeah.
15            DR. COTTON:  -- after they're brought to
16   you.  I mean, I can't -- I don't keep a clearinghouse
17   of every mistake that every resident --
18            DR. SNYDER:  I think Dr. Thurman just said
19   that there have been many other people that bring
20   information to you as the program director --
21            LINDA SNYDER:  Right.
22            DR. SNYDER:  -- to then present to me.
23            LINDA SNYDER:  Right.
24            DR. THURMAN:  The --
25            LINDA SNYDER:  And he didn't have it
```

Transcription of Audio                                      September 10, 2019

Page 69

1    presented.

2              DR. THURMAN:  The -- you -- you did have it

3    presented.  I mean, you had -- it -- it was -- you

4    know, it wasn't -- maybe you're talk- -- you're

5    mixing it with specific examples, but the overall

6    concerns about the focus, and following instructions,

7    and -- and not listening, and doing the same thing

8    over again after having something said, that didn't

9    come from just one person.

10             But, you know, you -- as a program director

11   and the way GME training works, Jeffrey, you should

12   know that faculty work with you at different times

13   and then they go back and talk to the program

14   director, who's kind of the head of the residents,

15   and says their con- -- their -- their concerns to

16   that.

17             It's not a written out thing.  It's not a

18   memo.  It's not always in e-mail form.  It's not --

19   but sometimes it's just coming from all these

20   different angles.

21             DR. SNYDER:  Do you not think it would be

22   good to have other specific documented concerns

23   provided to me from other attending physicians?

24             DR. THURMAN:  No.  I think if -- if on- --

25   if one -- if only one person witnesses something that

Transcription of Audio                    September 10, 2019

Page 70

1  you do that is inappropriate to patient care, that's

2  one too many.

3           DR. SNYDER:  That's all I'm saying.  Just

4  making a point.

5           LINDA SNYDER:  I guess it would --

6           DR. SNYDER:  Dr. Cotton's the only one --

7           LINDA SNYDER:  I guess it would be

8  helpful --

9           DR. SNYDER:  -- that has documented these

10  things.

11           LINDA SNYDER:  -- to any resident, though,

12  to know -- one that I worked with, you know, John

13  Smith, or whatever, this is what happened.

14           And the -- of course, the program

15  director's job would be to present it to the resident

16  as a complaint.

17           DR. THURMAN:  It is the program director's

18  job to make a final --

19           LINDA SNYDER:  But --

20           DR. THURMAN:  -- a decision on somebody's

21  level of confidence and whether they had concerns.

22  And Dr. Cotton did that job.

23           LINDA SNYDER:  Uh-huh.

24           DR. THURMAN:  I think what's being voiced

25  here, Jeffrey, is you're sort of -- this is -- this

Transcription of Audio                        September 10, 2019

Page 71

1    is an evidence (phonetic) of your distrust with this

2    program, that you don't believe in those first

3    complaints that Dr. Cotton had.  Even to this day,

4    you don't think that you did anything wrong.

5            LINDA SNYDER:  Well, he has --

6            DR. THURMAN:  And that is a significant

7    problem because that shows a lack of insight at this

8    point that even -- I don't know if he is -- he's

9    upset about the other stuff, but that's -- that's

10   concerning to me because if some- -- somebody doesn't

11   realize that they've done one thing wrong amongst all

12   those things, the odds of them returning back and

13   being successful are very small.

14           DR. SNYDER:  Let me -- let me clarify --

15           DR. THURMAN:  So you did nothing wrong

16   through any of this.  At the very beginning in

17   patient care, you made no mistakes.  After all those

18   things that she documented, you still feel like you

19   did nothing wrong?

20           DR. SNYDER:  Let me clarify and answer your

21   question.

22           I believe that there are things that I can

23   improve upon here at the hospital.

24           I think there are things that every

25   resident can improve upon as we work in the clinic or

Page 72

1    at the hospital.

2           I believe I have performed on par with any

3    resident up here.

4           And as far as the probation is concerned --

5    you know, as far as the probation's concerned, I

6    think that there -- and I -- I've mentioned this

7    before.  I sat down with both of you all, Dr. Cotton

8    and Dr. Thurman, in a meeting we had, I believe on

9    April 23rd, and there were many, many, many factually

10   inaccurate things in the documentation that was

11   written up by Dr. Cotton.  Okay?

12          I have evidence to prove that, with the

13   medical record as well.  Okay?

14          There are -- some of the things are true.

