## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| JEFFREY SNYDER, D.O., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CIV-16-384-F |
| | ) | |
| BOARD OF REGENTS FOR THE | ) | |
| OKLAHOMA AGRICULTURAL & | ) | |
| MECHANICAL COLLEGES, *ex rel.* | ) | |
| OKLAHOMA STATE UNIVERSITY | ) | |
| CENTER FOR HEALTH SCIENCES, | ) | |
| *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

---

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE EXPERT OPINIONS OF DR. PAUL THOMAS

---

Joshua Stockton, OBA #21833
Laura Talbert, OBA #32670
Jaklyn Garrett, OBA # 31556
**STOCKTON TALBERT, PLLC**
1127 N.W. 14th Street
Oklahoma City, Oklahoma 73106
Telephone: (405) 225-1200
Email: jstockton@stocktontalbert.com
**ATTORNEYS FOR PLAINTIFF**
**JEFFREY SNYDER, D.O.**

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................1

ARGUMENT & AUTHORITY ..........................................................................1

I.   DEFENDANTS CAUSED DR. SNYDER'S UNCERTAIN FUTURE, RENDERING THEM LIABLE FOR FUTURE DAMAGES ........................1

     A.   Defendants Discriminated Against Dr. Snyder Because of a Perceived Disability and Violated His Constitutional and Contractual Rights ...............................................................................4

     B.   Defendants Refuse to Submit Dr. Snyder's Post-Graduate Training Verification to the Oklahoma State Board of Osteopathic Examiners, Preventing Him from Becoming Licensed or Advancing to the Second Year of Residency Training ...................................................................................................6

II.   DR. THOMAS' OPINIONS ARE RELIABLE AND BASED ON ASSUMPTIONS ABOUT Dr. SNYDER'S FUTURE THAT ARE SUPPORTED BY REASONABLE FACTS ....................................................9

     A.   Dr. Snyder Desires to Return to Residency Training ......................10

     B.   Dr. Thomas' Assumption that Dr. Snyder Could Return to a Residency Program is Supported by the Facts.................................11

          1.   Dr. Snyder Satisfactorily Completed his First Year of Residency ...................................................................................12

          2.   Dr. Snyder Sought Placement in an Alternative Residency with Credit for His Satisfactorily Completed Rotations ...............................................................................16

          3.   Defendants Unlawfully Conditioned Dr. Snyder's Return to the Residency on a Waiver of his Discrimination Complaints and Appeal.....................................................18

     C.   Dr. Snyder Mitigated His Damages....................................................21

III.   DR. THOMAS' METHODOLOGY IS RELIABLE AND HIS DATA IS RELEVANT ........................................................................................23

CONCLUSION ....................................................................................................25

# TABLE OF AUTHORITIES

## Cases

*Andler v. Clear Channel Broad., Inc.,*
    670 F.3d 717 (6th Cir. 2012) ........................................................................ 24

*Artunduaga v. Univ. of Chicago Med. Ctr.,* 12 C 8733
    2016 WL 7384432 (N.D. Ill. Dec. 21, 20162) ......................................... 11, 12

*Askew v. City of Memphis, 14-CV-02080-STA-TMP,*
    2016 WL 4533587 (W.D. Tenn. Mar. 15, 2016) ......................................... 10

*Bigelow v. RKO Radio Pictures,*
    327 U.S. 251 (1946) ......................................................................................... 3

*Deyo v. Adjutant General's Dep't,*
    No. 93API12–1667, 1994 WL 425003 (Ohio Ct. App. Aug. 16, 1994).......... 24

*Goico v. Boeing Co.,*
    347 F. Supp. 2d 986 (D. Kan. 2004) .............................................................. 2

*Greene v. Safeway Stores, Inc.,*
    210 F.3d 1237 (10th Cir. 2000) ..................................................................... 2

*Gumbs v. Int'l Harvester, Inc.,*
    718 F.2d 88 (3d Cir. 1983) ............................................................................ 10

*Manpower, Inc. v. Ins. Co. of Penn.,*
    732 F.3d 796 (7th Cir. 2013) ......................................................................... 10

*McLean v. 988011 Ontario, Ltd.,*
    224 F.3d 797 (6th Cir. 2000) ......................................................................... 10

*Spulak v. K Mart Corp.,*
    894 F.2d 1150 (10th Cir. 1990) ..................................................................... 22

*Taylor v. Freedom Arms, Inc.,*
    No. CT2008–0071, 2009 WL 3863123 (Ohio Ct. App. Nov. 17, 2009) ......... 24

*Tilstra v. BouMatic LLC,*
    791 F.3d 749 (7th Cir. 2015) ......................................................................... 11

*United States v. L.E. Cooke Co.*,
   991 F.2d 336 (6th Cir. 1993) ........................................................................ 10

*Wulf v. City of Wichita*,
   883 F.2d 842 (10th Cir. 1989) ............................................................. 2, 3, 12

## **Statutes**

20 USC § 1681 ........................................................................................ 21

Okla. Stat. tit. 59, § 622(A)(1) ................................................................ 8

Okla. Stat. tit. 59, § 622(A)(2) ................................................................ 8

Okla. Stat. tit. 59, § 638(A)(1) ................................................................ 8

## <u>LIST OF EXHIBITS</u>

Ex. 1        Probation Letters

Ex. 2        Dr. Cotton Deposition Transcript ("**Cotton**")

Ex. 3        Dr. Alexopulos Deposition Transcript ("**Alexopulos**")

