```
 1            IN THE UNITED STATES DISTRICT COURT
             FOR THE WESTERN DISTRICT OF OKLAHOMA
 2

 3   JEFFREY SNYDER, D.O.,       )
     an individual,             )
 4                              )
                 Plaintiff,     )
 5                              )
     vs.                        ) NO. CIV-16-384-F
 6                              )
                                )
 7   BOARD OF REGENTS FOR THE   )
     OKLAHOMA AGRICULTURAL &     )
 8   MECHANICAL COLLEGES, ex rel.,)
     OKLAHOMA STATE UNIVERSITY  )
 9   CENTER FOR HEALTH          )
     SCIENCES, et al.,          )
10                              )
                 Defendants.    )
11

12

13


14         DEPOSITION OF LORA DIANNE COTTON, D.O.

15         TAKEN ON BEHALF OF THE PLAINTIFF

16            IN OKLAHOMA CITY, OKLAHOMA

17              ON AUGUST 5, 2019

18

19        REPORTED BY:  JANA C. HAZELBAKER, CSR

20

21

22

23

24

25
```



EXHIBIT
2

Lora Cotton, DO                                    August 5, 2019

Page 81

1     A    No.  I keep -- formal documentation, I put
2  in the resident file.
3     Q    What about informal documentation?
4     A    No.
5     Q    When you're filling out a quarterly
6  evaluation, for example, and you reference some prior
7  concerns that maybe a supervisory physician had
8  raised about a resident, how do you remember what
9  they said?
10    A    Yeah.  Well, the -- that evaluation, they
11 happen frequently enough.  At this time, it was
12 quarterly, now it's twice a year.  But, you know,
13 remembering within a three-month period is -- is
14 pretty easy to do.
15    Q    I guess --
16    A    Especially something as unusual as a phone
17 call about a resident performance.
18    Q    So how common were those, I guess?
19    A    Uncommon.
20    Q    Okay.  How many residents, during the last
21 five years, do you think you've received a phone call
22 like that?
23    A    Within what time period?
24    Q    The last five.
25    A    Five years?  Maybe -- outside of Jeffrey

Lora Cotton, DO                                      August 5, 2019

Page 105

1    or procedure that exists that you've seen or are

2    aware of that relates to what your role is, in terms

3    of providing information to the Oklahoma State Board

4    of Osteopathic Examiners?

5          A    No.

6          Q    Have you ever received any training

7    relating to what your role is or should be relating

8    to that process?

9          A    No.

10         Q    Have you ever provided training to any

11   other physician relating to that process?

12         A    No.

13         Q    Or any other administrative staff?

14         A    No.

15         Q    What is your understanding of your role in

16   that process?

17         A    I receive a form, and on it I document if

18   the resident completed their training at my residency

19   program.  And there are some follow-up questions that

20   I answer, based on the resident's experience while

21   they were there.

22         Q    Do you believe that it's your obligation to

23   provide that form to the Oklahoma State Board for

24   every resident in your program?

25         A    It is my responsibility to fill that out

Lora Cotton, DO                                  August 5, 2019

Page 106

1    and send it.

2         Q    You did not do that for Jeffrey Snyder?

3         A    I did not.

4         Q    And my understanding is that that's the

5    only resident for whom you have refused to submit a

6    licensure application to the Oklahoma State Board.

7         A    Correct.

8         Q    Why?

9         A    At the time that that verification was

10   given to me to fill out, if I had filled it out

11   honestly where the situation was, he would not have

12   received his license.

13             I was delaying filling that out until he

14   had successfully completed his first year of

15   residency so that I could fill it out in such a way

16   that he would receive his license.

17        Q    Okay.  Did you consult with anyone about

18   that decision prior to making it?

19        A    No.

20        Q    Did you talk to Dr. Thurman about it?

21        A    Not to my -- not that I recall.

22        Q    Talk to Dr. Alexopulos about it?

23        A    Not that I recall.

24        Q    Talk to Sunny Benjamin about it?

25        A    No.

Lora Cotton, DO                                    August 5, 2019

                                                         Page 107

 1        Q    Or Debby Nottingham?

 2        A    No.

 3        Q    Or anyone within the OSU or OSUMC human

 4   resources or administrative personnel?

