## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

|  |  |  |
|---|---|---|
| JEFFREY SNYDER, D.O., an individual, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No.: CIV-16-384-F |
| BOARD OF REGENTS FOR THE OKLAHOMA AGRICULTURAL & MECHANICAL COLLEGES, *ex rel.*, OKLAHOMA STATE UNIVERSITY CENTER FOR HEALTH SCIENCES, *et al.*, | ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## PLAINTIFF'S RESPONSES TO DR. LORA
## COTTON'S FIRST SET OF INTERROGATORIES

**INT. NO. 1:** Identify and describe with specificity the facts and/or information that

supports your claim that Defendant Cotton was **required** to complete your Postgraduate

Training Verification form.

**RESPONSE:** Dr. Cotton is the Program Director of the OSU Family Medicine

Residency Program. According to the American Osteopathic Association (AOA), "The

Basic Documents for Postdoctoral Training" makes clear that as Director of Medical

Education, Dr. Alexopulos is accountable for supervising all aspects of the OSU Family

Medicine Residency Program and for supervising Dr. Cotton, the Residency Program

Director. The 2 (two) Page "Postgraduate Training Verification" Form (Verification) is

part of the around 25 page "Oklahoma Osteopathic Physician and Surgeon License

Application Packet", and the Verification Form is a required component to complete an

1

EXHIBIT
5

During Plaintiff's first year of residency from July 1, 2013 through June 30, 2014, all his monthly rotation evaluations he received were satisfactory.  None of these monthly evaluations were marked as "unsatisfactory", and each of these monthly evaluations were signed and submitted by Dr. Cotton.

Additionally, as shown by Dr. Cotton's November 13, 2014 letter, Dr. Cotton confirmed that Plaintiff had successfully completed all twelve rotations of the first-year of the residency program. Accordingly, Dr. Snyder possessed all educational requirements to be a second-year resident and to have finished his first-year of the residency program.

**INT. NO. 4:** Identify and describe with specificity the facts and/or information that supports your claim that by the end of June 2014, you had *successfully* completed all requisite monthly rotation necessary to move on to your second year of the Residency Program as alleged in paragraph 42 of your Second Amended Complaint.

**RESPONSE:** Please see Plaintiff's objection and response to Int. No. 3.  As discussed in response to Int. No. 3, Dr. Cotton conceded that Plaintiff had successfully completed 12 monthly rotations, but refused to credit Plaintiff with all 12 rotations if Plaintiff did not resign his employment. Plaintiff's own experience in completing the twelve rotations, and his observation and belief that he successfully completed all twelve rotations, supports his claim that he successfully completed all twelve rotations.

**INT. NO. 5 *[INT. NOS. 5-6]*:** Identify and describe with specificity each instance in which Defendants Cotton and Alexopulos provided false information regarding you to Dr. Barnes or any other third party. Your answer should specifically identify and delineate the acts or omissions you attribute to Defendant Cotton and Defendant Alexopulos and

11

include the date(s) of the communication(s), the name(s) of any witness(es) to the communication(s) and the substance of the communication(s).

**RESPONSE:** Objection.   The interrogatory constitutes at least two discrete subparts.  A request for collateral witnesses is a separate discrete subpart.  ***See Ulibarri v. City & County of Denver***, 2008 U.S. Dist. LEXIS 93270, *5 (D. Colo. Nov. 10, 2008).

***RESP. INT. NO. 5:*** Plaintiff further objects to the request as unduly burdensome in that Plaintiff may not know at this stage of each and every instance he was provided false information regarding Plaintiff to Dr. Barnes or any other third party.  Plaintiff will provide the information to which he is currently aware:

Dr. Cotton and/or Dr. Alexopulos made statements indicating the Plaintiff engaged in inappropriate behavior that could harm patients.  These statements are false.

Around January 2014, Dr. McEachern, a physician for the Employers/School Defendants, commented to Dr. Cotton, the Residency Program Director, that the Plaintiff has a disability.  It is false that the Plaintiff has a disability.  This is when, to Plaintiff's knowledge, Dr. Cotton began making comments about the Plaintiff having a neurological or other medical condition.  It is false that the Plaintiff has a neurological or other medical condition.  During Plaintiff's Residency Program, Dr. Cotton made false comments and engaged in conduct indicating to the Plaintiff that she (Dr. Cotton) perceived Plaintiff as having a mental disability.  Around April 2014, Dr. Cotton made false comments indicating Plaintiff needed "counseling/testing" related to having a "mood or neurologic impairment," that Dr. Snyder had other cognitive impairments, and that Plaintiff should "undergo neuropsychiatric testing to assess for a component of a behavioral health, auditory

processing or other neurologic disorder." This false information was shared through correspondence with Dr. Alexopulos, who is accountable for supervising all aspects of the OSU Family Medicine Residency Program and for supervising Dr. Cotton, as well as Deby Nottingham, Sr. Human Resources Representative for the Employers/School Defendants, and Sunny Benjamin, Chief Human Resources Officer/Executive Director of Human Resources for the Employers/School Defendants. Both Ms. Nottingham and Ms. Benjamin acted at the direction of or on behalf of Dr. Cotton and Dr. Alexopulos, and all four of these individuals condoned and/or participated in numerous unlawful violations towards the Plaintiff. Ms. Nottingham and Ms. Benjamin consistently and collaboratively cooperated in understanding and agreement with Dr. Cotton and Dr. Alexopulos of perceiving the Plaintiff as having a disability and relaying this mindset and viewpoints to the CommunityCare Employee Assistance Program (EAP), who then subsequently referred the Plaintiff to Dr. Leslie Barnes.

