Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
 2          FOR THE WESTERN DISTRICT OF OKLAHOMA
 3   JEFFREY SNYDER, D.O.,
     an individual,
 4        Plaintiff,
 5   vs.                          No. CIV-16-384-F
 6   (1) BOARD OF REGENTS FOR THE
     OKLAHOMA AGRICULTURE & MECHANICAL
 7   COLLEGES, EX REL., OKLAHOMA
     STATE UNIVERSITY CENTER FOR
 8   HEALTH SCIENCES, ET AL.,
          Defendants.
 9
10             DEPOSITION OF RAY HAND, PH.D.
            TAKEN ON BEHALF OF THE DEFENDANTS
11       ON OCTOBER 18, 2019, BEGINNING AT 9:06 A.M.
                 IN OKLAHOMA CITY, OKLAHOMA
12
13                       APPEARANCES:
14   Appearing on behalf of the PLAINTIFF:
15        Laura Talbert
          STOCKTON TALBERT
16        1127 N.W. 14th Street
          Oklahoma City, Oklahoma 73106
17        (405) 225-1200
          ltalbert@stocktontalbert.com
18
19   Appearing on behalf of the DEFENDANT LESLIE BARNES,
     Ph.D.:
20
          Justin Hall
21        SECREST, HILL, BUTLER & SECREST
          7134 South Yale, Suite 900
22        Tulsa, Oklahoma 74136-6342
          (918) 494-5905
23        jhall@secresthill.com
24          (Appearances continued on next page.)
25   REPORTED BY:  Lacy Antle, CSR, RPR
```

**EXHIBIT 1**

Page 10

1      Q    We have what appears to be your report of

2  June 12, 2019?

3      A    Yes.

4      Q    Looks like another copy of the

5  Professional Practice Guidelines for OMPE, as well

6  as the ethical principles, the report of Dr. Shawn

7  Roberson, the affidavit of merit of Steven Sternlof,

8  Ph.D., then a manila folder containing what appear

9  to be pleadings from this lawsuit.  Is this yellow

10  slip of paper a bill, an invoice?

11     A    It's a -- yes.

12     Q    Then some handwritten notes dated

13  January 8, 2019.  Are these your handwritten notes?

14     A    They are.

15     Q    Okay.  I believe that is everything

16  contained in your file.

17          Is that everything you reviewed and relied

18  upon in forming your opinions that you're here to

19  testify about today?

20     A    Yes.

21     Q    Are there any documents, texts, treatise,

22  textbooks, anything of that sort that you relied

23  upon that is not included in your file that you used

24  in forming your opinions?

25     A    Well, I have been a psychologist for 38

1    years, so...

2         Q    So we can't put your personal experience

3    into a red rope, but that's also something you'll be

4    using to testify and you used in your report, is

5    that accurate?

6         A    Certainly.

7         Q    Okay.  I'm going to hand you what I'm

8    going to mark as Exhibit 2 to your deposition, which

9    looks like it was already marked as Exhibit 2 at one

10   point.  Can you tell me what that document is?

11             (Exhibit 2 marked for identification.)

12        A    That's my resume.

13        Q    Also contained in that document -- sorry,

14   on page 10, if you look at the top right, there's

15   page numbers, page 10 of 20, is that your report of

16   June 12, 2019?

17        A    It is.

18        Q    The first four, yeah, four pages is your

19   CV.  Is that CV accurate and up to date?

20        A    Yes.

21        Q    Page 5 looks like testimony at trial or

22   deposition, looks like in the last four years, is

23   this accurate and up to date?

24        A    There may be a couple of things that could

25   be added to this, because I've testified a couple

Page 13

1      A      Yeah, they gave me a copy of
2  Dr. Sternlof's what's the official...
3      Q      I think you have it listed as affidavit of
4  merit?
5      A      Right, his affidavit of merit, and asked
6  me if I'd be willing to review documents and see
7  what I thought.
8      Q      At any time were you asked to determine
9  whether Dr. Snyder was fit for duty to practice
10  medicine?
11     A      No.
12     Q      Although you were not asked to do so, have
13  you come to a determination as to whether Dr. Snyder
14  is fit for duty to practice medicine?
