# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

JEFFREY SNYDER, D.O.,            )
                                  )

       Plaintiff,           )
                                  )

v.                                )       Case No. CIV-16-384-F
                                  )

BOARD OF REGENTS FOR THE    )
OKLAHOMA AGRICULTURAL &     )
MECHANICAL COLLEGES, ex rel.  )
OKLAHOMA STATE UNIVERSITY  )
CENTER FOR HEALTH SCIENCES, )
*et al.*,                             )
                                  )

       Defendants.        )

---

## PLAINTIFF'S MOTION FOR SPOLIATION SANCTIONS
## WITH BRIEF IN SUPPORT

---

Joshua Stockton, OBA # 21833
Laura Talbert, OBA # 32670
**STOCKTON TALBERT, PLLC**
1127 N.W. 14th Street
Oklahoma City, Oklahoma 73106
Telephone: (405) 225-1200
Email: jstockton@stocktontalbert.com
**ATTORNEYS FOR PLAINTIFF**
**JEFFREY SNYDER, D.O.**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................. 1

STATEMENT OF FACTS ..................................................................... 3

    A.    Dr. Cotton's Email to Nottingham with the June Issues Letter ... 3

    B.    Dr. Snyder's Open Records Act Requests ...................................... 7

    C.    Cooper's Investigation ................................................................. 10

        1.    Cooper Interviews Dr. Cotton and Dr. Alexopulos ........... 11

        2.    Stop the Investigation! ....................................................... 12

        3.    Leaving Dr. Snyder in the Dark ......................................... 14

        4.    Where are the Notes? ......................................................... 15

ARGUMENTS & AUTHORITIES ....................................................... 17

I.    THE OSU DEFENDANTS FAILED TO PRESERVE EVIDENCE ...... 17

    A.    The OSU Defendants had a Duty to Preserve Evidence ............. 18

    B.    Dr. Snyder was Prejudiced by the OSU Defendants' Failure to Preserve Evidence ................................................................. 19

II.    THE COURT SHOULD ENTER AN ADVERSE INFERENCE INSTRUCTION OR OTHER APPROPRIATE RELIEF ....................... 22

CONCLUSION .................................................................................... 25

# TABLE OF AUTHORITIES

## Cases

*103 Investors I, L.P. v. Square D Company,*
    470 F.3d 985 (10th Cir. 2006) ........................................................ 18

*Adams v. Gateway, Inc., 2:02-CV-106 TS,*
    2006 WL 2563418 (D. Utah Mar. 22, 2006) .......................................... 23, 25

*Arambaru v. The Boeing Co.,*
    112 F.3d 1398 (10th Cir. 1997) ...................................................... 18

*Ashton v. Knight Transp., Inc.,*
    772 F. Supp. 2d 772 (N.D. Tex. 2011) ............................................. 20

*Burlington N. & Santa Fe Ry. Co. v. Grant,*
    505 F.3d 1013 (10th Cir. 2007) ...................................................... 18

*Cache La Poudre Feeds, LLC v. Land O'Lakes, Inc.,*
    244 F.R.D. 614 (D. Colo. 2007) ................................................. 19, 22

*Coyne v. Los Alamos Nat'l Sec., LLC, 15-CV-54 SCY/KBM,*
    2017 WL 3225466 (D.N.M. May 1, 2017) ............................................ 25

*Estate of Trentadue v. United States,*
    397 F.3d 840 (10th Cir. 2005) ...................................................... 22

*Henning v. Union Pac. R. Co.,*
    530 F.3d 1206 (10th Cir. 2008) ..................................................... 20

*Hicks v. Gates Rubber Co.,*
    833 F.2d 1406 (10th Cir. 1987) ................................................. 19, 22

*Jordan F. Miller Corp. v. Mid-Continent Aircraft Serv., Inc.,*
    139 F.3d 912 (10th Cir. 1998) ...................................................... 22

*Markham v. Nat'l States Ins. Co., CIV.02-1606-F,*
    2004 WL 3019308 (W.D. Okla. Jan. 8, 2004) ........................................ 18

*Schlumberger Tech. Corp. v. Greenwich Metals, Inc.,*
    No. 07-2252-EFM, 2009 WL 5252644 (D. Kan. Dec. 31, 2009) .................... 22

*Turner v. Pub. Serv. Co. of Colo.*,
   563 F.3d 1135 (10th Cir. 2009) ...................................................................... 22

*Turner v. Pub. Serv. Co. of Colo.*,
   563 F.3d 1136 (10th Cir. 2009) ...................................................................... 18

*United States ex rel. Koch v. Koch Indus., Inc.*,
   197 F.R.D. 463 (N.D. Okla. 1998) ................................................................. 17

## **Statutes**

20 U.S.C. § 1681 ............................................................................................... 24

Okla. Stat. tit. 51, § 24A.1 ................................................................................ 24

## **Rules**

Fed. R. Civ. P. 26, 34, and 37 ............................................................... 18, 22, 24

## **Regulations**

29 C.F.R. § 1602.14 ..................................................................................... 19, 24

## LIST OF EXHIBITS

Ex. 1, Missing Evidence Charts

Ex. 2, Cotton Transcript

Ex. 3, June 30th Issues Letter

Ex. 4, Cooper Transcript

Ex. 5, Snyder Discrimination Complaint.

