```
1            IN THE UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF OKLAHOMA
2

3    JEFFREY SNYDER, D.O.,        )
     an individual,              )
4                                )
               Plaintiff,        )
5                                )
     vs.                         )  NO. CIV-16-384-F
6                                )
                                 )
7    BOARD OF REGENTS FOR THE    )
     OKLAHOMA AGRICULTURAL &     )
8    MECHANICAL COLLEGES, ex rel.,)
     OKLAHOMA STATE UNIVERSITY   )
9    CENTER FOR HEALTH           )
     SCIENCES, et al.,           )
10                               )
               Defendants.       )
11

12

13


14          DEPOSITION OF SANDRA DIANNE COOPER

15         TAKEN ON BEHALF OF THE PLAINTIFF

16                IN TULSA, OKLAHOMA

17               ON OCTOBER 8, 2019

18

19       REPORTED BY:  JANA C. HAZELBAKER, CSR

20

21

22

23

24

25
```

EXHIBIT
4

Sandra Cooper                                    October 8, 2019

1                    SANDRA DIANNE COOPER,

2     having been first duly sworn at 1:10 p.m., deposes

3     and says in reply to the questions propounded as

4     follows, to wit:

5                    DIRECT EXAMINATION

6     BY MR. STOCKTON:

7          Q     Would you please state your full name for

8     the record?

9          A     Sandra Dianne Cooper.

10         Q     Ms. Cooper, are you currently employed?

11         A     Yes.

12         Q     Where do you work?

13         A     Tulsa Community College.

14         Q     And what is your position with Tulsa

15    Community College?

16         A     Chief human resources officer.

17         Q     How long have you held that position?

18         A     Since January of 2016.

19         Q     And in that role, to whom do you report?

20         A     Sean Weins.

21         Q     Prior to being the chief human resource

22    officer for Tulsa Community College, where did you

23    work?

24         A     Oklahoma State University.

25         Q     And what was your title at the time that

Sandra Cooper                                    October 8, 2019

Page 8

1    you left?

2         A    Assistant vice-president for human

3    resources at OSU in Tulsa.

4         Q    The job that you have currently as chief

5    human resources officer at Tulsa Community College,

6    are you working full time?

7         A    Yes.

8         Q    And my understanding is -- and I hate to

9    have to ask you about this, but just so we can talk

10   about it real quick.

11        A    Sure.

12        Q    -- is that you're currently going through

13   some health issues?

14        A    Yes.

15        Q    Are you able to testify today?

16        A    Yes.

17        Q    Okay.  If you need to take a break at any

18   time, just let me know.  This isn't a marathon --

19        A    Sure.

20        Q    -- and I don't anticipate we'll be here all

21   that long, relatively speaking, but if there's

22   anything you need, just let me know.

23        A    Okay.  Thank you.

24        Q    Is there anything about your health

25   situation that prevents you from remembering things

Sandra Cooper                                    October 8, 2019

Page 10

1      Q      You worked as the assistant vice-president

2  of human resources for OSU Tulsa, you said, correct?

3      A      OSU in Tulsa.

4      Q      And describe for me the organization that

5  is OSU in Tulsa.

6      A      Okay.  So in 2002, the human resources

7  department was one of six departments that merged, if

8  you will, for both OSU-CHS and OSU Tulsa.  So those

9  departments provided services for both campuses in

10 Tulsa.  And most of those departments housed at OSU

11 Tulsa campus, but primarily provided services for

12 OSU-CHS.

13     Q      How long was that true?  It started in

14 2002.  Did it continue through 2016 when you left?

15     A      Continued through today for human

16 resources.  Some departments have changed.

17     Q      Okay.  At the time you -- well, when did

18 you leave your employment with OSU Tulsa?

19     A      January of 2016.

20     Q      And did you resign voluntarily?

21     A      Yes.

22     Q      How much notice did you give?

23     A      Oh, gosh, two or three months.

24     Q      And why did you decide to leave?

25     A      Because the opening at Tulsa Community

Sandra Cooper                                    October 8, 2019

Page 11

1    College was one that I wanted for several years.

2        Q    Okay.  And at the time of Dr. Snyder's

3    residency, who did you report to in the hierarchy?

4        A    Ron Bussert.

5        Q    And what title or position did Mr. Bussert

6    have?

7        A    He was vice-president of administration,

8    finance administration, something like that, at OSU

9    Tulsa.

10       Q    Did you ever talk to him about Jeffrey

11   Snyder?

12       A    Probably not.

13       Q    And why do you say "probably not"?

14       A    Because he was OSU Tulsa only, and it would

15   not have been something related to his purview.  And,

16   generally, if it wasn't something related to his

17   work, I did not discuss it.

18       Q    Okay.  The situation that you mentioned,

19   starting in 2002 where the human resource functions

20   were merged for OSU-CHS and OSU Tulsa, describe for

21   me what that means in some more detail.

22            How were they merged?  Describe that

23   process.

24       A    So prior to that -- well, so in 1999, the

25   Tulsa campus was -- you know, prior to that it was

Sandra Cooper                                    October 8, 2019

Page 12

1    UCAT, and then Rogers, and then it became Oklahoma
2    State University.  So from '99 forward, that campus
3    was OSU.
4            And then the CHS campus, of course, was
5    OSU, and I had been at the OSU campus.
6            And so in 2002, they decided that, you
7    know, having those two campuses being two miles
8    apart, that it didn't make sense to have all those
9    services duplicated.
10           And so there were six departments that --
11   they decided that it made sense to merge those
12   departments and have one provider.  And so human
13   resources, accounting, facilities, IT, library and --
14   there were six.  I can't remember what the last one
15   was.
16           And so, initially, it was -- the directors
17   were chosen, and then over the next three months,
18   then the departments were merged and there were
19   layoffs and such.  So --
20      Q    Okay.  The -- I forget what the term was
21   used at the last deposition, but -- shared services?
22      A    Shared services.
23      Q    Was there an agreement, a written agreement
24   about that, that you knew of?
25      A    Probably.

Sandra Cooper                                    October 8, 2019

Page 13

1      Q    Okay.  In any event, the idea was that the
2   campuses would share the services relating to human
3   resources?
4      A    Right.
5      Q    And that was true in 2014?
6      A    Correct.
7      Q    Okay.  Was that true throughout the 2013 to
8   2015 time frame?
9      A    Yes.
10     Q    And as the assistant vice-president of
11   human resources, your role included human resource
12   responsibilities over OSU-CHS?
13     A    Correct.
14     Q    And that was true throughout that 2013 to
15   2015 time frame?
16     A    Correct.
17     Q    Describe for me, if you would, what your
18   job duties were as it related to OSU-CHS, or more
19   generally, whatever works best.
20     A    Sure.  So most human resources functions.
21   Just overseeing most human resources functions.  So
22   hiring, employee relations, the day-to-day HR issues.
23          So there were some things that were done
24   out of Stillwater, such as benefit decisions.  You
25   know, we -- we did the day-to-day benefit type

Sandra Cooper                                    October 8, 2019

Page 14

1    things, but the overarching, you know, benefit

2    decisions as far as, like, who the carriers were,

3    that type of thing was done at Stillwater.

4            The day-to-day payroll issues, a lot of the

5    operational, mostly the HR operational, but employee

6    relations were generally handled solely out of Tulsa.

7        Q    And describe for me what you mean by

8    "employee relations."

9        A    So performance issues, employee conflict,

10   any kind of harassment issues, discrimination issues,

11   those types of things.

12       Q    And the harassment or discrimination issues

13   that existed, did you -- again, we'll limit it to the

14   2013 to kind of 2015 time frame.

15           Did you view your office as having purview

16   over OSU-CHS students?

17       A    Students?

18       Q    Well, let's start with students at -- we're

19   sitting in the medical school, correct?

20       A    Uh-huh.  Yes.

21       Q    Students at the medical school.  Was it

22   your office who would investigate complaints of

23   harassment or discrimination brought by students of

24   the medical school?

25       A    No.

Sandra Cooper                                    October 8, 2019

Page 17

1     Q    With different institutional obligations?

2     A    Yes.

3     Q    And when he made a complaint to you, did

4  you think he did so as a student of OSU-CHS?