15   Some of the things are inaccuracies.  There are many

16   inaccuracies in that documentation.  Okay?

17          And, to me, it's not fair that this

18   documentation was provided down the line to other --

19   other sources.  That isn't fair.  And I discussed all

20   this with you all that day.  I very politely and

21   respectfully stated my positions on all these items.

22          There have been many occurrences in that

23   document, just to let you all know, where there is

24   things that are said where I was supposedly taught --

25   told this or that about something on a certain

Transcription of Audio                    September 10, 2019

Page 73

1  patient, and then the next day he just didn't do it.

2  He didn't do what he was told.

3            That is not the case.  I met down -- I met

4  and spoke with Dr. Cotton one-on-one casually one

5  evening, and then she told me some things.

6            I made every attempt from then forward to

7  follow her direct instructions.

8            And besides that, without getting into too

9  many details here, the handbook was not followed, as

10 I said, very clearly on the probation itself.  Okay?

11           There's a couple different options.  I can

12 be given a period of time to resolve the

13 deficiencies.  It was elected not to give me that

14 period of time to resolve the deficiencies.  Okay?

15           Or this probation, if I'm considered

16 detrimental to patient care, can be implemented

17 immediately.  I'm detrimental, under Dr. Cotton's

18 eye, as to patient care.  It should then be

19 implemented immediately.  These are things that

20 occurred in the middle of March.  My probation did

21 not start until May 1st.

22           Does that concern anyone?  What do y'all

23 think about that?

24           DR. THURMAN:  I think it's -- it's fodder

25 for lawyers.  I think it's splitting hairs and it's

Transcription of Audio                     September 10, 2019

Page 74

1    not the real thing that we should be talking about

2    right now because --

3              LINDA SNYDER:  But this is what happened.

4              DR. THURMAN:  I know, but if --

5              LINDA SNYDER:  That's the reason he --

6              DR. THURMAN:  -- but if your interest,

7    again, is to just catch somebody in -- and worry

8    about syntax, worry about this, worry about how

9    they're stating themselves and -- and what date

10   something finally happened, yet was finally caught.

11             LINDA SNYDER:  Well, it involves you as a

12   resident.

13             DR. THURMAN:  Yes.  But residency training

14   doesn't happen that fast where you get all the

15   information that you need, and the next day you've

16   got it written up and you call them in.

17             If it was that bad, she would have removed

18   you from patient care immediately --

19             DR. SNYDER:  If Dr. Cotton --

20             DR. THURMAN:  -- and not allowed you to

21   continue from that moment.  She would have dismissed

22   you --

23             DR. SNYDER:  With the position --

24             DR. THURMAN:  -- as --

25             DR. SNYDER:  -- that Dr. -- with the

Page 75

1   position and authority that Dr. Cotton has, I am

2   quite certain that if she wanted to place me on

3   probation immediately, she could.

4           I've discussed this with Dr. Allbright.

5   She completely understands what's happened here.

6   That's a direct contradiction, placing me on

7   probation immediately, and what occurred.  That

8   contradicts whether I was really a detriment to

9   patient care.

10          LINDA SNYDER:  Yeah, that's a concern --

11          DR. SNYDER:  That doesn't make any sense.

12          LINDA SNYDER:  -- for your patients.

13          DR. SNYDER:  Any rational person can come

14  to that conclusion.

15          DR. THURMAN:  Well, what did -- so since

16  you're going down this direction, do you have a point

17  that involves what to do for the future?

18          DR. SNYDER:  Well, I'm -- I'm --

19          DR. THURMAN:  We're just still digging and

20  re-hashing the old stuff.

21          LINDA SNYDER:  Well, we're talking about

22  probation.

23          DR. THURMAN:  This is still re-hashing --

24          LINDA SNYDER:  Yeah.

25          DR. THURMAN:  -- the old stuff.  Okay.

Transcription of Audio                    September 10, 2019

Page 76

1          DR. SNYDER:  You know, let me explain.  I'm
2      just asking some questions, and I was asking for a
3      response.  If y'all don't want to give me a response
4      to that -- I think it's completely clear and
5      something that should've -- should deserve a
6      response, but if you want to move past it, we won't
7      discuss it anymore.
8          DR. THURMAN:  Well, I just -- I -- I feel
9      like there's no way that -- that -- I mean, you're
10     trying to hold any program director in the country to
11     a standard that no program director does, in terms of
12     being omniscient and omnipresent and knowing how