Ex. 4        Dr. McEachern Email

Ex. 5        Dr. Snyder Response to Cotton

Ex. 6        Dr. Hall Deposition Transcript ("**Hall**")

Ex. 7        Heavin Case Notes

Ex. 8        EEO Complaints

Ex. 9        Email from Stewart

Ex. 10       2015 Email from Price

Ex. 11       Verification Form

Ex. 12       Aquino Transcript ("**Aquino**")

Ex. 13       Application Packet

Ex. 14       Handbook

Ex. 15       Resident Staff Agreement

Ex. 16       Dr. Snyder Deposition Transcript ("**Snyder**")

Ex. 17       Dr. Thomas Report

Ex. 18       Dr. Thomas Deposition Transcript ("**Thomas**")

Ex. 19       Dr. McEachern Deposition Transcript ("**McEachern**")

Ex. 20       OSUMC Patient Safety Policies

Ex. 21        Chart of Dr. Snyder's Evaluations

Ex. 22        AOA Basic Documents

Ex. 23        Dr. Lenhart Deposition Transcript ("**Lenhart**")

Ex. 24        Email from Childers re 360 Evaluation

Ex. 25        Dr. Snyder Evaluations, June 2014

Ex. 26        Licensure Letter

Ex. 27        2016 Rotations Letter from Dr. Cotton

Ex. 28        Childers Rotations Letter

Ex. 29        Dr. Snyder Evaluations, March 2014

Ex. 30        November Options Letter

Ex. 31        Exam Scores

Ex. 32        ACOFP Resident In-Service Examination

Ex. 33        Facebook Post

Ex. 34        Medical Student Performance Evaluation

Ex. 35        Letters of Recommendation

Ex. 36        Email from Snyder to LeBoeuf

Ex. 37        Dr. Snyder's Responses to OSUMCPS

Ex. 38        New Probation Emails

Ex. 39        Involuntary Leave of Absence Letter

Ex. 40        Kannady's Request for Appeal

Ex. 41        Dr. Cotton's Appeal Letter

Ex. 42        Cooper Deposition Transcript ("**Cooper**")

Plaintiff Jeffery Snyder, D.O. ("**Dr. Snyder**" or "**Plaintiff**"), by and through his counsel of record, Stockton Talbert, respectfully responds in opposition to the Motion to Exclude the Expert Opinion of Paul Thomas, Ph.D. ("**Dr. Thomas**"), filed jointly by defendants (ECF # 353). Dr. Snyder requests the Court deny the motion and allow Dr. Thomas to testify at trial.

## INTRODUCTION

Defendants' motion to exclude Dr. Thomas is based on a one-sided, and disputed, version of Dr. Snyder's past and future. Under defendants' view, the Court should prevent the jury from performing its duty to weigh the evidence underlying Dr. Thomas' opinions and assumptions, including whether defendants unlawfully prevented Dr. Snyder from working as a licensed physician and earning a livelihood. Because Dr. Thomas' testimony is relevant, reliable, and a fit for the case, the Court should allow him to testify at trial.

## ARGUMENT & AUTHORITY

### I. DEFENDANTS CAUSED DR. SNYDER'S UNCERTAIN FUTURE, RENDERING THEM LIABLE FOR FUTURE DAMAGES

Calculations of future earning losses, by their very nature, require that assumptions be made about events that have yet to occur. Thus, such calculations are always based on predictions of future events. As the Tenth Circuit has indicated several times, defendants should not be able to avoid

liability by relying on this fact. For example, when discussing front pay, the Court noted:

> A determination of front pay requires the district court to predict future events and consider many complicated and interlocking factors, including the possibilities of promotions, demotions, terminations, changes in business circumstances, and death. These unknowable factors always make a front pay award somewhat speculative. But a defendant should not be able to take advantage of the fact that its unlawful conduct is the cause of such uncertainty.

*Goico v. Boeing Co.*, 347 F. Supp. 2d 986, 992 (D. Kan. 2004), citing *Greene v. Safeway Stores, Inc.*, 210 F.3d 1237 (10th Cir. 2000).

The Tenth Circuit allows an award of front pay, even when there is some uncertainty about the future, if the defendants are the cause of the uncertainty. In *Wulf v. City of Wichita*, a police officer filed a civil rights case following his discharge. The trial court awarded front pay of $210,177 based on a finding that the plaintiff would have continued working for 8 years after his pension vested, even though the plaintiff only testified he "possibly" would have continued working past that time. *Wulf v. City of Wichita*, 883 F.2d 842, 873 (10th Cir. 1989). The Tenth Circuit upheld the award even though it was "somewhat speculative" because the defendants, "are the cause of this

uncertainty, and they may not take advantage of an uncertainty that they have themselves created. *Wulf*, 883 F.2d at 873.[1]

The rule is on firm ground. "The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created." *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 265 (1946). While the fact finder "may not render a verdict based on speculation or guesswork", it "may make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly." *Bigelow*, 327 U.S. at 264 (internal quotations and parenthesis removed).

Defendants argue that Dr. Thomas' assumption that Dr. Snyder can be admitted to another residency program is unrealistic. Defendants ignore, however, that it is *their* wrongful conduct that had precluded Dr. Snyder from becoming licensed or obtaining admission in another residency program.[2] Thus, the Court should deny their motion.

---

[1] Dr. Snyder also seeks reinstatement to the OSU-CHS Family Medicine Residency and/or credit for his completed year of training. *See* Third Amended Complaint (ECF # 197), ¶¶ 94, 101, 112, 120, 126, 131.