 5        A    No.

 6        Q    When did you make that decision?

 7        A    I don't recall a moment.  I do recall when

 8   the form was -- I mean, I don't even recall when I --

 9   how I got the form.  I don't know if Dr. Snyder

10   handed it to me or it came in interoffice mail.  I

11   don't recall how it came to me, so I don't recall a

12   moment.

13        Q    You're not the person who decides whether

14   doctors get licensed in the state of Oklahoma?

15        A    I'm not -- I -- no.  No, I'm not the Board,

16   huh-uh.

17        Q    You don't have that power?

18        A    No.

19        Q    That power is with an independent third

20   party outside of you or OSU?

21        A    Correct.

22        Q    And the form that you fill out for

23   residents allows you to specifically mention

24   probation, for example?

25        A    Right.

Lora Cotton, DO                                    August 5, 2019

Page 146

1    bit and talk about the program, in terms of

2    evaluation of residents generally.

3              It is a teaching hospital?

4    A    Yes.

5    Q    That -- and you're training residents the

6    proper way to conduct assessments of patients?

7    A    Yes.

8    Q    The differential diagnosis?

9    A    Yes.

10   Q    The workup and goals of patient care?

11   A    Yes.

12   Q    And trying to provide them a practical

13   education and planning a path to reach the goals of

14   care?

15   A    Correct.

16   Q    And this is, typically speaking, the first

17   time that a doctor has provided patient care

18   following medical school?

19   A    Correct.

20   Q    As part of that evaluation, residents are

21   going to make mistakes?

22   A    Yes.

23   Q    And it would be -- is it fair to say that

24   it's common for a resident to make mistakes relating

25   to patient care?

Lora Cotton, DO                              August 5, 2019

                                                    Page 147

1       A    Yes.

2       Q    The times that residents do make mistakes,

3   you're careful to make sure that you note that to the

4   resident?

5       A    Yes, we discuss it.

6       Q    You do so in writing?

7       A    Not always.

8       Q    How do you make that decision about when to

9   put in writing a resident's mistake relating to

10  patient care?

11      A    Based on the frequency of an error being

12  made, the severity of an error being made.  Yeah.

13      Q    Any other criteria?

14      A    I think that would summarize it.

15      Q    And do you consult any written sources

16  about when to put a mistake by a resident in writing

17  as opposed to not?

18      A    No.

19      Q    Are there any that exist, as far as you

20  know?

21      A    Not that I know of.

22      Q    The evaluation of residents, within the

23  Family Medicine Program, you do use the

24  New Innovations report for that evaluation?

25      A    For some.  That is one of the methods that

Lora Cotton, DO                          August 5, 2019

                                              Page 161

1   patient care mistakes that had an adverse impact on

2   the patient to anyone?

3        A    We do have a risk -- there is risk.  What

4   do they call it?  Quality -- quality department?

5   There's a risk officer that you talk to, yeah.

6        Q    At the time of Jeffrey Snyder's residency,

7   do you remember who that was?

8        A    Martha Dixon.

9        Q    And did you ever discuss Jeffrey Snyder

10  with Martha Dixon?

11       A    I don't believe so, no.

12       Q    What is the purpose of having a quality

13  department and risk officer?

14       A    To deal with adverse outcomes.  Or you

15  notice, like -- that a process is setting us up for

16  making an error, like, unable to catch an error, you

17  would want to point that out.

18       Q    If a resident caused an adverse reaction in

19  a patient due to a mistake that they made, would it

20  be your obligation to report that to the quality

21  department?

22       A    If there was patient harm, I definitely

23  would.

24       Q    Jeffrey Snyder never caused patient harm?

25       A    I don't know if some of his decisions did

Lora Cotton, DO                                    August 5, 2019

                                                        Page 162

 1  or did not.