Around the end of April 2014, Dr. Cotton corresponded with Dr. Alexopulos, Ms. Nottingham, and Ms. Benjamin, and Dr. Cotton communicated false statements indicating Plaintiff needed "counseling/testing" related to having a "mood or neurologic impairment," that Dr. Snyder had other cognitive impairments, and that Plaintiff should "undergo neuropsychiatric testing to assess for a component of a behavioral health, auditory processing or other neurologic disorder." This false claim of the need for neuropsychiatric testing was communicated by Ms. Nottingham and Ms. Benjamin at the direction and on behalf of Dr. Cotton and/or Dr. Alexopulos to third party individuals at the CommunityCare Employee Assistance Program (EAP), such as Jessica Heavin, Steve

13

Stewart, Terry Stover, and Dr. Jim Cage. Around May 8, 2014, Jessica Heavin documented the following "At approx 11:15am, received a PC from Deby Nottingham and Sonny Benjamin w/ OSU HR {speaker phone w both)." Ms. Heavin continued in documenting that "Sonny stated the attending physicians are "pushing" for a neuro psych test and she is not sure they will be ok w/ a FFD". Also, Jessica Heavin writes to Terry Stover, Senior Manager of the EAP, in an email on May 8, 2014 that "I have recommended a fitness for duty evaluation but the attending physicians are pushing for a neuro psych eval; the HR supervisor is concerned about violating ADA." It is interesting to note that the HR supervisor, Deby Nottingham, is "pushing for a neuro psych eval" on behalf of the attending physicians, such as Dr. Cotton and Dr. Alexopulos, even though she is consciously aware and concerned that they are violating the Americans with Disabilities Act (ADA). The false and inappropriate information from these attending physicians regarding the need for neuropsychiatric testing/evaluation, despite there being no medical necessity, was also communicated to Steve Stewart, CommunityCare EAP Supervisor, and Dr. Jim Cage, Vice President of Behavioral Health Care Services at Community Care.

Also, the April 22, 2014 letter of communication from Dr. Cotton and shared with third parties, including the CommunityCare EAP and Dr. Barnes, was full of false information about the Plaintiff, including Dr. Cotton's statement that the Plaintiff has "a deficit of knowledge and judgment". This false statement by Dr. Cotton was similarly reflected in Dr. Barnes' June 29, 2014 1st addendum that alleged the Plaintiff had "poor medical judgement" as "expressed by the attending physician", and it was again referenced in Dr. Barnes' 2nd addendum that alleged the Plaintiff had "problems with medical

14

judgement". Thus, it is clear that false information from Dr. Cotton was provided and utilized by third parties.

In addition, the Case Summary from the EAP, sent to Dr. Barnes, was based on the false information they were provided through correspondence from Dr. Cotton and/or Dr. Alexopulos, or Ms. Nottingham and/or Ms. Benjamin, as well as through the April 22, 2014 probation letter communicated from Dr. Cotton. The Case Summary to Dr. Barnes included a "summary of the concerns that were reported by OSU to EAP", which was based upon false information derived out of the April 22, 2014 probation letter of allegations from Dr. Cotton. Also, the EAP Case Summary to Dr. Barnes states further false information including that the Plaintiff "could have resulted in serious harm or death".

To Plaintiff's knowledge and belief, around July 1, 2014, Dr. Cotton communicated additional and false information to Dr. Barnes regarding Plaintiff's performance as a resident and Dr. Barnes used this information, in conjunction with other false information communicated such as from the April 22, 2014 probation letter from Dr. Cotton, to determine Plaintiff was not fit to continue his duties as a medical resident.

There is a document dated June 30, 2014 that references "Examples of issues observed" pertaining to the Plaintiff on 2 days listed, "6/24/14" and "6/28/14". This document contains false information that was communicated to third parties, including the CommunityCare EAP and Dr. Barnes, by Dr. Cotton and/or Dr. Alexopulos, or Ms. Nottingham and/or Ms. Benjamin acting on their behalf. This document was not openly shared with the Plaintiff and was not uncovered from the Employers/School Defendants until an Open Records Request was made under the Oklahoma Open Records Act. In the