15     A      I wouldn't be able to make any comment
16  about that, I've never personally evaluated
17  Dr. Snyder.
18     Q      Have you ever spoken to Dr. Snyder?
19     A      Briefly, on a couple of occasions.
20     Q      And what was the purpose of those
21  conversations?
22     A      Transferring, giving me some data and
23  discussing with him collecting a fee and giving him
24  my impression of what I saw in the records and
25  discussing briefly that I thought that I could

Page 14

1   provide some useful information to his case.

2        Q    When you say that he provided some data,

3   what data did he provide?

4        A    I think that he brought some of this data

5   that I got.  I originally had that data and I'm not

6   sure that he didn't just -- he was the one who

7   brought the data to my office from wherever it came

8   from.

9        Q    Just for the record, you're -- when you're

10  referencing "this data," you're pointing toward

11  what's labeled as Exhibit 1 --

12       A    Right.

13       Q    -- being your file?

14       A    Right.

15       Q    Your report is dated June 12th, 2019.

16  When were you asked to prepare a report?

17       A    Well, there was a change in attorney, so

18  there was a pretty long period of time where nothing

19  happened, and he acquired a new attorney at some

20  point and I eventually explained to him that, as I

21  said, I thought after reviewing the data I thought I

22  could be helpful, I made some contact with the new

23  attorneys to essentially decide whether they wanted

24  me to continue with the case in this kind of a

25  situation, I don't want to get crossways with

1    someone's lawyers, and somewhere around the first of

2    the year I think that January, very brief note,

3    centered on me telling Dr. Snyder that I could --

4    thought that I could be helpful and it was at some

5    point where I was officially hired and what I don't

6    have, I'd be happy to provide, because I didn't

7    include the billing -- all of the billing data,

8    because there was two receipts and at that point

9    that he brought me a check to hire me to write the

10   report, that's when it happened, so it was some time

11   early this year.

12        Q    And you say when he brought you the check,

13   are you referencing Dr. Snyder?

14        A    Yeah, correct.

15        Q    And so have you been paid by Dr. Snyder,

16   rather than through his attorneys?

17        A    Yes.

18        Q    You also stated that when speaking to

19   Dr. Snyder you thought that you could be helpful.

20   In what way did you think that you could be helpful?

21        A    Well, I thought there were problems

22   Dr. Barnes' report that were important to his matter

23   and talked to -- talked to him about that a little

24   bit and it was at that point when he -- he was okay

25   with it that I, you know, began to make contact with

Page 16

1   his lawyer and clarify with them that it was okay

2   and at that point I started spending some time

3   working on the report.

4        Q    How long have you been acting as an expert

5   witness?

6        A    Since early in my career, probably --

7   let's see, if I've been in practice 38 years,

8   probably 25 or eight years ago.  I did -- I've

9   always done evaluations, I've worked with children,

10  and I think the first one I did was an assessment

11  for the Indigent Defense Fund, so that was a long

12  time ago, 25 years.

13       Q    As we sit here today, are you still

14  practicing privately?

15       A    Yes.

16       Q    Okay.  And of your work, what percentage

17  is related to being an expert witness and what

18  percentage is related to private practice, providing

19  services for clients or patients?

20       A    Well, depends on how you describe expert

21  witness.  I mean, in terms of offering information

22  in forensic matters?

23       Q    In terms of -- I guess the best way to put

24  it is being retained not to provide therapeutic

25  services, but to give your expert opinion regarding

Page 18

1  be my guess.

2      Q     Would be the expert work?

3      A     Well, yeah, and so assessments, court

4  related things, consultation, maybe less, because I

5  do a lot of assessments for -- I've never really

6  sorted it out, but I do a lot of assessments for

7  adults and children, clinical assessments as well,

8  and I have an active psychotherapy practice, so...

9      Q     That's my question, I'm trying to divide

10 between the two, you know, your --

11     A     There's some clinical assessments and, you

12 know, I carry a, you know, 12 or 15 individual

13 therapy patients all the time.

14     Q     Okay.  As it relates to fitness for duty

15 evaluations, how many fitness for duty evaluations

16 have you done in the last five years?