Ex. 6, Barnes' 2nd Report

Ex. 7, Emails from Nottingham to CommunityCare

Ex. 8, Emails from Alexopulos

Ex. 9, Referral to FFD

Ex. 10, Fax from Heavin

Ex. 11, Email from Nottingham Providing Fax

Ex. 12, Heavin Notes

Ex. 13, Email from Nottingham

Ex. 14, 2016 Rotations Letter

Ex. 15, New Innovations Email to Alexopulos

Ex. 16, Email from Whatley

Ex. 17, Nottingham Transcript

Ex. 18, Zix Web Pages

Ex. 19, Email from Benjamin to Cotton's OSUMC Email

Ex. 20, Email from Nottingham to Heavin

Ex. 21, Barnes 3rd Report

Ex. 22, Involuntary Leave Letter

Ex. 23, Stipulation re Benjamin

Ex. 24, Kannady Open Records Request

Ex. 25, Kannady Appeal Letter

Ex. 26, 2014 Letter from Price

Ex. 27, Price Transcript

Ex. 28, Board's ORA Emails and Letters

Ex. 29, Alexopulos Letter to Board

Ex. 30, Post-Graduate Training Verification

Ex. 31, Summary of Events

Ex. 32, 2015 Open Records Letter

Ex. 33, Letter from Gattoni

Ex. 34, Mercy Privilege Log

Ex. 35, CommunityCare Privilege Log

Ex. 36, Emails re Discrimination Complaints

Ex. 37, Cooper Training Records

Ex. 38, November Options Letter

Ex. 39, Cooper Calendar Entry

Ex. 40, Email re OCRE Complaint

Ex. 41, Board's Response to Requests for Production

Ex. 42, OSUMC Response to Request for Production

Ex. 43, Original EEO File

Ex. 44, Emails re EEO Evidence

Ex. 45, Email re Cooper

Ex. 46, Pratt Email of November 21, 2019

Ex. 47, Redacted Email

Ex. 48, November 2019 Privilege Log from the Board

Ex. 49, Email from Alexopulos

Plaintiff Jeffrey Snyder, D.O. ("**Dr. Snyder**"), through his counsel of record, Stockton Talbert, moves the Court for spoliation sanctions against the defendants affiliated with Oklahoma State University ("**the OSU Defendants**"),[1] including an adverse inference instruction that informs the jury that the OSU Defendants failed to preserve evidence relating to Dr. Snyder's fitness for duty evaluation and subsequent discrimination investigation. Dr. Snyder offers the following brief in support of his motion.

## **INTRODUCTION**

The OSU Defendants did not preserve evidence about Dr. Snyder's fitness for duty evaluation or the subsequent investigation into their conduct, which prejudices Dr. Snyder's ability to present his case to the jury. The evidence the OSU Defendants failed to preserve centers around their efforts to ensure Dr. Snyder was declared "not fit" for duty by Leslie Barnes, Ph.D. ("**Dr. Barnes**"). There are at least three pieces of evidence that are irretrievably lost, while several others are only missing from the OSU Defendants.

The first piece of evidence that is irretrievably lost is a secure email sent by Dr. Cotton to Deby Nottingham ("**Nottingham**") on or about July 1, 2014, to which she attached a list of "issues" about Dr. Snyder's June 2014 rotation

---

[1] The OSU Defendants include the Board of Regents for the Oklahoma Agricultural & Mechanical Colleges, *ex rel.* Oklahoma State University Center for Health Sciences ("**the Board**"); Oklahoma State University Medical Trust, d/b/a Oklahoma State University Medical Center ("**OSUMC**"); Dr. Lora Cotton ("**Dr. Cotton**"); Dr. Jenny Alexopulos ("**Dr. Alexopulos**"), and Mercy ("**Mercy**").

at OSUMC that were written to obtain a third report from Dr. Barnes. Ex. 1, Missing Evidence, Chart 1; Ex. 2, Cotton, 292:1-295:2; Ex. 3, June 30th Issues Letter. The second and third are a set of handwritten notes written by Sandy Cooper ("**Cooper**") while interviewing Dr. Cotton and Dr. Alexopulos, separately, a few months later as part of her investigation into Dr. Snyder's discrimination complaint. Ex. 1, Missing Evidence, Chart 1; Ex. 4, Cooper, 67:11-69:18, 73:15-74:17; Ex. 5, Snyder Discrimination Complaint.

Dr. Cotton's missing email and Cooper's missing handwritten notes are not the only evidence the OSU Defendants lost or destroyed. While ultimately produced by their *co-defendants* in this case, the OSU Defendants also did not preserve: (1) Dr. Barnes' 2nd report dated June 29, 2014, which was faxed to OSUMC by Dr. Barnes on June 30, 2014; (2) Nottingham's emails to CommunityCare providing the 2nd Report; (3) Nottingham's email to Heavin providing Dr. Cotton's June 30th issues letter; and (4) Dr. Alexopulos' communications with Dr. Snyder, in which she promised to complete his June 2014 evaluation at his request, only to later claim she was "unable to evaluate" him. Ex. 1, Missing Evidence, Chart 2; Ex. 6, Barnes' 2nd Report; Ex. 7, Emails from Nottingham to CommunityCare; Ex. 8, Emails from Alexopulos.

The Court should find the OSU Defendants intended to deprive Dr. Snyder of this evidence while anticipating litigation. They first began withholding evidence from Dr. Snyder on August 6, 2014, when they responded

2

to Dr. Snyder's request under the Oklahoma Open Records Act by selectively producing some of his educational and employment records while withholding more than 6 dozen others, including the evidence they failed to preserve. Ex. 1, Missing Evidence, Chart 3. Over the next five years, the OSU Defendants compounded the prejudice they caused to Dr. Snyder by failing to timely produce evidence they *did* still possess, which concealed the full extent of their conduct.[2] Because the OSU Defendants' conduct warrants an adverse inference instruction, the Court should grant the motion.