5     A    No.

6     Q    Did you think that he did so as someone who

7  was academically sponsored by OSU-CHS?

8     A    As a -- resident-sponsored, yes.

9     Q    And you agreed to investigate his

10 complaint, correct?

11    A    I agreed to look into what -- if -- I

12 agreed to discuss -- to listen to him, yes.

13    Q    Okay.

14    A    Initially, yes.

15    Q    Do you recall when -- how you first came to

16 know the name "Jeffrey Snyder"?

17    A    I don't recall exactly.  I think I first

18 heard because he e-mailed me.  I think that was the

19 initial introduction was an e-mail from him to me.

20    Q    And in that e-mail he was describing his

21 complaint of gender/disability discrimination?

22    A    I believe it was just kind of an outreach

23 of, "I've got an issue and I'm trying to find

24 somebody to help me."

25    Q    Okay.  At the time, had you ever

Sandra Cooper                                    October 8, 2019

Page 28

1       A     The schedule -- the retention schedule.

2       Q     And you'll have to forgive me for my

3    ignorance, but is that a state policy?  Could you

4    describe for me what you're describing?

5       A     It's the -- the State has a library -- it's

6    the -- oh, gosh.  It's the records dis- --

7       Q     Is it, like, the Open Records Act stuff or

8    something --

9       A     No, it's not the open records.  It's the --

10   this is what I'm talking about with my memory.

11      Q     Sure.

12      A     I'm sorry.

13      Q     That's okay.  If you think of it, just let

14   me know.  The --

15      A     Records disposition schedule.

16      Q     And who authors the schedule?

17      A     It's the Department of Libraries, I

18   believe, something like that.

19      Q     And is that with a particular state agency,

20   that you know of?

21      A     I'm drawing a blank on it.  It's -- but

22   it's fairly easy to find.

23      Q     Sure.  Yeah, I'll find it.

24      A     It's real easy to find.

25      Q     Yeah.  Other than that -- one of the things

Sandra Cooper                                    October 8, 2019

Page 29

1    we've done in this case -- and I don't know if you're

2    aware of any of this, so I'll just tell you some of

3    it -- is we issued a -- what's called a 30(b)(6)

4    Notice to the organization, and with a series of

5    topics, and you've been designated as the person I

6    should ask these questions to, and so that's one of

7    the reasons we're talking to you today.

8                I haven't officially given you the notice

9    or anything, but I have some questions about policies

10   and procedures.

11               So other than this, were there other

12   written policies or procedures that applied to

13   complaints or their investigation that you were aware

14   of?

15        A    For Oklahoma State University employees

16   or --

17        Q    Well, and so I don't want to really limit

18   it to -- what types of policies existed, that you

19   remember, as it applied to a complaint that fell

20   within your office?  Let's start with that.

21        A    So there were grievance procedures for

22   Oklahoma State University employees.

23        Q    Any others besides that?

24        A    I mean, there were -- there were formal

25   policies about harassment and discrimination, you

Sandra Cooper                                    October 8, 2019

Page 38

1    about the truth.

2         Q     In order to make sure that a thorough

3    picture was developed through your investigation, you

4    kind of outlined for me some of the steps that would

5    lead you to that.

6         A     Yes.

7         Q     Listening to the complaint, mapping out,

8    and then conducting your investigation.

9               Throughout that process, did you think it

10   was important to document what you were hearing and

11   discovering?

12        A     Yes.

13        Q     And why was that important?

14        A     Because memories fail.

15        Q     Did you make it a point to document things

16   when you had meetings or discussions with

17   complainants or those you were investigating?

18        A     Generally, yes.

19        Q     And why did you think -- well, the -- would

20   you create separate notes, for example, when you were

21   interviewing the people against whom a complaint was

22   filed?

23        A     Like, separate notes?

24        Q     Yes.

25        A     What do you mean, "separate"?

Sandra Cooper                                    October 8, 2019

Page 39

1      Q    Well, if you were investigating a complaint
2   of gender discrimination, and you were investigating
3   the person or interviewing the person against whom
4   the complaint was lodged, would you take notes of
5   that meeting or discussion with the person?
6      A    Yes.
7      Q    And did you try to take down as much
8   information as possible so that you would have a
9   record of what was said during those meetings?
10      A    Yes.
11      Q    Did you record them with your cell phone or
12   other --
13      A    No.
14      Q    -- methods?
15      A    No.
16      Q    Or video, I suppose.
17      A    No.
18      Q    And so your notes and memory would have
19   been the only two sources of information to come out
20   of those investigation sessions?
21      A    Yes.  Sometimes I had someone with me to
22   record notes.
23      Q    Okay.  Was there a particular person who
24   did that in the 2013, 2015 time frame?
25      A    Frequently, it was Tina Tappana.

Sandra Cooper                                    October 8, 2019

Page 52

1   frustrated about the referral to EAP and not being

2   able to get answers.

3            I believe he kind of told me some of his

4   background, just his previous background as well.

5      Q     Okay.

6      A     So --

7      Q     Other than those kind of three general

8   topics, do you remember anything else Dr. Snyder told

9   you during this meeting?

10     A     Not specifically.

11     Q     Okay.  At the time of the meeting, did you

12  have an understanding that he was alleging gender

13  discrimination?

14     A     Yes.

15     Q     At the time of the meeting, did you have an

16  understanding that he was alleging disability

17  discrimination?

18     A     I don't specifically recall.  I can't

19  specifically say yes.

20     Q     To the disability?

21     A     Yes.

22     Q     During this meeting, did you ask him who

23  potential witnesses were to his complaint?

24     A     Most likely.

25     Q     Did you ask him who the offending parties

Sandra Cooper                                    October 8, 2019

Page 53

 1    were?

 2         A    Yes.

 3         Q    And who was your -- who did you understand

 4    that to be?

 5         A    It would have been Dr. Alexopulos,

 6    Dr. Cotton, Sunny Benjamin, and there was another

 7    individual from the OSUMC HR office that I didn't

 8    know.  I don't remember the name.

 9         Q    Okay.  Deby Nottingham?  Does that sound

10    right?

11         A    Sounds right.

12         Q    Did you ask Dr. Snyder specifics about what

13    Dr. Alexopulos or Dr. Cotton or Sunny Benjamin did

14    that formed the basis of his complaint?

15         A    He relayed those to me.  I don't think I

16    had to ask.

17         Q    You felt like you had an understanding of

18    what Dr. Snyder was complaining about?

19         A    He was very detailed in his -- in relaying

20    what happened.  I do recall that he was -- I didn't

21    have to ask a lot of questions.  He was very -- very

22    good at relaying his story.

23         Q    And did Dr. Snyder tell you about his

24    probation, for example?

25         A    Yes.

Sandra Cooper                                    October 8, 2019

Page 58

1   be more interested in expressing anger than trying to
2   resolve anything.
3        Q    Do you recall anything specifically that he
4   said that led you to believe that he did not seem
5   interested in resolving anything?
6        A    He seemed to want to rehash everything
7   instead of being focused on resolving.  It was -- it
8   seemed to be about placing blame.
9        Q    What did you think was the way he could
10  resolve the situation at the second meeting?
11       A    My recollection is that I really didn't
12  have much participation in the meeting, if any; that
13  I ended up being pretty much an observer; that
14  Dr. Thurman did quite a bit of the talking,
15  ultimately, and that he proposed -- he ended up
16  proposing a few different scenarios.  And I don't
17  remember specifically what they were, but they seemed
18  reasonable to me.
19       Q    Prior to this meeting, did you meet with
20  the participants about the meeting?  If that makes
21  sense.
22            So did you have a meeting with Dr. Thurman
23  and Dr. Cotton, for example, before the meeting with
24  Dr. Snyder, about the meeting?
25       A    I may have.  It's probable.