13     everything is going from everybody's standpoint and
14     then reacting on it immediately.
15         Dr. Cotton put that report together and did
16     the same thing that she's done with anybody who's had
17     any kind of issues with probation, and she went down
18     the same way.
19         The only thing that made your whole thing
20     separate was the not-fit-for-duty letter.  And if
21     that hadn't existed, we wouldn't be sitting here
22     today.
23         So let's -- and that -- that's not even
24     something I decided or Dr. Cotton decided.  So let's
25     get the not-fit-for-duty thing to the side and

1   that's -- that's your issues with other people.

2   That's not your issues with us.

3           But once we got that letter, we are held to

4   a standard to actually respond to that.  And that's

5   why I think starting over and getting a fit for duty

6   from Allbright, or whoever you wish to get that from,

7   is one of the pathways that we can kind of move

8   forward.

9           But I don't think it's going to do us any

10  good at this point to talk about how quickly from

11  this that this other thing started or -- you know,

12  I -- I don't think that that's --

13          LINDA SNYDER:  I guess that --

14          MS. COOPER:  Moving forward.

15          DR. THURMAN:  -- moving forward.

16          LINDA SNYDER:  -- the not fit for duty or

17  fit for duty, either one --

18          DR. THURMAN:  Yeah.

19          LINDA SNYDER:  -- report would be even

20  involved if, again, the probation was never involved

21  and if it was done appropriately to say these are

22  the -- my concerns.  You know, if you do not correct

23  these, you will be put on probation.  That was never

24  informed to Jeffrey, you know.  It was -- you know,

25  and it was never done immediately for patient care.

Page 78

1    It was, you know --

2              DR. COTTON:  The term --

3              LINDA SNYDER:  -- as -- as it's stated in

4    the handbook.

5              DR. COTTON:  In that context, the term

6    "immediate" means without that -- that period for

7    correction.

8              LINDA SNYDER:  Uh-huh.

9              DR. COTTON:  That's what that word

10   "immediate" means --

11             LINDA SNYDER:  Uh-huh.

12             DR. COTTON:  -- in that situation.

13             LINDA SNYDER:  Uh-huh.

14             DR. COTTON:  Not immediate, like tomorrow,

15   "immediate" means skipping that period.

16             DR. SNYDER:  Which I was not provided the

17   period of time --

18             DR. COTTON:  Right.

19             DR. SNYDER:  -- to resolve the

20   deficiencies.

21             DR. COTTON:  Because --

22             LINDA SNYDER:  Yeah, he never --

23             DR. COTTON:  Because the deficiencies were

24   such that providing a period -- that period of time

25   would have been inappropriate.  So you were provided

Page 79

1    with extra supervision.

2              DR. SNYDER:  I was --

3              LINDA SNYDER:  But he immediately --

4              DR. SNYDER:  -- provided a time period of

5    over probably six weeks to wait around until the

6    immediate probation started.

7              LINDA SNYDER:  Right.

8              DR. SNYDER:  That's what I was provided.

9              LINDA SNYDER:  Right.

10             DR. COTTON:  Uh-huh.

11             LINDA SNYDER:  And -- and it's supposed to

12   be done immediately, but --

13             DR. COTTON:  Well, during that time, I --

14   but -- but during that time -- I don't take these

15   decisions lightly.  I mean, these are not small

16   decisions.  Okay?

17             I consulted/talked with the other faculty

18   in the department that supervise you and made sure.

19   It's, like, "Okay, here we are.  This is what I'm

20   looking at.  So what" -- you know, how do we -- how

21   would you advise that we go forward?"

22             Because it isn't a single decis- -- I mean,

23   I represent -- I have to write the letter, but I

24   don't act all by myself.  I talk to the other people

25   that supervise you.

Transcription of Audio                    September 10, 2019

Page 80

 1              DR. SNYDER:  You're getting their opinions

 2    and advice --

 3              DR. COTTON:  Uh-huh.

 4              DR. SNYDER:  -- but you documented only

 5    concerns from yourself?

 6              DR. COTTON:  Uh-huh.

 7              DR. SNYDER:  Okay.

 8              DR. COTTON:  Uh-huh.

 9              LINDA SNYDER:  So do we follow the handbook

10    at this -- you know, through OSU residents?

11              DR. COTTON:  Uh-huh.

12              DR. THURMAN:  Uh-huh.

13              LINDA SNYDER:  We do?

14              DR. COTTON:  Uh-huh.

15              DR. SNYDER:  Okay.

16              DR. THURMAN:  That's the difference that we

17    have about the past.  I mean, we're not going to get

18    beyond that.

19              DR. COTTON:  Right.

20              DR. THURMAN:  We --