[2] Defendants' effort to use Dr. Lenhart's testimony against Dr. Snyder is counterproductive. ECF # 353 at 3. Defendants are *the reason* Dr. Snyder cannot become licensed or admitted into another program with credit for his completion of 1 year of residency training, rendering them liable for future damages.

A.     **Defendants Discriminated Against Dr. Snyder Because of a Perceived Disability and Violated His Constitutional and Contractual Rights**

Dr. Snyder intends to prove at trial that it was not the phantom of "patient safety" that caused his probation and ultimate dismissal, but the perception that he was disabled. The evidence is overwhelming that starting in January 2014, Dr. Cotton (and others) began believing Dr. Snyder had a cognitive and/or behavioral condition, falsely believed he was unable to perform his duties as a resident, and wanted Dr. Snyder to undergo neurological or psychological testing because of her belief. Ex. 1, Probation Letters; Ex. 2, Cotton, 179:10-181:6-20, 185:23-186:21, 188:1-192:22, 194:12-195:15, 199:19-25; Ex. 3, Alexopulos, 67:2-70:1; Ex. 4, McEachern Email.

Dr. Snyder vehemently disputes that characterization. Dr. Snyder did not harm patients, Dr. Cotton did not repeatedly tell him that he was not performing his duties, and he was treated less favorably than residents who did cause harm to patients. Ex. 5, Snyder Response to Cotton, Interrogatory No. 5 (disputing patient safety allegations). Other residents caused patients to suffer a stroke, another to have emergency surgery, and a third to enter cardiogenic shock because they did not follow orders, directly disobeyed them, and delayed necessary care. Yet those residents did not suffer Dr. Snyder's fate. Ex. 6, Hall, 54:3-55:1, 56:21-25, 57:18-22, 62:15-22, 58:10-16, 112:11-16, 115:17-23, 116:21-117:11.

4

For the last 5 years, Dr. Snyder has consistently told the same story, never wavering from the truth. In March 2014, during the Family Medicine Teaching Service rotation at OSUMC (the only month Dr. Cotton claims he did not successfully complete), Dr. Cotton told him *one time* about a better way to prescribe certain medications, a mistake that was common for all first-year residents. From mid-March 2014 to late April 2014, when she placed him on probation, Dr. Cotton did not inform him of any other concerns over his work. Ex. 7, Heavin Case Notes; Ex. 8, EEO Complaints. Despite his concerns over the veracity of her justifications, he was willing to comply with Dr. Cotton's probation demands, including the neuropsychiatric examination but for its prohibitive cost, and submitted to its substitute, the fitness for duty evaluation so he could resume his residency training as quickly as possible. Ex.7, Heavin Case Notes.

After he was declared not fit for duty in July 2014, defendants refused to tell him why, provide him the results of his evaluation, or explain the basis for his removal from the residency program – he would not find out until much later that defendants' conspired to obtain 3 reports before getting the "not-fit" determination. Ex. 7, Heavin Case Notes.[3]

---

[3] Dr. Snyder was repeatedly denied his rights by defendants. The EAP program supervisor even noted, after seeing Dr. Snyder's treatment, that OSUMC's "apparent ignorance of the HIPAA law is concerning, especially considering they're working in HR at a hospital." Ex. 9, Email from Stewart.

Despite the uncertainty over why he was removed from his program, he continued to willingly comply with Dr. Cotton's demand he seek counseling and met each of her demands to return to the program, except her demand that he waive his constitutional and contractual right to contest his unlawful treatment. Ex. 10, 2015 Email from Price.

He actively made efforts to return to the program, which included requesting an appeal of his probation, filing discrimination complaints, and seeking alternative residency programs. Ex. 8, EEO Complaints. While those efforts were on-going, he was dismissed from the program because of "abandonment" without a prior letter or phone call from those he entrusted with his post-graduate medical education. Ex. 2, Cotton, 317:18-20, 319:13-18; Ex. 3, Alexopulos, 57:4–64:12. Thus, the Court and/or jury could find the blame for any uncertainty surrounding Dr. Snyder's future lays at their feet.

**B.   Defendants Refuse to Submit Dr. Snyder's Post-Graduate Training Verification to the Oklahoma State Board of Osteopathic Examiners, Preventing Him from Becoming Licensed or Advancing to the Second Year of Residency Training**

In 2014, toward the end of Dr. Snyder's first year of residency training, Dr. Cotton and/or Dr. Alexopulos refused to submit Dr. Snyder's post-graduate training verification form to the Oklahoma State Board of Osteopathic Examiners, a refusal that continues to this day. Ex. 11, Verification Form; Ex. 2, Cotton, 105:15–107:3. Preventing Dr. Snyder's licensure was one of Dr.

Cotton's professed goals when placing Dr. Snyder on probation, even though she admits it was beyond her authority because it is a power reserved for the Oklahoma State Board. Ex. 1, Probation Letters; Ex. 2, Cotton,107:13-21. Dr. Cotton would have provided the Postgraduate Verification Form to the Board, but only if Dr. Snyder resigned from her program first. Ex. 2, Cotton, 311:6-314:5.[4]

Dr. Cotton and/or Dr. Alexopulos' actions violated the Board's rules, practices, and procedures, which require residency programs to submit training verifications to the Board, who alone is responsible for deciding whether a physician may be licensed. By their conduct, Dr. Cotton and Dr. Alexopulos not only prevented Dr. Snyder from a hearing by an independent and neutral body, they also prevented him from becoming licensed to practice medicine as a physician. Ex. 12, Aquino, 5:3-19, 9:3-13, 12:16-23, 13:13–15:13, 19:14-16, 21:25–23:1, 25:4-26:10, 37:2-38:19, 39:20-40:11, 41:19-20, 42:1-21, 47:2-8; Ex. 13, Application Packet.