 2        Q     Did you ever investigate whether they did?

 3        A     Not with the quality department.  I mean, I

 4  saw a case out, you know, as far as that goes.

 5        Q     Did you ever ask a patient whether any

 6  treating decision Jeffrey Snyder made caused them an

 7  adverse reaction or actual harm?

 8        A     No.

 9        Q     You didn't identify Jeffrey Snyder as

10  having caused any actual harm to a patient?

11        A     I identified some risk behaviors that I

12  thought could set up increased risk.

13        Q     Yeah, could lead to actual harm --

14        A     Absolutely.

15        Q     -- but none that actually occurred in the

16  present?

17        A     There were -- there was the case of the

18  patient who received Benzodiazepine and was

19  excessively sedated the next day.

20              I was concerned that use of that

21  Benzodiazepine could have contributed to that.  So

22  that was a teaching point.

23        Q     Jeffrey Snyder isn't the only resident who

24  has ever made a dosing or medication error relating

25  to Benzodiazepine.

Lora Cotton, DO                                    August 5, 2019

                                                        Page 169

1        A      I don't recall.

2        Q      Do you think it's a serious issue if a

3    resident fails to take the work seriously?

4        A      Yes.

5        Q      Do you think it's a serious issue if a

6    resident forgets to add all the details to a note?

7        A      Yes.

8               MR. CHILDERS:  Same request as it relates

9    to this resident in the protective order.

10              MR. STOCKTON:  Sure.

11       Q      (By Mr. Stockton) Do residents often have

12   trouble with their clinical judgment?

13              MR. CHILDERS:  Object to the form.

14              THE WITNESS:  That is a function of

15   residency training is to increase one's abilities in

16   clinical judgment.

17       Q      (By Mr. Stockton) So almost every resident

18   who's passed through that program has had trouble

19   with clinical judgment and learning the process?

20       A      I wouldn't say "trouble."  No, I would not

21   say every resident has trouble.

22       Q      Every resident is on a learning curve,

23   certainly?

24       A      Yes.

25       Q      Some residents take longer than others to

Lora Cotton, DO                                    August 5, 2019

                                                   Page 170

 1   get to where they need to be?

 2       A    Yes.  They start at different points and

 3   they do move at different rates.

 4       Q    If you told a resident to take some

 5   immediate action, what would you expect?

 6       A    If I told them to take some immediate

 7   action?  I would expect them to do it.

 8       Q    Okay.  Generally speaking, the word

 9   "immediate" means something quickly, right?

10       A    I think it means to follow.  I don't think

11   it necessarily means speed in all regards.

12       Q    When we're talking about patient care and

13   whether something should be done quickly or

14   immediately, time is usually of the essence.  It's a

15   legal phrase, but time's important when you're

16   treating patients?

17       A    Yeah, there are times when time is very

18   important.

19       Q    And if you told a patient -- I'm sorry, a

20   resident to do something and they waited a month to

21   do it, would you think that was immediate in relation

22   to patient care?

23            MR. WHATLEY:  Object to the form of the

24   question.

25            THE WITNESS:  I guess I would need to know

Lora Cotton, DO                          August 5, 2019

Page 179

1    bit broader than that.

2         A    Oh, okay.

3         Q    So at any point in time during Dr. Snyder's

4    residency, did you believe that he might have a mood

5    or neurologic impairment?

6         A    Yes.

7         Q    Did you believe that he might have

8    cognitive and/or emotional barriers?

9         A    Yes.

10        Q    And when -- the mood or neurologic

11   impairment, what did you believe he had?  What did

12   that reference?

13        A    Well, I couldn't be -- I mean, I try to not

14   diagnose residents, even when they're having

15   problems, but I am a physician so I'm always

16   observing and I'm always trying to find a way for

17   residents to progress.

18             So -- so while not -- you know, I'm unable

19   to examine him or ask him questions, but,

20   observationally, some of the behaviors that I saw

21   that might be interfering, taking excessive notes,

22   not -- you know, kind of multi-tasking when someone's

23   talking to him, like taking a lot of notes instead of

24   making eye contact or asking follow-up questions.