15

July 3, 2014 meeting, designated to remove the Plaintiff from program duties, the Plaintiff asked Dr. Cotton how she felt the Plaintiff had performed on his recent rotations. In response to the Plaintiff's question, Dr. Cotton declared to the Plaintiff that she was not going to talk about that, despite Dr. Cotton recently documenting the June 30, 2014 information that was communicated to third parties around July 1, 2014. On or around October 3, 2014, Remsen Beitel, legal counsel for the CommunityCare EAP, sent a letter to Chris Kannady, attorney for The Plaintiff, and Mr. Beitel stated that there is "a one-page letter dated June 30, 2014, which the EAP advises me OSUMC sent to Dr. Barnes, but also copied the EAP". This June 30th document has no fax information or identifying information on it to see who created the document or who it was sent to. On the other hand, the Plaintiff knows that the attending physician responsible for supervision of residents including the Plaintiff on the 2 days listed on this June 30, 2014 document was Dr. Cotton. Since the Plaintiff's referral to the EAP and during the Plaintiff's probation in May and June 2014, he only worked with Dr. Cotton for a few days while the Plaintiff worked with around 10 other attending physicians during those two months. Since Dr. Cotton knew she was not authorized to communicate in any form with Dr. Barnes, Dr. Cotton presumably felt it would be acceptable to deceptively not identify or sign her name to the information that she wanted communicated to influence Dr. Barnes. Dr. Barnes' findings from the completed report that had already been submitted to the Employers/School Defendants revealed that the Plaintiff has no "psychological dysfunction warranting immediate intervention" and "no indications of somatic, cognitive, emotional, thought, behavioral or interpersonal dysfunction". The June 30, 2014

16

information that was provided to Dr. Barnes, as confirmed by the CommunityCare EAP, was not shared with the Plaintiff and Plaintiff was not given the opportunity to respond to the information and accusations made against him.

The June 30th document included false information, exaggerations, was misleading and deceptive, and contained concealments/omissions of relevant information to the given context. This June 30th document was provided to Dr. Barnes around when Dr. Barnes was also provided an April 22, 2014 probation letter from Dr. Cotton, which included a wide arrange of false information, including that the Plaintiff was "detrimental to patient care" and so warranted "immediate probation" for events that occurred about 6 weeks prior to the probation starting May 1, 2014. Dr. Cotton's "detrimental to patient care" statement against the Plaintiff is completely false, absurd, and outrageous. Also, the Probation Procedure from the "Oklahoma State University Family Medicine Residency Handbook" was contractually breached by Dr. Cotton, which reveals the false and dishonest nature of her "detrimental to patient care" fabrication. This June 30, 2014 information was provided to Dr. Barnes to deceptively and misleadingly supplement the April 22, 2014 documented false allegations and "detrimental to patient care" statement from Dr. Cotton in an effort to persuade and influence Dr. Barnes. It is important to remember that Dr. Barnes is not a physician that practices medicine, but she is a psychologist who stated in the findings from her completed evaluation report that had already been submitted around June 23, 2014 to the Employers/School Defendants that the Plaintiff has no "psychological dysfunction warranting immediate intervention" and "no indications of somatic, cognitive, emotional, thought, behavioral or interpersonal dysfunction". Also, the Plaintiff was a resident, who

17

learns through practice, in a Graduate Medical Education Residency Training Program at OSU Medical Center, which is a Teaching Hospital that provides clinical education and training to residents like the Plaintiff. The two days listed from the June 30, 2014 document took place on a rotation at OSU Medical Center called Family Medicine Teaching Service. Listed below are the Plaintiff's responses to Dr. Cotton's allegations/deficiencies from her June 30, 2014 document that included false information and was shared with third parties, such as the CommunityCare EAP and Dr. Barnes. Specifically:

**Dr. Cotton's Allegation:**

"MR# 516865 64 yo male admitted with Acute Exacerbation of Congestive Heart Failure. New admit arrived to floor at about 0900. Dr Snyder took this case as a new admit. He did not write a progress note or dictate the H&P until 2255 that night. After rounding on the patient I gave specific instructions to give 40 mg of Lasix and then assess the output of urine over 2 hours. He was to then discuss with his senior resident how the next dosage of Lasix should be given, with the next dose to be given about 6-8 hours after the first dose of 40 mg. Dr Snyder ordered 40 mg of Lasix daily and did not assess the effect of this dosage of medication with his senior resident as I had instructed him."

**Dr. Snyder's Response:**

June 24, 2014 was the Plaintiff's first day back working with the day team residents, and he had not worked with the day team for the past few days as he was scheduled during this Family Medicine Teaching Service rotation month. Other residents on the day team that the Plaintiff worked with on this day had worked over the past few days. The Plaintiff remembers being assigned around five new patients that day, which is by no means a

18

typical work day with the day team on this rotation. Typically, residents continue seeing the same patients that they have been seeing for continuity of care. Therefore, other residents had several patients that they had already routinely been seeing for follow up visits, which allows for much greater ease in responsibilities during the day. As resident physicians know, being able to do interviews, physical exams, assessments, plans, and other evaluation/management work for follow up patients can be done much more efficiently than done for new patients, especially within a few hours in the morning prior the attending physician wanting everything presented to them pertaining to the patients. As a result of the Plaintiff's increased workload on this day, the Plaintiff stayed later at the hospital to get his work accomplished that same day. As Dr. Cotton acknowledged, the Plaintiff did do a progress note and H&P on this patient that day. The "Oklahoma State University Family Medicine Residency" Handbook states, "The resident who admits a patient to the hospital is the resident responsible for dictating the History and Physical within 24 hours". The Handbook also states, "Residents are to work on the teaching service for the full day including evening report. This ensures that patient care is complete and timely, and that all admissions, discharges and dictations are completed on the day of occurrence." The Plaintiff takes great pride in his work and followed the Handbook policy on this patient as it pertains to "Hospital Teaching Service". Even though the Plaintiff abides by this Handbook policy, the Plaintiff knows there are other residents in his residency program that do not ensure "all admissions, discharges and dictations are completed on the day of occurrence". Dr. Cotton did not allege the Plaintiff harmed this patient in any way. As Dr. Cotton states, the Plaintiff followed her advice to give her

19

suggested dosage of Lasix, and contrary to what Dr. Cotton alleged, she did not instruct the Plaintiff to assess the effect of the dosage of the medication with a discussion with his senior resident. Dr. Cotton intentionally did not provide this documented information to the Plaintiff, but it was instead communicated to third parties, including the CommunityCare EAP and Dr. Barnes, who received this false information, in conjunction with other false information communicated such as Dr. Cotton's April 22, 2014 documented false allegations and false "detrimental to patient care" statement from Dr. Cotton. The Plaintiff did not receive a copy of this June 30, 2014 documented information until it was uncovered from an Open Records Request made under the Oklahoma Open Records Act.