17     A     Probably 15 or 18, would be my guess.

18     Q     Have you done any this year?

19     A     Yes.

20     Q     How many have you done this year?

21     A     Well, I've -- don't particularly keep

22 count, but three or four, five.  It might be more

23 than that, because I do some for police officers who

24 have been involved in shootings, I know I've done

25 five or six of those, plus some other things as

Page 20

1    forensic psychology.

2         Q    All right.  Now, turning to your report,

3    starting at page 10 of 20 in Exhibit 2 -- those are

4    mine.

5         A    Yeah.  You get that back?

6         Q    No, you can keep that one.  If you want to

7    reference Exhibit 2, because that's what I'm looking

8    at, is the same thing as Exhibit 2 is.

9         A    Is my report in there?

10        Q    Your report is on page 10, but if you have

11   notes on one of them in there and you want to

12   reference that one, that's fine by me.

13        A    No, it's okay.

14        Q    You list the documents reviewed there in

15   those bullet points on page 10 and 11 and who

16   provided you with those documents?

17        A    Dr. Snyder, for the most part.

18        Q    Is that typical, when you've been retained

19   in a civil matter, to deal primarily with the party,

20   rather than their attorneys?

21        A    I'm not sure I could say typical, you

22   know, it kind of depends where things are.  This,

23   you know, again, he was the one who is transporting,

24   I think he was trying to save some money -- I'm

25   speculating -- by doing some of the leg work, but

Page 21

1    you know, often -- not trying to say often -- but I

2    think, all the civil suits I've been involved with,

3    that many, but, depends, sometimes attorneys will

4    prepare documents and provide them to me.

5         Q    In the civil cases that you've been

6    involved in, is it typical to receive payment

7    directly from the party, rather than their attorney?

8         A    Seems like, yes, I think more --

9    typically, more often than not.

10        Q    These bullet points under Documents

11   Reviewed, is this each and every document that you

12   reviewed and relied on in preparing your report?

13        A    Yes, as far as I know, that's what was in

14   the file.  It was meant to encompass everything

15   that's here.  I'm not sure every specific document

16   is listed.

17        Q    On page 12 of your -- of 20 of this

18   document, I keep referring to it as your report but,

19   really, it's your report, as well as your CV and

20   your fee schedule.

21        A    Yeah.

22        Q    But on page 12 you identify six problem

23   areas of Dr. Barnes' report.

24        A    Uh-huh.

25        Q    When you refer to them as "problem areas,"

1      A      Again, that is going to be a decision

2   that's made by someone else.  I think I typically,

3   throughout my document, refer to the Professional

4   Guidelines for Occupationally Mandated Psychological

5   Evaluations.

6      Q      So nowhere in your report do you state

7   that you have an issue with Dr. Barnes as it relates

8   to 2.01 of the Ethical Principles of Psychologists

9   and Code of Conduct, correct?

10     A      What I -- yes.

11     Q      Thank you.

12            So your report is based on the

13   Professional Practice Guidelines for Occupationally

14   Mandated Psychological Evaluations, correct?

15     A      Yes.

16     Q      Okay.  So going to problem area one that

17   you list, Dr. Barnes' preparation for her

18   evaluation, and you cite guideline 5, I think in

19   your report is page 192, I believe it's actually

20   page 191.

21     A      Okay.

22     Q      Your report states, "Guideline 5

23   parentheses, page 192, end parentheses, indicates

24   that psychologists should endeavor to understand and

25   meet their responsibilities to the referral source,

Page 29

1   the examinee and other relevant parties to the

2   evaluation."

3           That word, "endeavor," what does that

4   mean?

5       A    Work toward.

6       Q    Is that a requirement?  It doesn't say

7   that psychologists are required, does it?

8       A    No.

9       Q    Now, your report goes on to say that,

10  "Communicating expectations to these parties about

11  the type of information needed for a valid

12  assessment may enhance the relevance and reliability

13  of the information provided, as well as the accuracy

14  of the evaluation."

15          Did I read that correctly?

16      A    Yes, you did.

17      Q    You state that it "may enhance the

18  relevance."  When you say "may," does that mean that

19  it absolutely will in all circumstances?