## STATEMENT OF FACTS

### A.   Dr. Cotton's Email to Nottingham with the June Issues Letter

1.     Dr. Snyder was referred to a mandatory fitness for duty evaluation in May 2014 as a condition of his probation, which was conducted by Dr. Barnes. Ex. 9, Referral to FFD.

2.     After Dr. Barnes submitted her first report dated June 23, 2014, which did <u>not</u> declare Dr. Snyder "not fit" for duty, the OSU Defendants had CommunityCare provide Dr. Barnes additional information they believed would cause her to change her recommendations. Ex. 10, Fax from Heavin.

---

[2] Dr. Snyder incorporates by reference the facts regarding the OSU Defendants' discovery violations from his Motion for Leave to Supplement Aquino as a Witness (ECF # 420).

3.      In response, Dr. Barnes drafted a 2nd report dated June 29, 2014, which again did not declare Dr. Snyder "not fit" for duty, which she faxed to the OSU Defendants on June 30, 2014. Ex. 6, Barnes' 2nd Report (**never produced by the OSU Defendants**); Ex. 11, Email from Nottingham Providing Fax Number (**never produced by the OSU Defendants**).

4.      On June 30, 2014, Nottingham and Benjamin again asked CommunityCare to provide Barnes additional information to see if she wanted to amend her recommendations; Nottingham also emailed Dr. Barnes' 2nd report to Benjamin, Stewart, and Heavin later that day. Ex. 12, Heavin Notes; Ex. 13, Email from Nottingham (CommunityCare0626) (**never produced by the OSU Defendants**).

5.      Dr. Barnes then asked for "some information on how Dr. Snyder has been doing in his residency since his referral to EAP" if the OSU Defendants and CommunityCare wanted her to "continue to consult with us on this case." Ex. 12, Heavin Notes (emphasis in original).

6.      Dr. Cotton wrote a letter dated June 30, 2014, which she knew would be provided to Dr. Barnes, which contained negative (and disputed) information about Dr. Snyder's treatment of patients during his June 2014 rotation. Ex. 3, June 30th Issues Letter; Ex. 2, Cotton, 293:13-294:21.

7.     Despite the contents of Dr. Cotton's June 30th letter, Dr. Cotton admits Dr. Snyder successfully completed the June 2014 rotation. Ex. 2, Cotton, 294:11-15; Ex. 14, 2016 Rotations Letter.

8.     Dr. Alexopulos told Dr. Snyder she would complete an evaluation for the June 2014 rotation but later claimed she was "unable to evaluate" him. Ex. 8, Emails with Alexopulos (**<u>never</u> produced by the OSU Defendants**); Ex. 15, New Innovations Email to Alexopulos (withheld until <u>November 21, 2019</u>).

9.     Dr. Cotton provided the June 30th issues letter to Nottingham via a "secure email attachment," which the OSU Defendants confirm is missing and cannot be located. Ex. 1, Missing Evidence, Chart 1; Ex. 2, Cotton, 292:1-293:9; Ex. 16, Email from Whatley.

10.     Emails involving OSUMC were backed up on OSUMC's servers using a secure email system maintained by ZixCorp, which hosts secure email services that can back up and archive data. Ex. 17, Nottingham 129:13–18, 136:8–141:13; Ex. 18, Zix Web Pages.

11.     Even though Dr. Cotton was provided both an okstate.edu and osumc.net email address to use as Program Director, she admits she never searched her OSUMC email account for evidence in this case by claiming she never used it (even though there is evidence that proves otherwise) and

personally turned over emails to her counsel from her OSU email account. Ex. 2, Cotton, 91:16-94:6; Ex. 19, Email from Benjamin to Cotton's OSUMC Email.[3]

12.    On July 1, 2014, Nottingham emailed Heavin Dr. Cotton's June 30th Issues Letter to provide to Dr. Barnes, which the OSU Defendants also confirm is missing. Ex. 20, Email from Nottingham to Heavin (**never produced by the OSU Defendants**); Ex. 17, Nottingham, 136:8-21; Ex. 16, Email from Whatley.

13.    Nottingham denies deleting any of her emails but admits she was involved in turning over copies of her emails to attorneys, but she did not have a justification for why her email to Heavin was missing, other than it "could have been overlooked." Ex. 17, Nottingham, 140:10-141:13.

14.    The next day, Dr. Barnes declared Dr. Snyder "not fit" for duty in a 3rd report (which the OSU Defendants *did* produce), which she faxed to OSUMC on July 3, 2014, the same day Dr. Cotton and Dr. Alexopulos placed Dr. Snyder on an involuntary leave of absence, from which he would not return. Ex. 21, Barnes 3rd Report; Ex. 22, Involuntary Leave Letter.

---

[3] While Dr. Snyder requested Benjamin's deposition during discovery, she was not deposed after the OSU Defendants informed Dr. Snyder that she could not appear for a deposition due to personal family reasons and provided a note from a physician. All defendants have stipulated that she would not be called as a witness at trial. Ex. 23, Stipulation re Benjamin.

**B.     Dr. Snyder's Open Records Act Requests**

15.     On July 11, 2014, Dr. Snyder requested, through counsel, all documents regarding his residency from the Board of Regents under Oklahoma's Open Records Act, including:

> the entire student personnel file, any records associated with the Employee Assistance Program, any recommendations by outside physicians, any internal communication between staff including but not limited to emails, any external communication between staff and outside parties including but not limited to emails and any medical records, reports and diagnoses.