Sandra Cooper                                    October 8, 2019

Page 59

```
 1      Q    Okay.  Do you know whether or not Doug
 2  Price was there?
 3      A    I do not recall, but it would be probable.
 4      Q    Okay.  Do you recall anything that was said
 5  in the pre-meeting by any of the participants?
 6      A    No, because I can't even tell you for sure
 7  that we had one.
 8      Q    Sure.  And in between the time that you met
 9  with Dr. Snyder to receive his complaint and the time
10  of this meeting in November, how many times had you
11  verbally talked to Dr. Snyder, like, on the telephone
12  or in person?
13      A    I only saw him twice in person, and we
14  talked about those two meetings.
15           On the phone?  I'm not sure I ever talked
16  to him on the phone.
17      Q    Okay.  You did communicate with him via
18  e-mail?
19      A    Yes.
20      Q    Have you gone and looked for all your
21  e-mails relating to Dr. Snyder?
22      A    I have not because I don't have access to
23  those.
24      Q    Sure.  Fair enough.  Do you know whether IT
25  has gone through your old e-mail archive?
```

Sandra Cooper                                      October 8, 2019

Page 60

1        A     Yes, I know that that has happened.

2        Q     Okay.  Did you communicate with others

3   besides Dr. Snyder via e-mail about his complaint?

4        A     I know I communicated with Doug.  Beyond

5   that, I don't recall specifically.

6        Q     And that was via e-mail?

7        A     Some.

8        Q     Did you ever communicate with Dr. Thurman,

9   Dr. Cotton, Dr. Alexopulos in writing about

10  Dr. Snyder?

11       A     I don't specifically recall.

12       Q     Going back to the second meeting with

13  Dr. Snyder.  Did you provide any input into the

14  options that were being provided to him?  I mean, is

15  that something that you were a part of or -- or what

16  was your understanding of why you were at this

17  meeting?

18       A     I was at that meeting because I had -- we

19  had thought that I had developed a rapport with him

20  at that first meeting and that that may be helpful in

21  resolving the situation.  And -- but it was

22  immediately apparent that my presence was not going

23  to be helpful.

24       Q     And why do you believe that?

25       A     Because when I went to introduce myself to

Sandra Cooper                                    October 8, 2019

Page 61

1    his mother, I believe I was immediately cut off and

2    ignored.

3         Q     Do you remember who asked you to be present

4    at that meeting?

5         A     I believe it was Doug.

6         Q     Prior to that meeting, had you met with

7    Dr. Cotton about Dr. Snyder?

8         A     I believe so.

9         Q     How many times?

10        A     Probably once, maybe twice.

11        Q     And was that in person?

12        A     I don't specifically recall.

13        Q     Let's start with the first time.  Do you

14   remember who else was present?

15        A     Probably just myself and her.

16        Q     And, typically, when you interviewed

17   witnesses for an investigation, where did those

18   interviews take place?

19        A     Generally, they were in my office, but with

20   people such as her where I was trying to accommodate

21   schedules, I may go to their offices.

22        Q     Okay.  Do you remember where you were when

23   you met with Dr. Cotton?

24        A     I believe I may have gone to her office.  I

25   have some vague recollection that I went to her

Sandra Cooper                                    October 8, 2019

Page 62

1    office.

2         Q    Okay.  I know I'm jumping around on you a

3    little bit, and I apologize, but I want to go back.

4              When you're meeting with Dr. Snyder

5    concluded during that first hour-plus conversation,

6    when it was over did you map out an investigation

7    plan for Dr. Snyder?

8         A    Initially, the investigation was to

9    determine what exactly my role was to be because it

10   was a fairly unique situation.  Normally, I wouldn't

11   have any involvement.

12        Q    When the initial plan was to determine what

13   your role is to be, is that something you decided or

14   something somebody else decided?

15        A    Someone else.

16        Q    Was that Doug Price?

17        A    Yes.

18        Q    And the unique situation -- I think I asked

19   you this earlier, I just want to make sure I'm clear

20   on it, though.

21             Had you ever had a resident --

22        A    No.

23        Q    -- allege a complaint like this before?

24        A    No.

25        Q    I know you knew what I was going to ask,

Sandra Cooper                                October 8, 2019

Page 63

1    but just so the record is clear.

2              Would it be fair to say that you did agree

3    to investigate Dr. Snyder's complaints?

4    A    So I agreed to -- to look into what I could

5    do, I believe is what I told them.  I would look to

6    see what I could do.

7              And I believe I had e-mailed him and said I

8    would investigate, but I believe my intention was to

9    see what I could do, investigate, see what I could

10   do.

11   Q    The decision-maker about what you could do

12   was not you?

13             MR. PRATT:  Object to the form.

14             THE WITNESS:  Correct.

15   Q    (By Mr. Stockton) That was Doug Price?

16             MR. PRATT:  Object to form.

17             Josh, I mean, we're walking the line really

18   close, and I want to give you some leeway here, but I

19   think we're really trying to kind of get into

20   attorney-client privileged communications.  So I -- I

21   think I'm just going to advise her at this point

22   to -- questions about what she and Doug discussed, to

23   not answer those and see if we can work around it.

24             MR. STOCKTON:  On the basis of privilege, I

25   assume?

Sandra Cooper                                    October 8, 2019

Page 64

1              MR. PRATT:  On the basis of privilege, yes.

2         Q    (By Mr. Stockton) And did you determine

3    what your role is to be in relation to your

4    investigation of Jeffrey Snyder?

5         A    So -- so, initially, I believe the hope was

6    that I could have conversation with the parties to

7    come to some sort of resolution.

8              Very quickly we learned that Jeffrey had

9    retained counsel and, at that time, my communication

10   with Jeffrey stopped.

11        Q    Did you -- go ahead.

12        A    And I would communicate to Doug, Doug would

13   communicate with his counsel, and his counsel was to

14   communicate with him.  And I was to not communicate

15   with him.

16        Q    That was your understanding?

17        A    Correct.  Which is very standard that if

18   someone is represented by counsel, they are to

19   communicate with their counsel and not -- so there is

20   a gap in e-mail communication with me and Jeffrey.

21             And I believe he was aggravated by that,

22   and there was an e-mail from me communicating to him

23   that he should speak with his counsel.  And that was

24   between the two meetings.  And so -- and I don't --

25   I'm not sure if his counsel had explained that to him

Sandra Cooper                                    October 8, 2019

Page 65

1    very well.

2        Q    After you communicated what you just

3    described to Dr. Snyder, he responded to you and said

4    that his complaint was separate from any issue that

5    his counsel was handling on his behalf, right?

6        A    And that was not our understanding.

7        Q    Did you tell him that?

8        A    I don't believe so.

9        Q    Why not?

10       A    I believe it was communicated back through

11   his counsel.

12       Q    Were you told to stop investigating

13   Dr. Snyder's complaint?

14           MR. PRATT:  Object to form.

15           THE WITNESS:  I believe at one point my

16   role was determined to not be as an investigator.

17       Q    (By Mr. Stockton) So it sounds like the

18   answer to that is "yes"?

19           MR. PRATT:  Object to form.  And I know

20   we're still working on trying to get into what her

21   discussions with legal counsel were, so I'm going to

22   advise her not to answer.

23           MS. VELANDIA:  Hey, this is Hilary.  We can

24   hardly even hear Josh now.

25           MR. PRATT:  I don't know if this thing's

Sandra Cooper                               October 8, 2019

Page 66

1   picking up.

2          MR. STOCKTON:  I'll speak up.  My

3   apologies.

4          MR. PRATT:  We'll all try to speak up.

5          MR. STOCKTON:  I'll certify the question.

6   Q     (By Mr. Stockton) When did you stop

7   investigating Dr. Snyder's complaints?

8   A     Prior to the second meeting.

9   Q     And when that happened, had you talked to

10  anybody other than Doug Price about Dr. Snyder's

11  complaints?

12  A     We already discussed that I had talked to

13  Dr. Cotton and --

14  Q     At the time it was decided that your role

15  was not going to include an investigation of

16  Dr. Snyder's complaints, had you met with Dr. Cotton?

17  A     I had met with her previous to that.

18  Q     Had you met with her one time or two times

19  previous to that?

20  A     I don't recall if it was one or two.

21  Q     Other than any discussions with Doug Price

22  and your meeting with Dr. Cotton, had you met with

23  anyone else besides Dr. Snyder, in relation to his

24  complaints prior to the time that the decision was

25  made that you were not going to continue to

Sandra Cooper                                    October 8, 2019

Page 67

1    investigate?

2        A    I had met with Dr. Alexopulos.

3        Q    And how many times had you met with

4    Dr. Alexopulos prior to that decision being made?

5        A    Once.

6        Q    Where were you when that meeting took

7    place?