21              DR. COTTON:  I don't ever see how we -- you

22    are going to agree that you think --

23              DR. THURMAN:  We -- we feel that --

24              DR. COTTON:  -- you didn't and you feel

25    that we didn't.

Transcription of Audio                    September 10, 2019

Page 81

1          DR. THURMAN:  We feel that the handbook was

2   followed and you feel that it wasn't.  And that's not

3   an insurmountable barrier, by the way, because it

4   doesn't dictate what we do moving forward as much as

5   the way Jeffrey is -- is willing to move forward,

6   either with us or by his choice not with us.

7          But, you know, if -- if we -- if we want to

8   focus on something that we're not going to agree on,

9   that's not conducive to moving forward.  It's not

10  progress.

11          Now, I would rather --

12          LINDA SNYDER:  Well, he's willing to move

13  forward.

14          DR. THURMAN:  Okay.  So let's not focus on

15  asking us whether we followed the handbook, and you

16  feel like we didn't, because I'm going to always say

17  that we feel like we did.

18          LINDA SNYDER:  Well, the -- the reason

19  why --

20          DR. SNYDER:  Let me -- let me go and ask a

21  question.

22          DR. THURMAN:  Yes.

23          DR. SNYDER:  So do you all feel that

24  everything was handled appropriately down this entire

25  process?

Page 82

1           DR. THURMAN:  From Dr. Cotton's standpoint?

2    Yes.  But I -- but I -- I don't know -- I can't speak

3    for the EAP and the stuff at the hospital.  I mean,

4    but I just think from -- from the initial concern

5    that she had, and handling it, and putting you on

6    probation, I -- I think that that was appropriate.

7           DR. SNYDER:  On the surface --

8           LINDA SNYDER:  Do you feel that way, too,

9    Dr. Cotton?

10          DR. COTTON:  I do feel like my decision to

11   put you on probation was appropriate.

12          LINDA SNYDER:  So everything has been --

13          DR. THURMAN:  No, not every- -- I mean,

14   the -- the problem -- you know, from -- from anything

15   that we had control of --

16          LINDA SNYDER:  Uh-huh.

17          DR. THURMAN:  -- we feel like that has been

18   appropriate.

19          The -- the thing that we have no control

20   of --

21          DR. COTTON:  I don't have any qualms about

22   all that.

23          DR. THURMAN:  -- was Barnes, a report that

24   we didn't even get to see, but she had a letter

25   saying you weren't fit, or that they wouldn't share

Transcription of Audio                    September 10, 2019

Page 83

1    it with you.

2              We didn't -- that's not any -- I mean,

3    that's not in our realm.  We didn't have control of

4    any of that.  So, I mean --

5              LINDA SNYDER:  But the handbook was

6    followed?

7              DR. THURMAN:  Yeah.  From the -- from the

8    standpoint of what she did --

9              DR. COTTON:  From the probation

10   perspective.

11             DR. THURMAN:  From the probation

12   perspective, I believe.

13             I mean, that -- and that's the thing,

14   you -- you certainly feel strongly that it wasn't,

15   and that will be something that we need --

16             DR. COTTON:  I don't think we'll ever work

17   through.

18             DR. THURMAN:  -- both sides will need to be

19   able to see beyond in order to get you where you need

20   to be, in terms of -- I mean, you want to be

21   board-certified internal medicine res- -- you know,

22   trained doctor.  You want to finish your residency.

23             We're willing to see beyond that

24   disagreement about, "We feel like the handbook wasn't

25   followed and we feel like we did the right thing."

Transcription of Audio                    September 10, 2019

Page 84

1  We're willing to see beyond that and look beyond that

2  if -- as long as you are.  But I'm not so sure you

3  are because of how -- with what I'm seeing during

4  this meeting.

5          And so I would really like for you to do

6  some soul-searching and feel like what's going to

7  work best for you moving forward.

8          And if you're willing to see beyond that

9  and still continue to work with Dr. Cotton, we'll

10  have to -- she's still going to be your program

11  director.  You're going to have to come to an

12  agreement.  You have to trust her.  You have to

13  accept criticism and feedback that's negative

14  sometimes --

15          DR. SNYDER:  I'm perfectly open to that.

16          DR. THURMAN:  -- and not have a knee-jerk

17  reaction to going back to old problems and old sores

18  and old, you know --

19          DR. SNYDER:  When you don't get rational

20  explanations --

21          DR. THURMAN:  Yeah.

22          DR. SNYDER:  -- for things that have

23  occurred in the past, I believe questions are out --

24  open that have been unanswered.  That's why I asked

25  those questions.

Transcription of Audio                          September 10, 2019

Page 85