Under the Oklahoma Osteopathic Medicine Act, it is "unlawful for any person to practice as an osteopathic physician and surgeon in this state, without a license to do so, issued by the State Board of Osteopathic

---

[4] For additional facts regarding Defendants' interference with Dr. Snyder's licensure, *see* Dr. Snyder's Combined Response to Motion for Summary Judgment of the Board of Regents, Dr. Cotton, and Dr. Alexopulos (ECF # 376) at p. 6-12.

Examiners[.]" Okla. Stat. tit. 59, § 622(A)(1). A resident "engaged in postgraduate training beyond the internship year, also known as PGY-1, shall be licensed." Okla. Stat. tit. 59, § 622(A)(2). Practicing Osteopathic Medicine without a license issued by the State Board of Osteopathic Examiners is a felony punishable by up to 4 years in prison and/or a $10,000 fine. Okla. Stat. tit. 59, § 638(A)(1).

By placing Dr. Snyder on probation and refusing to submit his training verification form, Dr. Cotton and/or Dr. Alexopulos also prevented Dr. Snyder from advancing to the second year of a residency program. Ex. 14, Handbook, p. 28 ("No resident shall be afforded a new contract while on probation."); Ex. 15, Resident Staff Agreement, ¶ 6.2. Thus, while a 2nd year residency contract was signed by OSUMC for Dr. Snyder dated April 4, 2014 (which was prior to Dr. Snyder's probation effective May 1, 2014), the effect of preventing him from becoming licensed was to also prevent him from ever becoming a second-year resident. Ex. 16, Snyder, 437:14-23. The Court should not allow defendants to avoid liability for future damages when it is defendants' conduct that caused them. The Court should find that Dr. Thomas' opinions are admissible at trial and deny the motion.

## II.   DR. THOMAS' OPINIONS ARE RELIABLE AND BASED ON ASSUMPTIONS ABOUT DR. SNYDER'S FUTURE THAT ARE SUPPORTED BY REASONABLE FACTS

To assess the reliability of Dr. Thomas' opinion, the Court must assess whether he conducted a reasonable application of his technique or theory to the facts of the case, or whether he is impermissibly basing his opinion on *unrealistic* assumptions that are *completely* unsupported by the facts. *See, e.g., Gumbs v. Int'l Harvester, Inc.*, 718 F.2d 88, 98 (3d Cir. 1983). If there is evidence in the record that provides support for Dr. Thomas' assumptions, they are admissible. The subsequent determination of the *accuracy* of these assumptions becomes the job of the trier of fact.

"An expert's opinion, where based on assumed facts, must find some support for those assumptions in the record." *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000). "The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact . . . ." *Manpower, Inc. v. Ins. Co. of Penn.*, 732 F.3d 796, 806 (7th Cir. 2013). "However, mere 'weaknesses in the factual basis of an expert witness' opinion . . . bear on the weight of the evidence rather than on its admissibility.'" *McLean*, 224 F.3d at 801, quoting *United States v. L.E. Cooke Co.*, 991 F.2d 336, 342 (6th Cir. 1993).

9

Thus, the Court should allow expert testimony regarding future lost earnings, even if there is conflicting evidence, because "the weaknesses in the bases of [an expert's] opinion, including his assumptions regarding [the plaintiff's] line of work and when he would start that career path, bear on the weight of his testimony and can be challenged at trial through cross-examination." *Askew v. City of Memphis*, 14-CV-02080-STA-TMP, 2016 WL 4533587, at *9 (W.D. Tenn. Mar. 15, 2016), *aff'd, Askew v. City of Memphis*, 14-CV-02080-STA-TMP, 2016 WL 2757435 (W.D. Tenn. May 12, 2016) (allowing expert testimony regarding future lost earning capacity of an airline mechanic).

Dr. Thomas' damage model assumes Dr. Snyder will obtain a re-entry into graduate medical education starting in July 2020. Ex. 17, Thomas Report. Defendants argue that Dr. Snyder would not have finished the family medicine residency program, any other residency program, or received his license, even immediately after his first year of residency. They argue that any such assumptions on the part of Dr. Thomas would be "impermissibly speculative." ECF # 353, pg. 7. The Court should reject their argument.

## A.    Dr. Snyder Desires to Return to Residency Training

In *Artunduaga v. University of Chicago Medical Center*, the court found that even when an expert's assumptions are only supported by a party's own declarations, it does not make them unreliable, and that "despite the

10

Defendant's suggestion to the contrary, 'an expert witness is not required to verify all the facts on which he relies.'" *Artunduaga v. Univ. of Chicago Med. Ctr.*, 12 C 8733, 2016 WL 7384432, at *4 (N.D. Ill. Dec. 21, 2016), quoting *Tilstra v. BouMatic LLC*, 791 F.3d 749, 753 (7th Cir. 2015). Thus, an expert may rely on a party's statement of his future intentions.

Dr. Thomas communicated with Dr. Snyder about the events in his case, and Dr. Snyder told him that he expected to continue in the program into his second and third year of residency. Ex. 18, Thomas, 17:13–25.[5] Thus, Dr. Thomas could assume base his damage model on the assumption that Dr. Snyder desires to return to his residency training and would have completed it and become licensed but for Defendants' conduct. Courts do not require more. *See Wulf*, 883 F.2d at 873.