25             I thought that was an odd behavior,

Lora Cotton, DO                                     August 5, 2019

Page 180

1    especially when -- after given some feedback that he

2    might want to look at the patient more as he

3    interviews.  That had me concerned about -- about if

4    there was some obsessive-compulsive component with

5    unable -- unable to do it in a different way.  I

6    didn't know if that was there or not, but I saw a

7    behavior that was difficult -- he seemed to be

8    resistant to change.

9        Q    Other than an obsessive-compulsive

10   component, did you believe that any other type of

11   mood or neurologic impairment may have existed with

12   Jeffrey Snyder?

13       A    The -- the not following through on verbal

14   instructions or not being able to gather an accurate

15   medical history from a patient made me concerned.

16   It's, like, did he have an auditory-processing

17   concern where -- you know, difficulty understanding

18   the -- a verbal communication?

19            I did have some concern about that, just

20   based on what I observed from him interviewing a

21   patient and then the history -- what he would report

22   wasn't the same as what the next physician would

23   gather and report.

24            And then be -- being given specific

25   instructions and then not doing what was said, or

Lora Cotton, DO                                    August 5, 2019

Page 181

1    doing the opposite of what was said, and then denying

2    that the first instructions that were given to him

3    were what they were.  So that made me concerned about

4    auditory processing.

5         Q    What type of auditory processing conditions

6    exist?  Like, what could it be?

7         A    I am not an expert in auditory processing,

8    so I can't give you any subtypes about that.

9         Q    Okay.

10        A    I just noticed that he wasn't -- that

11   verbal communication seemed to be an area that was

12   very difficult.

13        Q    And you believe that these issues had a

14   tendency to limit his ability to do his job?

15        A    Yes.

16        Q    And you made decisions based on your

17   belief?

18        A    I made decisions based on the fact that his

19   patient care was poor, not on the belief of what was

20   making it poor.

21        Q    Other than auditory processing issues and,

22   potentially, OCD, did you believe that Jeffrey Snyder

23   could have had any other mood or neurologic

24   impairment?

25        A    I -- those were two specific ones that I

Lora Cotton, DO                                    August 5, 2019

                                                           Page 185

1    perceived disability?

2         A    No.

3         Q    Ever?

4         A    No.

5         Q    The first resident you mentioned -- and I'm

6    bad with the names today, but --

7         A    Aliyeah Ayadpoor.

8         Q    Aliyeah.  Is she a current resident?

9         A    No.

10        Q    She graduated?

11        A    She graduated.

12             MR. CHILDERS:  Defendants again -- I don't

13   know if I need to keep doing this --

14             MR. STOCKTON:  You don't, absolutely.

15             MR. CHILDERS:  -- but I just want to make

16   sure that we've got a -- it's extremely important,

17   obviously, for the -- you know, the confidentiality

18   of these residents, so I'll probably -- indulge me --

19   put it on the record.  But we designate, as it

20   relates to Haskins and Ayadpoor, regarding putting

21   that under the terms of the protective order.

22             MR. STOCKTON:  Sure.

23        Q    (By Mr. Stockton) When was the first time

24   that you came to believe that Dr. Snyder had some

25   sort of mood or neurologic impairment?

Lora Cotton, DO                                        August 5, 2019

Page 186

1              MR. WHATLEY:  Object to the form.

2              MR. CHILDERS:  I'll join in the objection.

3              THE WITNESS:  I think in January, when I

4    worked with him pretty closely on the family medicine

5    teaching service, as I supervised him was when I

6    started kind of putting together, layering the

7    different comments and different things that had been

8    reported to me up to that point.  And then I really

9    saw and observed for myself how that was playing out.

10   I think that that cumulative information caused me to

11   start to be concerned that there might be a barrier

12   there.