**Dr. Cotton's Allegation:**

"MR# 031880 67 yo female admitted on 6/19/14 for edema in her legs. Dr. Snyder was assigned to see the patient on 6/24/14. He presented the patient to me, but had left out significant parts of the case. The patient had new onset of atrial fibrillation a few days prior, but he did not know this when he presented the case to me. There were notes in the EHR describing this assessment and the recommendations from cardiology. The other residents on the service knew about this aspect of the case. It had been discussed during there morning hand-off report when Dr. Snyder was assigned the case."

**Dr. Snyder's Response:**

Contrary to what Dr. Cotton alleged, the Plaintiff was not assigned this patient during the morning hand-off report on 6/24/14. This patient was assigned to another resident during the morning hand-off report. The other resident, who was a 2nd year resident, was assigned

20

this patient that morning because he had most recently been evaluating and managing this patient's care, so it was understood that he would be able to provide the most efficient and effective continuity of care for the patient. Despite this 2nd year resident being assigned this patient, this resident decided that he did not want to be accountable any longer for seeing this patient, so he directed the Plaintiff to be responsible for this patient instead. The Plaintiff remembers having to see around five new patients that morning, which is not typical because usually residents see several patients that they have already seen for the past few days for follow up visits. Dr. Cotton did not allege the Plaintiff harmed this patient in any way. Alternatively, in an act of cooperation and teamwork, the Plaintiff followed the 2nd year resident's direction and went ahead and saw this patient despite the change in assignment of this patient when a limited amount of time was remaining in the morning prior to Dr. Cotton having the patients presented to her. As opposed to what Dr. Cotton alleged, the Plaintiff was aware of the atrial fibrillation as it relates to this patient. When the Plaintiff presented information regarding this patient to Dr. Cotton, the 2nd year resident that had been previously seeing this patient decided to mention in conjunction with the Plaintiff's presentation his familiarity of the patient's atrial fibrillation pertaining to his experience of recently managing and treating this patient. Since this 2nd year resident mentioned the atrial fibrillation, which the Plaintiff was also knowledgeable of, when this patient was being presented to Dr. Cotton, the Plaintiff did not need to mention the same information twice. This 2nd year resident, who was originally assigned this patient that morning, wanted to share information from his recent experiences in evaluating and managing this patient, which would be expected in terms of providing continuity of quality

care through effective integration, coordination, and sharing of information in a team based approach. Dr. Cotton intentionally did not provide this documented information to the Plaintiff, but it was instead communicated to third parties, including the CommunityCare EAP and Dr. Barnes, who received this false information, in conjunction with other false information communicated such as Dr. Cotton's April 22, 2014 documented false allegations and false "detrimental to patient care" statement from Dr. Cotton. The Plaintiff did not receive a copy of this June 30, 2014 documented information until it was uncovered from an Open Records Request made under the Oklahoma Open Records Act.

**Dr. Cotton's Allegation:**

"MR# 010031 51 yo female admitted on 6/27/14 with diagnosis of rhabdomyolysis and prolonged QT interval. Jeff was assigned to see the patient on /28/14. When he presented the case to me, he did not seem aware that QT prolongation was an issue for this patient. He then misreported to me that her QT interval was now normal, when actually is had not corrected. The issue of her QT prolongation had been discussed in the morning hand-off when Dr Snyder was assigned the case."

**Dr. Snyder's Response:**

Contrary to what Dr. Cotton alleged, the Plaintiff was aware of QT prolongation and its relation to this patient. The Plaintiff followed the instructions Dr. Cotton gave him regarding this patient. Dr. Cotton did not allege the Plaintiff harmed this patient in any way. Instead, the Plaintiff was helpful in facilitating effective care for this patient. Since the patient was on some medications that have the possibility of prolonging a QT interval, Dr. Cotton wanted the Plaintiff to consult Cardiology to investigate the patient's EKGs and

22

determine if restarting the medications that could prolong the QT interval would be appropriate. The Plaintiff discussed this with the Cardiology fellow, and he said he had no concerns regarding the patient's QT interval on the EKGs and said it was safe to restart the patient's appropriate psychiatric medications, which was then reported to Dr. Cotton by the Plaintiff. Dr. Cotton intentionally did not provide this documented information to the Plaintiff, but it was instead communicated to third parties, including the CommunityCare EAP and Dr. Barnes, who received this false information, in conjunction with other false information communicated such as Dr. Cotton's April 22, 2014 documented false allegations and false "detrimental to patient care" statement from Dr. Cotton. The Plaintiff did not receive a copy of this June 30, 2014 documented information until it was uncovered from an Open Records Request made under the Oklahoma Open Records Act.