20      A    Of course not, there are no absolutes in

21  psychology.

22      Q    Well, there are requirements of the

23  ethical principles, if you violate those, is that

24  not an absolute rule?

25      A    Well, those are treated in a very

Page 30

1    interesting way that allows for some wiggle room.

2         Q    And what -- can you explain that

3    interesting way for me?

4         A    There's -- almost all of the ethical

5    principles, specific ethical principles, offer some

6    flexibility from one -- in one matter or another,

7    "depending on," and there's a lot of language in

8    there that suggests some flexibility.  The question

9    in my mind is:  How much flexibility can be

10   expected?  Let me give you an example --

11        Q    I think that's a good question.  I guess

12   my question would be, where do we get to the point

13   where there's a breach of professional conduct?

14        A    I think it can be a specific finding,

15   having -- you know, cheating somebody out of their

16   money, if that can be proved, that's a breach, but

17   it -- in other matters.

18        Q    So there are specific instances that would

19   be a violation or a breach of professional conduct

20   under the ethical principles, correct?

21        A    Sure.

22        Q    Okay.

23        A    And there are some that have -- suggest

24   some flexibility.

25        Q    Are there portions of the Professional

1    Practice Guidelines for Occupationally Mandated

2    Psychological Evaluations that absolutely would be a

3    breach of professional conduct if they did not meet?

4        A    I think that any set of individual or

5    breaches of -- it's certainly possible -- let me put

6    it this way, it's possible that a failure to meet a

7    guideline characteristic would then lead to and be

8    concurrent with a ethical principle, like

9    competence, for instance.

10        Q    So is there anything that Dr. Barnes did

11    or failed to do which, in your opinion, did not meet

12    the professional practice guidelines, which you

13    believe to be a breach of professional conduct?

14        A    I think on the whole she made so many

15    mistakes in preparing and putting together this

16    evaluation that she, in my opinion, and it's

17    opinion, didn't do a competent job of preparing for

18    and producing this -- her report.

19        Q    And you believe that to be a violation of

20    2.01 of the ethical principles?

21        A    That's my opinion.

22        Q    Is there a reason you didn't include that

23    in your report?

24        A    I was focusing on the guidelines.

25        Q    Is there a reason you focused on the

Page 82

1    to the board for a disciplinary type hearing based

2    on informed consent?

3         A    I specifically don't recall.

4         Q    Do you recall what the standard would be,

5    should a psychologist be sent to the board for a

6    disciplinary procedure based on informed consent?

7         A    Well, the question would be, was there an

8    informed consent and was it adequate to the specific

9    situation, like in any legal case, it's, you know,

10   tied to the specifics of the situation.

11        Q    And is one of the areas of inquiry whether

12   the subject did in fact have knowledge of the

13   various issues that were going to be discussed and

14   how that procedure was going to take place?

15        A    It certainly could be.

16        Q    Back to your report on page 14 of 20, down

17   there at the bottom, that last sentence states, "It

18   appears that information gathered there," there

19   referring to OSCN, "regarding a traffic ticket

20   played a significant role in her evaluation, report

21   and conclusions."

22             What do you base that statement on?

23        A    Well, she talked about it a lot in her

24   report.

25        Q    Any other basis for that?

Page 83

1       A     That's a part of my review of her report.

2       Q     Moving on to page 15 of 20 of your report,

3   that second full paragraph, it states that, "She

4   specifically stated that any decisions based upon

5   evaluation data will be made by personnel of the OSU

6   Medical School."

7             Is that typical of performing a fitness

8   for duty evaluation, that the referring entity would

9   make decisions?

10      A     Typically, yeah, it gets the psychologist

11  off the hook --

12      Q     So there any --

13      A     -- psychologists provide psychological

14  data.

15      Q     So do you have any issue with her stating

16  that the decisions would be made by the personnel of

17  the OSU Medical School?

18      A     Only that she tended to cross that line

19  when she eventually told them that he was not fit to

20  practice medicine.

21      Q     When you perform a fitness for duty

22  evaluation in your practice, do you make a

23  determination of whether that individual is fit for

24  duty or not fit for duty?