Ex. 24, Kannady Open Records Request.

16.     On July 30, 2014, in the letter appealing his probation, Dr. Snyder again requested, through counsel, "a complete copy of his personnel file to include any assessments administered by outside parties." Ex. 25, Kannady Appeal Letter.

17.     On August 6, 2014, Doug Price, Deputy General Counsel with the Board of Regents, responded to Dr. Snyder's request with the production of 135 pages of records related to Dr. Snyder, including his contract, emails, letters, and evaluations. Ex. 26, 2014 Letter from Price; Ex. 27, Price, 26:15-27:5.

18.     Price testified that Dr. Cotton and Dr. Alexopulos assisted him in producing documents responsive to Dr. Snyder's Open Records requests and that the Board produced everything to Dr. Snyder that was turned over to him. Ex. 27, Price, 27:16-35:1.

19.    When responding to Dr. Snyder's 2014 open records request, the Board produced only 13 pages of emails to Dr. Snyder, ***all printed directly from Dr. Cotton's email account*** and 9 pages of letters from Dr. Snyder's residency file, including Dr. Cotton's June 30 issues letter and Dr. Barnes' 3rd Report. Ex. 1, Missing Evidence, Chart 3 (green highlights); Ex. 28, Board's ORA Emails and Letters.

20.    When responding to Dr. Snyder's 2014 open records request, the Board withheld from Dr. Snyder more than 6 dozen records, including more than a dozen emails or communications Dr. Cotton and Dr. Alexopulos *personally* sent or received concerning Dr. Snyder. Ex. 1, Missing Evidence, Charts 1, 2, and 3 (blue highlights); Ex. 29, Alexopulos Letter to Board (produced in May 2015); Ex. 30, Post-Graduate Training Verification (produced in September 2017).

21.    The OSU Defendants *also* withheld from Dr. Snyder: (a) Dr. Cotton's email to Nottingham with the June 30th issues letter (missing); (b) Dr. Barnes' 2nd report and the email communications to CommunityCare regarding the 2nd report (produced only by CommunityCare and Barnes); and (c) Dr. Alexopulos' emails with Dr. Snyder regarding the June 2014 rotation (produced only by Snyder). Ex. 1, Missing Evidence, Charts 1, 2, and 3 (blue highlights through August 6, 2014); Ex. 6, Barnes' 2nd Report; Ex. 7, Emails

from Nottingham to CommunityCare; Ex. 8, Emails from Alexopulos; Ex. 31, Summary of Events (produced December 2018).

22.    On April 1, 2015, Dr. Snyder sent an additional request under the Open Records Act to Doug Price, requesting that the OSU Defendants preserve all evidence and produce any additional evidence in their possession. Ex. 32, 2015 Open Records Letter; Ex. 27, Price, 46:24-48:1.

23.    On May 28, 2015, the OSU Defendants produced 172 pages of additional records, which included some of the records about Dr. Snyder's residency that the OSU Defendants failed to produce in 2014, while still withholding significant records about Dr. Snyder, including evidence regarding Cooper's investigation. Ex. 33, Letter from Gattoni; Ex. 1, Missing Evidence, Chart 3 (blue highlights after August 6, 2014).

24.    The Board asserts the work product doctrine over communications between Price and Benjamin/Nottingham as early as June/July 2014, both of whom Price admits were not his clients. Ex. 27, Price, 7:5-8:7; 57:17-63:8. *See also* Ex. 34, Mercy Privilege Log (asserting work product in April 2015); Ex. 35, CommunityCare Privilege Log (asserting work product in September 2014).[4]

_____

[4] The OSU Defendants have never produced an apparently redacted email responding to Nottingham on or about July 29, 2014, following Nottingham's request for guidance from Benjamin after CommunityCare informed her they could not

### C.    Cooper's Investigation

25.    In July 2014, after being placed on an involuntary leave of absence, Dr. Snyder requested from Dr. Rosalyn Green, OSU's Title IX Coordinator, an investigation into his treatment by the OSU Defendants during his probation and fitness for duty evaluation; Dr. Green told Dr. Snyder she had authority to investigate his discrimination complaints only to attempt to return all the documents Dr. Snyder provided her around 6 weeks later in early September 2014. Ex. 36, Emails re Discrimination Complaints (BSD4-001327-1333, 1373-1376, 1388, 1391) (withheld by the OSU Defendants until November 21, 2019).

26.    On September 8, 2014, Dr. Snyder emailed OSU President Burns Hargis, whose office directed another university official to "look into this matter and respond to" Dr. Snyder. Ex. 36, Emails re Discrimination Complaints (BSD4-001403-1404).[5]

27.    On August 26, 2014, Dr. Snyder emailed Cooper, an Assistant Vice-President for Human Resources with authority to investigate employees of OSU, requesting an investigation into his treatment by Dr. Cotton, Dr.

---

provide her any information under federal law since Dr. Snyder lawfully revoked his authorization. Ex. 1, Missing Evidence, Chart 1; Ex. 47, Redacted Email.

[5] President Hargis' office was later instructed to not discuss Dr. Snyder's complaint with him outside of communications with his counsel and the Board of Regent's counsel, even though Dr. Snyder was handling his discrimination complaint personally and not through his attorneys. Ex. 36, Emails re Discrimination Complaints (BSD4-001412, 1421, 1457).

Alexopulos, Benjamin, and Nottingham. Ex. 36, Emails re Discrimination Complaints (BSD4-001343-1344); Ex. 4, Cooper, 7:21-8:3; 10:1-16; 11:18-14:11; 89:12-90:13.