8        A    I don't recall.

9        Q    Who else was present?

10       A    Just myself.

11       Q    What did you discuss with Dr. Alexopulos

12   during that meeting?

13       A    Primarily -- again, it was the medical

14   judgment and the steps in the -- the steps that were

15   taken for probation, or whatever the appropriate

16   terminology is.

17       Q    Did you take notes during that meeting?

18       A    I'm sure I did.

19       Q    What did you do with them?

20       A    I would have thought they would be in the

21   file.

22       Q    Have you looked to see if they were?

23            MS. VELANDIA:   Josh, can you speak up,

24   please?

25            MR. STOCKTON:   My apologies.

Sandra Cooper                                      October 8, 2019

                                                            Page 68

1        Q     (By Mr. Stockton) Have you looked to see if
2    they were?
3        A     I looked in the file when I became aware of
4    the lawsuit.
5        Q     And where was that file located?
6        A     It was -- it was in my file cabinet at my
7    old office.
8        Q     At OSU Tulsa?
9        A     Yes.
10       Q     And were your notes from the Dr. Alexopulos
11   meeting in that file cabinet?
12       A     I don't recall.
13       Q     Would it have been unusual for you to have
14   not taken notes during the Dr. Alexopulos meeting?
15       A     Yes.
16       Q     And do you know whether you did or not?
17       A     I don't recall.
18       Q     Do you recall giving those notes to
19   anybody?
20       A     No.
21       Q     Giving somebody else access to your file
22   cabinet?
23       A     I gave Tina Tappana access to my file
24   cabinet when I left OSU.
25       Q     And when you looked in the file when you

Sandra Cooper                                    October 8, 2019

Page 69

1   learned of the lawsuit, were your notes in there?

2        A    I don't recall specifically.

3        Q    And why would you have not maintained notes

4   relating to your conversation with Dr. Alexopulos?

5        A    I don't recall.

6        Q    The meeting that you told me about before

7   the first one with Dr. Cotton, I believe you told me

8   it was only you and she in a room?

9        A    I believe so.  I believe that she and I

10  met.

11       Q    How long did that meeting take place?

12       A    I don't recall.

13       Q    What about with Dr. Alexopulos, how long

14  was that meeting?

15       A    I don't recall.

16       Q    And the meeting with Dr. Cotton, did you

17  take notes?

18       A    Most likely.

19       Q    And where are they?

20       A    It would have been the same.  They would

21  have been in the file.

22       Q    And sitting here today, you don't know one

23  way or the other whether they made it to your file?

24       A    Correct.

25       Q    Can you think of any reason that you would

Sandra Cooper                                    October 8, 2019

Page 70

1   have not taken notes during the meetings with

2   Dr. Cotton and Dr. Alexopulos?

3        A    No.

4        Q    When you left your employment with OSU --

5   I'm sorry, when was that again?

6        A    January 2016.

7        Q    Who took possession of your files, do you

8   know?

9        A    Tina Tappana.

10       Q    Is she still employed with the University?

11       A    Yes.

12       Q    Have you asked her about your notes?

13       A    Yes.

14       Q    And what'd she say?

15       A    She was the one that asked me about my

16   notes.

17       Q    What'd she ask you?

18       A    She asked me -- she asked me if there was

19   any other place that they might be.

20       Q    And --

21       A    And I then came to the office to review the

22   file and confirmed that all of my notes were in the

23   file.  There wouldn't be any others.

24       Q    That you weren't keeping notes separately?

25       A    No.

Sandra Cooper                                    October 8, 2019

Page 71

1      Q     Is that what you mean?

2      A     Correct.  That the only -- other than

3   e-mails and the notes that were in the file would be

4   the only --

5      Q     Did you destroy the notes that you took

6   during --

7      A     Absolutely not.

8      Q     Let me finish the question, if you would.

9            Did you destroy the notes that you took

10  during the meeting with Dr. Cotton or Dr. Alexopulos?

11           MR. PRATT:  Object to form.

12           THE WITNESS:  Absolutely not.

13     Q     (By Mr. Stockton) Did anybody tell you not

14  to take notes?

15     A     Absolutely not.

16     Q     The conversation that you had with

17  Dr. Cotton, I think you told me that it -- the first

18  one, that it was in her office.

19           Is it fair to say that during that

20  conversation you were investigating Dr. Snyder's

21  complaints?

22     A     Yes.

23     Q     And the other information that you learned

24  from Dr. Cotton during that conversation, what was

25  it?

Sandra Cooper                                    October 8, 2019

Page 72

1        A     I'm sorry, could you repeat that?

2        Q     Yeah.  What did she tell you during that

3    conversation?

4        A     She told me about the medical judgment

5    issue.  She told me about the steps that were taken

6    regarding probation.  And I believe that was all.

7        Q     Did you ask her about her perception about

8    Dr. Snyder's disability?

9        A     I don't recall.

10       Q     Did you ask her whether she had put in

11   writing any information about whether she believed

12   Dr. Snyder was disabled?

13       A     I don't recall.

14       Q     Did you ask her about her requirement to

15   have neuropsychological testing of Dr. Snyder?

16       A     I don't recall.

17       Q     And did you ask her about any comments she

18   may have made that were gender-based?

19       A     I don't recall.

20       Q     Do you recall asking her questions

21   specifically?

22       A     I don't recall specific questions.

23       Q     Was it a situation where she did most of

24   the talking and you were listening and asked

25   follow-ups, or did you go in with an idea of the

Sandra Cooper                                    October 8, 2019

Page 73

1   questions that you wanted answered?

2        A    I generally ask for a narrative and ask

3   probing questions throughout.  And then if there's

4   anything -- I generally have questions ahead of time

5   that aren't -- and if those aren't answered, I ask

6   those at the end.

7        Q    Do you recall doing that during this

8   meeting?

9        A    I don't recall specifically, but that's

10  generally how I would have done it.

11       Q    The conversation that you had with

12  Dr. Snyder, you said, lasted over an hour and he was

13  very detailed?

14       A    Yes.

15       Q    How did you know what questions to ask

16  Dr. Cotton during this meeting?

17       A    He -- well, he sent me what he told me he

18  would send me.

19       Q    Did you have it with you during the

20  meeting?

21       A    I don't recall.

22       Q    Is that standard practice, something you

23  would have done?

24       A    Probably not.  I probably would have made

25  my notes ahead of time.

Sandra Cooper                                    October 8, 2019

Page 74

1          Q     And the notes that you made ahead of time
2     would have been based on your review of the
3     information he provided along with questions you
4     might have for Dr. Cotton based on that information?
5          A     Correct.
6          Q     Where are those notes?
7          A     They would have been in the file.
8          Q     Have you seen them?
9          A     I -- whatever was in the file is -- is all
10    that's in the file.
11         Q     What is in the file?
12         A     I don't remember.  It's been a year or more
13    since I looked at it.
14         Q     When you kept a file relating to a
15    complaint, what is typically in it?
16         A     The initial complaint and the interview
17    notes.
18         Q     What about documents that you gather as
19    part of your investigation?
20         A     Correct.
21         Q     Did you ever gather any documents as part
22    of your investigation into Dr. Snyder's complaint?
23         A     It did not get to that point.
24         Q     Why not?
25         A     Because the investigation stopped before

Sandra Cooper                                    October 8, 2019

1    then.

2         Q    The meeting with Dr. Alexopulos, you

3    described it for me.  You generally would have taken

4    notes along the same manner that you just described

5    for Dr. Cotton in terms of questions you needed

6    answered or things from Dr. Snyder's complaint that

7    you needed to ask her about?

8         A    Uh-huh.

9         Q    Correct?

10        A    Yeah.

11        Q    Other than interviewing these two

12   witnesses, did you interview any other people as part

13   of your investigation into Dr. Snyder's complaints?

14        A    Not that I recall.

15        Q    Do you recall ever having talked to Sunny

16   Benjamin?

17        A    Not specifically, but I can't deny that I

18   didn't.

19        Q    Okay.

20        A    I know Sunny, and periodically we would

21   have conversation, but I can't -- I don't remember

22   having a formal conversation with her.