```
 1                 DR. COTTON:  Right.

 2                 DR. THURMAN:  Yes.

 3                 DR. COTTON:  Well, but when I answer the

 4     question and it doesn't satisfy you, you reask the

 5     question and I answer it the same way.  So in some

 6     ways, we're having kind of a circular conversation.

 7                 DR. THURMAN:  Yeah.

 8                 DR. COTTON:  So --

 9                 DR. THURMAN:  Yeah.  So it's --

10                 DR. COTTON:  -- I -- I don't know how to

11     get out of this circle.

12                 DR. SNYDER:  Let me -- let me say this.  I

13     have received nothing in writing from you all, up

14     until some letter you sent me without going through

15     your attorney, I believe, or OSU, Mr. Price, in

16     August, or even acknowledging my -- my attorneys as

17     well.  But I received nothing in writing recently.

18                 And in my feeling, the ball is just as much

19     in your all's court and is primarily in your all's

20     court right here.

21                 LINDA SNYDER:  It'd be nice --

22                 DR. SNYDER:  I shouldn't --

23                 LINDA SNYDER:  -- to get a letter.

24                 DR. SNYDER:  I shouldn't -- I -- I

25     shouldn't be sitting here without receiving nothing
```

Transcription of Audio                    September 10, 2019

Page 86

1    from you guys.  I mean, I feel like, to a certain

2    extent, it's like I've been abandoned.  I'm over here

3    off of work for over four months --

4            LINDA SNYDER:  Which is a long time.

5            DR. SNYDER:  -- and I know I'm here today

6    talking with you all about this, but I'm not

7    receiving anything in written --

8            LINDA SNYDER:  It's a long time to wait.

9            DR. SNYDER:  -- or writing, and I'm going

10   to go back and do some soul-searching.

11           I mean, you all might need to provide me

12   some documentation, or writing, or do some

13   soul-searching as well.

14           DR. THURMAN:  Well, I think --

15           DR. SNYDER:  It's a two-way street.

16           DR. THURMAN:  Well --

17           LINDA SNYDER:  At least let him know his

18   status --

19           DR. THURMAN:  -- the first step, though --

20           LINDA SNYDER:  -- even in writing.

21           DR. THURMAN:  -- after not hearing

22   anything, because once lawyers get involved, that

23   really affects our communication, does it not?  Back

24   and forth?  I mean, we're not all touchy-gooey and --

25   I think once lawyers get involved.

Transcription of Audio                         September 10, 2019

Page 87

1              DR. SNYDER:  Well, I mean --

2              DR. THURMAN:  So that has had --

3              LINDA SNYDER:  That was in someone's place

4      (phonetic).

5              DR. THURMAN:  I'll have to say that has

6      played some extent in it because we were waiting, in

7      some cases, on our own -- on Doug Price and -- and

8      their -- and their team to tell us what we should do

9      next, and we're not -- we weren't getting a lot of

10     feedback there.

11             So that being said, now that we've at least

12     had kind of a sit-down, face-to-face, I don't think

13     there's anything wrong with us codifying what we've