## B. Dr. Thomas' Assumption that Dr. Snyder Could Return to a Residency Program is Supported by the Facts

In *Artunduaga*, the court also found that a Court should not exclude expert testimony when there is support for an expert's assumptions in the record. In that case, the defendants argued that a terminated resident's

[5] Dr. Thomas also reviewed Dr. Snyder's Third Amended Complaint before writing his report, which also contain Dr. Snyder's stated desires to complete a residency program and become licensed. Ex. 17, Thomas Report. The Third Amended Complaint indicates that Dr. Snyder expected to complete all three years of the family medicine residency program and become a licensed, practicing physician, and that it was only because of the Defendants' wrongful acts/omissions that he was prevented from doing so. ECF # 197, ¶¶ 23, 24, 63, 66, 67, 85, 86, 87, and others.

expert's opinions were "unreasonable and/or speculative" when the expert assumed the resident would successfully completed the a residency program in six years, be admitted to and successfully completed a fellowship in two years, pass her licensing exams, find a lucrative job as a plastic surgeon in the U.S., and hold that job continuously until her retirement at age 72, among others. *Artunduaga v. Univ. of Chicago Med. Ctr.*, No. 12 C 8733, 2016 WL 7384432, at *4 (N.D. Ill. Dec. 21, 2016).

The court refused to exclude these opinions because they had support in the record. For example, the court found that there was evidence that the plaintiff had a successful academic history, held research positions, and received numerous honors and awards. Based on these facts, the court concluded that "there is a factual record supporting the assumption that Plaintiff would have passed her licensing exams." *Artunduaga,* 2016 WL 7384432 at *6. The same is true in this case.

### 1.    Dr. Snyder Satisfactorily Completed his First Year of Residency

The parties vigorously dispute the veracity of Dr. Cotton and Dr. Alexopulos' claims against Dr. Snyder, including the allegations Dr. Cotton raised against Dr. Snyder in the probation letter that he endangered patient safety. Ex. 5, Snyder Response to Cotton, Interrogatory No. 5 (providing specific factual disputes for each incident). Dr. McEachern, his Associate

Program Director, admits Dr. Snyder was never a direct threat to a patient, nor did he cause a patient harm. Ex. 19, McEachern, 33:1-5; Ex. 2, Cotton, 161:24-162:1.

Dr. Snyder was never reported to the Risk Management Committee of OSUMC for any patient safety concerns, which would violate OSUMC's policies and procedures if the allegations were true, despite Dr. Alexopulos' admonition to all residents, "when in doubt, report." Ex. 2, Cotton, 161:18-23; Ex. 6, Hall 105:20–106:15; Ex. 20, OSUMC Patient Safety Policies. Dr. Snyder undoubtedly made mistakes during his residency, as all residents do - mistakes were so common for first-year residents that they occur on a "daily" basis. Ex. 2, Cotton, 146:3-147:1, 169:11-170:3; Ex. 6, Hall, 69:9–70:12. According to Dr. Cotton, however, Dr. Snyder was not dismissed from the program due to patient safety concerns and could have returned to the program. Ex. 2, Cotton 310:19-312:22.[6]

Based on the record, the jury could find that Dr. Snyder satisfactorily completed his first year of residency. Dr. Snyder participated in and received satisfactory scores on his monthly rotation evaluations during his first year.

---

[6] Defendants failed to give Dr. Snyder the competency evaluations given to other residents that would have proven, or disproven, their claim that he was not competent, which violates their accreditation guidelines. Ex. 22, AOA Basic Documents, p. 49, ¶ 8.3, 8.4; Ex. 2, Cotton, 81:5-14; Ex. 23, Lenhart, 137:15-138:8; Ex. 24, Email from Childers re 360 Evaluation; Ex. 25, Snyder Evaluation, June 2014.

Ex. 16, Snyder, 432:9-441:16; Ex. 21, Chart of Dr. Snyder's Evaluations. None of Dr. Snyder's monthly preceptor rotations, which were completed by more than a dozen separate supervising physicians, rated Dr. Snyder as "unsatisfactory." Ex. 21, Chart of Dr. Snyder's Evaluations. As of March 2014, Dr. Alexopulos believed Dr. Snyder was qualified for licensure without reservation. Ex. 26, Licensure Letter. According to his supervising physicians, Dr. Snyder demonstrated respect and professionalism throughout his residency, while other residents who graduated did not.[7]

Even Dr. Cotton admits that Dr. Snyder satisfactorily completed 11 of 12 rotations during his first year. Ex. 27, 2016 Rotations Letter from Dr. Cotton. There is only one rotation Dr. Cotton claims Dr. Snyder did not successfully complete, which was his March 2014 rotation on the Family Medicine Teaching Service at OSUMC. Ex. 28, Childers Rotations Letter. During that rotation, Dr. Snyder received a satisfactory evaluation in March 2014 from Dr. McEachern, the Associate Program Director, who rated Dr. Snyder overall as "Average" and complimented his progress during the first quarter of 2014. Ex. 29, Snyder Evaluations, March 2014. Dr. Cotton offered

---

[7] Ex. 19, McEachern, 76:20–77:16 (noting Dr. Snyder put forth effort, was polite and respectful, and had rapport with his patients); Ex. 6, Hall, 84:3– 88:12; 181:22–182:23 (claiming Dr. Snyder was shy and did not identify with other residents on a social level, but that she did not observe professionalism issues as she has with other residents).

to tell others that Dr. Snyder "successfully completed" all 12 rotations, including the March 2014 rotation, had Dr. Snyder simply resigned from her program. Ex. 30, November Options Letter.