13        Q    (By Mr. Stockton) Would that have been --

14   in January 2014, would that have been the first time

15   that you had that extensive of an interaction with

16   Jeffrey Snyder on a monthly rotation?

17        A    Yes.  I had supervised him in clinic on a

18   few days, but not -- but that one week when I -- when

19   you supervise teaching service for a week, it's very

20   intensive interaction, case after case after case,

21   so --

22        Q    And up and to that point, Dr. Snyder had

23   been evaluated by other supervisory physicians,

24   correct?

25        A    Yes.

Lora Cotton, DO                                    August 5, 2019

                                                        Page 188

1       Q    Do you recall any type of oral

2   communication with Dr. Lewis about Jeffrey Snyder's

3   performance?

4       A    I don't recall.

5       Q    During January, you received an e-mail from

6   Dr. McEachern relating to Jeffrey Snyder?

7       A    Yes.

8            (Whereupon, Plaintiff's Exhibit Number 7 was

9   marked for identification purposes and made a part of

10  the record.)

11      Q    (By Mr. Stockton) I'm going to hand that to

12  you.  Let me know when you've had a chance to look at

13  it.

14           MR. CHILDERS:  This is OSUMC 278, for the

15  group.

16           THE WITNESS:  Okay.

17      Q    (By Mr. Stockton) Looking at this document,

18  it is an e-mail dated January 23rd, 2014, that was

19  sent from Dr. McEachern to you with the subject line

20  "Resident Performance."

21      A    Yes.

22      Q    And it references Jeffrey Snyder?

23      A    Yes.

24      Q    At the time you received this e-mail from

25  Dr. McEachern, had you discussed with her any

Lora Cotton, DO                                    August 5, 2019

                                                    Page 189

1    concerns that she had relating to Jeffrey Snyder's

2    performance before this e-mail?

3          A    Yes.

4          Q    Okay.  How often?

5          A    I don't recall the specific day or

6    anything, but she -- she's associate program director

7    of the program at this point, and so she and I worked

8    very closely on all aspects of the residency at this

9    time.

10              She had talked to me about these similar

11   concerns, and I specifically asked her if she would

12   please e-mail me with the concerns.

13         Q    Okay.  And was that within a few days of

14   the e-mail -- you receiving the e-mail, as far as you

15   know?

16         A    I really don't remember.  It was in close

17   proximity, but I don't remember how close.

18         Q    And when she talked to you about the

19   concerns that she had, prior to sending the e-mail,

20   where were you when that conversation took place?

21         A    I don't recall.

22         Q    Did you make any notes?

23         A    No.

24         Q    The e-mail that she sent you references

25   some concerns that she apparently had about

Lora Cotton, DO                                    August 5, 2019

                                                        Page 190

1    Dr. Snyder's communication style.

2         A    Yes.

3         Q    It mentions that she thinks that he

4    "struggled with patient interaction, rarely made eye

5    contact, was robotic, stiff, insensitive and

6    uninterested."

7              Do you see that?

8         A    Yes.

9         Q    Are those conditions or behaviors that

10   would correlate to any mood or neurologic impairment

11   that you thought Dr. Snyder may have?

12        A    Yeah.  They're very general behaviors that

13   you would notice, but they could be indicative of a

14   wide variety of things.

15        Q    Okay.  Such as what?

16        A    Depression, autism, OCD.  It could just be

17   none of those things, it could just be a

18   communication style.

19        Q    Looking down towards the bottom,

20   Dr. McEachern asks you how we can help Jeffrey

21   Snyder, and I'm paraphrasing.

22        A    I'm sorry, which paragraph are you

23   paraphrasing?

24        Q    If you go three paragraphs up from the

25   bottom, it starts, "The other concern is he showed

Lora Cotton, DO                                  August 5, 2019

Page 191

1   lack of initiative."

2        A    Okay.

3        Q    Looking through -- and I'll give you time

4   to just read that paragraph.

5        A    Okay.

6        Q    Dr. McEachern mentions, "How can we help

7   him?"

8        A    Uh-huh.

9        Q    And then the last sentence also says, "If

10  you have any suggestions for how else I could help

11  him, please let me know."