**Dr. Cotton's Allegation:**

"MR# 516983 58 yo male admitted for bradycardia on 6/27/14. After rounding on the patient, I instructed Jeffery to make patient a full admit. He did not do this. I noticed the next day that the patient was still in observation status and changed the admit status to full admit at that time."

**Dr. Snyder's Response:**

The Plaintiff remembers following Dr. Cotton's instruction to make this patient a full admit, so the Plaintiff changed the admit status from observation to full admit. Dr. Cotton did not allege the Plaintiff harmed this patient in any way. Dr. Cotton intentionally did not provide this documented information to the Plaintiff, but it was instead communicated to third parties, including the CommunityCare EAP and Dr. Barnes, who received this false

information, in conjunction with other false information communicated such as Dr. Cotton's April 22, 2014 documented false allegations and false "detrimental to patient care" statement from Dr. Cotton. The Plaintiff did not receive a copy of this June 30, 2014 documented information until it was uncovered from an Open Records Request made under the Oklahoma Open Records Act.

Around August 23, 2016 Dr. Cotton provided a letter confirming Plaintiff successfully completed eleven rotations.   However, Dr. Cotton knew that Plaintiff had successfully completed twelve rotations (not eleven) and intentionally misstated that Plaintiff had not successfully completed twelve rotations.

Dr. Cotton and/or Dr. Alexopulos have also made the false claims that Plaintiff was a danger to patients and/or failed to satisfactory carry out his job and educational responsibilities as a resident.

For instance, the Plaintiff worked night shifts at OSU Medical Center during the week of March 16-21, 2014. These shifts started at 5:30 pm and ended around 7:30 am the following morning. There are about 5 resident physicians that work during the day and do a handoff report to the single resident physician, who works night shift. The Plaintiff was the single person working night shifts during this week to which all of Dr. Lora Cotton's allegations were deceptively contrived. During night shifts, the Plaintiff takes care of up to approximately 30 patients that the family medicine team divides up and cares for during the day, and the Plaintiff admits new patients to the hospital all throughout the night. The Plaintiff is called by the nursing staff throughout the night to receive any updates on patients. Listed below are the Plaintiff's responses to Dr. Cotton's allegations/deficiencies

24

from her April 22, 2014 probation document letter to the Plaintiff.  This April 22, 2014 probation letter shared with third parties, such as the CommunityCare EAP and Dr. Barnes, included false information.  Specifically:

**(1) Dr. Cotton's Allegation:**

"On the night of 3/17/14, you admitted a 28 year old male brought in for altered mental status. You ordered Ativan 2 mg IV later that night. No assessment or indication was documented for giving this medication. When I did rounds on 3/18/14, the patient was heavily sedated and remained so throughout the day. I met with you in person in the evening of 3/18/14 and spoke to you about this situation. I provided education about not giving benzodiazepines or other sedating medications to patients with altered mental status. I told you that you must assess the patient and document that assessment before giving any high-risk medications. I instructed you to not give this particular patient any further benzodiazepines. That very night you ordered Restoril 15 mg PO without writing an assessment in the chart, which is directly contrary to the instructions and education that I had just provided. I spoke to you again on 3/19/14 and discussed this situation. You explained your actions by saying you thought I told you to give the patient benzodiazepines orally. You didn't explain why you hadn't documented as assessment."

**(1) Dr. Snyder's Response:**

Dr. Cotton states that Plaintiff admitted a patient for altered mental status on 3/17/14. It was documented and known that the patient's altered mental status was a direct result of his polysubstance abuse.  A chest x ray, EKG, and CT of the head were all normal.  The

patient did have a positive Urine Drug Screen for marijuana and methamphetamines. Plaintiff's written history as well as written orders were actually done on 3/18/14 at 4:42 am. At 5:10 am, Plaintiff ordered for the patient to also receive Ativan 2mg IV. Dr. Cotton states that no assessment or indication was given for the medication. However, as clearly documented in Plaintiff's history, the patient was very anxious and agitated. He wouldn't even allow Plaintiff to do a physical exam. No separate documentation for the Ativan was done by Plaintiff due to the documentation being clearly stated in Plaintiff's history taken on the patient. Plaintiff did have the nurse document in the patient's chart that this medication was given. Dr. Cotton even documented the following morning in her note that the patient was given the Ativan due to anxiety, so she knew the indication for the mediation as well. Dr. Cotton mentions that the patient was sleepy when rounding to see the patient later that morning. This would be expected anyways since the patient was given Plaintiff's order at 5:10 am. Dr. Cotton claims she met with Plaintiff one-on-one the following evening on 3/18/14 to discuss this issue, documentation, and education of medication prescribing; however, this meeting never transpired as she contended. Dr. Cotton never "provided education about not giving benzodiazepines or other sedating medications to patients with altered mental status" as claimed she did on March 18, 2014. Specifically, Dr. Cotton's only comment was that it would have been better not to prescribe a benzodiazepine like Ativan due to the patient's sedation when she first saw the patient earlier that morning on 3/18/14. Dr. Cotton then stated if the patient was having issues with anxiety and sleep that it would be ok to prescribe Restoril, which is a benzodiazepine medication. On the evening of 3/18/14, the same patient was having issues with sleep and

26

anxiety.  Dr. Cotton never instructed Plaintiff to not give this particular patient any further benzodiazepines.  Therefore, Plaintiff saw the patient and ordered for Restoril 15 mg orally to be given as Dr. Cotton previously authorized.  Dr. Cotton then met with Plaintiff the following evening on 3/19/14 to discuss this.  This visit on 3/19/14 is the only time that Dr. Cotton actually met with Plaintiff one-on-one to give him suggestions on things that could have been done differently during Plaintiff's week of night shifts.  Once Plaintiff learned that Dr. Cotton's preference would be to write a general physician's note in the chart himself to coincide with the nurse documentation of the medication given, per his request, Plaintiff followed this instruction thereafter.