25      A     No.

Page 92

```
 1        A     No, no.  I was hired to do -- I was hired
 2   to do a critique of Dr. Barnes' report.
 3        Q     Okay.  So you are not in a position to
 4   testify as to why the ultimate decision was made
 5   that Dr. Snyder was not to provide medical treatment
 6   to patients, are you?
 7        A     No.
 8        Q     Okay.
 9        A     No, and I haven't ever said that I did
10   either.
11        Q     I just wanted to clarify that.
12        A     Okay.
13        Q     All right.  So moving on to the testing
14   portion of your report, it starts on page 15, you
15   discuss the MMPI-2-RF profile.  Did you review the
16   results of that test?
17        A     Yes.
18        Q     And what was your opinion as to any issues
19   related to Dr. Snyder based on the results of that
20   test?
21        A     I didn't have any based on that test.
22   That's a very good test, it's well researched and
23   she reported what that test -- data from that test,
24   which is very specific, she reported that
25   accurately.
```

1  entity did not understand the nature of the testing

2  result report findings?

3      A    I can't attest to what other people

4  understood.

5      Q    Back to your report on page 17, that last

6  paragraph, we're now under Dr. Barnes' conclusions,

7  down there at the bottom of that paragraph you

8  state, "She did not identify other plausible

9  interpretations, such as the presence of a

10 significant clinical anxiety disorder or a social

11 anxiety disorder that may affect the examinee's

12 judgment."

13          Are you aware of Dr. Snyder having any

14 significant clinical anxiety disorder or social

15 anxiety disorder that may affect his judgment?

16     A    What was the first part of that?

17     Q    Are you aware of Dr. Snyder having a

18 significant clinical anxiety disorder or a social

19 anxiety disorder that may affect his judgment?

20     A    I'm just -- based on what -- I'm just

21 looking at what her testing was that suggests that

22 there may be other alternatives that she didn't

23 identify.

24     Q    But is there any evidence based support

25 for this statement that that was a plausible

1          Q     So do you agree that, based on what you

2     have reviewed, it's plausible that Dr. Snyder has a

3     significant clinical anxiety disorder or a social

4     anxiety disorder that may affect his judgment?

5               MS. TALBERT:   Form.

6               THE WITNESS:   I'm not attesting to that.

7     I'm suggesting that there are other -- giving an

8     example of other plausible alternatives.

9          Q     (BY MR. HALL) You believe that that's a

10    plausible alternative?

11         A     That's a possible plausible alternative.

12         Q     Okay.   Going on to page 18 of your report,

13    the last sentence, where you quote from OMPE

14    Guideline 10, it's referring to collateral sources

15    and then in the parentheses it states, "Coworker and

16    supervisor interviews, background check of examinee,

17    end parentheses, are considered essential."

18              Would you agree that she performed a

19    background check using OSCN to look into Dr. Snyder?

20         A     She certainly did.

21         Q     Earlier you testified that she did not

22    require a release to speak with Dr. Snyder's

23    supervisor, correct?

24         A     Correct.

25         Q     The next paragraph, second sentence

1          MS. TALBERT:  Okay.

2          (Break taken from 12:56 p.m. to 1:06 p.m.)

3          MR. HALL:  Dr. Hand, we're back on the

4     record.  I don't have any further questions at this

5     time.  I'll pass the witness.

6          MS. MCDUFFEY:  Pass the witness.

7          MS. VELANDIA:  Pass the witness.

8          MS. TALBERT:  Phone people?

9          MR. HALL:  Do y'all want to get on the

10    record that y'all don't have any questions on the

11    phone or you want me to just speak for everybody?

12         MS. RAY:  You can speak for me, we don't

13    have any questions.

14         MR. HALL:  Well, I can confirm after

15    speaking with defense counsel that no one on the

16    phone has any questions.

17         MS. TALBERT:  I have some questions for

18    you.

19         THE WITNESS:  Okay.

20                   CROSS-EXAMINATION

21    BY MS. TALBERT:

22      Q    So you stated -- the gist of what I'm

23    understanding is that the reason you used the

24    guidelines in your report instead of the standards

25    is because they're more specific?