28.    On September 5, 2014 Cooper acknowledged receipt of Dr. Snyder's discrimination complaint and agreed to "begin an investigation immediately" while promising to keep Dr. Snyder apprised of its status. Ex. 36, Emails re Discrimination Complaints (BSD4-001342-1368, 1382); Ex. 4, Cooper, 17:9-14, 52:25-53:11, 63:2-10, 90:11-13.

### 1.    Cooper Interviews Dr. Cotton and Dr. Alexopulos

29.    The Board of Regents trained Cooper to take notes during her investigations of discrimination complaints and to remain a "neutral fact finder." Ex. 37, Cooper Training Records; Ex. 4, Cooper, 38:9-18, 39:1-10.

30.    During her investigation, Cooper interviewed Dr. Cotton at least once (and possibly twice) in Dr. Cotton's office, where they met alone to discuss Dr. Snyder's complaints. Ex. 4, Cooper, 61:6-62:1, 71:16-73:25.

31.    Cooper also interviewed Dr. Alexopulos alone and discussed Dr. Snyder's complaints. Ex. 4, Cooper, 66:21-67:18.

32.    Cooper took handwritten notes during her interviews of Dr. Cotton and Dr. Alexopulos that she maintained in a physical file in her office. Ex. 4, Cooper, 66:21-68:15 (admitting she was "sure" she took notes during her interview of Dr. Alexopulos);  Ex. 4, Cooper, 69:6-70:3 (admitting she "most

11

likely" took notes during her interview of Dr. Cotton); Ex. 4, Cooper, 113:8-115:8 (noting she saved an electronic file on OSU's servers, while handwritten notes she saved in her physical file).

33.     Cooper also claims her standard practice was to make notes *before* she met with Dr. Cotton and Dr. Alexopulos that contained information from Dr. Snyder's complaint along with specific questions she had for them, which she normally keeps in her physical file. Ex. 4, Cooper, 73:15-75:14.

34.     Cooper cannot think of any reason she would have failed to take notes during her interviews of Dr. Cotton and Dr. Alexopulos, admitted it would have been unusual for her to *not* take notes during those interviews, and testified she did not destroy any of her notes. Ex. 4, Cooper, 68:13-15, 69:25-70:3, 71:9-12.

## 2.     Stop the Investigation!

35.     After Cooper interviewed Dr. Cotton and Dr. Alexopulos, a decision was made to end her investigation after she met with Doug Price, who determined what Cooper's role was in terms of investigating Dr. Snyder's discrimination complaints. Ex. 4, Cooper, 62:2-17, 115:9-15.[6]

---

[6] On September 11, 2014, there was a meeting between Doug Price, McKenzie Wilfong (another lawyer with the Board of Regents), Dr. Cotton, Dr. Alexopulos, and Dr. Thurman, though Cooper does not recall that meeting and does not believe she was present. Ex. 4, Cooper, 90:21-92:7.

36.     Cooper stopped investigating Dr. Cotton and Dr. Alexopulos because her "role was determined to not be as an investigator," but to help "facilitate a resolution" by assisting Dr. Cotton and Dr. Alexopulos resolve Dr. Snyder's concerns "in a way that would help Dr. Snyder be successful . . . ." Ex. 4, Cooper, 62:25-66:8, 127:15-128:1, 131:19-22; 138:1-139:23.

37.     Cooper's investigation was stopped before she could gather documents or generate conclusions, which is her standard practice during her investigations. Ex. 4, Cooper, 74:18-25, 82:6-9.

38.     Cooper did not investigate Dr. Snyder's concerns that the OSU Defendants were using CommunityCare as a "middleman" to do their bidding, nor did she investigate Benjamin's admission that Dr. Cotton and Dr. Alexopulos were "pushing for a neuropsych eval," though she admits this was a "red-flag" that should have been investigated. Ex. 4, Cooper, 96:15-98:18, 104:21-106:14.

39.     Instead of investigating Dr. Snyder's complaints, Cooper attended the November 2014 options meeting at Dr. Cottons' request, though she admits she only provided "minimal" human resources advice during meetings. Ex. 38, November Options Letter; Ex. 39, Cooper Calendar Entry (withheld by the OSU Defendants until November 21, 2019); Ex. 4, Cooper, 58:22-59:7; 60:12-61:5; 126:19-128:1.

40.     Cooper admits that the OSU Family Medicine Residency had an obligation to investigate Dr. Snyder's discrimination complaints, though she never conveyed that information to Dr. Snyder. Ex. 4, Cooper, 76:18-77:25, 78:9-79:23.

### 3.     Leaving Dr. Snyder in the Dark

41.     On September 25, 2014, Dr. Snyder requested an update from Cooper regarding the status of his discrimination complaint. Ex. 36, Emails re Discrimination Complaints (BSD4-001458-1459).

42.     On September 29, 2014, Cooper responded claiming his attorney had been given frequent updates about the EAP report and request for an appeal, to which Dr. Snyder responded by stating that his discrimination complaint was "an entirely separate issue to the circumstances and situations being handled by my attorneys." Ex. 36, Emails re Discrimination Complaints (BSD4-001457-1458).

43.     Cooper never responded to Dr. Snyder's email or told him she stopped investigating his complaint, which she concedes he had a right to know, and is not aware of any other investigation by the university. Ex. 4, Cooper, 79:16-81:4, 101:19-103:5.