23        Q    About Dr. Snyder?

24        A    I don't remember having -- I can't imagine

25   having an informal one, so --

Sandra Cooper                                    October 8, 2019

Page 76

1       Q     What was your relationship like from a --

2  on a professional level with Sunny Benjamin?

3             Did you have any overlap of

4  responsibilities?

5       A     No.  So occasionally there would be

6  confusion from employees about who her employer was,

7  and so -- so sometimes there would be that type of

8  thing.  And so we would, you know, get a call from

9  someone and so we'd kind of refer them back to the

10  other.  I would see her at different HR events and so

11  I knew her professionally.

12       Q     Were you friends?

13       A     No.

14       Q     Okay.  When you looked at the file after

15  this case was filed, was there anything in it other

16  than a single page of notes?

17       A     I don't recall.

18       Q     The decision that was made about concluding

19  or ending your investigation, I asked you a question

20  that you didn't quite answer.  And it was whether or

21  not that was a decision that you made or whether that

22  was made by somebody else.

23       A     So the investigation of what my role should

24  be was primarily regarding, again, what -- as a

25  resident, his employer was the medical center.  And

Sandra Cooper                                    October 8, 2019

Page 77

1   so any harassment, discrimination complaint would be

2   against the employer, which -- so I was not the

3   employer.  I was not the employer.  I was also not

4   part of the academic arm.  And so my role really was

5   to help facilitate a resolution.

6        Q    But my question was a little more specific

7   than that.

8        A    I'm getting there.

9        Q    Okay.

10       A    And it quickly became apparent that there

11  was no need for me to go any further in investigating

12  anything because the academic unit and the employer

13  had a responsibility to investigate and not me.

14       Q    Was that a decision you came to or somebody

15  else came to?

16       A    That was the action I took.

17       Q    Okay.  Who did you convey that to?

18       A    I conveyed that to Doug.

19       Q    Did you ever convey that to Jeffrey Snyder?

20       A    That was the -- conveyed to Doug to convey

21  to his attorney.

22       Q    My question, though, was a little more

23  specific.

24       A    Did I convey that to Jeffrey?  No.

25  Because -- no.

Sandra Cooper                                          October 8, 2019

Page 78

1      Q     Why not?

2      A     As I stated before, my communication was to

3   our counsel to communicate to his counsel.  And I was

4   not communicating to him directly.

5      Q     Was that a directive you received?

6      A     No, that is --

7            MS. McDUFFEY:  Object to --

8            THE WITNESS:  -- our practice.

9      Q     (By Mr. Stockton) You said that the

10  academic unit had a responsibility for investigating

11  Dr. Snyder's complaint, or did I misunderstand you?

12     A     Through their process.

13     Q     Who is the academic unit?

14     A     The residency arm.

15     Q     Which, for Dr. Snyder's residency, is who?

16     A     Family medicine.

17     Q     Is it your testimony that Dr. Snyder should

18  have limited his complaint of gender discrimination

19  to the family medicine department?

20     A     As far as Oklahoma State University is

21  concerned?

22     Q     As far as expectations for investigating.

23           MR. PRATT:  Object to form.

24     Q     (By Mr. Stockton) Let me ask a better

25  question.  If it wasn't you who had the obligation to

Sandra Cooper                                    October 8, 2019

Page 79

1   investigate his complaints, who was it?

2        A     From an employer's standpoint, it was

3   OSU Medical Center.

4        Q     What about from an academic one?

5        A     It was the -- yes, family medicine

6   residency.

7        Q     And who within family medicine was

8   Dr. Snyder supposed to ask to investigate?

9        A     Well, there is a chain of command above

10  that.

11       Q     So who, in essence, was it?

12       A     Well, Dr. Thurman is above Drs. Alex

13  {verbatim} and Cotton.

14       Q     And I just want to make sure I understand

15  your testimony.

16             Is it your testimony that you believe that

17  Dr. Snyder's complaint of gender and disability

18  discrimination should have been investigated by

19  Dr. Thurman instead of you?

20       A     Not investigated.  Well, it -- I'm not part

21  of the academic arm, so it should have been referred

22  to someone in that area.  I'm not saying who it

23  should be.

24       Q     Well, I'm asking you, though, who it should

25  be.  Who do you think it should be?  You're the

Sandra Cooper                                October 8, 2019

Page 80

1    vice-president of human resources for OSU.

2            Who was it?  Who should he have asked, if

3    not you?

4        A    At that time -- give me a minute to think

5    of who the players were at the time.

6        Q    Sure.  Of course.

7        A    There was academic administrators that had

8    appropriate roles for that.  I can't tell you who

9    they were specifically.

10       Q    Well, what were their titles?

11       A    I can't think of the title.  There was --

12   and I don't even know if he's still here, but there

13   was an individual by the name of Jonathan Franklin.

14   And I don't remember what his title was.

15       Q    Do you recall what office he was with?

16       A    He was in the academic affairs office.

17       Q    And where is that office located, or was it

18   in 2014?

19       A    It was here at the medical school.  I

20   couldn't tell you specifically.

21       Q    Okay.  Somewhere at OSU-CHS?

22       A    Yes.

23       Q    Did you ever tell Jonathan Franklin that

24   you have a complaint that needs his assistance?

25       A    No.

Sandra Cooper                                    October 8, 2019

Page 81

1        Q     After you stopped investigating

2   Dr. Snyder's complaints, are you aware of anyone who

3   investigated it from the academic side?

4        A     No.

5        Q     After you stopped investigating, that was

6   it, in terms of investigations, from an academic

7   standpoint, right?

8        A     I don't know.

9        Q     Other than Jonathan Franklin, are you aware

10  of any other persons who would have had the

11  responsibility to investigate Dr. Snyder's complaints

12  from the academic unit?

13             MR. PRATT:  Object to form.

14             THE WITNESS:  As I mentioned, there is a

15  chain of command, so there possibly are others.

16       Q     (By Mr. Stockton) Dr. Thurman, you

17  mentioned?

18       A     Dr. Thurman.  There is -- well, there are

19  others over the residency programs.

20       Q     But for Dr. Snyder's residency, Dr. Thurman

21  was the chair of the department?

22       A     Uh-huh.

23       Q     Correct?

24       A     Yes.

25       Q     And did you ever tell Dr. Thurman that

Sandra Cooper                                    October 8, 2019

Page 82

1    there was a complaint that needed his attention?

2        A    Dr. Thurman was aware.

3        Q    But did you tell him that he should

4    investigate?

5        A    I don't believe I said those words.

6        Q    And did you come to any written conclusion

7    about the fact that you were not -- your role was not

8    to be an investigator any longer for Dr. Snyder?

9        A    No.

10       Q    That was a conclusion that was reached

11   about Dr. Snyder's complaint, correct?

12       A    Correct.

13       Q    Why wasn't it written down?

14       A    I don't know.

15       Q    Other than the meeting -- well, let's ask

16   about this.  Dr. Cotton -- you said you met with her

17   one or two times, and we talked about the first one.

18            What about the second time?

19       A    I said one or two times.  I don't recall if

20   there was a second time.

21       Q    Okay.  Is there anything you can recall

22   about a second meeting sitting here?

23       A    If there was a second one, it was in

24   preparation of the meeting.  I don't recall if she

25   was -- I don't even remember if there was a proper

Sandra Cooper                                    October 8, 2019

Page 85

1    do you want to wait?

2            MR. STOCKTON:  That's fine.

3            MR. PRATT:  I'm assuming we have quite a

4    while left to go?

5            MR. STOCKTON:  I don't think it's quite a

6    while.

7            MR. PRATT:  Okay.  How are you doing?  Do

8    you want to just wait and keep going and then tell us

9    when -- if you need a break, or would you like to

10   take a break now?

11           THE WITNESS:  A break soon.

12           MR. STOCKTON:  Let's just do one now.

13           MR. PRATT:  Okay.  Thanks.

14           (Whereupon, a recess was had from 3:10 p.m.

15   until 3:15 p.m.)

16       Q    (By Mr. Stockton) All right.  Ms. Cooper,

17   I'm going to hand you what I've marked as Plaintiff's

18   Exhibit Number 1, which is OSUMC 692.  Let me know

19   when you've had a chance to look at that.

20       A    Okay.

21       Q    Okay.  First question, is this your

22   handwriting?