14     discussed, in terms of the pathways, into a written

15     document so you can have some evidence of that

16     documentation and then feel better about what --

17     whatever your option may be.

18             DR. SNYDER:  Well, and also --

19             DR. THURMAN:  That's completely fair.

20             DR. SNYDER:  -- also formally notify me of

21     what my status is, which I haven't received anything

22     in writing of that as well.

23             LINDA SNYDER:  Yeah.  He -- he said he

24     would document.

25             DR. SNYDER:  I know.  He's talking about in

Transcription of Audio                    September 10, 2019

Page 88

1    terms of the documentation of what options we can go

2    forward, but I would like to know what my status is,

3    too, so I can have that documented.

4         LINDA SNYDER:  That would be good.

5         DR. COTTON:  Okay.

6         DR. THURMAN:  And when -- once we get those

7    things to you, do you feel -- you know, after that,

8    how long do you feel it would be before you would

9    have a response, in terms of --

10        LINDA SNYDER:  Pretty quickly.

11        DR. THURMAN:  -- choosing one of those

12   options?

13        LINDA SNYDER:  Pretty quick.

14        DR. THURMAN:  Because I would -- I know

15   that you want to see the end of this as quickly as --

16        LINDA SNYDER:  He's been waiting for a long

17   time.

18        DR. THURMAN:  Yeah.  Well, I think that's

19   probably the best way to try to move forward.

20        LINDA SNYDER:  Uh-huh.  Sounds good.

21        MS. COOPER:  Again, thank you for trying to

22   meet and --

23        DR. THURMAN:  Appreciate it.

24        LINDA SNYDER:  Thank you for your time.

25        DR. SNYDER:  Thanks for having me.

Transcription of Audio                    September 10, 2019

Page 89

1          DR. THURMAN:  Okay.

2          LINDA SNYDER:  It was good to meet --

3          DR. THURMAN:  Thanks, man.

4          LINDA SNYDER:  -- each one of you.

5          DR. SNYDER:  It was good to see you.

6          DR. THURMAN:  Good to see you.

7          It was nice to meet you.

8          DR. SNYDER:  Give them my word?  I don't

9     want to write to these people.

10          I'll turn this off real quick.

11               (Recording ended)

12               *  *  *  *  *  *

13

14

15

16

17

18

19

20

21

22

23

24

25

Transcription of Audio                    September 10, 2019

Page 90

1                    C E R T I F I C A T E

2

3    STATE OF OKLAHOMA   )
                         )   SS:
4    COUNTY OF OKLAHOMA  )

5

6

7              I, Jana C. Hazelbaker, Certified Shorthand

8    Reporter for the State of Oklahoma, certify that the

9    foregoing audio recording was taken by me in

10   stenotype and thereafter transcribed and is a true

11   and correct transcript of the recording to the best

12   of my ability to hear the recording; that I am not an

13   attorney for nor a relative of any said parties, or

14   otherwise interested in said action.

15             IN WITNESS WHEREOF, I have hereunto set my

16   hand and seal of office on this 10th day of

17   September, 2019.

18

19

20

21

22             _____

23             Jana C. Hazelbaker, CSR #1506
               for the State of Oklahoma
24

25