The record also reflects that Dr. Snyder passed his relevant clinical examinations that were administered by neutral third parties. Dr. Snyder passed his COMLEX Exams I, II, and III, which test a resident's clinical abilities and knowledge. Ex. 31, Exam Scores. Dr. Snyder also passed his Resident In-Service Examination, a test administered by the American College of Osteopathic Family Physicians ("**ACOFP**"), a professional medical association. Ex. 32, ACOFP Resident In-Service Examination. Defendants even publicly listed him as a second-year resident. Ex. 33, Facebook Post.

Finally, Dr. Snyder has a long history of academic success in his undergraduate studies, medical school, and residency. Dr. Kayse Shrum, the Dean of OSU-CHS, confirmed Dr. Snyder's academic successes at the conclusion of his medical school tenure. Ex. 34, Medical Student Performance Evaluation. She noted Dr. Snyder received academic awards as an undergraduate at Oklahoma City University and received several compliments and/or commendations throughout medical school rotations. Ex. 34, Medical Student Performance Evaluation. Ex. 35, Letters of Recommendation. Thus, there is evidence in the record to support Dr. Thomas' assumptions that Dr. Snyder may return to a residency program.

> **2.    Dr. Snyder Sought Placement in an Alternative Residency with Credit for His Satisfactorily Completed Rotations**

Dr. Thomas' assumption Dr. Snyder could find placement in an alternate residency program is also supported by other evidence. First, OSU-CHS itself considered Dr. Snyder qualified for its residency program, both at the time it admitted him in 2013 and even when it dismissed him in 2015. Dr. Cotton testified that the sole reason she dismissed Dr. Snyder from the program was because he had abandoned his position – and not, as defendants now imply, because he was not qualified for the program. Ex. 2, Cotton, 310:19-312:22.

Second, Dr. Snyder was qualified for any osteopathic residency program at the time he graduated from medical school, as is any osteopathic medical school graduate who has successfully completed all their class requirements and passed their COMLEX I Exam. He remained qualified at the time he finished his first year in the family medicine residency and could have transferred to another program.

Third, as defendants discuss in their motion, Dr. Snyder sought admission to another residency program at OSU in a different medical specialty, radiology, instead of withdrawing his complaints and appeal. ECF # 353, pg. 13. Around January 2015, as instructed by Doug Price, an attorney for the Board of Regents, Dr. Snyder contacted Mr. Jeffrey LeBoeuf, the Executive Director of the Osteopathic Medical Education Consortium of Oklahoma

16

("**OMECO**"), to transfer into a different residency program, Radiology, within OSU. Ex. 36, Email from Snyder to LeBoeuf.

Thereafter, Dr. Snyder was told by LeBoeuf that it would be possible for him to transfer into the Radiology residency program to continue his residency training. Dr. Snyder's request to transfer to a different residency program was communicated to Price. Snyder, through his attorney, notified Price that he was willing to return to the Residency Program in a different residency program. Dr. Snyder repeatedly attempted to return to the Residency Program and/or transfer to another Residency Program, but OSU-CHS refused to allow it. Ex. 37, Snyder Responses to OSUMCPS, Interrogatory Nos. 7, 8.[8]

Given this record, the Court and/or jury could conclude that Dr. Snyder would have either finished his family medicine residency program or another residency program and become a licensed physician but for defendants' unlawful conduct. How much weight to afford that evidence, as well as how much weight to afford Dr. Thomas' opinions themselves, are determinations reserved for the jury. The Court should allow Dr. Thomas to testify.

---

[8] Nor should Dr. Snyder be forced to lose credit for his first year of training Ex. 16, Snyder, 779:2-23 (discussing transfer to another residency, which is different than the "match", which is for 4th year medical students or people getting an entry level position, such as just starting the 1st year of a residency); 627:15-628:19 (explaining the "match" and "scramble" is designed for applicants looking for a entry level starting positions at the beginning of a residency program, not residents like Dr. Snyder who have already completed a year of residency).

### 3.   Defendants Unlawfully Conditioned Dr. Snyder's Return to the Residency on a Waiver of his Discrimination Complaints and Appeal

Defendants also argue in their Motion that Dr. Thomas' opinions are unreliable because he was not aware that Dr. Snyder "had been given the option to return to the Residency Program or transfer to another residency program with the assistance of OSU." ECF # 353, pg. 12. While partially true, Defendants omit a critical and material detail: that they conditioned Dr. Snyder's "option" to return to the residency program on him withdrawing his discrimination complaints and request to appeal his probation.

Dr. Cotton, Dr. Alexopulos, Dr. Thurman, and Dr. Hall placed Dr. Snyder on "immediate" probation starting May 1, 2014, for events Dr. Cotton alleges occur in mid-March 2014. Ex. 1, Probation Letters; Ex. 38, New Probation Emails. Dr. Cotton and Dr. Alexopulos placed Dr. Snyder on an involuntary leave of absence on July 3, 2014. Ex. 39, Involuntary Leave of Absence Letter. In November 2014, Dr. Cotton wrote a letter to Dr. Snyder (with the assistance of the Board of Regents' counsel) about his options following his probation and involuntary leave of absence. Ex. 30, November Options Letter. In the letter, Dr. Cotton gave Dr. Snyder the option of returning to residency program if he provided a confirmation of his fitness for duty. Ex. 30, November Options Letter, Option 1(A). She then stated:

> By returning to duty you waive any complaints or appeals you may
> have regarding your status as an OGME 1 and agree to continue
> in the program from the point you left.