12            Did you respond to this e-mail?

13       A    Not in writing.

14       Q    Okay.  Did you verbally?

15       A    I don't recall.

16       Q    What practice, procedure or change did you

17  institute in order to help Jeffrey Snyder deal with

18  these perceived communication deficits?

19       A    I did not make a plan.

20       Q    The final sentence of that paragraph we

21  were looking at says, "Could he have a learning

22  disability, or psychiatric condition, or behavioral

23  issue that inhibits connecting with other people and

24  attention to detail?"

25            Do you see that?

Lora Cotton, DO                                    August 5, 2019

                                                    Page 192

 1        A     I do see that question.

 2        Q     Is that question something she raised to

 3   you in your verbal conversation prior to her sending

 4   this e-mail?

 5        A     Yes.

 6        Q     And what did you say when she said that?

 7        A     I said -- I told her I had observed

 8   similarly and that it is possible.

 9        Q     And so you believed, as of January 23rd,

10   2014, that it was possible that Dr. Snyder had a

11   learning disability?

12        A     That is when I started to be concerned that

13   there may be some aspects of that that are

14   prohibiting his progression.

15        Q     On that date, you believed he may have a

16   psychiatric condition or other behavioral issue?

17        A     Uh-huh.

18        Q     Yes?

19        A     Yes.

20        Q     And in response to that belief, you didn't

21   do anything?

22        A     Not at that time.

23        Q     When is the first time that you took any

24   action in relation to your belief about his mental

25   health condition?

Lora Cotton, DO                                    August 5, 2019

                                                        Page 194

1    did you use a different term?

2         A    I don't recall.

3         Q    Do you recall what he said in response?

4         A    He recalled that he had never had any

5    concerns like that in the past.

6         Q    Other than discussing Dr. Snyder's -- your

7    belief about Dr. Snyder's potential learning

8    disability or psychiatric condition with

9    Dr. McEachern, did you discuss it with anyone else in

10   the January time frame?

11        A    Not that I recall.

12        Q    Throughout Dr. Snyder's residency, did you

13   discuss whether Dr. Snyder had a learning disability,

14   or psychiatric condition, or behavioral issue with

15   anyone else besides Dr. McEachern?

16        A    I'm trying to think.  Well, during his

17   probationary period, I did voice my concerns when I

18   was talking to Dr. Alexopulos and with human

19   resources, during those conversations, but I did have

20   concerns about that.

21        Q    The conversation with human resources, is

22   that referring to the conversation you had with Sunny

23   Benjamin that we've already talked about?

24        A    And Debby Nottingham, yeah.

25        Q    Debby Nottingham, was she present for that

Lora Cotton, DO                                    August 5, 2019

                                                        Page 195
 1    same meeting in which --
 2         A    I'm not talking -- I'm talking about, in
 3    general, that I know that I did talk about that there
 4    may be barriers here.  I don't recall a specific --
 5    what specific meeting or meetings that that was.
 6    It's just been too long.
 7         Q    Okay.  So of the individuals who had any
 8    involvement in Dr. Snyder's residency, you spoke
 9    about his potential learning disability, psychiatric
10    condition or behavioral issue with Dr. Alexopulos,
11    Sunny Benjamin and Debby Nottingham?
12         A    And Andrea McEachern.
13         Q    And Andrea McEachern.
14              Was there anyone else?
15         A    Not that I recall.
16         Q    When did you speak with Dr. Alexopulos
17    about that?
18         A    That was just when I was thinking about the
19    probationary -- like, how to deal -- after my
20    observations in March, where I didn't see any
21    progression from his performance in January to March,
22    and was trying to formulate an appropriate response
23    to the situation, it was at that point when --
24    late -- mid, late March, early April.
25         Q    That you went and spoke with

Lora Cotton, DO                                    August 5, 2019

                                                        Page 199

     1       Q    Supervision and evaluation?

     2       A    Yes.

     3       Q    Did you feel like it was important to go

     4    talk to her about Dr. Snyder?