**(2) Dr. Cotton's Allegation:**

"On the night of 3/17/14, you were called by a floor nurse about a patient on the general medical floor who was having bradycardia on telemetry. You gave a verbal order "call if heart rate is less than 40." No evaluation of the patient was documented. No other orders were given. You did not recognize the importance of this abnormal vital sign. Further assessment was warranted and at this point in your training it is expected that you would recognize the importance of bradycardia and respond appropriately."

**(2)  Dr. Snyder's Response**

Dr. Cotton's characterization of Plaintiff's conduct is false.  Dr. Snyder–reviewed the patient's medical file prior to giving instructions to the nurse.  Plaintiff's instructions were noted by the nurse in the medical file, as is consistent with Dr. Snyder's training.  When Dr. Snyder reviewed the patient's medical records that night, he found that the patient had

27

been routinely having a heart rate running in the 40s. Even the discharge summary for this patient clearly states that this patient's heart rate was consistently bradycardic throughout his stay. It also states that the patient was asymptomatic and stable with his heart rate running in the 40s, which apparently was a baseline for this patient.

At the time of Dr. Snyder's involvement with this particular patient, Dr. Snyder had not been made aware of Dr. Cotton's expectation that he provide a general physician note in the file (as opposed to the other documentation going into the file). Once Dr. Snyder was made aware of this expectation, he began to follow these instructions and provide a general physician note.

Dr. Cotton did not bring this issue up to Dr. Snyder until Dr. Cotton wrote the April 22, 2014 probation letter to the Plaintiff. However, Dr. Cotton met with Plaintiff several times prior to this probation letter and never indicated Dr. Snyder's conduct with respect to this patient, or his treatment of the patient, was anything less than satisfactory.

**(3) Dr. Cotton's Allegation**

"On 3/17/14, you were instructed by an OGME 2 resident on the team to dismiss a patient who was admitted and treated for pseudo-seizures. The OGME 2 resident instructed you to call her if there were any problems with the dismissal. You did not dismiss the patient and you did not call the OGME 2 resident regarding any issues with the dismissal."

**(3) Dr. Snyder's Response**

28

Dr. Cotton's allegations are untrue. The 2nd year resident taking care of the patient during the day made the decision to discharge the patient before Plaintiff's shift began at 5:30 p.m. The 2nd year resident told Plaintiff that everything was arranged for the patient to be discharged and leave the hospital, and there shouldn't be anything left for Dr. Snyder to do.

Around 8pm that evening, a rapid response was called to the room to which that patient was in earlier that day. Plaintiff looked down at his list of patients with the understanding that this patient should be already out of the hospital. Plaintiff went upstairs and found that this patient was still in the hospital. While examining the patient, Plaintiff found the patient to be unarousable for an extended period of time while the patient had pseudoseizure activity. This same patient had previously been in the ICU and seen by a 3rd year internal medicine resident that was also working the night shift and accessing the patient with Plaintiff on this current evening. This 3rd year resident and Plaintiff felt that due to this current event happening at such a late evening hour, it would be appropriate and necessary to keep the patient until the following day. Plaintiff found out that night, the patient never had an arrangement for any transportation to pick her up from the hospital. There should have been better discharge planning by the day team in order to prevent this occurrence from taking place. If discharge transportation was questionable for the patient, the day team resident physician assigned to this patient could have provided a cab voucher to take her home. This is a common solution in these circumstances. Once again, Plaintiff was told at the 5:30pm handoff report that everything was arranged and set up for the patient's discharge; however, this was certainly false as delineated herein.

29

**(4) Dr. Cotton's Allegation:**

"On the night of 3/18/14, you admitted a 54 year old female for a complaint of what appeared to be syncope or a seizure. Her tilt vital signs in the ED were positive. You ordered Ambien and opiate pain medication for this patient. This was again contrary to education I had given you in our face to face meeting earlier in the evening of 3/18/14 – to not give sedating medications to people who are altered or unstable."