Page 118

1     A    That's correct.

2     Q    Is that accurate?

3     A    That's correct.

4     Q    Okay.  You're not saying that Dr. Barnes

5 didn't violate the mandatory standards?

6     A    I think she violated mandatory standards.

7     Q    Okay.  I want to go through some of the

8 standards, and I know we talked a lot about 2.01,

9 the boundary of competence.

10    A    Yes.

11    Q    Okay.  And my understanding of your

12 testimony, and correct me if I'm wrong, is that her

13 conduct as a whole violated 2.01?

14    A    Yeah, that's --

15         MR. WHATLEY:  Object to the form of the

16 question.

17    Q  (BY MS. TALBERT) You can answer.

18    A    That's what I've been saying --

19    Q    Okay.

20    A    -- that these specifics that I've talked

21 about collectively address a variety of the issues

22 and standards and one of them is competence.

23    Q    Okay.  What other standards within the

24 ethical principles did she violate, in your opinion?

25    A    Well, one was 3.07, third-party request

Page 119

1    for services, "When psychologists agree to provide

2    services to a person or entity at the request of a

3    third party, psychologists attempt to clarify at the

4    outset of the service the nature of the relationship

5    with all individuals or organizations involved.

6    This clarification includes the role of the

7    psychologist and identification of who is the

8    client, the probable uses of services provided or

9    the information obtained and the fact that there may

10   be limits to confidentiality."

11           I didn't see any documentation in the

12   records that I saw that convinced me that she was

13   able to document that she did, you know, met the

14   standard of 3.07.

15        Q    And it's not in her informed consent

16   either, correct?

17        A    No, it's not.

18        Q    What other standards -- is there a delay?

19             What other standards do you think

20   Dr. Barnes violated?

21        A    I think that she violated the informed

22   consent standard, especially Part D, "Psychologists

23   appropriately document written or oral consent,

24   permission and ascent."  I saw a variety of problems

25   in the consent that she provided and she didn't do

```
                                        Page 120
```

1    it in the first place and she had a responsibility

2    to do that.

3        Q    Okay.

4            MR. HALL:  If I can, Dr. Hand, what

5    provision are you referring to right now?

6            THE WITNESS:  3.10, Section D at the

7    bottom of that, 3.10, Informed Consent, Section D,

8    toward the bottom of those paragraphs.

9            MR. HALL:  Thank you.

10       Q    (BY MS. TALBERT) And in regards to 3.10, it

11   talks about, you know, the informed consent should

12   use language that's reasonably understandable to the

13   person, do you think this informed consent, do you

14   think Dr. Snyder could reasonably understand the

15   scope of what she was going to do, based on her

16   informed consent?

17           MR. HALL:  Form.

18           THE WITNESS:  No.

19       Q    (BY MS. TALBERT) Okay.  So you think that

20   was a violation also, correct?

21           MR. HALL:  Form.

22           THE WITNESS:  She didn't explain fully

23   what she was going to do.

24       Q    (BY MS. TALBERT) Okay.  What other

25   standards do you feel like Dr. Barnes violated?

Page 121

1        A     I think 4.02, Discussing the Limits of

2    Confidentiality, "Psychologists discuss with persons

3    including, to the extent feasible, persons who are

4    legally incapable of giving informed consent and

5    their legal representatives and organizations with

6    whom they establish the scientific or professional

7    relationship the relevant limits of confidentiality,

8    the foreseeable uses of information generated

9    through their psychological activities."  I think

10   her discussion was inadequate.

11       Q     Okay.  So that was 4.02, correct?

12       A     Correct.

13       Q     Okay.  What other standards?

14       A     4.04, Minimizing Intrusions on Privacy.

15   "Psychologists include written and oral reports and

16   consultation only information germane to the purpose

17   for which the communication is made."

18            She included a lot of private information

19   testing results that were not relevant to what she

20   purported to do in terms of a fitness for duty

21   evaluation, a lot of speculative use of data from

22   the testing that shouldn't have been in a fitness

23   for duty report.

24       Q     Okay.  Are there more standards that you

25   feel that she violated?