44.     Several months after Cooper stopped communicating with him, Dr. Snyder filed a discrimination complaint with the Office of Civil Rights Enforcement, which was later transferred to the Equal Employment

Opportunity Commission. Ex. 40, Email re OCRE Complaint (produced from Dr. Cotton's email account in August 2019).

### 4.    Where are the Notes?

45.    After Cooper left her employment with OSU in January 2016, the custodian of her former files, Tina Tappana, called to ask Cooper about her missing notes and whether there was some other place they could be, causing Cooper to physically travel back to OSU to review her old physical file. Ex. 4, Cooper, 68:1-24, 70:4-25.

46.    Cooper testified she does not recall whether Dr. Alexopulos' interview notes were in the filing cabinet when she reviewed her old physical file. Ex. 4, Cooper, 67:2-68:12, 68:25-69:1; 76:14-17.

47.    At the time of her deposition, Cooper testified she had not seen any of her notes "recently" beyond a single page of notes she created *after* her investigation was halted, which she believes she created before the November options meeting by referring back to her calendar, and admits those notes are **<u>not</u>** the same notes as the notes she took during her interviews of Dr. Cotton and Dr. Alexopulos. Ex. 4, Cooper, 68:1-70:1, 85:16-87:9.

48.    In 2017, the Board and OSUMC promised, without objection, to produce responsive documents to Dr. Snyder's discovery request for all evidence regarding his complaints of discrimination. Ex. 41, Board's Response

to Request for Production No. 4; Ex. 42, OSUMC Response to Request for Production No. 4.

49.    During the first 2 years of discovery, the OSU Defendants claimed they only possessed **15 pages** of evidence about the investigation into Dr. Snyder's discrimination complaint, consisting of Cooper's calendar notes along with one letter from Dr. Snyder enclosing his EEO intake questionnaire with attachments. Ex. 43, Original EEO File; Ex. 44, Emails re EEO Evidence.

50.    On October 4, 2019, prior to Cooper's deposition, the Board claimed they were "unable to locate any additional EEO related emails associated with Jeff Snyder," instead referring Dr. Snyder to the emails *he* had produced to the OSU Defendants during discovery while failing to produce any of their own evidence. Ex. 44, Emails re EEO Evidence.[7]

51.    On November 21, 2019, after the close of discovery and the deadline to file responses to dispositive motions, the OSU Defendants produced hundreds of pages of emails relating to Dr. Snyder's discrimination complaints the OSU Defendants had withheld, some of which *Dr. Snyder* produced to the

---

[7] Dr. Snyder first requested Cooper's deposition on July 24, 2019, but the OSU Defendants claimed she was not able to testify. Ex. 45, Email re Cooper. On September 16, 2019, Dr. Snyder issued a Deposition Notice (ECF # 292) seeking testimony from the OSU Defendants' representatives about certain topics, including the investigation into Dr. Snyder's discrimination complaints. Dr. Snyder subpoenaed Cooper individually, the OSU Defendants designated Cooper as their representative for Topics 7-10, and her deposition took place on October 8, 2019. Ex. 4, Cooper, 28:25-29:22. *See* Notice of Depositions (ECF # 300).

OSU Defendants during discovery, while some he had never seen, including communications from President Burns Hargis' office regarding Dr. Snyder's discrimination complaints. Ex. 46, Pratt Email of November 21, 2019.

52.    In 2017, the Board represented that it was *not* withholding any documents pursuant to any privilege regarding Dr. Snyder's discrimination complaints, a position it held for the next 2 years, until November 21, 2019, when it first claimed privilege over communications between Price and Cooper regarding Cooper's investigation into Dr. Snyder's discrimination complaints. Ex. 42, Board Response to Request for Production No. 28 re Privilege Log ("No such documents were withheld."); Ex. 48, November 2019 Privilege Log from the Board (listing allegedly privileged communications from 2014-2015 about Dr. Snyder's discrimination complaints).

## ARGUMENTS & AUTHORITIES

## I.    THE OSU DEFENDANTS FAILED TO PRESERVE EVIDENCE

The Court should find that the OSU Defendants intentionally failed to preserve evidence and instruct the jury accordingly. "Spoliation includes the intentional or negligent destruction or loss of tangible and relevant evidence which impairs a party's ability to prove or defend a claim." *United States ex rel. Koch v. Koch Indus., Inc.*, 197 F.R.D. 463, 482 (N.D. Okla. 1998). Spoliation sanctions are appropriate even where spoliation has occurred through a party's mere negligence, which the Court may remedy by barring testimony or other

17

remedies. *103 Investors I, L.P. v. Square D Company*, 470 F.3d 985, 988-89 (10th Cir. 2006). If evidence was destroyed in bad faith or with an intent to deprive an opposing party of that evidence, the Court may provide an adverse inference instruction to the jury. Fed. R. Civ. P. 37(e); *Turner v. Pub. Serv. Co. of Colo.*, 563 F.3d 1136, 1149 (10th Cir. 2009); *Arambaru v. The Boeing Co.*, 112 F.3d 1398, 1407 (10th Cir. 1997).

The Court should enter spoliation sanctions when "(1) a party has a duty to preserve evidence because it knew, or should have known, that litigation was imminent, and (2) the adverse party was prejudiced by the destruction of the evidence." *Burlington N. & Santa Fe Ry. Co. v. Grant*, 505 F.3d 1013, 1032 (10th Cir. 2007). Because the OSU Defendants failed to preserve evidence while anticipating litigation to Dr. Snyder's prejudice, the Court should enter spoliation sanctions.