23       A    Yes.

24       Q    All right.  Other than this page, are you

25   aware of any other notes that you've seen that relate

Sandra Cooper                                    October 8, 2019

Page 86

1   to Dr. Snyder's complaint recently?  I guess, any

2   notes you've seen recently?

3       A    Not that I've seen recently.

4       Q    Okay.  It looks like, and correct me if I'm

5   wrong, that this is a quick time line of some events

6   that happened in relation to Dr. Snyder's complaint.

7   It doesn't appear to be contemporaneous notes of

8   meetings.

9       A    No.

10      Q    Do you remember where you were when you

11  created this document?

12      A    No.

13      Q    And do you remember why you created it?

14      A    No.

15      Q    Do you know what the purpose of this is?

16      A    No.

17      Q    Do you know whether it includes everything?

18           MS. McDUFFEY:  Object to form.

19           THE WITNESS:  When was the meeting that --

20  with his mother?  Was that in November?

21      Q    (By Mr. Stockton) Yes, ma'am.

22      A    I can't say for sure.

23      Q    Okay.  Do you think that it was created

24  before that meeting, since it's not referenced here?

25      A    Yes.

Sandra Cooper                                    October 8, 2019

Page 87

1     Q     And when you created this document, did you

2  consult any sources, or were you doing this by

3  memory?

4     A     Oh, I'm sure I consulted my calendar.

5     Q     Okay.  And how did you keep your calendar

6  back in 2014?

7     A     Every meeting was on my calendar.

8     Q     And was it an Outlook calendar?

9     A     Yes.

10    Q     Did you maintain a physical calendar?

11    A     No.

12    Q     And the Outlook calendar, was it associated

13 with your OSU e-mail address?

14    A     Yes.

15    Q     When you set up meetings, for example, with

16 Dr. Cotton and Dr. Alexopulos, would that have been

17 pursuant -- would you have created an event for that

18 in your calendar?

19    A     Yes.  It would not have necessarily been an

20 invite, but it would have been on my calendar.

21    Q     Okay.  Looking through this, the -- it

22 looks like, for example, on August 26th, it says

23 "E-mail From."  And is that a "J"?

24    A     Yes.

25    Q     Does that stand for Jeffrey Snyder?

Sandra Cooper                                    October 8, 2019

Page 89

1      Q     And what was the purpose of providing that
2   notification to Dr. Snyder or anyone else?
3      A     Just to acknowledge that we met, and
4   anything else I needed to convey in that e-mail.  I
5   probably told him I would e-mail him.
6      Q     During the meeting?
7      A     Uh-huh.  Yes.
8      Q     Did you tell him during the meeting that
9   you would investigate his complaints?
10      A     I probably said something to that effect.
11   I probably said I would look into things.
12      Q     Did you tell him during that meeting, "I
13   don't think I have the ability to investigate your
14   complaints"?
15      A     The ability to?  What do you mean by that?
16      Q     Well, informally, your counsel and I have
17   been using the word "jurisdiction," but I don't think
18   that's the right word, so I just happened to come up
19   with a better one.
20      A     Right.
21      Q     How would you -- let me ask you.  What --
22   if you had a complaint that you didn't think fell
23   within your purview --
24      A     Right.
25      Q     -- how would you describe that?

Sandra Cooper                                    October 8, 2019

Page 90

1     A     So -- right.  So whether or not that that

2   complaint was one that I -- whether or not I could

3   help him with his complaint.

4     Q     Maybe a better way to say it is the

5   "authority" to investigate?

6     A     Correct.

7     Q     Who would you have authority to investigate

8   as -- in your role in 2014?

9     A     Employees of Oklahoma State University,

10  employees of OSU Tulsa, and employees of OSU-CHS.

11    Q     At the time of Dr. Snyder's complaints,

12  Dr. Cotton and Alexopulos met that bill?

13    A     Correct.

14    Q     For Monday, September 8th, you met with

15  Doug Price?

16    A     Yes.

17    Q     And I just have to ask the question so

18  privilege can be invoked, but what was discussed at

19  that meeting?

20    A     I don't recall.

21    Q     Okay.  And it looks like on September 11th,

22  you had a meeting with Doug, Mackenzie, Cotton,

23  Thurman and Alex.

24          MR. PRATT:  Well, I'll let you ask the

25  question.

Sandra Cooper                              October 8, 2019

Page 91

1        Q     (By Mr. Stockton) First, is that accurate?

2    Did you meet with Doug Price, Mackenzie Wilfong,

3    Dr. Cotton, Dr. Thurman and Dr. Alexopulos on

4    September 11th?

5        A     I don't recall that meeting at all.

6        Q     There's a note here in your handwriting

7    that references their names next to a date.

8              Do you see that?

9        A     I do see it.  I don't recall the meeting at

10   all.

11       Q     Do you think that meeting took place?

12       A     It must have.

13       Q     All right.  You wrote this here because

14   there was a meeting then?

15       A     Correct.

16       Q     And sitting here today, you cannot recall

17   what was discussed during that meeting?

18       A     I don't recall what was discussed at that

19   meeting, and I also wonder if I was there because I

20   do not recall that meeting.

21       Q     Why would you note it here if you weren't

22   present?

23             MS. McDUFFEY:  Object to form.

24             THE WITNESS:  Because perhaps it happened

25   and it was relevant.

Sandra Cooper                                    October 8, 2019

Page 92

1        Q     (By Mr. Stockton) Do you remember why you
2    thought so, if that's, in fact, what happened?
3        A     I don't know because I don't remember it.
4        Q     Okay.
5        A     So I couldn't -- I really can't answer
6    anything about it other than that is my handwriting.
7    That's really all I can answer about it.
8        Q     The meeting with Doug Price, do you recall
9    how long it lasted?
10       A     I don't, no.  I really don't recall.
11       Q     Do you recall where you were?
12       A     No.
13       Q     Whether it was your office or his?
14       A     I don't recall.
15       Q     Do you recall having traveled to Stillwater
16   to meet with Doug Price at any point in time?
17       A     No.
18       Q     The next line down mentions September 25th,
19   and there was an e-mail from Dr. Snyder asking for an
20   update, correct?
21       A     Yes.
22       Q     And then you note that you responded on
23   September 29th, an e-mail to Dr. Snyder saying his
24   attorney has been given frequent updates.
25             Do you see that?

Sandra Cooper                                    October 8, 2019

1       Q    Prior to this time, did you know whether

2    that was an issue relating to Dr. Snyder's

3    complaints?

4            MS. VELANDIA:  Object to form.  This is

5    Hilary.

6            THE WITNESS:  I don't recall.

7       Q    (By Mr. Stockton) And in the e-mail to you

8    on September 25th, he's asking questions about why --

9    well, he says, "It's curious to me why OSU was still

10   pushing for this type of evaluation when they were

11   not in the proper capacity to make that determination

12   for me."

13           Do you see that?

14      A    Uh-huh.  Yes.

15      Q    And then he asks you, "Was OSU utilizing

16   the EAP as the middleman to carry out their requests

17   and desires?"

18           Do you see that?

19      A    Yes.

20      Q    And he tells you that, according to an

21   e-mail, "It says" -- he says -- "I have recommended

22   the fitness-for-duty evaluation, but the attending

23   physicians are pushing for a neuropsych eval.  The HR

24   supervisor is concerned about violating ADA."

25           Do you see that?

Sandra Cooper                                    October 8, 2019

Page 97

1      A    Yes.

2      Q    Once you received this e-mail from

3  Dr. Snyder, did you investigate the complaint that he

4  made that the "attending physicians are pushing for a

5  neuropsych eval"?

6      A    No.

7      Q    During the prior discussions you had with

8  Dr. Cotton or Dr. Alexopulos, did you ask them about

9  whether or not they were pushing for a neuropsych

10 eval after the fitness-for-duty evaluation?

11     A    I do not recall.

12     Q    In response to Dr. Snyder raising this

13 issue with you on September 25th, you responded on

14 September 29th, correct?

15     A    Yes.

16     Q    And the e-mail that you sent in response

17 is -- starts on the bottom of Plaintiff Snyder 2930

18 and goes over to 2931, and is dated September 29th,

19 right?