Ex. 30, November Options Letter, Option 1(B).[9]

Previously, Dr. Snyder attempted to appeal his probation through counsel, but Dr. Cotton refused to consider it. Ex. 40, Kannady's Request for Appeal; Ex. 41, Cotton's Appeal Letter.[10] By November 2014, Dr. Snyder had also submitted several internal discrimination complaints to OSU, including to Dr. Rosalyn Green, OSU's Title IX Officer; to Sandy Cooper ("**Cooper**"), a Vice President of Human Resources with responsibilities over OSU-CHS; and to Burns Hargis, the President of OSU, whose staff directed that the university respond to Dr. Snyder. Ex. 8, EEO Complaints. Dr. Green initially agreed to assist Dr. Snyder, but later returned his file based on the false, and unlawful, claim that she did not have jurisdiction over his complaints. Ex. 8, EEO Complaints.[11]

---

[9] While defendants claim this letter does not state Dr. Snyder was required to waive his EEO complaints, the Court should find that claim; it is contradicted by the letter's unambiguous language. *See* OSUMC Motion for Summary Judgment (ECF # 333) at 46-47. Notably, the letter is written in the disjunctive. If it only referred to Dr. Snyder's request for an appeal, why the need to write the word "complaint" at all?

[10] Dr. Snyder moved the Court for partial summary judgment because this denial violated his contractual and due process rights. *See, e.g.,* Dr. Snyder's Motion for Partial Summary Judgment (ECF # 335) at 20-21; Dr. Snyder's Combined Response to the Board, Cotton, and Alexopulos (ECF # 376) at 23-36.

[11] Dr. Green's refusal to investigate Dr. Snyder's complaints violated Title IX of the Educational Amendments of 1972 ("**Title IX**"), 20 U.S.C. § 1681, *et seq.*

Cooper did the same. After agreeing to investigate his complaints of discrimination, Cooper met with Dr. Cotton and Dr. Alexopulos in September 2014 to interview them as part of her investigation. She consulted with Doug Price, the attorney for the Board of Regents, and a decision was made (by someone other than Cooper) that she was to stop her investigation. Instead, Cooper attended the November 2014 meeting where Dr. Cotton presented Dr. Snyder with his "options", which Dr. Cotton would then confirm in writing. The handwritten notes Cooper took during her meetings with Dr. Cotton and Dr. Alexopulos are missing, which she discovered after the lawsuit was filed. Ex. 42, Cooper, 55:19-21,57:7-9, 58:19-59:7, 62:25-64:15, 65:12-71:15, 81:1-82:2, 82:19-83:2, 85:16-86:25, 126:6-15; Ex. 30, November Options Letter (conditioning return on withdrawal of complaints and appeal). Dr. Snyder declined to return to the residency program under Option 1 because it conditioned his return on a waiver of his protected rights. Ex. 10, 2015 Email from Price. Defendants would then use this refusal to claim Dr. Snyder "abandoned" the residency program because he declined to waive his complaints and appeal.

The jury could find that Defendants unlawfully attempted to strong arm Dr. Snyder into giving up his right to contest his discriminatory treatment and seek credit for the rotations he had already successfully completed, and then used their wrongful conduct as a basis to dismiss Dr. Snyder for pretextual

reasons. The legitimacy of Dr. Snyder's reasons for not accepting these "offers" will undoubtedly be a factual dispute at trial, and their resolution will inform the jury's decision about whether Dr. Snyder met his duty to mitigate his damages. Because Dr. Thomas' opinions are based on proper assumptions, the Court should allow him to testify.

## C.   Dr. Snyder Mitigated His Damages

The Court should not exclude Dr. Thomas' opinions because of his assumption that Dr. Snyder mitigated his damages. Instead, the Court should allow the jury to resolve whether defendants can meet their affirmative defense. "When the defendant employer claims the employee has failed to mitigate, the employer must satisfy a two-prong test: '(1) there were suitable positions which the claimant could have discovered and for which she was qualified, and (2) the claimant failed to use reasonable care and diligence in seeking such a position." *Entrada v. Marriott Hotel Servs., Inc.,* Case No. CIV-15-322-C, at ¶2 (W.D. Okla. Nov. 7, 2016). An employee's duty is to "take reasonable steps under the circumstances" to minimize damage. *Spulak v. K Mart Corp.,* 894 F.2d 1150, 1158 (10th Cir. 1990). The employee needs to make a "reasonable and good faith effort and is not held to the highest standards of diligence." *Id.* (citation omitted).

Defendants must show Dr. Snyder had suitable positions he was qualified for and that he failed to use reasonable care to obtain them. They can

21

show neither. First, Defendants have failed to articulate which *comparable* positions Dr. Snyder was qualified for. According to defendants now (though not at the time), Dr. Snyder is not qualified for *any* comparable positions, which defeats their claim he failed to mitigate his damages. Defendants refused to provide Dr. Snyder with his post-graduate training verification form, causing Dr. Snyder to forgo any chance of obtaining a medical license unless he either gave up his legal rights to contest his treatment or sacrifice the year he spent training. Ex. 16, Snyder, 210:7-213:7. Thus, defendants have not shown that Dr. Snyder failed to mitigate damages.