     5       A    Yes.  She represents the GME committee.

     6       Q    And serves as the DME for the hospital?

     7       A    Correct.

     8       Q    Dr. Snyder was in a medical education

     9    residency, correct?

    10       A    Correct.

    11       Q    At OSUMC where she served, right?

    12       A    Correct.

    13       Q    And as far as you recall, she was

    14    supportive of your belief that he needed to have

    15    neurological and psychological testing?

    16       A    She was supportive of a plan that would

    17    help him find any barriers that he could work on so

    18    that he could progress.

    19       Q    When you discussed your concerns about his

    20    barriers, did you tell her that you thought that he

    21    should be referred to neurological or psychological

    22    testing?

    23       A    Yes.

    24       Q    And she was supportive of that?

    25       A    Yes.

Lora Cotton, DO                                August 5, 2019

Page 310

1   conditioned Dr. Snyder's return to the residency

2   program based on him withdrawing his complaint of

3   gender or disability discrimination?

4          MR. CHILDERS:  Object to the form.

5          THE WITNESS:  No.

6      Q   (By Mr. Stockton) Do you think that would

7   have been prohibited?

8      A   Absolutely.

9      Q   And you knew that at the time that you

10  wrote this letter?

11     A   Yeah, I'm aware that that's a civil right,

12  and so you can't have someone contract out of a civil

13  right.

14     Q   Option 2, the resignation from OSU Family

15  Medicine Residency.  You offered to allow Dr. Snyder

16  to choose this if he, again, offered a fit for duty

17  from a psychologist, correct?

18     A   Correct.

19     Q   And had he done so and resigned

20  immediately, then you would have provided prospective

21  program directors and employers this statement that's

22  listed under Option 2, Paragraph B?

23     A   Correct.

24     Q   Do you believe that that statement was true

25  on November 13th, 2014?

Lora Cotton, DO                                    August 5, 2019

                                                        Page 311

 1        A     I would have -- I would have provided that

 2     statement, yes.

 3        Q     My question was a little bit different than

 4     that.

 5        A     Okay.

 6        Q     Do you believe -- did you believe, as of

 7     November 13th, 2014, that Dr. Snyder successfully

 8     completed 12 months of OGME 1 rotation training from

 9     June 1st, 2013, through June 30th, 2014?

10             MR. WHATLEY:  Object to the form.

11             MR. CHILDERS:  I'll join the objection.

12             THE WITNESS:  Yeah, I would have attested

13     to that, yes.

14        Q     (By Mr. Stockton) Okay.  Did you think it

15     was true when you wrote it?

16        A     I had my doubts about it.

17        Q     Okay.  Why were you willing to tell people

18     that Dr. Snyder had successfully completed 12 months

19     of OGME 1 rotation training?

20        A     Because if he had gone to another

21     residency, that residency would have an opportunity

22     to assess Dr. Snyder's competency and decide how many

23     of those rotations they would accept of his first

24     year of residency.  And that would be something for

25     them to determine.

Lora Cotton, DO                                    August 5, 2019

                                                        Page 312

 1            So there was going to be another program

 2    director somewhere who would accept him into the

 3    program.  He would be in the program for some period

 4    of time.  They would make an assessment at some time

 5    whether he was -- they were going to say he was a --

 6    to advance to PGY 2 status, whether he could be

 7    licensed.

 8            So someone else was going to have further

 9    assessment, so that is why I felt safe about

10    providing this.

11            But, at that point, successfully completed

12    12 months was something -- I'd already said he'd only

13    successfully completed 11.  So for my program, if

14    he's going to stay with me, it's 11, and he's going

15    to need to add an additional rotation month.

16            For another program, they'll assess the

17    situation and decide how many additional months he

18    needs, as far as to move from one to two.

19       Q    But you were making a representation, were

20    you not, about Dr. Snyder's rotation completion at

21    your program when you wrote that sentence?

22       A    Yes.

23       Q    And you intended that, had Dr. Snyder

24    elected this option, that other people in third

25    parties would have been told that Dr. Snyder had

Lora Cotton, DO                                    August 5, 2019

                                                        Page 313

1    successfully completed those rotations?