**(4) Dr. Snyder's Response**

Contrary to what Dr. Cotton alleged, Dr. Cotton did not instruct Plaintiff to not give sedating medications to people who are altered or unstable.  On the night of 3/18/14, Plaintiff admitted a 54 year old female with a complaint of what appeared to be a history of reported syncope, or loss of consciousness.  Dr. Cotton states that the patient had tilt positive vital signs in the Emergency Department.  However, the ER Medical record had no mention of this.  Dr. Cotton states that she and Plaintiff had a face to face meeting earlier in the evening on 3/18/14 to not give sedating medications to patients who are altered or unstable.  However, this constructive education dialogue never occurred.  The only time Dr. Cotton casually met with Plaintiff one on one to discuss any occurrences this week was on 3/19/14, which was the following evening after he had seen this patient.  Dr. Cotton writes as if she discussed this the evening prior to this event, which is not factually correct. Plaintiff mentioned this fact to Dr. Cotton around April 23, 2014, and Dr. Cotton did not have any comment regarding the inaccuracy of the dates she used in her probation documentation.  Further, as opposed to this patient being unstable or exhibiting altered

30

mental status, when Plaintiff did his evaluation and admission for this patient, the patient was alert, awake, oriented, and was table with a BP of 129/76. The patient at home routinely took Oxycodone 15mg and Xanax 1mg every evening. Plaintiff didn't give the Xanax and instead gave the lowest dose of Ambien due to the patient reporting issues of initiating sleep nightly. Ambien is a common mediation utilized for sleeping issues that Dr. Cotton has even recommended to give in the past. Once again, these medications were given by Plaintiff at the time of the admission due to the patient not being unstable or exhibiting altered mental status.

**(5) Dr. Cotton's Allegation**

"On 3/18/14 a patient was admitted by the day team for seizure. The resident who admitted the patient gave you specific instructions to not give this patient any sedating medications due to altered mental status from a postictal state. That evening you gave the patient Norco without documenting that you assessed the patient. When the admitting resident asked about this decision the next day, you gave the reason that "the nurse said the patient was fine."

**(5) Dr. Snyder's Response**

Plaintiff admits giving the patient Norco. Again, Dr. Snyder assessed the patient's situation prior to providing Norco. Plaintiff denies the resident instructed him not to prescribe Norco; instead, Plaintiff was specifically told by the day team resident that an acceptable medication the Plaintiff could provide this particular patient for pain later that night would be Norco. Again, at the time of treating this patient, Dr. Snyder had not been informed of

31

Dr. Cotton's preference to include a physician note in the file. Plaintiff recognizes he is a 1st year resident and there is a learning curve when being educated and trained in a residency program. However, Plaintiff was not accused of engaging in improper conduct with this patient,–giving verbal orders to nurses, rather than writing specific notes, was common practice with residents and medical care providers.

**(6) Dr. Cotton's Allegation:**

"On 3/18/14 you admitted a patient for acute exacerbation of COPD. She also had a diagnosis of diabetes which was treated with oral medications. Her admission glucose was 174. You put the patient on Lantus 40 units once daily. When I asked you why you did this you said you weight-basing this medication, and stopped her oral medications. This is a large dose of Lantus for a patient who has never been on insulin before. She did not have an indication for insulin at the time of her admission. At this point in your training, it is expected that you would have a better working knowledge of appropriate use of insulin and a respect for the dangers of hypoglycemia. The resident who took over the case in the morning noticed that this was an inappropriate medication and stopped it before a dose of Lantus was given."

**(6) Dr. Snyder's Response:**

On 3/18/14, a patient was admitted for acute exacerbation of COPD. The patient also had diabetes for which she took Metformin 1000 mg by mouth twice daily, which was her oral diabetes medication. Since residents, including the Plaintiff, have been instructed to not use Metformin in the hospital, Plaintiff stopped the Metformin and put in an order

for Lantus 40 units to be given the next evening at bedtime. Lantus is a long acting insulin working over a 24-hour time period that is slowly released. This patient weighed approximately 150kg or 330 pounds. The patient had a BMI of greater than 50 putting her above the morbid obesity category and into the highest classification of super obesity. The patient had a glucose of 174 but had further glucose readings done showing uncontrolled diabetes with levels such as 378. Due to the patient's obesity classification and likely being insulin resistant, Plaintiff utilized guidelines from the Society of Hospital Medicine that assembled a glycemic control task force of physicians that recommended individuals that are obese and likely insulin resistant to be given 0.5 to 0.6 or higher units/kg/day of insulin. Based on this calculation, Plaintiff halved this amount to get the 40 unit dosage of Lantus, a long-acting basal, slow release insulin. The resident who took over the following day decided to cancel the order for the Lantus that would be given later on that evening. Instead, the patient was on an insulin sliding scale. After learning of Dr. Cotton's expectations, Plaintiff made sure to follow her guidelines in any future occurrence of this nature. Plaintiff knows techniques will vary from physician to physician in education and training of residents in residency programs, but knowing her preference, Plaintiff has made certain to follow her desires in future similar situations.

**(7) Dr. Cotton's Allegation:**

"On 3/20/14 a rapid response was called on a 79 year old female who had just been admitted for abdominal pain. The rapid response was called for bradycardia. You did assess the patient and you did write a note. You did not call your backup resident or attending

33

physician regarding this change in patient status. At this point in your training, you should know to call your backup resident and the attending physician regarding sudden changes in status, especially when these changes result in a rapid response."