Page 122

1     A     Well, then there's 9.03, it's more

2     informed consent and assessments.  One purpose of

3     the testing is to -- if one person is -- let's see,

4     you have to look at the whole thing, but it's 9.03

5     and I'm looking specifically to the line, "Informed

6     consent includes an explanation of the nature and

7     purpose of the assessment, fees, involvement of

8     third parties and limits of confidentiality and

9     sufficient opportunity for the patient to ask

10    questions and receive answers."  It was clear to me

11    that her informed consent didn't meet that criteria.

12    Q     Okay.  So that's a violation also,

13    correct?

14              MR. HALL:  Form.

15              THE WITNESS:  I believe it is.

16    Q     (BY MS. TALBERT) Are there any other

17    standards that you feel like she violated, "she"

18    being Dr. Barnes?

19    A     Yes, 9.09, "Psychologists retain

20    responsibility," point C, "psychologists retain

21    responsibility for the appropriate application,

22    interpretation and use of assessment instruments,

23    whether they score and interpret such tests

24    themselves or use automated or other services."  And

25    I think the appropriate application part of that is

Page 123

1    the violation when she repeated verbatim paragraphs

2    from a computerized report that she did not identify

3    as such.

4         Q    Okay.  Any other ones?

5         A    The, "Explaining assessment results,

6    regardless of whether the scoring or interpretation

7    are done by psychologists or employees or assistants

8    or by automated or other outside services,

9    psychologists take reasonable steps to ensure the

10   explanation of results are given to the individual

11   or designated representative, unless the nature of

12   the relationship precludes provision of an

13   explanation of results, such as in some

14   organizational consulting, pre-employment or

15   security screenings and forensic evaluations and

16   this fact has been clearly explained to the person

17   being assessed in advanced."  And I didn't see any

18   explanations or evidence in the report that I saw

19   that that explanation -- those explanations were

20   being made in advance.

21        Q    There were conversations before about the

22   informed consent and how it didn't specifically

23   state whether or not Dr. Snyder would receive a copy

24   of the report or receive the results of his

25   assessment, is that what you're talking about in

Page 124

1   terms of, "This fact has been clearly explained to

2   the person assessed in advance"?

3          MR. HALL:  Form.

4          THE WITNESS:  Yes.

5      Q   (BY MS. TALBERT) So it's not just the

6   guidelines that she violated, it's also based on

7   these standards in this specific case, correct?

8          MS. MCDUFFEY:  Object to form.

9          MR. HALL:  Form.

10         THE WITNESS:  The guidelines and standards

11  work together and in this particular case the

12  guidelines help explicate those standards were not

13  met and why they're violations of those standards.

14         MS. TALBERT:  Let me just see what else I

15  got.

16         I don't have any other further questions.

17         MR. HALL:  I have some follow-ups.

18              REDIRECT-EXAMINATION

19  BY MR. HALL:

20     Q   First question is, why didn't you include

21  the standards that you say that Dr. Barnes violated

22  in your report?

23     A   I thought that the specifics of this

24  situation, this particular case, really demanded a

25  look at details and the -- and I believed that the

Page 125

1    occupationally mandated guidelines provided an

2    opportunity to assess those details and I believe

3    that those details relate to those standards that I

4    just mentioned.

5         Q    Are you of the opinions that the ethical

6    principles promulgated by the American Psychological

7    Associate are deficient?

8              MS. TALBERT:   Form.

9              THE WITNESS:   Obviously they require some

10   explanation and one of the ways that the ethics are

11   used -- ethics are taught are to describe specific

12   situations, such as this, that relate to broad -- or

13   those specific ethical violations, it's clear to me

14   that these standards do relate to -- have been

15   violated and relate to the specific issues noted in

16   the occupationally mandated guidelines and the

17   deficiencies in Dr. Barnes' report and her informed

18   consent.

19        Q    (BY MR. HALL) Do the guidelines go above

20   and beyond what is required under the ethical

21   principles?

22        A    I think some do and some don't.  I think

23   some specifically relate to the principles and some

24   ask for -- look at best practices, but there's

25   nothing best practices about what some of these