## A.    The OSU Defendants had a Duty to Preserve Evidence

The OSU Defendants had a duty to preserve evidence regarding Dr. Snyder's claims, which was triggered in two independent ways. "Sanctions for spoliation are appropriate when a party destroys discoverable material which the party knew or should have known was relevant to pending, imminent, or reasonably foreseeable litigation." *Markham v. Nat'l States Ins. Co.*, CIV.02-1606-F, 2004 WL 3019308, at *12 (W.D. Okla. Jan. 8, 2004). The duty to preserve arises regardless of whether a formal complaint is filed. *Cache La*

*Poudre Feeds, LLC v. Land O'Lakes, Inc.*, 244 F.R.D. 614, 620 (D. Colo. 2007). By invoking the work product doctrine over communications between Price and Nottingham and Benjamin in June or July 2014, the OSU Defendants admit they anticipated litigation *before* they responded to Dr. Snyder's open records request in August 2014 and *before* Cooper's September 2014 investigation. Ex. 27, Price, 7:5-8:7; 57:17-63:8. The Court should find the OSU Defendants were under a duty to preserve evidence as of June or July 2014.

The OSU Defendants also had a mandatory duty to preserve evidence once Dr. Snyder filed his external discrimination complaint. The Code of Federal Regulations require the OSU Defendants to preserve records until the "final disposition" of Dr. Snyder's complaints, which is the date this lawsuit will eventually terminate. 29 C.F.R. § 1602.14. Because the OSU Defendants "selectively retained certain self-serving documents and discarded the remainder," the Court should find Dr. Snyder is entitled to an adverse inference instruction. *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1419 (10th Cir. 1987) (defendant's destruction of daily reports containing notes regarding job performance creates a presumption of spoliation).

### B. Dr. Snyder was Prejudiced by the OSU Defendants' Failure to Preserve Evidence

The Court should also find that Dr. Snyder was prejudiced because of the OSU Defendants' failure to preserve evidence. To demonstrate prejudice, Dr.

Snyder must show that the missing evidence was relevant to his claims or the OSU Defendants' defense. *Henning v. Union Pac. R. Co.*, 530 F.3d 1206, 1220 (10th Cir. 2008). "Generally, the prejudice element is satisfied where a party's ability to present its case or to defend is compromised." *Ashton v. Knight Transp., Inc.*, 772 F. Supp. 2d 772, 801 (N.D. Tex. 2011) (internal quotation omitted). "At the same time, courts must be careful that the application of this burden is not too onerous, otherwise the spoliating party might be allowed to profit from its own misconduct." *Id*.

By failing to preserve the missing evidence, the OSU Defendants compromised Dr. Snyder's ability to present the jury contemporaneous statements relevant to Dr. Cotton's and Dr. Alexopulos' intent while obtaining a "not fit" determination from Dr. Barnes through a 3rd report. Dr. Cotton's failure to preserve her June 30, 2014 email to Nottingham, apparently just weeks after she wrote it, deprives Dr. Snyder of contemporaneous communications between those he claims were responsible for conspiring to have him declared "not fit," which they accomplished by exchanging (misleading) information *after* Dr. Snyder declined to authorize communications between Dr. Cotton and Dr. Barnes.

Because Dr. Cotton admits that Dr. Snyder satisfactorily completed the June 2014 rotation despite her letter to Dr. Barnes, the absence of her email transmitting that letter to Nottingham is not harmless. Dr. Cotton's email may

have made critical admissions that bolster Dr. Snyder's claims, but the OSU Defendants' failure to preserve it prevented Dr. Snyder from access to key evidence. Dr. Cotton's decision to withhold her email to Nottingham while producing only the attachment in response to Dr. Snyder's open records request just weeks later proves that she knew the importance of these communications.

Dr. Snyder was also deprived of key evidence by the OSU Defendants' failure to preserve Cooper's investigation notes, which also prevents Dr. Snyder from presenting the justifications Dr. Cotton and Dr. Alexopulos provided for their actions to the jury. While Cooper investigated them, did Dr. Cotton or Dr. Alexopulos admit they worked with CommunityCare to get Dr. Barnes to declare Dr. Snyder "not fit"? Did they know why Dr. Barnes' 2nd Report could not be located? Did they contradict each other during their separate interviews? The jury may never know what Dr. Cotton and Dr. Alexopulos said during their interviews, but the jury should know the absence of Cooper's notes allows them to infer that what Dr. Cotton and Dr. Alexopulos said was harmful to their defense. Thus, the Court should find that Dr. Snyder "is entitled to the benefit of a presumption that the destroyed documents would have bolstered [his] case." *Hicks*, 833 F.2d at 1419.

## II.   THE COURT SHOULD ENTER AN ADVERSE INFERENCE INSTRUCTION OR OTHER APPROPRIATE RELIEF

When deciding what (if any) relief is appropriate for spoliation, the Court "has discretion to fashion an appropriate remedy depending on the culpability of the responsible party and whether the evidence was relevant to proof of an issue at trial." *Estate of Trentadue v. United States*, 397 F.3d 840, 862-63 (10th Cir. 2005). *See also Jordan F. Miller Corp. v. Mid-Continent Aircraft Serv., Inc.*, 139 F.3d 912 (10th Cir. 1998) (affirming dismissal of damages claim). In addition to dismissing claims or defenses, the Court may exclude countervailing evidence or enter an adverse inference instruction at trial. *See, e.g., Schlumberger Tech. Corp. v. Greenwich Metals, Inc.*, No. 07-2252-EFM, 2009 WL 5252644, at *5 (D. Kan. Dec. 31, 2009).