20     A    Yes.

21     Q    And you tell Dr. Snyder that you did meet

22 with Dr. Cotton and Alexopulos, as well as OSU legal

23 counsel, right?

24     A    Yes.

25     Q    And that you had a follow-up call on Friday

Sandra Cooper                                          October 8, 2019

Page 98

1    to get an update?

2         A    Yes.

3         Q    That you understood progress was being made

4    on the two main issues we talked about, access to the

5    EAP report and your appeal.

6              Do you see that?

7         A    Yes.

8         Q    In the complaint below, though, Dr. Snyder

9    was raising other issues besides the EAP report and

10   the appeal, correct?

11        A    Yes.

12        Q    And you decided not to investigate that,

13   right?

14        A    I did not address those.

15        Q    Did you investigate them?

16        A    No.

17        Q    Why not?

18        A    I don't recall.

19        Q    You mention that, "The OSU attorneys have

20   been in frequent contact with your attorney on these

21   items," referring to the EAP report and the appeal,

22   right?

23        A    Yes.

24        Q    And then you told him to call his lawyer if

25   he wanted an update on that?

Sandra Cooper                                    October 8, 2019

Page 101

1       Q     Did you ask Dr. Snyder any questions about

2    that?

3       A     No.

4       Q     And even though you knew he was represented

5    by counsel, you were communicating with him on

6    September 29th?

7       A     Yes, I did.

8       Q     You did not tell Dr. Snyder on

9    September 29th that you were not allowed to

10   communicate with him because he was represented by

11   counsel?

12      A     I didn't say that I wasn't allowed to.

13      Q     The e-mail that you sent on September 29th,

14   do you think that that's the last e-mail that you

15   provided Dr. Snyder, aside from the one that starts

16   this exhibit on Plaintiff Snyder 2929, which is an

17   automatic e-mail?

18      A     As far as I recall.

19      Q     Okay.  And did you ever tell Dr. Snyder,

20   "I'm no longer investigating your complaint"?

21      A     Not that I recall.

22      Q     Do you think he had a right to know that

23   information?

24      A     Yes.

25      Q     Why didn't you tell him that?

Sandra Cooper                                    October 8, 2019

Page 102

1        A     I believe it was communicated through
2    counsel, is what I believed.
3        Q     Do you know whether that happened?
4        A     I don't directly know.
5        Q     In the e-mail Dr. Snyder sent you on
6    September 29th, that's at Plaintiff Snyder 2930, in
7    the middle paragraph it says that, "Perhaps you or
8    the other OSU attorney can decide who would be
9    appropriate to investigate." and it goes on.
10             Do you see that?
11       A     Yes.
12       Q     Was that information ever provided to
13   Dr. Snyder, to your knowledge?
14       A     I don't recall.
15       Q     It is fair to say that in this e-mail
16   Dr. Snyder sent, he was asking you to take his
17   complaint seriously and investigate it through the
18   proper channels?
19       A     Yes.
20       Q     Did that happen?
21             MR. PRATT:  Object to form.
22             THE WITNESS:  I do not have that knowledge.
23       Q     (By Mr. Stockton) Do you know of anyone
24   investigating his complaint other than you?
25       A     No.  I do not have that knowledge.

Sandra Cooper                                    October 8, 2019

Page 103

1        Q    Yeah.  Sitting here today, can you identify

2   anyone else who investigated his complaint besides

3   you?

4             MS. McDUFFEY:  Object to form.

5             THE WITNESS:  I cannot.

6             (Whereupon, Plaintiff's Exhibit Number 3

7   was marked for identification purposes and made a

8   part of the record.)

9        Q    (By Mr. Stockton) I'm going to hand you

10  what I've marked as Plaintiff's Exhibit Number 3,

11  which is Plaintiff Snyder 2934 through 2940.

12       A    Okay.

13       Q    Okay.  And we'll start at the front because

14  it kind of overlaps with what we just looked at.  But

15  the first e-mail is the same one we just looked at.

16            And then if you go to the second page,

17  there is a -- looks like a typed version of that with

18  an e-mail at the bottom of it.

19            Do you see that?

20       A    Uh-huh.

21       Q    And do you recall having reviewed this when

22  Dr. Snyder provided it to you?

23       A    I don't specifically recall at the time,

24  no.

25       Q    Did you discover or ask anyone who Jessica

Sandra Cooper                                    October 8, 2019

Page 104

1   Heavin was?

2        A    At the time?

3        Q    Correct.

4        A    I probably did.

5        Q    Do you remember who you asked?

6        A    I probably asked -- I probably would have

7   asked Dr. Alexopulos.

8        Q    And do you recall what she told you?

9        A    I don't.  I don't know if she was with the

10  medical center or if she was with the EAP.  I don't

11  recall.

12       Q    What's your understanding of what an EAP

13  program does?

14       A    EAP program provides --

15            MS. VELANDIA:  Object to form.

16            THE WITNESS:  -- provides employee

17  assistance with a variety of things.  It can provide

18  employee counseling, provide referrals, can

19  provide -- and just work/life assistance, can provide

20  assessments.

21       Q    (By Mr. Stockton) And when Dr. Snyder

22  provided you this information, you had an

23  understanding that he had been referred to the EAP?

24       A    Correct.

25       Q    You knew that he had been referred to a

Sandra Cooper                                    October 8, 2019

Page 105

1    fitness-for-duty evaluation, as well?

2         A    Yes.

3         Q    And you knew that Dr. Cotton had originally

4    requested that he have a neuropsych evaluation?

5         A    Yes.

6         Q    And when you see this e-mail and read it,

7    did it cause any concerns for you?

8         A    Yes.

9         Q    And tell me about those.

10        A    Being unaware of their processes, being

11   aware -- excuse me, being unaware of their processes,

12   being unaware of their EAP, it was hard to know

13   exactly whether they were following their procedures,

14   whether this was normal protocol to request a

15   neuropsych eval at this stage, especially since, you

16   know, they were -- there were concerns about -- or

17   expressing concerns about violating the ADA.

18            It -- as an HR professional, I thought it

19   seemed concerning, but I didn't really have enough

20   information about OSUMC's, policies, procedures,

21   protocols to have full judgment.

22        Q    And you were not able to resolve those

23   concerns or come to a full judgment during the course

24   of your investigation?

25        A    Correct.

Sandra Cooper                                    October 8, 2019

Page 106

1       Q    How many times have you been provided
2    information where, in writing, there is a reference
3    to an HR supervisor being concerned about violating
4    the ADA?
5       A    I don't recall others.
6       Q    This was a major red flag to you, right?
7       A    Correct.
8       Q    Something that should be investigated?
9            MS. McDUFFEY:  Object to the form.
10           MR. PRATT:  Same.
11           THE WITNESS:  Investigated by someone.
12      Q    (By Mr. Stockton) Okay.  But somebody
13   should get to the bottom of it?
14      A    Someone.
15      Q    And if the e-mail is correct, that
16   Ms. Heavin recommended a fitness-for-duty evaluation
17   but the attending physicians were pushing for a
18   neuropsych eval, that's something you would want to
19   get to the bottom of, or someone should?
20           MR. BRUCE:  Form.
21           MS. McDUFFEY:  Object to form.
22           MS. VELANDIA:  Object to form.
23           THE WITNESS:  It should be what the
24   process -- they should follow their process about
25   what the proper testing should be, to follow that.

Sandra Cooper                                    October 8, 2019

Page 113

1     of sex and disability, with subsequent documentation.

2          Q    And this is information that he provided to

3     you during your investigation?

4          A    I believe so.

5          Q    Did you review it prior to the time that

6     you met with Dr. Cotton about his complaint?

7          A    I believe so.

8          Q    Did you maintain this information in a file

9     that you kept on Jeffrey Snyder?

10         A    I believe I maintained it electronically.

11         Q    And tell me about that.  How did you

12    maintain it electronically?

13         A    I maintained e-mails electronically.

14         Q    Did you open a file for Dr. Snyder

15    physically?

16         A    Like, a -- I did not print e-mails, so

17    e-mails were saved electronically.

18         Q    As part of your routine practice, if you

19    received a complaint that you were going to

20    investigate -- for example, when I have a new case I

21    open up an electronic file.