Second, Defendants cannot show Dr. Snyder lacked good faith or was unreasonable for requesting his verification form be submitted to the Oklahoma State Board, credit for his first year of residency, or transfer to another residency. Dr. Snyder has taken efforts to mitigate his damages in good faith but has struggled to find a position because Dr. Cotton and/or Dr. Alexopulos interfered with his application for licensure, which has prevented Dr. Snyder from practicing medicine.[12]

---

[12] Ex. 16, Snyder, 201:10–202:14, 211:24–212:12, 216:5–226:2, 224:3-225:25(discussing efforts to find other employment and the significance of the lack of a verification form for licensure and lawfully continuing employment), 593:13–596:15, 595:3-596:13(discussing attempts to reenter OSU residency program and apply to transfer to another residency program at OSU), 779:2-23, 1178:8-14 (discussing attempts to transfer into radiology residency with OSU through communications between Snyder, LeBoeuf, Kannady, and Price).

Despite these hurdles, Dr. Snyder searched for potential employment job positions though the osteopathic opportunities website, looked up available handbook requirements for job applicants, searched residency websites in Oklahoma, reviewed requirements for job positions by reading handbook policies from employers/school defendants, reviewed emails referencing the licensure requirements for one to continue training after the first year of residency.[13] Thus, the Court should not exclude Dr. Thomas.

## III.   DR. THOMAS' METHODOLOGY IS RELIABLE AND HIS DATA IS RELEVANT

Defendants request the Court exclude Dr. Thomas from testifying because his opinions are not based on relevant data. ECF # 353 at 9-11. Defendants are mistaken. The statistical numbers that Dr. Thomas utilizes in his calculations and report are from the U.S. Bureau of Labor Statistics. Ex. 17, Thomas Report. These are well-established and often relied upon by economics experts. "When calculating earning-capacity factors such as projected salary and years in the workforce, experts often consult actuarial tables, Bureau of Labor Statistics figures, or other averages along with the

---

[13] Ex. 37, Snyder's Responses to OSUMCPS, LLC, Interrogatory No. 8; Ex. 16, Snyder, 210:7-213:7 (discussing resume and impact of refusal to submit verification form on continuation of residency training and future employment as a physician); at 213:8-215:23 (discussing post-graduate training verification form); at 216:24-218:16 (discussing attempts/efforts to find other employment, significance of verification form for licensure and lawfully continuing employment); at 268:16-271:13, 595:6-18(discussing verification form and impact on licensure).

plaintiff's historical earnings." *Andler v. Clear Channel Broad., Inc.*, 670 F.3d 717, 728 (6th Cir. 2012). *See also Taylor v. Freedom Arms, Inc.*, No. CT2008–0071, 2009 WL 3863123, at *3 (Ohio Ct. App. Nov. 17, 2009); *Deyo v. Adjutant General's Dep't*, No. 93API12–1667, 1994 WL 425003, at *6 (Ohio Ct. App. Aug. 16, 1994).

In this case, Dr. Snyder is in a unique position in that he does not really have "historical earnings" or a "work history" because he was in the first year of post-graduate medical education. At the time he was dismissed from the residency program, he had spent nearly the whole of his adult life in school, pursuing his career as a physician. Therefore, Dr. Thomas' reliance on nationally accepted statistical averages to calculate both projected salary and probability of employment in Dr. Snyder's case was reliable, necessary, and justified. Further, the use of average salaries for both "family and general practitioners" and "physicians and surgeons," were both appropriate. Dr. Snyder would have been a member of both groups, but for Defendants' wrongful acts and omissions.

Defendants appear to argue in their Motion that it was inappropriate for Dr. Thomas to rely on these numbers because they are not sufficiently representative of Dr. Snyder's unique position. According to defendants, these numbers are not relevant to Dr. Snyder because they include other types of doctors that would make more money than a doctor practicing family medicine

24

and are not representative of Dr. Snyder's actual chances of getting hired as a physician. The Court should reject these arguments.

The reason experts routinely rely on the U.S. Bureau of Labor Statistics is because it is unrealistic, if not impossible, to calculate individualized numbers that track precisely a single, unique individual's salary level and probability of employment over their lifetime. Theoretically, such a determination would require surveys of all potential employers of that individual, mock interviews, constantly updated information on the viability and hiring capacity of potential employers' companies, and more. Instead, statistics are used. The reason why this type of damage model is used so frequently is because they create a reliable and certain model that can be applied to all kinds of individuals in different cases. The numbers for "family/general practitioners" and "physicians/surgeons" are based on licensed, reporting categories across the U.S., both competent and not. Thus, they are representative of the average likelihood that any member of these groups will find and engage in work. Dr. Snyder would have been a member of these groups but for Defendants' unlawful conduct. Dr. Thomas used a reliable methodology.

## CONCLUSION

Dr. Thomas' opinions are admissible and reliable because they are based on assumptions that are supported by relevant facts in the record. Therefore, the Court should not exclude any of Dr. Thomas' expert testimony.

Respectfully submitted,

**JEFFREY SNYDER, D.O.**,
Plaintiff, by and through:

Joshua Stockton, OBA # 21823
Laura Talbert, OBA # 32670
Jaklyn Garrett, OBA # 31556
**STOCKTON TALBERT, PLLC**
1127 N.W. 14th Street
Oklahoma City, OK 73106
Phone: (405) 225.1200
Email: jstockton@stocktontalbert.com
**ATTORNEYS FOR PLAINTIFF**

## <u>CERTIFICATE OF SERVICE</u>

I certify that on December 9, 2019, I filed the attached document with the Clerk of Court. Based on the records currently on file in this case, the Clerk of Court will transmit a Notice of Electronic Filing to those registered participants of the Electronic Case Filing System.

JOSHUA STOCKTON