2         A    Yes.

3         Q    And did you know at the time that you wrote

4    that sentence that he would still not be able to be

5    licensed by the State of Oklahoma, absent a new

6    evaluation from a new program?

7         A    If he had chosen to resign, I would have

8    filled out his verification form.

9         Q    Did you --

10        A    And I would have put "probation," and

11   then -- then it's -- because -- you know, at that

12   point there's no way, no time for me to create a

13   better story for him, a better experience for him.

14   That would be the resolution of my training

15   responsibility with him.

16        Q    Had Dr. Snyder resigned from your program,

17   you would have submitted the postgraduate

18   verification form to the Oklahoma State Board of

19   Licensure?

20        A    Yes.

21        Q    Did you tell him that?

22        A    No.

23        Q    Did you tell anyone else that?

24        A    No.

25        Q    Did you think it was appropriate for you to

Lora Cotton, DO                                  August 5, 2019

Page 314

1   condition your submission of that form on

2   Dr. Snyder's resignation from the program?

3        A    I think that that question misrepresents my

4   intention of what I said, so I'm not going to say yes

5   to that.

6        Q    Did you -- strike that.

7             The third option for Dr. Snyder was

8   dismissal from the OSU Family Medicine Residency

9   Program.

10       A    Uh-huh.

11       Q    And you said that this would occur if the

12  program didn't receive a fit-for-duty statement by

13  the date stated, and that it would be subject to

14  appeal, et cetera.

15       A    Uh-huh.

16       Q    Looking down at the similar statement that

17  you would make in the event of a dismissal as opposed

18  to a resignation, you omitted the word

19  "successfully," correct?

20       A    Correct.

21       Q    And why?

22       A    I do not recall the reason why.

23       Q    Do you recall whether it was a intentional

24  choice?

25       A    I do not recall.

Lora Cotton, DO                                    August 5, 2019

                                                        Page 317

    1        Q     Was it Vi Le?

    2        A     That sounds right.

    3        Q     Steve Stephens, Vi Le.  What other

    4   attorneys do you recall being present for this

    5   meeting?

    6        A     I don't remember if Doug Price was there or

    7   not.  That's all I can recall.

    8        Q     Do you recall saying anything during this

    9   meeting?

   10        A     I did speak during the meeting.

   11        Q     Do you recall what you said?

   12        A     I don't recall exactly what I said.

   13        Q     Do you recall generally what you said?

   14        A     Generally, was that this position -- a

   15   resident not training in this position keeps me from

   16   being able to recruit into that position.  I'm only

   17   approved for a certain number.

   18              I also felt like I wasn't hearing any

   19   intention from Dr. Snyder to return, had not heard

   20   anything through his attorney about his intention to

   21   return, and it had been a number of months and I felt

   22   like that we were at a dead end and that there was no

   23   indication that he was going to return.  And he was

   24   not -- he could have resigned, but he didn't resign,

   25   so he was making a non-choice.

Lora Cotton, DO                                    August 5, 2019

Page 319

1        A     Yes.

2        Q     Did you believe that claiming that

3    Dr. Snyder had abandoned his position as opposed to

4    you firing him from it, had any consequence

5    procedurally or otherwise?

6              MR. CHILDERS:  Object to the form.

7              THE WITNESS:  No.

8        Q     (By Mr. Stockton) Why didn't you call him

9    up and ask him if he wanted to come back?

10       A     Because my attorney had already spoken to

11   his attorney about that, and I don't think direct

12   communication at that point would be appropriate.

13       Q     Were you ever told that Dr. Snyder had

14   indicated that he did not want to return to the

15   program?

16       A     That specific statement was not related to

17   me.  It was related to me that he wanted to be placed

18   in a radiology residency.

19       Q     Do you have an understanding that

20   Dr. Snyder is currently suing to return to the

21   program?

22       A     That is not -- yeah, I mean, I'm aware that

23   that has been in some of the requests.

24       Q     You know that that's something he's asking

25   as part of this lawsuit?