**(7) Dr. Snyder's Response:**

March 19, 2014 was the first time Dr. Cotton instructed Plaintiff of her expectation towards general physician notes in the medical documentation. Plaintiff followed Dr. Cotton's instructions and Dr. Cotton acknowledges that Plaintiff assessed and documented this entire situation properly.  Since the patient was stable in evaluation as assessed by Plaintiff and another 3rd year internal medicine resident, Plaintiff didn't feel it was urgent to make phone calls to a backup resident or attending physician in this case.  Plaintiff has worked with attending physicians other than Dr. Cotton where there have been rapid responses that had similar scenarios of patients being stable upon evaluation.  These other attending physicians never informed the Plaintiff of any expectation to do anything differently.  Once Plaintiff was finally notified from Dr. Cotton over a month later regarding her expectation in this particular type of situation, Plaintiff made certain to make phone calls to backup residents or attending physicians for any perceived changes or updates in patient status.

The Probation Procedure from the "Oklahoma State University Family Medicine Residency Handbook" was contractually breached by Dr. Cotton, which reveals the false and dishonest nature of her "detrimental to patient care" fabrication. The Handbook states the following:

34

"When academic deficiencies are identified, the Program Director will inform the resident orally and in writing of the specific deficiencies. The trainee will be provided a specified period of time in which to implement specified actions required to resolve the academic deficiencies. This period of time to resolve the deficiencies may be waived and the trainee may be placed on immediate probation if the deficiencies are felt by the Program Director to be detrimental to patient care. Following this period, if academic deficiencies persist, the trainee will be placed on probation for an initial period of not less than three months and no longer than six months."

Also, the Handbook stipulates that if Dr. Cotton believes the Plaintiff was detrimental to patient care, he should be immediately placed on probation, to which he was not. The probation allegations/deficiencies Dr. Cotton cited occurred over a three-day period on March 17th, 18th, and 20th of 2014, and the Plaintiff's probation did not start until May 1, 2014. Dr. Cotton's action of waiting over this extended time frame (nearly 6 weeks), in which the Plaintiff freely performed all of his regular patient care duties, directly contradicts Dr. Cotton's false accusation of Dr. Snyder being a detriment to patient care. Also, it is important to note that Dr. Cotton was the only supervising physician to document and provide to the Plaintiff any specific allegations regarding concerns of a probationary magnitude when the Plaintiff had worked with over 30 supervising physicians in his first year of residency. Therefore, since Dr. Cotton acted alone with her specific documented probation concerns, she had the clear ability to act "immediately" to place the Plaintiff on probation instead of waiting nearly 6 weeks. Evidently, it was an intentional

35

misrepresentation and false accusation for Dr. Cotton to claim the Plaintiff was detrimental to patient care.

Additionally, the validity of the specific allegations in the probation document is disputed by the Plaintiff as well, as the Plaintiff documented on the April 22, 2014 probation letter the day of its receipt around April 23, 2014.  Dr. Cotton's probation document is full of mischaracterizations and inaccuracies with a clear intent of depicting the Plaintiff in a negative manner.  It is important to understand that even though Dr. Cotton eventually cited to my client orally and in writing of alleged academic deficiencies that occurred over a month earlier in which Dr. Cotton was the supervisor, and due to Dr. Cotton's false statement of him being detrimental to patient care, probation was never justified as defined in the Handbook.  Dr. Cotton intentionally never wanted to provide the Plaintiff a period of time to resolve any alleged deficiencies because the Plaintiff believes that Dr. Cotton knew he could easily make any improvements to meet her expectations. As the Handbook states, after the period of time to resolve deficiencies, which the Plaintiff was not given, and "if academic deficiencies persist, the trainee will be placed on probation" at that time.  Since Dr. Cotton intentionally didn't follow this procedure, she certainly breached and violated the procedure for implementing a probation as defined in the Handbook.  As shown, in Dr. Cotton's April 22, 2014 Probation letter document, Dr. Cotton initiated a false accusation by claiming the Plaintiff was "detrimental to patient care" and so warranted "immediate probation" for events that occurred about 6 weeks prior to the probation starting May 1, 2014.  This false information was shared with third parties

36

at the CommunityCare Employee Assistance Program and with Dr. Leslie Barnes, a psychologist.

**RESP. INT. NO. 6:** Plaintiff does not know of all witnesses to each communication. Plaintiff believes the following persons may have been witnesses to the communications:

Dr. Lora Cotton; c/o Crowe & Dunlevy

Dr. Jenny Alexopulos; c/o Crowe & Dunlevy

Dr. Leslie Barnes; c/o Secrest Hill Butler & Secrest

Deborah Nottingham; 20403 E. Queen St.; Catoosa, Oklahoma 74015

Sunny Benjamin; 7269 Aberdeen Pkwy E.; Tulsa, Oklahoma 74132

3110 East 71st Street; Tulsa, OK 74136

Jessica Heavin; 805 West Granger Street Broken Arrow, OK 74012

Steve Stewart; Address unknown

Terry Stover; 4706 S. 199th East Ave.; Broken Arrow, Oklahoma 74014

Dr. Jim Cage; 21290 E. 61st St. S.; Broken Arrow, Ok 74104

**INT. NO. 6 [INT. NO. 7]:** Identify and describe with specificity the facts and/or information that supports your claim that Defendants Cotton and Alexopulos directed and/or influenced Dr. Barnes to amend her assessment of you as alleged in your Second Amended Complaint. Your answer should specifically identify and delineate the acts or omissions you attribute to Defendant Cotton and Defendant Alexopulos.

**RESPONSE:** Objection, Plaintiff does not know at this early stage all facts and/or information supporting his claim that Drs. Cotton and Alexopulos directed and/or