The Court may enter an adverse inference instruction only if Dr. Snyder can show bad faith or an intent to deprive him of electronic evidence. *Turner v. Pub. Serv. Co. of Colo.*, 563 F.3d 1135, 1149 (10th Cir. 2009); Fed. R. Civ. P. 37(e)(2). Bad faith implies some wrongdoing or self-interest motivation. *Cache La Poudre*, 244 F.R.D. at 635. Because direct evidence of bad faith destruction is inherently difficult to discover, Dr. Snyder may rely on circumstantial evidence for a finding of bad faith. *See Adams v. Gateway, Inc.*, 2:02-CV-106 TS, 2006 WL 2563418, at *3 (D. Utah Mar. 22, 2006) (finding spoliation of evidence based on circumstantial evidence).

The Court should find there is circumstantial evidence that the OSU Defendants intended to deprive Dr. Snyder of critical evidence. Cooper's handwritten notes were so plainly relevant to potential future litigation at the time she wrote them that their absence is presumptively incriminating. As for the missing electronic evidence, the OSU Defendants concede they anticipated litigation as early as June or July 2014, yet concealed evidence from Dr. Snyder the next month, when Dr. Cotton failed to turn over her June 30th email to Nottingham while producing the attachment itself. At the same time, the OSU Defendants concealed Nottingham's communications to CommunityCare regarding their efforts to get Dr. Barnes to render Dr. Snyder "not fit" for duty, including Dr. Barnes' 2nd Report and Nottingham's communications regarding the 2nd Report, some of which Barnes sought to recall on July 2, 2014. Ex. 1, Missing Evidence, Charts 2, 3; Ex. 7, Emails from Nottingham to CommunityCare; Ex. 31, Summary of Events (Nottingham omitting any mention of Barnes' 2nd Report or communications about the 2nd Report).

The absence of this evidence is revealing. By concealing Dr. Barnes' 2nd Report and their communications regarding it, the OSU Defendants made it appear as if Dr. Barnes rendered only 2 reports instead of 3, suggesting that her July 2, 2014 "not fit" determination was an extension of her original report instead of the product of a *second* request by the OSU Defendants to amend her recommendations after she failed to deliver their desired outcome:

preventing Dr. Snyder from returning to the program. The OSU Defendants failed to preserve this evidence after stopping the investigation into Dr. Snyder's discrimination complaint while failing to preserve evidence from that investigation.[8]

The circumstantial evidence of the OSU Defendants' intent to deprive Dr. Snyder of evidence would be a much closer call had the OSU Defendants merely failed to turn over one or two emails as part of their production in this case. But that is not what happened. Instead, they concealed critical evidence of a conspiracy to render Dr. Snyder "not fit" for duty, including evidence from the investigation into that very conduct, and then spent years concealing the full extent of that conspiracy through deflection and misrepresentation during discovery in violation of the Oklahoma Open Records Act, the Code of Federal Regulations, and the Federal Rules of Civil Procedure. *See* Okla. Stat. tit. 51, § 24A.1, *et seq.*; 29 CFR § 1602.14; and Fed. R. Civ. P. 26, 34, and 37(c)(1).

Dr. Snyder does not make that allegation lightly, but it "is the only interpretation of the entire record of the discovery in this case that makes sense." *Adams,* 2006 WL 2563418, at *3. One court has fairly summarized why a fair exchange of information is fundamental to arriving at the truth:

---

[8] The Court should also instruct the jury this was a violation of their obligations under Title IX of the Educational Amendments of 1972 ("**Title IX**"), 20 U.S.C. § 1681, *et seq.*

> The ultimate goal of our civil justice system is to determine what is true and then apply law to that truth to obtain a just resolution of the conflict at issue. Recognizing that factual disputes exist, the system presumes that the honest exchange of information, combined with the adversarial process, will allow truth to reveal itself to the factfinder. Thus, the system's foundation is built on the idea that parties to a dispute will honestly exchange information. Given the importance of this honest exchange, the system demands harsh sanctions against those who seek to defeat its truth-seeking function by engaging in willful, bad faith conduct designed to deprive the opposing party of relevant information related to the claims at issue.

*Coyne v. Los Alamos Nat'l Sec.*, LLC, 15-CV-54 SCY/KBM, 2017 WL 3225466, at *1 (D.N.M. May 1, 2017) (dismissing case because plaintiff destroyed cell phone records).

The absence of evidence in this case is a product of the OSU Defendants' pattern of withholding information not only from Dr. Snyder, but from nearly every person or entity who could provide neutral oversight of their conduct, including Sandy Cooper, the Oklahoma State Board of Osteopathic Examiners, the Graduate Medical Education Committees, and ultimately, the jury. The jury should know that the OSU Defendants failed to preserve or produce evidence because it was harmful to their defense.

## CONCLUSION

The Court should enter spoliation sanctions against the OSU Defendants by providing an adverse inference instruction to the jury and other relief.

Respectfully submitted,

**JEFFREY SNYDER, D.O.**,
Plaintiff, by and through:

Joshua Stockton, OBA # 21833
Laura Talbert, OBA # 32670
**STOCKTON TALBERT, PLLC**
1127 NW 14th Street
Oklahoma City, OK 73106
Phone: (405) 225.1200
Email: jstockton@stocktontalbert.com
**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I certify that on February 14, 2020, I filed the attached document with the Clerk of Court. Based on the records currently on file, in this case, the Clerk of Court will transmit a Notice of Electronic Filing to those registered participants of the Electronic Case Filing System.

_____
JOSHUA STOCKTON