22         A    Uh-huh.

23         Q    Did you do the same thing electronically

24    for investigations that you conducted?

25         A    Uh-huh.  Yes.

Sandra Cooper                                    October 8, 2019

Page 114

1        Q      Did you open any kind of physical file as

2    part of those investigations typically?

3        A      Yes.

4        Q      And where were the electronic files kept

5    for investigations in 2014?

6        A      So the electronic files would be part of my

7    Outlook.

8        Q      Did you -- do you know what File Explorer

9    is?  Like, the folders on a computer --

10       A      Correct.

11       Q      -- or on PCs anyway?

12       A      Yes.

13       Q      Did you open a new folder -- create a new

14   folder for Dr. Snyder and save a bunch of stuff in

15   there relating to him?

16       A      Most likely, yes.

17       Q      And was that on OSU servers?

18       A      Yes.

19       Q      Did you create anything on a personal

20   computer that was not backed up to some other system?

21       A      No.

22       Q      The physical files that you maintained

23   would have included things like your notes that we

24   looked at and --

25       A      Anything handwritten.

Sandra Cooper                               October 8, 2019

Page 115

1      Q     Okay.  Did you review those files to
2  prepare for today's deposition?
3      A     Which?  The --
4      Q     Either the electronic file that you
5  maintained, or printed out copies of it, or anything
6  in the physical copy file?
7      A     Just the documents that I mentioned
8  previously.
9      Q     Okay.  We talked about a little bit ago
10  that you told Dr. Snyder you would begin your
11  investigation immediately, correct?
12     A     Yes.
13     Q     And then thereafter a decision was made to
14  end that investigation, correct?
15     A     Yes.
16     Q     How many times has that happened during
17  your 20-year career with OSU?
18     A     I really don't know.
19     Q     Sitting here today, can you think of
20  another time where that's happened?
21     A     I can't say that it hasn't happened before,
22  but I can't point to a specific instance.  Generally,
23  it would be if something were to be resolved, there's
24  some sort of resolution before an investigation ends.
25  That happens frequently before an investigation is

Sandra Cooper                                    October 8, 2019

                                                        Page 126

1    Dr. Alexopulos, Sunny Benjamin, Deby Nottingham, any

2    of those folks or anyone else relating to Dr. Snyder

3    that you haven't already told me about?

4               MS. McDUFFEY:  Object to form.

5               THE WITNESS:  Not that I recall.

6         Q     (By Mr. Stockton) After the November

7    meeting that you attended, did you meet with the

8    other attendees outside of Dr. Snyder's presence?

9         A     I believe there was some meeting of some

10   sort, and I don't remember -- I don't remember

11   exactly when, how, where, regarding the letter that

12   was sent to him and the wording of the letter.

13        Q     The dismissal letter?

14        A     No, the letter giving him his options.

15        Q     Okay.  The November -- some of us --

16        A     The letter from that meeting that said, you

17   know, here's some choices for you.  That -- the one

18   he didn't respond to.

19        Q     What was your involvement with -- in the

20   meeting relating to the wording for that letter?  Or

21   let me ask this.

22              Do you remember who was present?

23        A     No, but I --

24        Q     Was Doug Price present?

25        A     I would assume so.  I -- I think I had

Sandra Cooper                                    October 8, 2019

Page 127

1    minimal involvement in it.  If it's -- I think my

2    involvement probably was, "Yes, this was what we

3    discussed in the meeting, or this was what was

4    expressed in the meeting," to confirm it.  Since I

5    was present, that was probably -- that was probably

6    what my involvement was, was to confirm that that was

7    what was expressed.  I don't remember it being much

8    more than that.

9        Q    Do you remember raising any concerns during

10   any of these meetings, privately, to anyone, relating

11   to Dr. Snyder?

12       A    Concerns?

13       Q    Yeah.

14       A    Such as?

15       Q    We need to make sure that we're not

16   retaliating against him.

17       A    My -- my understanding was that the goal

18   was to -- to make him successful.

19       Q    Were you providing human resources advice

20   during the meetings that you attended?  Is that why

21   you thought you were there?

22       A    Generally, my presence was to assist in

23   resolving this in a way that would help Dr. Snyder be

24   successful.

25       Q    Did you provide human resources advice?

Sandra Cooper                                    October 8, 2019

Page 128

1        A      Minimally.

2        Q      Did you provide that to anyone other than

3    Doug Price?

4               MS. McDUFFEY:  Object to form.

5        Q      (By Mr. Stockton) In other words, I'm

6    trying to figure out whether it's a privileged

7    conversation or not.

8               So did you provide human resources advice

9    outside of a communication with counsel?

10       A      Not that I recall.

11       Q      Okay.  Do you recall providing human

12   resources advice, regardless of its substance, to

13   Doug Price?

14       A      Not that I recall.

15       Q      Okay.  Other than the conversations you've

16   told me about, are there any other conversations you

17   had relating to Dr. Snyder that you remember sitting

18   here today?

19       A      No.

20       Q      Did you attend any meeting in which

21   Dr. Snyder's dismissal was discussed, specifically

22   whether or not he had abandoned his position?

23       A      Vaguely.

24       Q      Okay.  That was a meeting you were at,

25   though, right?

Sandra Cooper                                    October 8, 2019

Page 131

1       A    No.

2       Q    And why not?

3       A    Because he was not an employee of Oklahoma

4    State University, and he was also not a student of

5    Oklahoma State University, which are the two types of

6    complaints that I would typically see.

7       Q    So when you received his complaint, did it

8    make things less clear?

9            MR. STOCKTON:  Object to the form.

10      Q    (By Mr. Pratt) In regard to -- let me reask

11   it.

12           Did it make things less clear as to what

13   your responsibilities were in regard to his

14   complaint?

15           MR. STOCKTON:  Object to the form.

16           THE WITNESS:  It was very gray as to what

17   the responsibilities were on behalf of Oklahoma State

18   University, correct.

19      Q    (By Mr. Pratt) What did you believe your

20   role to be in regard to Dr. Snyder and his complaint?

21      A    I believed my role was to find a resolution

22   that would help Dr. Snyder be successful.

23      Q    And why did you believe that to be your

24   role?

25      A    Because I had previously held that role on

Sandra Cooper                                    October 8, 2019

Page 138

1      Q    In relation to Dr. Snyder, you testified

2    that your role was to find a resolution to help

3    Dr. Snyder be successful.

4            Do you recall that?

5      A    Yes.

6      Q    What do you believe was the resolution?

7      A    So, like, in her situation, in the student

8    situation, it was -- there was a -- I don't recall

9    the specifics, but there was something -- kind of a

10   remediary (sic) way to get her back into -- back --

11   get her back into the program and to get her

12   successfully back into where she could become a

13   physician.

14           And so that was the hope is that we could

15   come up with some solution that -- where Dr. Snyder

16   would be able to, you know, regain his training.

17     Q    And return to the family medicine

18   residency?

19     A    Yes.

20     Q    Did you ever propose potential resolutions

21   to anyone?

22     A    Didn't get that far.  And then we got to

23   that meeting where Dr. Thurman proposed solutions,

24   and that was kind of where we were at with that

25   meeting was -- that was to propose -- where we were

Sandra Cooper                                    October 8, 2019

Page 139

1   wanting to propose solutions.  That was really the

2   point of that meeting.

3        Q    As far as you can recall, was that when

4   your involvement ended was that meeting?

5        A    I believe so.

6        Q    And then you mentioned that "we" were

7   trying to find solutions for Dr. Snyder.

8             Who is the "we"?

9        A    OSU.

10       Q    Dr. Cotton?

11       A    Just OSU.

12       Q    Did that include Dr. Cotton?

13       A    Yes.  "We" would be all the parties we

14  talked about.  "We" would be family medicine,

15  Dr. Thurman, Dr. Alex, Dr. Cotton, yes.

16       Q    And so you viewed your role as working with

17  those individuals to help find a resolution to help

18  Dr. Snyder be successful?

19       A    Yes.

20       Q    And not to investigate his complaint?

21       A    My investigation of his complaint was

22  primarily to find a way to help him be successful, to

23  find -- to help find a way to help him be successful.

24            MR. STOCKTON:  Pass the witness.

25            THE WITNESS:  Does that make sense?