# IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA

JEFFREY SNYDER, D.O., an )
individual, )
  )
      Plaintiff, )
  )
-vs- )    Case No. CIV-16-384-F
  )
BOARD OF REGENTS FOR THE )
AGRICULTURAL & )
MECHANICAL COLLEGES, *ex. rel.*, )
OKLAHOMA STATE UNIVERSITY )
CENTER FOR HEALTH SCIENCES, )
*et al.*, )
  )
      Defendants.

## AMENDED ORDER[1]

### I.

*Background*

In May of 2013, plaintiff, Jeffrey Snyder, received a Doctor of Osteopathic Medicine (D.O.) degree. Shortly thereafter, in July of 2013, he commenced a residency in the Family Medicine Residency sponsored by the Oklahoma State University Center for Health Sciences. The Family Medicine Residency is a three-year postgraduate medical program (OGME 1, OGME 2 and OGME 3). As a first-year medical resident (OGME 1), plaintiff was employed by the Oklahoma

---

[1] This order corrects some errors and omissions in the order on summary judgment, entered on February 18, 2020, doc. no. 428. That order is **VACATED**. This order replaces the order at doc. no. 428.

State University Medical Center.  Completion of one year of the residency program was required to obtain an osteopathy license; an osteopathy license was required to continue in the three-year residency program.

Dr. Snyder alleges that after he began the application process to obtain an osteopathy license, he was placed on probation for three months starting May 1, 2014, and, incident to that probation, was directed to voluntarily undergo neuropsychiatric testing.  After Dr. Snyder requested reconsideration of the testing requirement because of its expense, he was directed to participate in the medical center's Employee Assistance Program (EAP).  The EAP, provided by CommunityCare HMO, Inc., d/b/a CommunityCare of Oklahoma, referred Dr. Snyder to Leslie Barnes, Ph.D., a licensed psychologist, for a fitness-for-duty evaluation.

On June 23, 2014, Dr. Barnes issued a report of her evaluation.  After receipt of additional information from the medical center's human resources department, including a report from the residency's Program Director, Lora Cotton, D.O., of incidents involving Dr. Snyder observed from June 24, 2014 to June 29, 2014, Dr. Barnes advised a human resources officer by letter that Dr. Snyder was not fit to provide medical treatment to patients.

On July 3, 2014, Dr. Snyder was placed on a three-month paid leave of absence and instructed to participate in counseling sessions as directed by the EAP. Dr. Snyder hired counsel and attempted to appeal his "probation," which was denied by Dr. Cotton.  He also filed internal complaints of sex and disability discrimination.  Further, Dr. Snyder requested release of Dr. Barnes' report, and letters supplementing her report, from Dr. Barnes, the medical center and CommunityCare of Oklahoma.  The report and letters were ultimately provided to

Dr. Snyder's counsel by CommunityCare of Oklahoma's counsel in October of 2014.

A meeting was held on November 7, 2014 to discuss Dr. Snyder's residency training status and available options to move forward. In a letter dated November 13, 2014, Dr. Snyder was provided three options – return to training, resignation and dismissal. A return to training required receipt of a written statement from a clinical psychologist that Dr. Snyder was fit for duty for patient care, waiver of any complaints or appeals he had regarding his status as an OGME 1 and agreement to continue the program from the point where he left – one month of active rotation on probation. Dismissal from the residency program would result if a written fit-for-duty statement was not received by January 1, 2015.

Dr. Snyder provided a fit-for-duty statement from a psychologist dated January 6, 2015. Subsequently, on February 2, 2015, Dr. Snyder was advised by the medical center's human resources officer that since "no resolution has been reached in [his] situation," with respect to his "compliance with the conditions of the leave," his employment status was being changed to "inactive," he would no longer receive a paycheck and his benefits were being canceled. Doc. no. 341-81. Dr. Snyder filed a discrimination complaint with the Office of Civil Rights Enforcement against the medical center.

In August of 2015, Dr. Snyder was notified by Dr. Cotton of his dismissal from the residency program due to the abandonment of his position and was advised by a human resources officer, employed by Mercy Health System (which was contracted to manage the medical center), that his employment was terminated. According to plaintiff, Jenny Alexopulos, D.O., the Director of Medical Education, was involved in the decisions relating to probation, leave of absence and the dismissal from his residency.

Dr. Snyder commenced this action in April of 2016. He has amended his complaint several times. The operative complaint is the Third Amended Complaint, and in that complaint, Dr. Snyder asserts claims under the Rehabilitation Act of 1973, 29 U.S.C. § 701, *et seq*., the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq.*, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, 42 U.S.C. § 1983, 42 U.S.C. § 1985(3) and various claims under state law. Named as defendants are the Board of Regents for the Oklahoma Agricultural & Mechanical Colleges, *ex rel.* Oklahoma State University Center for Health Sciences (OSU-CHS), Oklahoma State University Medical Trust, a public trust, d/b/a OSU Medical Center (OSUMC), Mercy Health and Mercy Health Oklahoma Communities, Inc. d/b/a Mercy Health System, Oklahoma State University Medical Authority, Dr. Lora Cotton, in her individual and official capacities, Dr. Jenny Alexopulos, in her individual and official capacities, Dr. Leslie E. Barnes, in her individual and official capacities, and CommunityCare HMO, Inc. d/b/a CommunityCare of Oklahoma (CommunityCare).[2] After extensive discovery, defendants have moved either for partial summary judgment or for summary judgment. Dr. Snyder has also moved for partial summary judgment as to certain claims against OSU-CHS, OSUMC and CommunityCare. The motions have been fully briefed. The summary judgment record–thousands of pages–includes twenty-six briefs and 516 exhibits.

---

[2] OSUMC Professional Services, LLC was also named as a defendant in the Third Amended Complaint but was later dismissed. *See*, Joint Stipulation of Dismissal With Prejudice (doc. no. 308).

Upon due consideration of the parties' submissions, the court makes its determination.[3]

## II.

### Standard of Review

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Rule 56(a), Fed. R. Civ. P. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." _Id_. "There is a genuine issue of material fact if a rational jury could find in favor of the nonmoving party on the evidence presented." Fassbender v. Correct Care Sols., LLC, 890 F.3d 875, 882 (10th Cir. 2018) (quotations omitted).

In reviewing the record, the court "view[s] the evidence and draw[s] all reasonable inferences therefrom in the light most favorable to the party opposing summary judgment." Atl. Richfield Co. v. Farm Credit Bank of Wichita, 226 F.3d 1138, 1148 (10th Cir. 2000).

## III.

### Standard of Review – Qualified Immunity Defense – Cotton and Alexopulos

Qualified immunity protects public officials performing discretionary functions unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Qualified immunity leaves "ample room for

---

[3] Plaintiff filed a motion for spoliation sanctions on February 14, 2020. Doc. no. 427. The court's careful review of that motion leaves the court satisfied that, regardless of the outcome on that motion, nothing in the motion would affect the court's consideration or determination of the motions addressed in this order.

mistaken judgments," protecting "all but the plainly incompetent or those who knowingly violated the law." Malley v. Briggs, 475 U.S. 335, 341 (1986).

When defendants, such as Dr. Cotton and Dr. Alexopulos, raise the qualified immunity defense on summary judgment, the burden shifts to the plaintiff to meet a strict two-part test. "First, the plaintiff must demonstrate that the defendant[s'] actions violated a constitutional or statutory right. Second, the plaintiff must show that the constitutional or statutory rights the defendant[s] allegedly violated were clearly established at the time of the conduct at issue." Nelson v. McMullen, 207 F.3d 1202, 1206 (10th Cir. 2000). "If, and only if, the plaintiff meets this two-part test does a defendant then bear the traditional burden of the movant for summary judgment—showing that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law." Clark v. Edmunds, 513 F.3d 1219, 1222 (10th Cir. 2008) (internal quotation marks omitted).

IV.

*Relevant Facts*

Oklahoma State University Center for Health Sciences is an academic health center comprised of the College of Osteopathic Medicine, the School of Biomedical Sciences, the School of Forensic Sciences, the School of Health Care Administration, and the School of Allied Health. OSU-CHS academically sponsors the Family Medicine Residency. It is a recipient of federal financial assistance.

OSU-CHS entered into an Academic Affiliation Agreement with Oklahoma State University Medical Center Trust (OSUMCT), a public trust having the City of Tulsa, Oklahoma, as its beneficiary. The agreement had an effective date of May 1, 2009. The trust had been formed in January of 2009 to own and operate an acute care hospital known as the Oklahoma State University Medical Center. The

agreement set forth the terms and conditions under which the parties agreed to become affiliated and under which Oklahoma State University Medical Center was designated as the primary teaching hospital for OSU-CHS. In the agreement, the trust agreed to employ residents under the residency program. Doc. nos. 323-3, 379-66.

Oklahoma State University Medical Authority (OSUMA) is a state agency created by statute, the Oklahoma State University Medical Authority Act (Act), 63 O.S. 2011 §§ 3271-3293. The mission and purposes of the OSUMA "are to support and upon a declaration of necessity, to serve as teaching and training facilities for students enrolled at Oklahoma State University Center for Health Sciences, upon a declaration of necessity, to acquire and provide a site for conducting medical and biomedical research by faculty members of the Oklahoma State University Center for Health Sciences and to facilitate and upon a declaration of necessity, to provide care for the patients of Oklahoma State University Center for Health Sciences physician trainers." 63 O.S. 2011 § 3273.

The Act expressly approves the creation of a public trust, "Oklahoma State University Medical Trust," of which the State of Oklahoma is the beneficiary. The principal purpose of the public trust is to effectuate the purposes of the OSUMA. Pursuant to the Act, the acting members of OSUMA serve as the trustees of OSUMT. 63 O.S. 2011 § 3290.

Pursuant to the Tripartite Agreement and Plan of Merger, entered into October 30, 2013, among OSUMA, Oklahoma State University Medical Trust and OSUMCT, OSUMCT agreed to quitclaim, transfer and convey to OSUMA all real property comprising the Oklahoma State University Medical Center. OSUMCT agreed to amend its Declaration of Trust to read exactly as the Declaration of Trust of the Oklahoma State University Medical Trust, to designate the State of

Oklahoma as its sole beneficiary and to authorize its merger with Oklahoma State University Medical Trust. OSUMCT was to be designated as the surviving trust; the trustees of the OSUMCT were to resign and be replaced by the trustees of Oklahoma State University Medical Trust; and the OSUMCT was to be governed by the Declaration of Trust of Oklahoma State University Medical Trust. OSUMCT also agreed to change its name to Oklahoma State University Medical Trust (OSUMT). OSUMA agreed to lease all real property comprising the Oklahoma State University Medical Center to OSUMT. Doc. nos. 323-16, 379-76.

Under the Tripartite Agreement and Plan of Merger, the Academic Affiliation Agreement between OSU-CHS and OSUMCT was to remain in force. All existing contractual arrangements of OSUMCT relating to the operation of the Oklahoma State University Medical Center were to continue as contractual arrangements with OSUMT.

As a condition precedent to a lender's consent to the trust merger and the transfer of real property and other transactions under the Tripartite Agreement and Plan of Merger, the lender required execution of a ratification and amendment to the Academic Affiliation Agreement by OSUMT and OSU-CHS, as consented to and acknowledged by OSUMA. On December 6, 2013, OSUMT and OSU-CHS executed a Ratification and Amendment of Academic Affiliation Agreement, wherein the parties agreed to ratify the Academic Affiliation Agreement. OSUMA consented and acknowledged the document. On the same day, OSUMA leased all real property comprising the Oklahoma State University Medical Center to OSUMT. OSUMT operates the hospital under the trade name Oklahoma State University Medical Center. Doc. nos. 323-22, 379-73. (For the remainder of this order, OSUMT will be referred to as OSUMC). OSUMC is a recipient of federal financial assistance.

In addition to leasing the real property comprising the medical center to OSUMC, OSUMA is a vehicle for funding the medical center. OSUMA and OSUMC present a consolidated financial statement for audit purposes.

OSUMC and Mercy Health Oklahoma Communities Inc. d/b/a Mercy Health System (Mercy) entered into a Management Services Agreement effective May 1, 2014 for the management and operation of the medical center. Under the agreement, OSUMC's Board of Trustees, who constitute the governing body of OSUMC with full power and authority to operate the medical center, granted Mercy "sole and exclusive right to supervise and direct the management and operation of the [m]edical [c]enter in the name, for the account, and on behalf of the Board pursuant to the terms and conditions set forth in [the] Agreement and subject to oversight of the Board." Doc. nos. 323-21, 379-65 ¶ 1(a). The agreement also stated that Mercy would have "full power and authority to administer, manage, control, and operate the business and affairs of the [m]edical [c]enter in whatever reasonable manner Mercy deems appropriate to meet day-to-day requirements of the [m]edical [c]enter []." *Id.* According to the agreement, the Board would exercise "legal authority, supervision, direction and control over the business, policies, operation, and assets of the [m]edical [c]enter." The Board retained "oversight responsibility for the medical, professional and ethical affairs of [OSUMC] "and governance authority over the medical staff, medical staff bylaws, rules and regulations, quality of care, telemedicine services, [and] contracted services []." *Id.*, ¶ 2(a)(iv) and (vi). All expenses required for operation of the medical center were paid by OSUMC, not Mercy.

Under their agreement, Mercy agreed to supply a Chief Executive Officer and Chief Financial Officer, reasonably acceptable to and approved by the Board. It also supplied the Director of Finance, a Vice President of Clinical Operations,

and human resources support. These personnel, except Keith Minnis (Minnis), Vice President of Human Resources, were assigned to provide services on a dedicated, full-time basis to OSUMC. However, they were employees of Mercy and were paid by Mercy. Under the agreement, OSUMC had the discretion to request that Mercy remove, after appropriate instruction and counseling, any employee providing services to OSUMC. Any removal of the Chief Executive Officer or Chief Financial Officer required a thirty-day notice and cure period.

The agreement provided that, aside from the Chief Executive Officer and Chief Financial Officer and any employees Mercy utilized to perform the services to the hospital, OSUMC was to employ all other personnel required for the hospital's operation and maintenance. They were to remain subject to the direction and control of OSUMC.

OSUMC and Mercy were separate entities with separate ownership and finances. They maintained separate bank accounts, lines of credit, account receivables and account payables. They had separate human resources policies and procedures. However, as part of the Management Services Agreement, the Mercy human resources employees who were designated to provide services to OSUMC on a full-time basis did have oversight of OSUMC's human resources employees. Mercy did not receive any federal financial assistance.

OSU-CHS and Mercy were separate entities with separate leadership, boards, ownership, human resource departments and policies, payroll administration and finances. They maintained separate bank accounts and lines of credit. They maintained separate account receivables and account payables. They shared no employees.

After Dr. Snyder was selected as a medical resident in the Family Medicine Residency, he and Oklahoma State University Medical Center entered into an

Osteopathic Graduate Medical Education Resident/Fellow Staff Agreement for his first year. The agreement provided that the training program would commence on July 1, 2013 and continue for twelve months. The agreement set Dr. Snyder's compensation rate at $44,411.00. Pursuant to the Tripartite Agreement and Plan of Merger, this agreement was an existing contractual arrangement which continued as a contractual arrangement for OSUMC.

Dr. Snyder's pay stubs were issued by OSUMC and his W-2 tax forms identified OSUMC as his employer. OSUMC handled all payroll matters for Dr. Snyder and paid his Social Security tax, FUTA, SUTA and other employment-related taxes. It also maintained his workers' compensation coverage and employment insurance. In addition, OSUMC provided his health insurance benefits. Dr. Snyder did not report to any Mercy employee during his residency. Dr. Snyder's employment was contingent on his participation in the residency program. Mercy lacked authority to unilaterally terminate Dr. Snyder's employment.

Dr. Lora Cotton was a member of the faculty of OSU-CHS's Family Medicine Department and served as Program Director for the Family Medicine Residency. As Program Director, Dr. Cotton was responsible for supervising and coordinating all educational activities for the residents in the Family Medicine Residency. She was to coordinate those activities with the Director of Medical Education. For her performance of her duties as Program Director, Dr. Cotton was paid a stipend by OSUMC. However, she was an employee of OSU-CHS.

Dr. Jenny Alexopulos was also a member of the faculty of OSU-CHS's Family Medicine Department and served as Director of Medical Education for OSUMC. As Director of Medical Education, Dr. Alexopulos supervised, oversaw and consulted with Dr. Cotton in her role as Program Director for the Family

Medicine Residency. She also supervised all other residency programs at OSUMC. OSUMC reimbursed OSU-CHS 50% of the cost of Dr. Alexopulos' compensation package. Dr. Alexopulos reported to the CEO of OSUMC, together with the Dean of OSU-CHS, and was to be reviewed annually by them. Dr. Alexopulos reported to the Dean of OSU-CHS regarding academic issues. She was an employee of OSU-CHS. While she served at the pleasure of OSU-CHS in the position of Director of Medical Education, OSUMC could request to replace her. Among other duties, Dr. Alexopulos was responsible for setting resident's salaries.

Although Dr. Snyder was an employee of OSUMC for his first residency year, he was also a student in the residency program sponsored by OSU-CHS. Dr. Snyder was supervised by Dr. Cotton and Dr. Alexopulos, as well as other OSU-CHS faculty members.

At all times relevant to this action, there was another residency program known as the OMECO Teaching Health Center Family Medicine Residency. Dr. Sarah Hall was the Program Director for this residency program. Residents in this program were employed by OSU-CHS rather than OSUMC.

OSU-CHS and OSUMC had written policies relating to academic and disciplinary action. Doc. nos. 379-75, 400-5. Under the policies, academic issues included "a failure to attain proper level of scholarship or non-cognitive skills, including clinical abilities, interpersonal relations, and/or personal and professional characteristics." Doc. nos. 335-4, p. 2, 379-75, p. 2; doc. nos. 400-5, p. 27; 341-1, p. 27. With respect to probation, the policies provided that the Program Director

> will inform the resident orally and in writing of the specific deficiencies. The trainee will be provided a specified period of time in which to implement specified actions required to resolve the academic deficiencies. This period of time to resolve the deficiencies may be waived and the trainee may be placed on immediate

probation if the deficiencies are felt by the Program Director to be detrimental to patient care. Following this period, if academic deficiencies persist, the trainee will be placed on probation for an initial period of not less than three months and no longer than six months . . . The trainee will be provided an opportunity to meet with evaluators to appeal a decision regarding probation.

Doc. nos. 335-4, p. 3, 379-75, p. 3; doc. nos. 400-5, 341-1, pp. 27-28

The first year in the Family Medicine Residency (OGME 1) included rotations in Emergency Medicine, Obstetrics and Gynecology, Pediatrics, Internal Medicine, Surgery, Critical Care, Osteopathic Manipulative Medicine, Community Medicine, Geriatrics, Sports Medicine and Electives. It also included a Weekly Didactic Program every Friday afternoon. The purpose of the Weekly Didactic Program was to expand the resident's knowledge base of clinical medicine and prepare the resident for yearly in-service exams and the Family Medicine certification exams.

Residents in the Family Medicine Residency were evaluated for their rotations by attending or supervising physicians. Residents received scores between 1 and 9, with 1 being the lowest rating and 9 being the highest rating. A "C" designation was between 4 and 6 (but was not designated as "5"). A "C" designation indicated "Competent." The categories scored included (1) dependability and attendance; (2) team participation; (3) initiative; (4) clinical knowledge; (5) responsiveness to patients; (6) general psychosocial skills; (7) professional appearance; (8) knowledge of osteopathic principles; (9) charts; (10) professional judgment; (11) professional relationships; and (12) relationships with patients and families. Residents were also given an overall evaluation with categories of (1) unsatisfactory; (2) fair; (3) average; (4) above average; and (5) outstanding.

In rotations in July and August of 2013, Dr. Snyder did not receive any scores lower than a score of "6" in any of the categories and received overall evaluations of average and above average.

For the Pediatrics rotation in September of 2013, Dr. Snyder's lowest score was "4" in three categories, clinical knowledge, charts and professional judgment. He received an overall evaluation of fair. Dr. Travis Campbell commented that Dr. Snyder "overall [] struggles to remember instructions given" and "patient histor[ies] are unfocused [and] full of non[-]pertinent information but missing other essential element[s]." Dr. Campbell also commented that Dr. Snyder's "knowledge as well as assessment [and] management skills are not on level with his peers." Doc. no. 336-20, doc. no. 379-10 (OSUMC 142-144). In another evaluation for that Pediatrics rotation, Dr. Duncan gave Dr. Snyder scores of either "Competent" or higher in all categories and rated him overall as above average.

For the Intensive Care Unit rotation in October of 2013, Dr. Bilal Chaudhry gave Dr. Snyder scores of either "8" or "9" and he received an overall evaluation of outstanding. Dr. Chaudhry commented that Dr. Snyder was "Awesome, a total Rock Star[,] great doctor." Doc. no. 379-10 (OSUMC 145-147).

For the Geriatrics rotation in November 2013, Dr. Cotton gave Dr. Snyder scores of either "Competent" or higher in all categories and an overall evaluation as average.

Dr. Snyder took a Resident In-Service Examination in October of 2013. He received a score of 483 with the "OGME Mean Standard Score" of 460.

In November of 2013, Dr. Connie Nickel-Mertz completed a Quarterly Competency Based Assessment for Dr. Snyder for the first quarter of his residency (July through September) using a scale of 0 to 6 with a score of "0" as "Deficient," a score of "2" as "Usually Meets Competency" and a score of "4" as "Consistently

14

Meeting Competency" and a score of "6" as "Exceptional." Dr. Snyder received scores of "3" and "4." Dr. Mertz indicated that Dr. Snyder was "progressing satisfactorily in relation to OGME level." She commented that he "was very thorough with both his interviews and physical exam." She however commented that "he should rely on his memory and stop taking notes" as it "would greatly increase his speed" but "[o]therwise, he was doing a great job." Doc. no. 379-10 (OSUMC 000085-000086), doc. no. 336-21.

Dr. Cotton completed a Family Medicine Residency Periodic Evaluation for Dr. Snyder in December of 2013 for the July-October period. She noted that Dr. Snyder was "[p]rogressing appropriately," but commented he should "work on gathering appropriate level of detail, not just detail for detail sake." Doc. no. 379-10 (OSUMC 000084); doc. no. 336-22. That same month, Dr. Snyder took and passed the Comprehensive Osteopathic Medical Licensing Examination. Doc. no. 379-34.

For the Emergency Medicine rotation in December of 2013, Dr. Snyder's lowest score was a "4" in professional judgment. He received an overall evaluation as fair. Dr. Jennifer Galbraith commented that there were a "few occasions I was surprised at his lack of knowledge for diagnosing some basic clinical conditions encountered in all of medicine." She also commented that "[h]e seems a little 'greener' than others for his level of training, although he seems very teachable and willing to learn." Doc. no. 379-10 (OSUMC 000105-000107); doc. 341-10. With respect to the same rotation, Dr. William Wylie gave Dr. Snyder an "8" in every category and rated him overall as above average.

In January of 2014, Dr. Snyder had his first Family Medicine Teaching Service rotation. This rotation involved the care of hospitalized patients.

Responsibilities included evaluation, admission, management and discharge of patients.

On January 23, 2014, Dr. Andrea McEachern, Associate Program Director, sent an email to Dr. Cotton "to relay a few concerns" she had about Dr. Snyder's "communication with patients and the other members of the team." Doc. nos. 335-4; 341-18. She stated that he "seems to struggle with patient interaction." He "would rarely make eye contact with his patients or [her], but would read his plan from his notes quietly for a few sentences and then ask if any questions, and this was the end of the encounter." She said that "[t]his may be his style, or only how he acts during attending rounds due to shyness, but it comes across as robotic, stiff, insensitive, and uninterested." According to Dr. McEachern, he "seemed to have a fairly accurate physical exam, but rarely did he have a thorough history and assessment because of his poor communication skills." She also stated that "he showed lack of initiative and problems following through." Dr. McEachern stated that he "had to be explicitly told what to do and how to do it. And the other team members' frustration showed because of constantly having to follow up on what [he] was supposed to do." She questioned if he could have a "learning disability, or psychiatric condition, or behavioral issue that inhibits connecting with other people and attention to detail[.]" *Id*.

Dr. McEachern also had raised her concerns about a learning disability, psychiatric condition or behavioral issue with Dr. Cotton verbally. Dr. Cotton had asked Dr. McEachern to put her concerns in an email. Dr. Cotton told Dr. McEachern her that "she had observed similarly and that it was possible." Doc. nos. 379-9, 400-3 p. 192, ll. 7-8. Dr. Cotton testified that as of January 23, 2014, she was concerned that a learning disability was "prohibiting his progression" and

believed he may have a psychiatric condition or other behavioral issue.  *Id.*, ll. 9-19.  Dr. Cotton did not take any action at that time.

Dr. Cotton evaluated Dr. Snyder for his Family Medicine Teaching Service rotation in January.  Dr. Snyder received a "2" for general psychosocial skills and a "4" for dependability and attendance, team participation, clinical knowledge, professional judgment and professional relationships.  Doc. no. 379-10 (OSUMC 000108-000111).  For the "2" score for the general psychosocial skills category, she commented that he "seems unconnected with those he speaks to.  He often reads out-loud from a paper and takes to [sic- no] notice of the patient's non-verbal communication cues – that they don't understand or that they are frightened by the news he is giving them."  Doc. no. 379-10 (OSUMC 000109).

For the January rotation, Dr. Cotton gave Dr. Snyder an overall evaluation of fair.  In her overall comments, she said that "while Dr. Snyder has strengths in some areas such as documentation and professional dress, he lacks in many areas.  Of particular concern is that he still functions clinically and behaviorally like a medical student."  She said he "spends an extraordinary amount of time gathering and writing down information, but doesn't process the information he gathers.  Whether talking to another physician or to a patient, he just reads the information out loud from his paper in an almost robotic way."  She said "[m]aking decisions is another area where [he] has yet to realize that he is the doctor" and "[h]e must start functioning in a more independent manner."  Also, she said that "[e]fficiency is another issue."  She said that "the work [he] completes is very detailed and neat, but contains information that is unnecessary" and he "takes about two to three times longer to complete tasks that he should at this stage of training."  She admitted she was "pretty critical" but she had "deep concerns" that Dr. Snyder was "not progressing towards being able to practice medicine without direct supervision."

Further, she had "concerns that he may be struggling with social anxiety and obsessive-compulsive tendencies." She said that he "doesn't connect empathically and can't seem to change the way he completes tasks, even when his approach is proving maladaptive." She suggested that he seek help. Both Dr. Cotton and Dr. Snyder signed the evaluation. Doc. no. 379-10 (OSUMC 000110-000111). According to Dr. Snyder, Dr. Cotton did not discuss the evaluation with him and he did not address it with her.

Dr. Regina Lewis also evaluated Dr. Snyder for the January Family Medicine Teaching Service rotation. Dr. Snyder did not receive any score below Competent. He was given an overall evaluation of average. In her overall comments, she stated "Dr. Snyder is very quiet which sometimes makes it difficult to assess his knowledge base. He is still becoming comfortable with the notion that he is the physician." Doc. no. 336-30.

At some point, Dr. Cotton inquired of Dr. Snyder if there had been any concerns in his previous educational experiences about a learning disability and he told her he had never had any concerns like that.

Upper level residents, who had supervisory-like roles over Dr. Snyder, testified that they had some concerns with Dr. Snyder's performance and some of those residents expressed their concerns to Dr. Cotton.

Each month, the faculty of the Family Medicine Department had a meeting and minutes of the meetings were taken. After the conclusion of one meeting in January or February, Dr. Cotton advised the faculty that "concerns had been brought to her attention and from her observations about [Dr. Snyder's] performance." Doc. no. 400-2, p. 96, ll. 9-11. No other resident was discussed. The faculty informally recommended to Dr. Cotton that she place him on an additional month of the Family Medicine Teaching Service.

For the Emergency Medicine rotation in February of 2014, Dr. Wylie gave Dr. Snyder a score of "8" in every category and gave him an overall evaluation as above average.

On February 25, 2014, Brenda Davidson, Coordinator of Graduate Medical Education, sent an email to Dr. Snyder advising him of a mandatory meeting on March 3, 2014 at which the executive director of the Oklahoma State Board of Osteopathic Examiners would be presenting information relating to the osteopathic license application. Davidson advised that first year residents must be licensed by July 1, 2014 to begin their second year of residency.

In March of 2014, Dr. Snyder had another Family Medicine Teaching Service rotation. Dr. McEachern provided an evaluation for the rotation. Dr. Snyder only received one score below "Competent." Specifically, he received a "3" for general psychosocial skills. His overall evaluation was average. In her overall comments, she stated that she did see some improvement in his performance from January. She said he "has an unassuming and soft-spoken manner, and I feel that humility is very important for a physician; But [Dr. Snyder] sometimes comes across as unsure of himself, distant, or indifferent." She said at times "he seems uncomfortable, avoids eye contact with me or the patient while presenting and it feels artificial and disconnected from the patient. I feel he is focusing so much on trying to get every detail right that he forgets he's talking to a real person, and it appears he's either not interested or uncaring, which I don't believe is true—it's just a communication issue." Further, she stated that "I've not found a major deficit with his basic medical knowledge, rather more of a problem with managing the case, making arrangements and making decisions." Doc. no. 341-12.

Dr. Hall also provided an evaluation for the Family Medicine Teaching Service rotation in March of 2014. Dr. Hall gave Dr. Snyder a score of "4" in

categories of team participation, initiative, clinical knowledge and general psychological skills. Dr. Hall's overall evaluation for Dr. Snyder was fair. She commented that Dr. Snyder "has a great deal to still learn in residency" and "must focus on clinical decision making and increasing his knowledge of the care of the hospital patient." She also commented that "I think he gets overwhelmed and often forgets key points. I do hope he continues to work hard on building relationships and can find a section of medicine he can become an expert." Doc. no. 379-10 (OSUMC000126). Although the evaluation was submitted by Dr. Hall on May 4, 2014, it was not signed off by Dr. Cotton. It was signed by Dr. McEachern on February 4, 2016.

On March 19, 2014, Dr. Alexopulos signed a letter to the Oklahoma State Board of Osteopathic Examiners (Board) stating Dr. Snyder "is serving and will successfully complete an [American Osteopathic Association] approved OGME 1 residency" at OSU Medical Center; "[t]here has been no disciplinary action taken" against Dr. Snyder; and that Dr. Snyder "exhibits proper and professional character and is in good standing" with OSU Medical Center. She recommended for licensure "without any reservation." Doc. no. 335-9 (OSUMC 01367). The signed letter was not submitted to the Board by Dr. Alexopulos.

In mid-to-late March or early April, Dr. Cotton spoke to Dr. Alexopulos about her concerns regarding Dr. Snyder. Dr. Cotton felt that based on accumulated observations and the timing in the year, she wanted Dr. Snyder "to have some kind of evaluation for things that he can work on to help him progress." She told Dr. Alexopulos that she thought he should be referred for neurological or psychological testing. Dr. Alexopulos supported that process. Doc. no. 400-3, Doc. no. 335-6, p. 197, ll. 12-18; p. 199, ll. 13-25.

On April 4, 2014, Dr. Snyder signed a Postgraduate Training Verification form relating to his application for an osteopathy license. He submitted the form to Shontay Patterson (Patterson), the Residency Coordinator, for completion and submission by Dr. Cotton. The form asked information about the postgraduate training year and whether it had been successfully completed. The answers relating to successful completion were yes, no or "[i]n progress with expected completion date of _____." Doc. no. 379-69. The form requested information about "Unusual Circumstances" including whether the individual ever took a leave of absence, was ever placed on probation or had any negative reports filed by instructors for behavioral reasons. Patterson typically provided the Board with the residents' verification forms in May. She asked Dr. Cotton about sending the verification form for Dr. Snyder. Dr. Cotton told her to "[h]old off on that one." Doc. 379-71, p. 33, l. 17. Patterson asked Dr. Cotton on two other occasions about Dr. Snyder's verification form. The verification form was never sent to the Board. Patterson testified that Dr. Snyder was the only resident whose postgraduate training was not verified.

On April 18, 2014, Dr. Cotton sent an email to other attending physicians stating that she was in the process of reviewing resident competency levels in preparation for advancement to the next level of training. She said Dr. Snyder was on teaching service in March, and serious issues with clinical competency were recognized by attending physicians and peers. She said she had written a list of specific examples from her experience with him in March and asked for any examples of specific concerns. She stated that "it doesn't seem that he has made enough progress this year to become licensed at this point." On April 29, 2014, Dr. McEachern responded to the email, with a specific example of having to perform a pelvic exam because Dr. Snyder seemed uncomfortable with it.

According to Dr. McEachern, the patient "was freaking out and requested a female." Doc. no. 341-20. In deposition, Dr. McEachern testified that it was not uncommon for a resident to appear uncomfortable with a pelvic exam and that patients have requested a different provider to do the exam. Dr. Cotton did not receive any other response to her email from the attending physicians.

Dr. Cotton met with Dr. Snyder and then emailed him, on April 22, 2014, a draft of a letter placing him on academic probation for three months, beginning May 1, 2014 and ending July 31, 2014, and a document setting forth ten specific requirements Dr. Snyder had to meet (referred to as the Academic Probation Requirements Plan).

In the letter, Dr. Cotton stated that the academic probation resulted "from a failure to attain a proper level of scholarship and non-cognitive skills, including judgment, clinical abilities, maturity and professionalism." She stated that during his recent Family Medicine Teaching Service rotation, his "clinical performance revealed deficiencies" that showed he had not "achieved a level of competency that supports progression to OGME 2 level or approval for a state medical license." She then gave seven specific examples of the deficiencies occurring between March 17 and March 20, 2014. Dr. Cotton stated that the examples reveal "patterns of behavior that place patients at risk" and she determined the deficiencies to be "detrimental to patient care and so warrant immediate probation." She advised Dr. Snyder that he had the "right to appeal this probation decision as described in the Resident Handbook" and if he decided to appeal, to do so in writing to her and to the office of Graduate Medical Education at OSUMC. Doc. no. 341-36 (OSUMC 000239-000241). In addition, she advised him that during the probation, he would be classified as an OGME 1, and near the end of the probationary period, the faculty members of the Family Medicine Department would meet to determine his

residency status based on his level of clinical performance and his "participation in the specific requirements listed in the Academic Requirements Plan." She stated that at the probation's conclusion, one of three actions would be taken – release from probation, continuation of probation or termination of his residency training contract.

One of the requirements Dr. Snyder had to meet during the probationary period was to "voluntarily undergo neuropsychiatric testing to assess for a component of a behavioral health, auditory processing or other neurologic disorder that could be impairing your ability to attain the level of competence required for progression in residency training." Doc. no. 341-36 (OSUMC 000238).

Both Dr. Cotton and Dr. Snyder signed the letter and the Academic Probation Requirements Plan. In signing the letter, Dr. Snyder stated that "I have read and understand the content but do not fully agree with the above information in this letter." Doc. no. 341-36 (OSUMC 000241). Dr. Joan Stewart, OSU-CHS Director of Medical Education, and Dr. Alexopulos were copied on the letter.

The Graduate Medical Education Committee served as a policy making, advisory and disciplinary committee, serving the Director of Medical Education and the professional staff regarding the residency training program. Dr. Alexopulos and other program directors of residency programs served on the committee. It usually met monthly. Dr. Alexopulos testified that she expected that all probations, suspensions and dismissals would be discussed with the committee. Dr. Cotton did not consult the committee regarding Dr. Snyder.

On April 28, 2014, Dr. Snyder emailed Dr. Cotton advising her that he had read her requirements and "promise[d] to fulfill each and every request to best of my abilities." He also advised that he had contacted neuropsychiatric testing centers in Tulsa and that the cost of the evaluation was around $3,000.00 and his

insurance company would not reimburse him for the testing unless it was medically necessary. He stated he was quite confident his family doctor of over twenty years would not recommend it. He requested that Dr. Cotton reconsider her request. Doc. no. 341-37.

On April 29, 2014, Dr. Cotton emailed Sunny Benjamin (Benjamin), Chief Human Resources Officer for OSUMC, advising her that she had placed Dr. Snyder on academic probation and one of the requirements for his probation was "to get testing/counseling to see if he has a mood or neurologic impairment that is hindering his academic and clinical performance." She said she had asked Dr. Snyder "to take on the responsibility to find and follow through with this testing" but he was "resistant to this aspect of his probation plan." She advised that he was "struggling to find an affordable resource for this testing and [was] resisting asking his personal physician for a referral." She asked if he could start with the OSUMC Employee Assistance Program. Doc. no. 341-38. Benjamin responded that starting with the EAP was a great plan and she wanted to talk with her and receive a copy of the academic probation paperwork.

Dr. Cotton then forwarded Dr. Snyder's April 28th email to Dr. Stewart and Dr. Alexopulos, with a copy to Benjamin, and advised them that Dr. Snyder wanted her to cancel the requirement for neuropsychiatric testing. She stated that she believed that "this part of the probation is critical and key element [of] the Academic Probation Plan." She stated "I, and other attending physicians, have noticed patterns of thinking and behavior that seem to point toward cognitive and/or emotional barriers to his achieving the required level of competency necessary for advancement to the second year of residency training." She said that she had communicated with Benjamin for her recommendations and stated that Benjamin agreed that his starting with the EAP was a good first step. Dr. Cotton stated she

hoped the EAP could guide him toward accessing appropriate evaluation resources. Doc. no. 341-39.

Dr. Cotton also spoke with Benjamin. Benjamin told her that she was concerned about Dr. Cotton violating the Americans with Disabilities Act by requiring the neuropsychiatric testing. She told her it would be better to refer him to the EAP. Dr. Cotton agreed to the EAP referral.

On the same date, Dr. Cotton emailed Dr. Snyder, telling him that she had spoken with OSUMC's human resources; they had shared information about the Employee Assistance Program; and she believed it was an acceptable alternative to the neuropsychiatric testing. She asked to meet with him on April 30th at 11:00 at the OSUMC human resources office to explain further. She also stated that she would like to meet to him on May 2nd to "touch base." Dr. Snyder responded: "That sounds great! I'll meet you tomorrow at 11 at OSU. Thanks." Doc. no. 328-3.

Benjamin had forwarded Dr. Cotton's email to Deborah Nottingham (Nottingham), Senior Human Resources Representative for OSUMC. Nottingham met with Dr. Cotton and Dr. Snyder regarding the EAP. Dr. Snyder signed a Consent for Disclosure of Information between CommunityCare EAP and Company Contact Personnel for Supervisory Referral, which was to be valid for two years. Dr. Snyder authorized CommunityCare Employee Assistance Program to disclose certain information to "EAP contact [Nottingham], or his or her successor." He also authorized his "employer to provide EAP representatives, upon request, information pertaining to events and circumstances that resulted in [his] referral, as well as information that the EAP representative determines is necessary to allow the EAP to satisfy its obligations to [him] and/or [his] employer." He understood that he "may see and have a copy of any written information disclosed by the EAP to [his] employer, unless [] by federal law or

EAP believes that my access to that information could result in mental or emotional suffering and/or damage to [him] or jeopardize and/or compromise [his] treatment or counseling." He also understood that if he wished "to see any information provided by my employer to the EAP in connection with [his] referral, [he] would need to request that information from [his] employer." Nottingham signed the document as a witness. Doc. nos. 379-51; 379-78.

On April 30, 2014, Dr. Cotton amended the Academic Probation Requirements Plan to require Dr. Snyder "participate in OSUMC Employee Program as per guidelines from OSUMC Human Resources Department." Doc. no. 336-36. Dr. Snyder acknowledged on the amendment document that he had read and understood the academic probation requirements.

For his Osteopathic Manipulative Medicine rotation in April of 2014, Dr. Snyder received above "Competent" scores in all categories and his overall evaluations were average and above average. For his Surgery rotation in May of 2014, Dr. Snyder received ratings of "Competent" and above "Competent" in all categories and received an overall evaluation of "average" from Dr. Hal Robbins. Dr. Robbins commented that Dr. Snyder "did what he was asked to do while on rotation. May need to work on time management as he progresses through residency." Doc. no. 379-10 (OSUMC 000150).

Dr. Erin Kratz completed a competency-based assessment for Dr. Snyder for January through March of 2014. Dr. Kratz did not rate Dr. Snyder deficient in any area. Dr. Snyder received scores of "2" and "3" in the medical knowledge category. Dr. Kratz commented that Dr. Snyder's treatment plans are sometimes not the most effective. She added, however, that "[t]here has been improvement." Doc. no. 379-10. Dr. Kratz gave Dr. Snyder scores of "2" in the patient care category, commenting that "[t]here are some occasions when [Dr. Snyder's] clinical decision

making is not the most appropriate." Dr. Kratz did not give an overall evaluation. Instead, Dr. Cotton added an overall comment that Dr. Snyder "[i]s not progress[ing] appropriately in some key areas." Doc. no. 379-10 (OSUMC 000089).

Dr. Cotton completed a periodic evaluation for November of 2013 to May of 2014, stating that Dr. Snyder was in a probation remediation process regarding clinical judgment. She also completed an annual evaluation and rated him "Deficient" in categories of medical knowledge and patient care (performance of diagnosis, treatment and procedures appropriate to family medicine). She declined to certify him as having "made satisfactory progress in the training program and is promoted to the next year of training." Doc. no. 379-10 (OSUMC000204).

Dr. Cotton did not rank any other OGME-1 resident in 2012-2013 or in 2013-2014 less than competent on any category in the monthly evaluations. Even for OMECO residents in 2012-2013 and in 2013-2014, Dr. Cotton did not rate any resident less than competent on any category. She did, however, include criticisms in her comments.

OSUMC contracted with CommunityCare Employee Assistance Program to provide employee assistance services for OSUMC. Nottingham had spoken with Terry Stover, Senior Manager for the CommunityCare Employee Assistance Program, regarding Dr. Snyder and set up an appointment for Dr. Snyder after the scheduled meeting with Dr. Snyder on April 30th. Nottingham faxed to CommunityCare a "Supervisory [] Referral" form stating that "performance issues" led to the supervisory referral and attached the probation letter and probation requirements. The fax cover sheet advised that Dr. Cotton had initially stated that Dr. Snyder would be required to undergo neuropsychiatric testing as a probation

condition, but the requirement had been amended to require his participation in the EAP referral. Doc. no. 379-89.

Dr. Snyder went to CommunityCare after his meeting with Dr. Cotton and Nottingham and was given some forms. He signed a document entitled "Employee Assistance Program Confidentiality Statement of Understanding and Program Description." It stated, in part, that the EAP counselor would not "share information about you with any person without your written authorization, except to the extent permitted or required by law." Doc. no. 328-10. He was also given a copy of "CommunityCare Managed Healthcare Plans of Oklahoma, Inc. Notice of Privacy Practices," which provided notice as to how medical information about Dr. Snyder could be used and disclosed and how he could get access to the information.

Dr. Snyder met with Jessica Heavin (Heavin), a CommunityCare EAP Assessor. He admitted to her that he had made some mistakes and that his supervisor had addressed those with him. However, he never had heard any more about it from his supervisor. Then he was told that he was being placed on immediate probation. He said that to his knowledge, he had not made those mistakes repeatedly. Dr. Snyder disagreed with the "timeline" of what happened and reiterated that after his first discussion with the supervisor, he was never "redirected" again. Doc. no. 379-15 (CommunityCare0084).

Heavin contacted Nottingham and Nottingham advised that Dr. Snyder was "repeatedly" given instructions and not following them and was referred to them to ascertain whether he was purposefully not following instructions or "lacks the understanding necessary" to follow instructions given. Doc. no. 379-15 (CommunityCare0083). Heavin advised Nottingham that she wasn't sure whether the EAP could provide the assistance needed for Dr. Snyder. She thought they may be asking for a fitness for duty assessment, and the EAP did not do that type of

assessment. She advised that she had another appointment with Dr. Snyder set for May 6, 2014.

On May 6th, Heavin discussed Dr. Snyder at a regular staff meeting. The consensus was to send Dr. Snyder for a fitness-for-duty evaluation since patient safety was involved and EAP had no objective measure with which to ascertain whether he was not following instructions or whether there was a cognitive issue that was preventing him from following instructions. Heavin then advised Dr. Snyder of the recommendation to refer him to a fitness-for-duty evaluation. She explained that she felt this was the best course of action since there was no way to ascertain whether his or his employer's version of events was the most accurate. She advised he was to be referred to Dr. Leslie Barnes, Ph.D. Snyder signed an Authorization to Obtain, Use or Disclose Protected Health Information, authorizing CommunityCare "to use, disclose and/or obtain [Dr. Snyder's] Protected Health Information." The information authorized for use or disclosure, or to be obtained, was the "EAP assessment and referral information" for the purpose of the "EAP supervisory referral." Doc. no. 336-46; doc. no. 379-85.

Heavin advised Nottingham by email that she was referring Dr. Snyder for a fitness-for-duty evaluation. After speaking by phone with Nottingham and Benjamin, Heavin sent an email to Stover asking if EAP had ever recommended neuropsychological testing. She said she had recommended the fitness-for-duty evaluation, but "the attending physicians are pushing for a neuro psych eval." She also said that "the HR supervisor is concerned about violating the ADA." Doc. no. 379-15 (CommunityCare0080).

Heavin and Steve Stewart (Stewart), an EAP Supervisor, participated in a conference call with Benjamin and Nottingham. Stewart advised that the fitness-for-duty evaluation could possibly indicate a need for further evaluation and

psychological testing and that if "neuro" testing was eventually recommended, it might be covered under insurance if the provider could prove medical necessity. Stewart discussed the possibility of asking Dr. Snyder to undergo a drug screen, which Benjamin declined. Doc. no. 335-13 (CommunityCare0078).

Thereafter, Dr. Barnes provided the assessment tools to be used in the fitness-for-duty evaluation, which Heavin emailed to OSUMC's human resources.

On May 14, 2014, Heavin faxed a one-page care summary regarding Dr. Snyder to Dr. Barnes. In the summary, Heavin stated in part:

> Dr. Snyder met w/ Jessica Heavin (LP, NCC) on 4-30-14 . . . . During the interview, the client denied any psychosocial stressors or symptoms of a mental health or substance abuse disorder. He explained the issues at work by stating that A) not evaluating a patient before medicating is a fairly common place procedure in times where there isn't time to do a thorough assessment B) client denies that his supervisor advised him several times; he stated he was spoken to one time about the mistakes, felt everything had been accounted for and taken care of and then approx. 1 month later was informed of his academic probation. Client also stated that at no time were his patients in danger. The client signed the document stating that he is on probation but stated he disagrees with the timelines given.

Doc. no. 328-15.

Dr. Barnes met with Dr. Snyder on May 20, 2014 and June 12, 2014. Written tests were conducted on June 5, 2014 and June 12, 2014. On June 12, 2014, Dr. Snyder signed an Authorization to Release Patient Information, which authorized Dr. Barnes to communicate about Dr. Snyder with Nottingham by "providing information to" and "receiving information from" Nottingham. The authorization stated that "Evaluation results and report" were information to be released by Dr. Barnes and "Verbal communication" was information to be released to Dr. Barnes.

After the testing was complete, Dr. Barnes prepared a Report of Psychological Evaluation regarding Dr. Snyder.

On June 19, 2014, Dr. Barnes contacted Heavin to ask for contact information for Dr. Cotton and asked whether another authorization for release of information was needed for Dr. Barnes to receive information from Dr. Cotton. Heavin stated that she was not sure, however, she said that if they wanted to err on the side of caution, it might be better to have Dr. Snyder sign an authorization. Dr. Barnes had her secretary contact Dr. Snyder about signing a release authorizing her to talk with Dr. Cotton. He contacted Heavin and told her that Dr. Barnes said she was going to hand over his record to Dr. Cotton. Heavin told Dr. Snyder it was her understanding that Dr. Barnes wanted to talk to Dr. Cotton, not hand over his information to her. She advised him that if he had concerns about the authorization, he should address it with Dr. Barnes. He contacted Dr. Barnes's office and advised that he did not want Dr. Barnes to release his records to Dr. Cotton and would not be signing the release.

On June 21, 2014, Dr. Snyder sent a letter to Dr. Barnes requesting her to email or mail a copy of his completed report. The letter also stated that "as I have previously authorized, please send any necessary information to the Employee Assistance Program and OSU Human Resources." He also emailed Dr. Barnes on June 22, 2014 with the same message.

On June 23, 2014, Dr. Barnes left a message with Dr. Snyder to the effect that there had been no mention of releasing records to Dr. Cotton. She wanted to talk with Dr. Cotton about the circumstances surrounding his probation. Dr. Snyder never signed a release. After email communication with OSUMC human resources, Heavin instructed Dr. Barnes to release the report as is.

Dr. Barnes sent her report to Nottingham on June 24, 2014 and Nottingham met with Dr. Cotton and Benjamin to discuss it. Nottingham sent the report to CommunityCare.

The June 24th report reviewed Dr. Snyder's background, behavior and test results. Dr. Barnes made several remarks and recommendations, including that Dr. Snyder had difficulty admitting personal shortcomings or mistakes and that he should receive mental health counseling to address issues of defensiveness and difficulty in admitting personal shortcomings. The report stated that "there are no indications of somatic, cognitive, emotional, thought, behavioral or interpersonal dysfunction." It did not state whether Dr. Snyder was or was not fit for duty. Doc. no. 341-47.

Nottingham met with Dr. Cotton and Benjamin to discuss the report. The next day, June 25, 2014, Nottingham sent an email to Heavin asking if she had provided Dr. Barnes with Dr. Cotton's letter and details of Dr. Snyder's probation. She stated it was not clear whether Dr. Barnes had advance knowledge of Dr. Snyder's referral. She wondered if Dr. Barnes' assessment would have been different if she had seen Dr. Cotton's concerns. Heavin forwarded the one-page case summary that she had sent Dr. Barnes to Benjamin and Nottingham.

On June 26, 2014, Benjamin requested by email that Heavin send Dr. Cotton's probation documents to Dr. Barnes. Heavin faxed the documents to Dr. Barnes. In the fax cover sheet, Heavin stated in part that "HR feels these facts may change your recommendations so please call [Nottingham] after you have reviewed them." Doc. no. 379-21.

In a letter dated June 29, 2014 to Nottingham, Dr. Barnes acknowledged receipt of the April 22nd probation letter to Dr. Snyder from Dr. Cotton. She again recommended that Dr. Snyder receive counseling and stated that if he continued to

have problems similar to those that prompted probation, he should be removed from having contact with patients until he completes mental counseling. She again did not state whether he was fit for duty. Nottingham contacted Dr. Cotton about the letter and sent the letter to CommunityCare.

Stewart had a conference call with Benjamin and Nottingham and then met with Heavin. According to Heavin, Stewart advised that human resources had requested EAP to contact Dr. Barnes to ask, "Do you (Dr. Barnes) feel the client is fit to see patients right now as long as he is under supervision" and "Do you want to amend recommendation based on the new data that was received." Doc. no. 379-14 (CommunityCare0061).

Heavin contacted Dr. Barnes on June 30, 2014 and emailed Nottingham and Benjamin, with a copy to Dr. Barnes' office, regarding the conversation. According to Heavin, she asked if Dr. Barnes felt Dr. Snyder should be seeing patients "right now" under supervision. Heavin then advised that Dr. Barnes wanted some information on how Dr. Snyder had been doing in his residency since his referral to EAP and felt that would be pertinent information for her to have to continue to consult with them. Heavin also stated that Dr. Barnes did not feel that Dr. Snyder should move on in the residency until he had completed intensive therapy to address issues highlighted in her report. Doc. no. 379-14 (CommunityCare0060).

Nottingham emailed Heavin and Steven Stewart on the same day, stating that she had met with Dr. Cotton and Dr. Alexopulos and "we would like for you to contact Dr. Barnes and request a written 'Fit' or 'Not Fit' determination for Dr. Snyder." She advised that they had decided to move forward "with the requirement for Dr. Snyder to participate in counseling with a qualified mental health professional. During this period of counseling, Dr. Snyder will be placed on a paid

leave of absence, and removed from patient contact." Doc. no. 379-14 (CommunityCare0059); Doc. no. 328-22.

Heavin contacted Dr. Barnes and asked her to provide a fit or not fit recommendation as soon as possible. Nottingham then sent an email to Heavin and Dr. Barnes's office stating that Dr. Snyder continued to struggle with assessment and treatment of patients and attached a list of concerns from cases Dr. Snyder was involved in the previous week. The list, dated June 30, 2014, gave examples of issues observed from June 24, 2014 until June 29, 2014. The information was provided by Dr. Cotton to Nottingham. Dr. Cotton understood the information was to be provided to Dr. Barnes. Dr. Cotton had told Dr. Snyder that she did not want to be involved in the fitness-for-duty evaluation.

The next day, July 2, 2014, Dr. Barnes wrote a letter to Nottingham stating that "[b]ased upon the information that has been available to me, it is my professional opinion that Dr. Snyder is not fit to provide medical treatment to patients at this time." Doc. no. 328-25.

Also on July 2, Dr. Snyder requested a copy of Dr. Barnes' report from Nottingham. She advised Heavin that she was not comfortable giving the report to him. Heavin advised her not to release the report to him and tell him to ask for it directly from Dr. Barnes.

Dr. Cotton testified that Dr. Snyder successfully completed the Family Medicine Teaching Service rotation for June of 2014. Doc. no. 400-3, p. 246, ll. 24-25.

On July 3, 2014, Dr. Cotton advised Dr. Snyder personally and by letter that the results of his evaluation through EAP revealed that he was not currently "fit for duty" and should undergo counseling before returning to direct patient care activities. Dr. Cotton advised him that he was granted a three-month paid leave of

absence to participate in counseling sessions as directed by the EAP, and near the conclusion of the three-month period, his progress would be reassessed by the EAP and a decision would be made regarding his continued participation in the residency. The leave of absence included all aspects of Dr. Snyder's residency, including the Weekly Didactic Program. Dr. Alexopulos had reviewed and approved Dr. Cotton's letter to Dr. Snyder. Dr. Snyder signed the letter acknowledging that he had "read and [understood the] academic probation letter." Doc. no. 335-9.

Dr. Alexopulos, Benjamin and Nottingham were also present with Dr. Cotton at the July 3rd meeting. Dr. Snyder asked for an explanation for the reasoning behind Dr. Barnes' not-fit-for-duty evaluation. They told him they understood he had some "barriers." Doc. no. 379-16 (PLF SNYDER 02971).

On July 3, 2014, Dr. Snyder requested Dr. Barnes' report from EAP and Stewart advised him that he would have to contact Dr. Barnes.

On July 9, 2014, Dr. Barnes met with Dr. Snyder. The meeting was secretly recorded by Dr. Snyder. He asked for his report and told her that OSUMC had told him to get the information from her. Dr. Barnes told him that she could not give him the report because it was under the custody and control of OSUMC.

Shortly thereafter, Dr. Snyder retained counsel to represent him.

Around July 10, 2014, Heavin contacted a provider in Tulsa about counseling for Dr. Snyder. When a counselor agreed to provide it, Dr. Snyder requested Heavin to find a counselor in Edmond or the Oklahoma City area because he had moved to Edmond. Heavin contacted a counselor in Edmond who agreed to provide counseling.

Nottingham asked Heavin to call Dr. Barnes and request a copy of the report be given to Dr. Snyder. Heavin advised Nottingham on July 11, 2014 that Dr.

Barnes could not release the report with a verbal request and that Nottingham should contact her to discuss it. Dr. Snyder again requested Dr. Barnes' report from Heavin on July 17, 2014. He was advised that EAP does not re-disclose another provider's information.

On July 22, 2014, Dr. Snyder filed an internal complaint of sex and disability discrimination against Dr. Cotton, Dr. Alexopulos, Benjamin and Nottingham. He filed it with Dr. Rosalyn Green, the Director of Equal Employment and Title IX at OSU-Stillwater. Dr. Cotton was notified of the complaint.

Heavin provided Dr. Snyder contact information for a counselor in Edmond on July 24, 2014. That same day, Heavin received a letter dated July 23, 2014 from plaintiff's counsel that stating that Dr. Snyder was "revoking authorization for disclosure of any additional information." Doc. no. 328-27. Heavin advised Dr. Snyder that she would not be able to provide OSU with attendance/compliance updates and he would need to sign a release of information with the counselor to allow her office to communicate with OSU.

Plaintiff's counsel sent a letter, dated July 30, 2014, to Dr. Cotton, referencing plaintiff's placement on probation and on leave of absence, and advising that Dr. Snyder was "appealing the probation decision" and requesting neutral and detached parties to evaluate the appeal per the "Handbook." Counsel also asserted that Dr. Snyder's status was "akin to a suspension" and requested "a full neutral and detached investigation into these matters per the 'Handbook.'" Doc. no. 324-10; Doc. no. 335-9.

On August 12, 2014, Dr. Snyder sent an email to Stewart asking the EAP to direct him to another psychologist because after his initial appointment with the psychologist Heavin had contacted for him, he had been advised, without reason, that the psychologist would not see him as a client. The next day, Heavin provided

information on three other providers in the Edmond area and advised him that if he wished for the new provider to give attendance updates to OSU, he would need to sign a release authorizing communication directly from the provider to OSU. During his deposition, Dr. Snyder could not recall whether he contacted any of the providers, but stated that it was possible he did.

On August 18, 2014, Dr. Cotton sent a letter acknowledging her receipt of the July 30th letter from plaintiff's counsel and advising that he was "still in [his] first academic probation period, so an appeal opportunity is not available at this time." She advised that in the last of week of September, she would make a decision as to the outcome of the academic probation period and one of three decisions would be made – removal from probation, continuation of probation, or dismissal from the residency. She advised that at that point, Dr. Snyder could "request an appeal from the GME committee [at] OSU Medical Center." Doc. no. 324-11.

In late August of 2014, Dr. Snyder contacted Dr. Jason Kirksey, OSU Chief Diversity Officer, regarding his discrimination complaint. Subsequently, Dr. Green advised Dr. Snyder that her authority to review equal opportunity matters were limited in scope and returned his documents to him. In early September of 2014, Dr. Snyder contacted OSU President, Burns Hargis, concerning his complaint. Shortly thereafter, Dr. Kirksey sent an email to Dr. Snyder stating that it was his understanding that Dr. Snyder's counsel was communicating directly with the university's legal counsel and that he should direct any correspondence regarding his complaint to his attorney.

On August 26, 2014, Dr. Snyder sent an email to Sandy Cooper (Cooper), Assistant Vice President of Human Resources for OSU-Tulsa informing her that he was an employee of the OSUMC and had a discrimination complaint he wanted

to file against supervisors and the human resources department. Cooper agreed to begin an investigation of his complaint of sex and disability discrimination. Doug Price (Price), Deputy General Counsel for the Oklahoma State University Board of Regents, advised Cooper to meet with Dr. Snyder. Cooper met with Dr. Cotton regarding the allegations. However, after she learned he had legal counsel, she stopped communicating with him. It was subsequently determined by Price that Cooper was not to be an investigator of his complaint. Cooper testified in deposition that someone on the academic side of the residency program had an obligation to investigate his complaint through the chain of command. According to Cooper, Dr. Chris Thurman, Chair of the Family Medicine Department, who supervised both Dr. Alexopulos and Dr. Cotton, was aware of the complaint. Price also testified that OSU had an obligation to respond to his internal complaint.

Dr. Snyder saw Dr. Karan Allbright, a licensed psychologist, for initial consultation on August 27, 2014 and for subsequent psychotherapy sessions on September 2, 2014, September 8, 2014 and September 16, 2014. She wrote a letter dated September 17, 2014 that Dr. Snyder had "decided to conclude therapy sessions feeling he ha[d] adequately worked through his concerns" and she concluded the plan was acceptable. Doc. no. 328-29. Dr. Snyder did not sign an authorization for Dr. Allbright to communicate with his employer or to provide an assessment to his employer.

On September 18, 2014, counsel for CommunityCare sent a letter to Dr. Barnes advising that Dr. Snyder's counsel had asked the company for copies of all documents contained in his file and that the file contained her "reports" regarding Dr. Snyder's fitness for duty. Counsel advised that it was CommunityCare's intent to provide Dr. Snyder's counsel with copies of the "reports" unless she advised in

writing of her intent to seek a protective order or pursue other legal process. Counsel gave the report and letters to Dr. Snyder's counsel in October of 2014.

During August, September and October, Price and Dr. Snyder's counsel exchanged emails and phone calls to discuss Dr. Snyder's probation and leave of absence. Ultimately, a meeting was arranged involving the parties.

On November 7, 2014, Dr. Cotton and Dr. Thurman held a meeting with Dr. Snyder to discuss his options. Cooper was in attendance as well as Dr. Snyder's mother. Dr. Snyder secretly recorded the meeting. At the meeting, Dr. Snyder requested documentation of his status and options for moving forward. Dr. Cotton and Dr. Thurman agreed to set forth in a written document Dr. Snyder's residency status and options for moving forward.

In a letter dated November 13, 2014, Dr. Cotton set forth descriptions of Dr. Snyder's status and outcome options. Dr. Cotton advised that his residency status "was OGME 1 on Academic Probation" and his employment status at OSUMC "was Leave of Absence with pay due to the not fit-for-duty determination on July 2, 2014." Doc. no. 379-53. Dr. Cotton advised Dr. Snyder of three outcome options – return to training, resignation and dismissal.

The return to training option required (1) "a written statement from a clinical psychologist stating that you are fit-for-duty for patient care;" (2) "[waiver of] any complaints or appeals you have regarding your status as an OGME 1 and agree to continue in the program from the point you left;" (3) a status of "OGME 1 on Academic Probation with one month of active rotation time remaining in [the] probation period;" and (4) three possible determinations at the end of the probation period – release from probation, continuation of probation or dismissal from the program.

The resignation option required (1) a statement of resignation; and (2) a fit-for-duty determination from a clinical psychologist. If prospective program directors and employers requested a description of the circumstances of his leaving, the following description would be given:

> Dr. Snyder successfully completed 12 months of OGME 1 rotation training from June 1, 2013 through June 30, 2014. He voluntarily resigned from the Program on _____. His status at the time of his resignation was OGME 1 resident.

The dismissal option would be triggered if the residency program did not receive a fit-for-duty statement or a resignation by January 1, 2015. Dr. Cotton advised that the dismissal would be subject to appeal as provided in the Oklahoma State University Family Medicine Residency Handbook and that if an appeal was successful, Dr. Snyder would return to patient care with a status of OGME 1 "subject to any additional requirements as required by the appeal committee." She also advised that if an appeal was not successful, the dismissal would be final. If prospective program directors and employers requested a description of the circumstances of his leaving, the following description would be given:

> Dr. Snyder completed 12 months of OGME 1 rotation training from June 1, 2013 through June 30, 2014. He was dismissed through this residency program for academic reasons on this date: _____. His residency status at dismissal was OGME 1 resident on academic probation.

Doc. no. 379-53.

Counsel for Dr. Snyder sent Doug Price, counsel for OSU-CHS, a letter dated January 6, 2015 from Dr. Allbright stating that Dr. Snyder was fit to continue his work at OSUMC.

On February 2, 2015, Benjamin sent a letter to Dr. Snyder advising him that his employment status had been changed to "inactive" and his January 30th paycheck would be his last paycheck while he remained inactive. Benjamin stated that his "leave was extended beyond the three months as a courtesy to [him] and to the OSU College of Health Sciences while attempts were made to assess [his] compliance with the conditions of the leave" and that she understood "no resolution [had] been reached in [his] situation." Doc. no. 341-81.

Around February 11, 2015, Dr. Snyder filed a sex and disability discrimination complaint against OSUMC with the Office of Civil Rights Enforcement.

During February 2015, Dr. Snyder's counsel continued to communicate with Price concerning Dr. Snyder's options. The attorneys were in the process of scheduling an in-person meeting in March of 2015, when Dr. Snyder's counsel advised Price that he was no longer counsel for Dr. Snyder.

On April 1, 2015, Dylan Charles Edwards of Mullinix, Edwards, Rosell & Goerke advised Price that the firm had been retained to represent Dr. Snyder. Mr. Edwards made a formal request for all records related to Dr. Snyder and provided a formal notice to Price, OSU-CHS and OSU Medical Center to "maintain, preserve, retain, protect, and not destroy any and all file(s), correspondence, reports, emails, notes, test results, and any other documents, both in electronic and hard copy, in any way pertaining to Dr. Snyder." Doc. no. 400-6.

From April 1, 2015 and August 4, 2015, no communication occurred between Price and Dr. Snyder's counsel or between anyone at OSU-CHS and OSUMC and Dr. Snyder.

On August 5, 2015, a meeting was called to discuss Dr. Snyder. The meeting involved Dr. Cotton, Dr. Alexopulos, Dr. Gary Slick, Head of OPTI, Dr. Thurman,

Cooper, Brenda Davidson, Sunny Benjamin, Debbie Nottingham, Price, Steve Stephens, OSU counsel,[4] and Vi Le, Mercy's counsel. According to Dr. Cotton, Vi Le was on the call because of the discrimination complaint that Dr. Snyder had filed against OSUMC. Dr. Cotton was aware the complaint was still ongoing. A collective decision was made that Dr. Snyder had abandoned his position.

On August 5, 2015, Dr. Snyder was notified by letter from Dr. Cotton of his dismissal from the residency program. Dr. Cotton stated in part:

> We have received your fit-for-duty determination dated January 6, 2015, but you have not notified the OSU-CHS Family Medicine Residency Program of your choice to either to resign from the program or return to active training status. This lack of communication of your intentions regarding returning to training puts you in noncompliance with the requirements of the program and constitutes an abandonment of your position in this training program.

Doc. no. 379-64.

On August 10, 2015, Dr. Snyder was notified by letter from Katrina Godfrey, Executive Director of Human Resources, a Mercy employee assigned full-time to OSUMC, of the termination of his employment. Ms. Godfrey advised that because of his dismissal from the OSU-CHS Family Medicine Residency, he was "no longer eligible for employment as a Resident at OSU Medical Center." Doc. no. 379-67. The termination of employment was effective as of August 5, 2015. Rhett Stover, a Mercy employee assigned as CEO of OSUMC, was apprised of decisions involving Dr. Snyder. He was also apprised of the discrimination complaint against OSUMC.

---

[4] Dr. Alexopulos testified in deposition that Mr. Stephens was not involved in the meeting. Dr. Cotton, however, testified that he was.

On January 27, 2016, Christi Aquino (Aquino), Licensure Specialist for the Board, sent an email to Davidson stating that Dr. Snyder had submitted his application for licensure in April 2014 and that the application had said he was working there until June 2016. Aquino reported that they had never received a postgraduate training verification form stating that Dr. Snyder had completed his first year and informed her that he should not be working if he was not licensed. She also said Dr. Snyder was the only licensure from the past that remained pending. Davidson responded to Aquino by email that same day and informed her that Dr. Snyder was no longer in the residency program. Dr. Cotton also emailed Aquino to tell her that Dr. Snyder had not successfully completed his first year of residency training.[5]

Dr. Hall testified in deposition that she had never had a resident in the OMECO residency program who did not successfully complete the first year of residency.

In a letter dated August 23, 2016, Dr. Cotton documented that Dr. Snyder had satisfactorily completed eleven of twelve rotations while training in the residency program.

---

[5] In their reply brief, doc. no. 383, OSU-CHS and Dr. Cotton and Dr. Alexopulos challenge evidence provided by Aquino and request the court to strike that evidence for purposes of summary judgment. Rule 56(c)(2), Fed. R. Civ. P., permits a party to object to cited material that cannot be presented in a form that would be admissible in evidence. No separate motion to strike is needed. Advisory Committee Notes to 2010 Amendment. Defendants contend that evidence cannot be presented in a form that would be admissible at trial because Aquino was not listed as one of Dr. Snyder's witnesses on his final witness list. Dr. Snyder has filed a motion seeking leave to supplement his final witness list with Aquino, which is set for hearing at a later date. The court need not address the admissibility of the evidence challenged by defendants because most of the evidence proffered is not pertinent to the court's ruling. The evidence the court has utilized comes from sources other than Aquino herself.

V.

*Discussion*

Liability of OSUMA and Mercy

In the Third Amended Complaint, Dr. Snyder alleges discrimination and retaliation claims against OSUMA and Mercy under the Rehabilitation Act of 1973 (Rehabilitation Act), 29 U.S.C. § 701, the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq.* (ADA), and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq* (Title VII).[6]

To make out a prima facie case of discrimination or retaliation under the Rehabilitation Act, the ADA and Title VII, a plaintiff must first prove the defendant was his employer. *See*, Knitter v. Corvias Military Living, LLC, 758 F.3d 1214, 1225 (10th Cir. 2014). If the plaintiff cannot meet his burden to prove the defendant was his employer, the discrimination and retaliation claims necessarily fail. *Id*. Depending on the situation, the Tenth Circuit applies one of three different tests to determine whether a defendant is an employer: (1) the hybrid test; (2) the joint employer test; and (3) the single employer test. *Id*. at 1226. In the case at bar, plaintiff relies upon the joint employer and single employer tests to hold OSUMA

---

[6] In the Third Amended Complaint, Dr. Snyder purports to allege breach of contract claims against OSUMA and Mercy. The Second Amended Complaint included breach of contract claims against OSUMA and Mercy, and at the hearing on dismissal motions with respect to the Second Amended Complaint, counsel for Dr. Snyder withdrew the breach of contract claims against all defendants except Oklahoma State University Medical Trust d/b/a Oklahoma State University Medical Center, referred to as OSUMC. The Second Amended Complaint was deemed amended to drop the breach of contract claim against all defendants except OSUMC. *See*, doc. no. 125. Dr. Snyder sought leave to file a Third Amended Complaint to add retaliation claims under the Rehabilitation Act and a breach of contract/breach of professional duty claim against CommunityCare. *See*, doc. no. 177. The court granted the motion. *See*, doc. no. 196. Although Count VII of the Third Amended Complaint purports to include OSUMA and Mercy as defendants on the breach of contract claim, the court construes Count VII as only alleging a breach of contract claim against OSUMC in accordance with its prior orders.

and Mercy liable on the discrimination and retaliation claims under the Rehabilitation Act, the ADA and Title VII. OSUMA and Mercy seek summary judgment, arguing that they do not qualify as Dr. Snyder's employer under either test.

Single Employer Test

"Unlike the joint employer test, which focuses on the relationship between an employee and its two potential employers, the single employer test focuses on the relationship between the potential employers themselves." Knitter, 758 F.3d at 1227. Two entities can be found to effectively constitute a single employer if they are an "integrated enterprise." Id. at 1226-1227. Courts applying the single-employer test weigh four factors: (1) interrelations of operation; (2) common management; (3) centralized control of labor relations; and (4) common ownership and financial control. Bristol v. Board of County Commissioners of County of Clear Creek, 312 F.3d 1213, 1220 (10th Cir. 2002). All four factors are not required for single-employer status. Knowlton v. Teltrust Phones, Inc., 189 F.3d 1177, 1184 (10th Cir. 1999). Generally, courts consider the third factor—centralized control of labor relations—to be the most important of the four factors. Bristol, 312 F.3d at 1220. Nonetheless, "the heart of the inquiry is whether there is an absence of an arm's length relationship among the companies." Knowlton, 189 F.3d at 1184.

*OSUMA*

In his response to OSUMA's summary judgment motion, Dr. Snyder asserts that OSUMA is an integrated enterprise with "[OSUMC] and/or OSU-CHS." Doc. no. 374, ECF p. 9. At the outset, the court notes that Dr. Snyder, in his response, has failed to address any of the four factors of the single-employer test with respect to OSU-CHS. In any event, the court concludes that Dr. Snyder has failed to proffer evidence sufficient to raise a genuine issue of material fact in support of his

contention that OSUMA is an integrated enterprise with OSU-CHS and that the two entities should be considered to be a single employer. Dr. Snyder has not submitted adequate evidence to demonstrate the existence of the second and third factors—common management and centralized control of labor relations—between OSUMA and OSU-CHS. Because the entities are governmental entities, the fourth factor—common ownership and financial control—is irrelevant. Bristol, 312 F.3d at 1220.

As to the remaining factor—interrelations of operation—Dr. Snyder appears to claim that the entities are interrelated on the following grounds: (1) the mission and purpose of OSUMA, in part, is to support, and upon declaration of necessity, to serve as teaching and training facilities for its students enrolled at OSU-CHS and to provide care for patients of its physician trainers; (2) the Notes to OSUMA's June 30, 2014 Financial Statements state that OSUMA "voluntarily provides free care to patients who lack financial resources and are deemed to be medically indigent," doc. no. 400-16 (Plf Snyder 03059); (3) OSUMC, a public trust, was formed to effectuate the purpose of OSUMA; (4) the acting members of OSUMA serve as trustees of OSUMC, and according to language recited in the Management Services Agreement between OSUMC and Mercy, the board of trustees has full power and authority to operate the medical center; (5) under the Academic Affiliation Agreement which OSUMC and OSU-CHS ratified, OSUMC became affiliated with OSU-CHS to effectuate the desire of the parties to have residents associated with OSU-CHS participate in teaching programs at the medical center; (6) OSU-CHS designated the medical center as its primary teaching hospital and OSUMA leased the hospital to OSUMC; (7) OSU-CHS has an agreement to pay OSUMA $2,500,000 if certain events occurred; and (8) OSUMA was a party to the Tripartite Agreement and Plan of Merger.

The court, however, concludes that these facts, taken in a light most favorable to Dr. Snyder, do not show interrelations of operation between the two entities to establish an absence of an arm's length relationship between them. Under the Oklahoma State University Medical Authority Act, the purpose and mission of OSUMC is to support the medical education programs of OSU-CHS and the statute requires OSUMA to maintain a close affiliation with OSU-CHS and to coordinate their operations and activities in a cooperative manner. 63 O.S. 2011 § 3273. The record does not suggest that the relationship between OSU-CHS and OSUMA was more than that.

Pursuant to the Tripartite Agreement and Plan of Merger, OSUMA obtained ownership of the medical center and then leased the medical center to OSUMC. According to the agreement, the Oklahoma Legislature would not allow $13 million in funds appropriated to OSUMA to be spent on the medical education programs until it had title to the assets, licenses, and property of the medical center. Doc. nos. 379-76(D); 323-16(D). Ownership of the medical center itself, which is designated as OSU-CHS's primary teaching hospital, does not show that the entities' operations are interrelated.

In addition, under the Act, OSUMA is a vehicle for funding the medical center and the graduate medical programs. Providing this funding does not show an absence of an arm's length relationship between OSUMA and OSU-CHS. There is no showing that OSUMA kept OSU-CHS's books, issued its paychecks or paid its bills. *See*, Frank v. U.S. West, Inc., 3 F.3d 1357, 1362-1363 (10th Cir. 1993) (listing indications of interrelated operations, including joint bookkeeping and payroll, shared office space and equipment, common employees or common advertising). Although OSU-CHS also did agree to pay $2,500,000 annually to OSUMA, the payment was for capital expenditures at the medical center. Doc. no.

400-16; doc. no. 323-22, ¶ 1 and doc. no. 323-3 ¶ 2.10. This payment does not raise an issue that the parties' operations were so highly interrelated to have an absence of an arm's length relationship. The payment was pursuant to an agreement between the parties.

OSUMC does operate the medical center, which serves as OSU-CHS's primary teaching facility, and the residency program at issue is governed by the Affiliation Academic Agreement ratified by OSUMC and OSU-CHS. There is also no dispute that the acting members of OSUMA serve as trustees for the public trust who have authority to operate the medical center. However, duplication and sharing of all members or trustees between OSUMC and OSUMA is not fatal to treating them as separate entities. *See*, United States v. Bestfoods, 524 U.S. 51, 62 (1998). The Act expressly requires that the members of OSUMA serve as trustees of the public trust and it does not indicate that this service affects the separateness of the public trust and the state agency. Further, the fact that OSUMC operates the medical center does not, by itself, show that OSUMC and OSU-CHS's operations are so highly interrelated as to demonstrate an absence of an arm's length relationship between them. The court concludes that a rational jury could not find that OSUMA and OSU-CHS constituted a single employer at the time of the alleged unlawful acts in this case. On this issue, aside from all of the conventional considerations discussed above (which are dispositive), the court will also note, as is discussed in some cases cited below, that organizational structures which–as is plain here–have been carefully crafted by state authorities to serve essential state functions should not cavalierly be disregarded by courts–especially federal courts.

Dr. Snyder also contends that OSUMA and OSUMC constitute a single employer. In support of this contention, Dr. Snyder relies heavily on the fact that the acting members of the OSUMA serve as trustees for OSUMC which operates

the medical center. Dr. Snyder argues that "the positions themselves, irrespective of the people who fill them at varied times, formally bind OSUMA and OSUMT together." Doc. no. 374, ECF p. 11. According to Dr. Snyder, OSUMA members' positions as trustees establish the three relevant factors of common management, centralized control of labor relations and interrelation of operations. However, as stated, duplication or sharing of members and trustees is not fatal to treatment of OSUMA and OSUMC as separate entities. *See*, Bestfoods, 524 U.S. at 62. Moreover, the Act establishing OSUMA explicitly directs the members to serve as trustees of the public trust. Those members, while serving as the trustees of the public trust, comprise, by statute, of a different entity. The legislative branch's decision to utilize the members of OSUMA to serve as trustees of the public trust cannot be equated with a decision by two private entities to have the same board of directors.

The court notes that in Sandoval v. City of Boulder, Colo., 388 F.3d 1312, 1323 (10th Cir. 2004), the Tenth Circuit, in its discussion of the test involving two municipal entities, noted that "other courts have been particularly cautious in finding that two nominally separate state or municipal governmental entities are in fact a single employer, since such a conclusion effectively negates what we assume was a state's conscious choice to create distinct organizations. Absent some indication that the state's decision was motivated by desire to circumvent the civil rights law or other laws, principles of comity counsel federal courts not to be too quick to erase organizational dividing lines drawn up by state authorities." *Id*. at n. 3 (citing Lyes v. City of Riviera Beach, Fla., 166 F.3d 1332, 1343-1344 (11th Cir. 1999)). In the case at bar, the court is not convinced that the mere fact that the public trust and the state agency share trustees and members erases the separateness of the public trust and state agency.

Even though OSUMA leased the medical center to OSUMC, provided funding in accordance with the enabling legislation and presented a single consolidated financial statement with OSUMC, the court cannot conclude that these facts raise a genuine issue of material fact to support plaintiff's contention that OSUMA and OSUMC are an integrated enterprise and do not have an arm's length relationship.

Accordingly, the court finds that OSUMA does not qualify as Dr. Snyder's employer under the single employer test and summary judgment is appropriate in OSUMA's favor on that issue.

*Mercy*

Dr. Snyder, in his response to Mercy's summary judgment motion, contends that Mercy was an integrated enterprise "with OSUM[C] and OSU-CHS." Doc. no. 375, ECF p. 19; *see also*, ECF p. 20 ("In this case, all three entities-Mercy, OSUM[C] and OSU-CHS—are an integrated enterprise."). According to Dr. Snyder, Mercy should be considered an integrated enterprise with OSU-CHS because OSUMC, with which Mercy contracted to manage at all relevant times, was an integrated enterprise with OSU-CHS. Dr. Snyder's response, however, does not address the applicable four-factor test with respect to OSU-CHS and OSUMC. The court declines to advocate on Dr. Snyder's behalf to determine that OSU-CHS and OSUMC constitute an integrated enterprise. In any event, the record relevant to Mercy's motion is insufficient to raise a genuine issue of material fact in support of plaintiff's contention that OSU-CHS and OSUMC are an integrated enterprise.

Considering the four-factor test with respect to OSU-CHS and Mercy, the court concludes that Dr. Snyder has failed to raise a genuine issue of material fact as to whether Mercy and OSU-CHS constitute a single employer. The evidence in

the record does not show that Mercy and OSU-CHS have common management, centralized control of labor relations or common ownership and financial control.

In support of his contentions as to interrelation of operations, Dr. Snyder appears to rely upon evidence that (1) OSUMC is the primary teaching hospital for OSU-CHS; (2) the Academic Affiliation Agreement, ratified by OSUMC, provided that residents participating in activities at OSUMC were to be supervised in accordance with all legal requirements; (3) Mercy, under the Management Services Agreement with OSUMC, had full power and authority to manage and operate the affairs of OSUMC; (4) residents, like Dr. Snyder, were employed by OSUMC; (5) Dr. Alexopulos recruited, designated, assigned and supervised residents at OSUMC and set their salaries; (6) Dr. Alexopulos reported to both the Dean of OSU-CHS and the CEO of OSUMC, a Mercy employee, and both annually evaluated her; (7) Katrina Godfrey, a Mercy employee, terminated Dr. Snyder's employment with OSUMC because he was dismissed from his residency; (8) pursuant to the Academic Affiliation Agreement, OSUMC became affiliated with OSU-CHS; (9) under the Academic Affiliation Agreement, the CEO of OSUMC could notify the Director of Medical Education of a failure of a resident to act in accordance with the Medical Center's bylaws, rules or regulations; (10) Rhett Stover, CEO of OSUMC at all relevant times and a Mercy employee, was apprised of the decisions concerning Dr. Snyder. However, this evidence, viewed in light most favorable to Dr. Snyder, does not raise a genuine issue of material fact as to whether the overall relationship between Mercy and OSU-CHS made them an integrated enterprise. The evidence does not show[7] an absence of an arm's length

---

[7] Of course, plaintiff need not actually "show" or "establish" anything to defeat defendants' motions. Plaintiff must merely demonstrate the existence of a genuine issue of material fact.

relationship between the entities. Indeed, the relationship between OSUMC's CEO, a Mercy employee, and Dr. Alexopulos, an employee of OSU-CHS, does not establish that the entities should be considered as one. While the evidence shows Dr. Alexopulos, an employee of OSU-CHS, reported to Stover, a Mercy employee, the evidence also shows that Dr. Alexopulos did not report to Stover regarding academic matters. And although the evidence reveals that Stover was apprised of the decisions concerning Dr. Snyder, there is no showing that he was in any way involved in those decisions. The evidence only shows that Stover was made aware of Dr. Snyder's discrimination complaint against OSUMC. Further, even though Stover, on behalf of OSUMC, could notify Dr. Alexopulos of a resident's failure to comply with the medical center's bylaws, rules and regulations, thereby requiring her to initiate proceedings against the resident, there is no showing that Stover could be involved in the disciplinary proceedings. And notably, the notification by Stover was to be done "[i]f, in the sole opinion of [OSUMC]," the resident failed to act in accordance with specified bylaws, rules and regulations. Doc. no. 327-4, ¶4.7.

Dr. Snyder additionally contends that Mercy and OSUMC constitute a single employer. Applying the single-employer test, the court finds that Dr. Snyder has failed to raise a genuine issue of material fact on the issue of whether the entities constitute an integrated enterprise. As to the common management factor, the evidence reveals that Mercy provided certain high-level officers to OSUMC. However, all these officers, except Minnis, were dedicated on a full-time basis to

Although this order sometimes uses the quoted terms because they are used in the case law, the court has consistently judged plaintiff's claims by the lesser standard which is appropriate at this stage. Goodwin v. General Motors Corporation, 275 F.3d 1005, 1011 at n.7 (10th Cir. 2002) (abrogated on other grounds.).

OSUMC.  There was no overlap of services between the entities.  And while Minnis was a shared officer, the court cannot conclude that this fact sufficiently raises a genuine issue as to whether the common management factor is met.  *See*, Frank, 3 F.3d at 1364; Florez v. Holly Corp., 154 Fed. Appx. 707, 709 (10th Cir. 2005) (mere existence of a single common manager or officer is not adequate to establish a disputed material fact concerning the common management element) (unpublished decision cited as persuasive pursuant to 10th Cir. R 32.1(A)).

Next, there is no evidence that Mercy and OSUMC had common ownership.  As to financial control, Dr. Snyder points to the language of the Management Services Agreement and the fact that Mercy provided the Chief Financial Officer and Director of Finance for OSUMC.  In the court's view, these facts do not raise a genuine issue of material fact as to Mercy's financial control over OSUMC.  The Management Services Agreement provided that all expenses for the operation of OSUMC were paid with OSUMC's funds.  Mercy did not provide the funding for OSUMC's operations.  Moreover, even though Mercy provided the Chief Financial Officer and Director of Finance to work on OSUMC's behalf, they were required under the Management Services Agreement to apply the "general revenues of the Medical Center to the operation and management of the Medical Center in accordance with the Approved Budgets."  Doc. no. 327-5, § 2(b).  Those annual capital and operating budgets were approved by OSUMC, not Mercy.  Moreover, the evidence shows that OSUMC and Mercy maintained separate bank accounts, lines of credit, account receivables and account payables.

With respect to centralized control of labor relations, Dr. Snyder again relies upon the Management Services Agreement which gave Mercy the sole and exclusive right to supervise the operation of OSUMC.  However, the agreement also provided that OSUMC's employees were subject to the direction and control

of OSUMC.  And the evidence in the record reflects that Dr. Snyder was not supervised by anyone from Mercy.  As stated, Dr. Alexopulos reported to Stover, OSUMC's CEO, but not regarding academic issues.  Moreover, Stover was assigned full time to OSUMC and did not provide services to Mercy.  Dr. Snyder additionally points to the fact that Mercy provided human resources support to OSUMC and that Katrina Godfrey terminated Dr. Snyder's employment. However, again, Godfrey was assigned full time to work at OSUMC.  She did not perform human resources services for Mercy (Mercy Health System being, the court will judicially notice, a substantial health care provider in its own right, with its own separate operations and its own separate employees to be concerned with). And Mercy and OSUMC maintained separate human resources policies and procedures.  While Godfrey advised Dr. Snyder of the termination of his employment from OSUMC, the termination resulted because of his dismissal from the residency program of OSU-CHS.  Dr. Snyder's employment was contingent on his participation in the residency program.  The Management Services Agreement and other record evidence do not indicate that Mercy could unilaterally terminate Dr. Snyder's employment.

According to Dr. Snyder, the language of the Management Services Agreement demonstrates the interrelations of operation between Mercy and OSUMC.  Again, Dr. Snyder points out that the agreement granted Mercy sole and exclusive right to supervise and direct the management and operation of the medical center.  Although Mercy did contract to perform services for OSUMC, the court cannot conclude that the mere contractual relationship between the two entities raises a genuine issue of material fact as to whether the entities were an integrated enterprise.  *See*, Rhodes v. Sutter Health, 949 F. Supp. 2d 997, 1007-08 (E.D. Cal. 2013) (declining to extend the integrated enterprise doctrine to two

separate corporate entities that merely had a contractual relationship). The Management Services Agreement does not evidence an absence of an arm's length relationship between Mercy and OSUMC.

Accordingly, the court finds that Mercy does not qualify as Dr. Snyder's employer under the single employer test and summary judgment in its favor is appropriate on that issue.

Joint Employer Test

"Under the joint employer test, two entities are considered joint employers if they 'share or co-determine those matters governing the essential terms and conditions of employment.'" Knitter, 758 F.3d at 1226 (quoting Bristol v. Board of County Commissioners of County of Clear Creek, 312 F.3d 1213, 1218 (10th Cir. 2002)). "Both entities are employers if they both 'exercise significant control over the same employees.'" Id. The right to terminate is considered the most significant factor in determining whether significant control exists. Id. Other factors to consider include the ability to: (1) promulgate work rules and assignments; (2) set conditions of employment, including compensation, benefits and hours; (3) supervise and discipline employees on a day-to-day basis; and (4) control employee records including payroll, insurance and taxes. Id.

OSUMA

Upon review of the record in a light most favorable to Dr. Snyder, the court finds that Dr. Snyder has failed to proffer adequate evidence to raise a genuine issue of material fact in support of his contention that OSUMA exercised significant control over the essential terms and conditions of his employment. In his response to OSUMA's summary judgment, Dr. Snyder relies on evidence that OSUMA's acting members were the trustees of OSUMC and the chain of command from Dr. Snyder's direct supervisor, Dr. Cotton, ultimately led to the trustees of OSUMC.

Dr. Snyder asserts that the members' authority as trustees to operate the hospital gave them the power to promulgate work rules and assignments, set conditions of employment, supervise and discipline Dr. Snyder and control his employment records. However, as previously found, OSUMA's members, when serving as trustees, comprise, by statute, a different entity. The court cannot conclude that the members' status as trustees results in OSUMA having the requisite control over OSUMC's employees. Further, OSUMA did not "share or co-determine" the essential terms and conditions of Dr. Snyder's employment with OSUMC.[8]

Accordingly, the court finds that OSUMA does not qualify as Dr. Snyder's employer under the joint employer test and summary judgment is appropriate in OSUMA's favor on that issue. Because OSUMA does not qualify as an employer under the joint employer or single employer tests, the court finds that OSUMA is entitled to summary judgment on the discrimination and retaliation claims under the Rehabilitation Act, the ADA and Title VII.

*Mercy*

Upon review of the record in a light most favorable to Dr. Snyder, the court concludes that Dr. Snyder has not raised a genuine issue of material fact in support of his contention that Mercy was Dr. Snyder's joint employer. The evidence in the record does not demonstrate that Mercy exercised significant control over the terms and conditions of Dr. Snyder's employment. Under the Management Services Agreement, Mercy had authority to supervise and direct the operation and management of OSUMC. There is no evidence, however, that Mercy was involved in Dr. Snyder's residency program. That was plainly not Mercy's role. OSUMC,

---

[8] In his response, Dr. Snyder argues that OSUMA had an obligation to comply with the Rehabilitation Act because it was a subcontractor of OSUMC or OSU-CHS. Dr. Snyder, however, has failed to raise a genuine issue of material fact that OSUMA was a subcontractor for purposes of the Act.

not Mercy, issued Dr. Snyder's paychecks and W-2 forms and withheld taxes from his income. In addition, OSUMC provided Dr. Snyder's benefits, including vacation, sick leave, workers' compensation coverage and insurance. It also maintained Dr. Snyder's personnel file. Mercy was not involved in the day-to-day supervision of Dr. Snyder. Moreover, Mercy was not involved in setting Dr. Snyder's hours or his rotations. He was supervised and evaluated by OSU-CHS faculty. Although Dr. Cotton, Dr. Snyder's direct supervisor, reported to Dr. Alexopulos, who reported to Stover, OSUMC's CEO, the evidence reflects that Dr. Alexopulos did not report to Stover on academic issues. Further, while Stover, on behalf of OSUMC, could report to Dr. Alexopulos a resident's failure to act according to the medical center's bylaws, rules and regulations, thereby initiating disciplinary proceedings, there is no evidence that Stover could be involved in those proceedings. And the notification occurred if, in the sole opinion of OSUMC, the resident failed to act in accordance with specified bylaws, rules and regulations.

There is no evidence that Mercy played any role in the decisions to place Dr. Snyder on academic probation, leave of absence or inactive status. While Dr. Snyder asserts that Mercy's human resources support supervised individuals involved in those employment decisions, there is no evidence in the record that the support personnel were aware, or were in any way involved, with those employment decisions.

As to the ability to terminate Dr. Snyder's employment, Katrina Godfrey, Mercy's employee, did send a termination letter to Dr. Snyder. Godfrey as well as Minnis approved his termination. However, the evidence shows that Dr. Snyder's employment was terminated because Minnis and Godfrey understood that he was no longer eligible for employment upon his dismissal from the residency program. Moreover, the evidence shows that Mercy had no authority to unilaterally terminate

Dr. Snyder's employment. While the evidence does show that a Mercy attorney was present during the August 2015 meeting discussing Dr. Snyder's position, and Godfrey and Minnis sought advice from the attorney, there is no evidence that she had, or exercised, any authority to make decisions about Dr. Snyder's future as a resident or, relatedly, as an employee. Moreover, even if the ability to terminate is an important factor in determining the existence of a joint employer, it is not the sole factor. Knitter, 758 F.3d at 1228.

In his papers, Dr. Snyder relies upon Browning-Ferris Industries of California, Inc. v. Nat'l Labor Relations Board, 911 F.3d 1195, 1199 (D.C. Cir. 2018), to support his position that Mercy qualifies as a joint employer. In that case, plaintiff operated a recycling plant and contracted with another company to provide certain workers to plaintiff. A local union petitioned to represent those workers as a bargaining unit under the National Labor Relations Act, designating both plaintiff and the company as joint employers of those workers. The D.C. Circuit found that an employer's authorized but unexercised control and an employer's indirect control over employees' terms and conditions of employment were relevant considerations for whether a company is a joint employer.

The Tenth Circuit has not had an opportunity to address the Browning-Ferris decision and decide whether to adopt the standard advanced by the D.C. Circuit. Under existing Tenth Circuit precedent, "courts [are to] look to whether both entities exercise significant control over the same employees." Sandoval, 388 F.3d at 1323; see also, Crumpley v. Associated Wholesale Grocers, 2018 WL 1933743, *30 (D. Kan. Apr. 24, 2018) ("Both entities are employers if they both exercise significant control over the same employees.") (quoting Knitter, 758 F.3d at 1226). However, even assuming that the Tenth Circuit would adopt the standard advanced in Browning-Ferris, the court finds that the application of the standard does not

raise a genuine issue of material fact as to whether Mercy was a joint employer over Dr. Snyder. The Management Services Agreement did give Mercy the sole and exclusive right to supervise and direct the operation of the medical center. It also gave Mercy the power and authority to administer, manage, control, and operate the business and affairs of the medical center in whatever reasonable manner Mercy deemed appropriate to meet the day-to-day requirements of the medical center. However, the agreement also provided that OSUMC's employees remained at all times under the direction and control of OSUMC. In the court's view, the Management Services Agreement, including its Schedule of Services provided by Mercy, does not support a finding that Mercy had a reserved but unexercised right to control, or indirect control, over the residents' terms and conditions of employment. It does not show that Mercy "co-determine[d] those matters governing the essential terms and conditions of employment" of Dr. Snyder. Bristol, 312 F.3d at 1218. Further, while Minnis and Godfrey approved of Dr. Snyder's termination and Godfrey notified Dr. Snyder of his termination, there is no evidence that Mercy had the ability under the Management Services Agreement to unilaterally terminate Dr. Snyder's employment.[9] The short of the matter is that, in every respect relevant to this case, Dr. Snyder's fate rested with the academic authorities and not with Mercy. As to matters on the academic side of this teaching hospital, Mercy was just along for the ride.

---

[9] In his response, Dr. Snyder argues that Mercy had an obligation to comply with the Rehabilitation Act and is liable under the Act because it was a subcontractor of OSUMC. Dr. Snyder, however, has failed to raise a genuine issue of material fact that Mercy was a subcontractor for purposes of the Act. Further, the evidence also shows that Mercy did not receive federal financial assistance which, as later discussed, is a prerequisite to a claim under the Act.

Accordingly, the court concludes that Mercy does not qualify as Dr. Snyder's employer under the joint employer test and that summary judgment is appropriate in Mercy's favor on that issue. Because Mercy does not qualify as an employer under the joint employer or single employer tests, the court finds that Mercy is entitled to summary judgment on the discrimination and retaliation claims under the Rehabilitation Act, the ADA and Title VII.

42 U.S.C. § 1983 Claims – Procedural Due Process

Dr. Snyder alleges that Dr. Cotton and Dr. Alexopulos are liable in their individual and official capacities for depriving him of his constitutional right to procedural due process in violation of the Fourteenth Amendment to the United States Constitution.

The Fourteenth Amendment prohibits any state from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. In 42 U.S.C. § 1983, Congress has created a federal cause of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." Dr. Snyder claims the benefit of this provision, arguing that defendants deprived him of property and liberty interests without due process of law. Specifically, he claims that Dr. Cotton and Dr. Alexopulos deprived him of his property interest in his three-year residency program, in his residency agreement and in his obtaining a medical license. He additionally claims that defendants deprived him of his liberty interest by tarnishing his good name and reputation in their adverse actions against him.

In evaluating his procedural due process claims, the court must determine whether the plaintiff was deprived of a protected interest to which due process protection was applicable, and if so, whether he was afforded an appropriate level of process. Kirkland v. St. Vrain Valley School Dist. No. Re-1J, 464 F.3d 1182,

1188 (10th Cir. 2006). To be entitled to procedural due process, Dr. Snyder must demonstrate that he either has a protected property or liberty interest. Hennigh v. City of Shawnee, 155 F.3d 1249, 1253 (10th Cir. 1998).

Before the court proceeds with evaluation of Dr. Snyder's procedural due process claims, the court finds that Dr. Snyder cannot pursue his § 1983 claims against Dr. Cotton and Dr. Alexopulos, in their official capacities, to the extent he seeks monetary relief. In a suit for damages "neither a State nor its officials acting in their official capacities are 'persons' under § 1983." Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989). Dr. Snyder, however, may pursue his claims against defendants, in their official capacities, to the extent he seeks prospective relief. Id. at 71, n. 10 ("[A] state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because official-capacity actions for prospective relief are not treated as actions against the State.") (internal quotations omitted). In addition to an injunction, reinstatement is a form of prospective relief. Meiners v. University of Kansas, 359 F.3d 1222, 1232 (10th Cir. 2004).

Dr. Snyder may seek monetary relief against Dr. Cotton and Dr. Alexopulos, in their individual capacities, under § 1983. Defendants have asserted qualified immunity as an affirmative defense to those claims. Brown v. Montoya, 662 F.3d 1152, 1164 (10th Cir. 2011) ("Government defendants sued under § 1983 in their individual capacities have qualified immunity: 'government officials are not subject to damages liability for the performance of their discretionary functions when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'") (quoting Buckley v. Fitzsimmons, 509 U.S. 259, 268 (1993)). Consequently, to overcome the affirmative defense, Dr. Snyder bears the heavy burden of showing that defendants'

actions violated a constitutional right and that the constitutional right defendants allegedly violated was clearly established at the time of the conduct. Nelson, 207 F.3d at 1206.

*Property Interest*

An individual has "a property interest in a benefit" for purposes of procedural due process only if he has a "legitimate claim of entitlement" to the benefit, as opposed to a mere "abstract need or desire" or "unilateral expectation." Board of Regents v. Roth, 408 U.S. 564, 577 (1972). Such an interest does not arise from the Due Process Clause of the Constitution. Instead, it is created by "existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure [a] certain benefit and that support claims of entitlement to [that benefit]." *Id*. Thus, a property interest may be created by "[s]tatutes, ordinances, contracts, implied contracts, as well as rules and policies developed by governmental officials." Simmons v. Uintah Health Care Special Service Dist., 364 Fed. Appx. 507, 515 (10th Cir. 2010) (citing Calhoun v. Gaines, 982 F.2d 1470 (10th Cir. 1992)).

Dr. Snyder claims a property interest in his three-year residency. In Goss v. Lopez, 419 U.S. 565 (1975), the Supreme Court found "on the basis of state law" that primary and secondary students "plainly had legitimate claims of entitlement to a public education." *Id*. at 573. It found that state statutes "direct[ed] local authorities to provide a free education to all residents between five and 21 years of age," and thus, the students possessed a property interest in their public education. *Id*.

Following Goss, the Tenth Circuit in Gaspar v. Bruton, 513 F.2d 843 (10th Cir. 1975), determined that a student at the Gordon-Cooper area Vocational-Technical School, pursuing courses and training in nursing, had a property right in

her public education. In its reasoning, the Tenth Circuit pointed out that the plaintiff had paid a specific, separate fee for enrollment and attendance at the school. Subsequently, in Harris v. Blake, 798 F.2d 419 (10th Cir. 1986), the Tenth Circuit found that a graduate student in the University of Northern Colorado's Center for Special and Advanced Programs had a property interest in his enrollment. It pointed out that the Colorado legislature had directed colleges to remain open to all persons in the state upon payment of a reasonable tuition fee. Citing Gaspar, the Tenth Circuit explained that the payment of the tuition secured the claim of entitlement. *Id*. at 422.

In Goss, Gaspar and Harris, the courts determined that property interests were present based upon state statutes or the payment of fees or tuition. Dr. Snyder, in his papers, has not referred the court to any statute creating a legitimate claim of entitlement to his three-year residency. Also, there is no question that he does not pay any tuition for his postgraduate education. Thus, Goss, Gasper and Harris do not provide authority for recognition of a property interest in his residency.

Dr. Snyder refers to his Osteopathic Graduate Medical Education Resident/Fellow Staff Agreement to create a property interest. The agreement, however, was not between OSU-CHS and Dr. Snyder. It was between OSUMC and Dr. Snyder. Although Dr. Snyder argues that OSU-CHS was a joint employer or an integrated enterprise with OSUMC for purposes of the federal discrimination statutes, Dr. Snyder has not shown, in response to defendants' motion, that OSU-CHS is a joint employer or is an integrated enterprise with OSUMC. Moreover, he has not cited any authority under Oklahoma law which would make the residency agreement enforceable against OSU-CHS based upon those theories of liability.

In any event, the court concludes that the language of the contract, even assuming the OSUMC's House Staff Policies & Non-Cognitive Academic Standards for 2013-2014 are incorporated into the document, does not give rise to a legitimate claim of entitlement to a three-year residency. Dr. Snyder specifically cites ¶ 6.2 of the residency agreement to support his claim. That paragraph states in part that the resident "will not be permitted to *continue the Program* under any circumstances until the appropriate license has been obtained" and "[i]t is acknowledged by the parties that [OGME 1] Interns will not be eligible for licensure at the time of the execution of this agreement." Doc. no. 379-56, ¶6.2. This language, however, does not guarantee a three-year residency. Indeed, paragraph 1.1 of the agreement states that "[t]he Program will commence on the Effective Date and continue for twelve (12) months unless sooner terminated in accordance with the terms hereof." *Id*. at ¶1.1. The residency agreement appears to be a form contract that is used for not only first year residents but also second-year and third-year residents. The record reflects that the residents enter into a new contract each year of their residency. Thus, the "continue the Program" language does not support a property interest in the three-year residency program.

In his papers, Dr. Snyder cites <u>Stretten v. Wadsworth Veterans Hospital</u>, 537 F.2d 361 (9th Cir. 1976), as authority recognizing a property interest in his medical residency. However, the Ninth Circuit found the existence of a property interest based upon the form appointing the resident, which stated the appointment was "for (the) duration of this training unless sooner terminated, and . . . subject to periodic review by resident review board" and the duration of the training for the resident was four years. *Id*. at 363, 367. Here, neither the agreement nor OSUMC's house policies indicated that Dr. Snyder would be employed for the duration of a three-year residency.

Dr. Snyder also relies upon a Second Circuit decision, Ezekwo v. New York City Health & Hospitals Corp., 940 F.2d 775 (2nd Cir. 1991), in support of his claim of a property interest in his residency. In that case, the Second Circuit found a resident had a property interest in a chief resident position. The Second Circuit found the creation of a property interest in the position because defendant had adopted a policy and practice of awarding the position to all third-year students on a rotating basis and had verbally advised the resident that she would be chief resident from November 1987 until February 1988. According to the Second Circuit, defendant's course of conduct, coupled with the resident's reasonable reliance on that conduct, created a contractual right that rose to the level of a significant property interest protected under state law. Id. at 783. In the case at bar, Dr. Snyder has not presented similar evidence of defendants' course of conduct and his reasonable reliance on that conduct. The testimony of Dr. Hall relating to her expectations regarding the residency program, doc. no. 400-2, pp. 17, ll. 13-25; p. 27, ll. 1-3, is not sufficient to establish defendants' course of conduct or to establish an understanding between the parties which would secure a benefit in the form of the three-year residency. The court therefore finds that the Ezekwo decision does not support a conclusion that Dr. Snyder has a property interest in the three-year residency.

Like OSUMC, OSU-CHS issued an Oklahoma State University Family Medicine Handbook, which provided rules and procedures for the 2013-2014 residency program. Doc. no. 336-6. However, nothing in the handbook guaranteed the continuation of Dr. Snyder's residency for three years or placed substantive restrictions on the ability of OSU-CHS to dismiss Dr. Snyder from the residency program. Even though the handbook, like OSUMC's policies, contained procedures with respect to probation, suspension, dismissal, disciplinary actions,

those procedures are not, by themselves, adequate to create property interests protected by the Fourteenth Amendment. *See*, Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 541 (1985) ("'Property' cannot be defined by the procedures provided for its deprivation any more than can life or liberty."); *see also*, Teigen v. Renfrow, 511 F.3d 1072, 1081 (10th Cir. 2007) ("This court has explained it is well established that an entitlement to nothing but procedure cannot be the basis for a property interest.") (internal quotation omitted).

In his papers, Dr. Snyder also contends that he had legitimate claim of entitlement to his continued residency for the first year. According to Dr. Snyder, his agreement extended beyond the expressly stated twelve months' duration because he was placed on probation and leave of absence. He maintains that under OSUMC's policies, which were incorporated into the contract, he was entitled to pay and benefits while he was on probation and he was entitled to make up a leave of absence at the end of the contract year. As stated, the agreement was not with OSU-CHS. Nonetheless, the agreement expressly provided that to the extent the policies might differ or were inconsistent from the terms of the agreement, the terms of the agreement controlled. Doc. no. 379-56, §§ 3.1 and 8.11. Further, continuation in the residency program was not guaranteed; it was contingent upon satisfactory academic and professional performance. *Id*. at § 6.4. The court thus concludes that Dr. Snyder did not have a legitimate claim of entitlement to continuation of his first-year residency based upon his residency agreement.

With respect to his obtaining a medical license, the court concludes that Dr. Snyder's claim does not implicate a property interest. It is true that possession of a professional license constitutes a property interest protected by the Fourteenth Amendment. Keney v. Derbyshire, 718 F.2d 352, 354 (10th Cir. 1983) ("A license to practice medicine is a property right deserving constitutional protection,

including due process.")  But, here, the license was not possessed; there was only the potential to obtain one.  "The Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits."  Roth, 408 U.S. at 576.  Moreover, Dr. Snyder has not referred to any statute or other authority which required Dr. Cotton or Dr. Alexopulos to submit the postgraduate training verification form to the Oklahoma State Board of Osteopathic Examiners for issuance of a license.  The residency agreement, even if binding on OSU-CHS, did not obligate Dr. Cotton or Dr. Alexopulos to submit the form.  The court thus concludes that Dr. Snyder's potential for obtaining medical licensure does not implicate a property interest.

Even if a property interest existed in his residency or in his obtaining a medical license, the court concludes that Dr. Snyder received appropriate due process.  For purposes of procedural due process, Dr. Snyder, a medical resident, is considered a student rather than an employee.  Halverson v. University of Utah School of Medicine, 2007 WL 2892633, *11 (D. Utah 2007).  Moreover, as discussed, Dr. Snyder did not have an employment contract with OSU-CHS.  Therefore, he is entitled only to the lesser due process procedures accorded students.  See, Davis v. Mann, 882 F.2d 967, 973 (5th Cir. 1989) ("Courts overwhelmingly agree that students, whether dismissed for academic or disciplinary reasons, are not entitled to as much procedural protection under the Fourteenth Amendment as employees who are terminated from their jobs.").

The level of due process required for students varies according to whether an action was taken for disciplinary or academic reasons.  See, Board of Curators of Missouri v. Horowitz, 435 U.S. 78, 85 (1978).  When an action is taken for disciplinary reasons, the student is to "be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities

have and an opportunity to present his side of the story." Goss, 419 U.S. at 581. Academic action, however, "calls for far less stringent procedural requirements." Horowitz, 435 U.S. at 86. The requirements are met when the student is fully informed of faculty dissatisfaction with his performance, the danger posed to timely graduation and continued enrollment and the decision was careful and deliberate. *Id*. at 85. No hearing is required. *Id*. at 90.

Dr. Snyder's probation was for academic, as opposed to disciplinary reasons. Consequently, no hearing was required. Dr. Cotton advised him in person and in writing about the three-month probation. Dr. Cotton's letter advised that the "academic probation" was due to "a failure to attain a proper level of scholarship and non-cognitive skills, including judgment, clinical abilities, maturity and professionalism." In addition, it gave some specific examples of Dr. Snyder's purported deficiencies. The letter also stated that at the probation's conclusion, one of three actions would be taken – release from probation, continuation of probation or termination of his residency training contract. The record reflects that the decision to place Dr. Snyder on probation was made after Dr. Cotton consulted with Dr. Alexopulos as well as other faculty members. The court concludes that a rational jury could not find that the probation decision, even though Dr. Snyder challenges it, was not careful and deliberate. Thus, Dr. Snyder received all the process that was due with respect to being placed on probation.

Subsequently, Dr. Snyder was advised by letter and in person that he was being placed on a three-month leave of absence due to the assessment that he was "not fit for duty." The court concludes that this action was academic rather than disciplinary. The record reflects that Dr. Snyder was required to participate in counseling sessions as directed by the EAP, and he was advised that near the conclusion of the three-month period, his progress would be reassessed by the EAP

and a decision would be made regarding his continued participation in the residency program.  Although Dr. Snyder asserts that he was not told the reasons behind the not fit for duty evaluation, he nonetheless was told he received that evaluation.  And Dr. Cotton consulted with Dr. Alexopulos and human resources personnel prior to advising Dr. Snyder of his leave of absence.  Hence, Dr. Snyder received all the process that was due with respect to being placed on leave of absence.

After Dr. Snyder was placed on leave of absence, he hired counsel who, via email and phone calls, discussed his status with OSU-CHS's counsel.  A meeting was ultimately arranged for November 7, 2014 involving Dr. Cotton and Dr. Snyder to discuss his options for moving forward.  At the meeting, Dr. Snyder requested documentation of his status and options for moving forward.  Subsequently, Dr. Cotton set forth in a written document Dr. Snyder's residency status and options for moving forward.  The November 13, 2014 letter advised Dr. Snyder of three outcome options – return to training, resignation and dismissal.

The return-to-training option required a fit-for-duty for patient care statement; a waiver of any complaints or appeals he had regarding his status as an OGME 1 and agreement to continue in the program from the point he left; and the status of OGME 1 on academic probation with one month of active rotation time remaining in the probation period.  The process for determining his residency status at the end of the probation period would remain the same.

The resignation option required a statement of resignation and a fit-for-duty determination.  The dismissal option would be triggered if the residency program did not receive a fit-for-duty statement or a resignation by January 1, 2015.  Dr. Cotton advised Dr. Snyder that dismissal would be subject to appeal as provided in the Oklahoma State University Family Medicine Residency Handbook.  If he successfully appealed, he would return to patient care with the status of OGME 1

subject, as has been noted, to "any additional requirements as required by the appeal committee." If he did not successfully appeal, the dismissal would be final.

Dr. Snyder, through counsel, submitted a fit-for-duty letter dated January 6, 2015. Counsel for OSU-CHS and Dr. Snyder continued to discuss his residency status. Prior to a meeting to be held in March of 2015 to discuss Dr. Snyder's options, Dr. Snyder's counsel advised OSU-CHS's counsel that he was no longer representing him. There is no evidence in the record that prior to that time, Dr. Snyder, through his counsel or otherwise, indicated any agreement to return to his residency program. There is also no evidence that Dr. Snyder, through counsel or otherwise, indicated any opposition to the requirement of a waiver of complaints or appeals as a condition of returning to the residency program. Moreover, there is no evidence that a statement of resignation was provided by Dr. Snyder. Although new counsel advised OSU-CHS of his representation of Dr. Snyder and requested OSU-CHS to preserve records, counsel never initiated any communication, on behalf of Dr. Snyder, to resume negotiations, and no communication was made by counsel on behalf of Dr. Snyder or by Dr. Snyder himself regarding his decision with respect to the options given to him in the November 13, 2014 letter. In August of 2015, a meeting was held to discuss Dr. Snyder's position. The conclusion was that he had abandoned his position. Dr. Snyder was notified by letter that he was dismissed from the residency program because his failure to notify of his choice to either resign or return to active training status put him in noncompliance with the requirements of the program and constituted an abandonment of his position.

The court concludes that the decision to dismiss Dr. Snyder was academic rather than disciplinary, and thus, no hearing was required. Dr. Snyder had been previously placed on probation and thus had been previously advised of faculty dissatisfaction with his performance. At the time of his leave of absence, Dr.

Snyder had not completed his probationary period. The November 13th letter advised Dr. Snyder that he had the option to return to training if he agreed to return to the program where he left off–probationary status for one month with review of that status at the end of the month. The other options provided were resignation or dismissal. The letter made Dr. Snyder aware that dismissal was one possible outcome. The decision to dismiss Dr. Snyder was made after a meeting involving OSU-CHS and OSUMC personnel, as well as OSU-CHS and Mercy legal counsel, to discuss Dr. Snyder's status. The decision was not based upon Dr. Snyder's violation of rules or codes of conduct or any disruptive behavior. It was based upon his failure to indicate his intention to pursue his postgraduate education. Consequently, based upon the record before it, the court concludes that Dr. Snyder was provided all the process that was due for him as a medical resident dismissed for academic reasons.

Dr. Snyder, in his papers, complains that defendants violated his procedural due process rights by failing to comply with their own procedural guidelines regarding the actions taken against him. However, even assuming defendants failed to follow their own procedures, this failure does not, by itself, give rise to a constitutional claim under the Fourteenth Amendment. Trotter v. Regents of University of New Mexico, 219 F.3d 1179, 1185 (10th Cir. 2000) (citing Horowitz, 435 U.S. at 92 n. 8).

Accordingly, because there is no genuine issue of material fact as to whether Dr. Snyder received all the process to which he was entitled as a medical resident, the court concludes that summary judgment in favor of Dr. Cotton and Dr. Alexopulos, in their official capacities, is appropriate on Dr. Snyder's procedural due process claim based upon deprivation of property interests.

As stated, Dr. Snyder also asserted his procedural due process claim against Dr. Cotton and Dr. Alexopulos, in their individual capacities, to which they have raised the affirmative defense of qualified immunity. Dr. Snyder bears the burden of demonstrating that the defendant's actions violated a constitutional or statutory right. Also, Dr. Snyder bears the burden of showing that the constitutional or statutory rights the defendants allegedly violated were clearly established at the time of the conduct at issue. *See*, Nelson v. McMullen, 207 F.3d at 1206. As discussed, Dr. Snyder has not shown the violation of a constitutional right to procedural due process based upon deprivation of property interests. Further, Dr. Snyder has not pointed to a Supreme Court or Tenth Circuit decision or to the weight of authority from other courts, existing at the time of the alleged violation, demonstrating that Dr. Snyder had a property interest in the continuation of his three-year residency or in obtaining his medical license, or that the process Dr. Snyder was given was less than that to which he, as a medical resident, was entitled. Consequently, the court concludes that Dr. Cotton and Dr. Alexopulos, in their individual capacities, are entitled to summary judgment on the ground of qualified immunity. *See*, Trotter, 219 F.3d at 1184-1185 (granting defendants' motion for summary judgment based on qualified immunity for failure to identify clearly established law supporting plaintiff's claim of a property or liberty interest in continued enrollment at the medical school and requiring more process than she received before the medical school dismissed her).

*Liberty Interest*

"The Due Process Clause also forbids arbitrary deprivations of liberty." Goss, 419 U.S. at 574. "Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, the minimal requirements of the Clause must be satisfied." *Id*. (internal quotations omitted).

Dr. Snyder alleges that his good name and reputation were tarnished as they relate to actions taken against him because multiple residents heard that he had a mental health evaluation, was receiving counseling, had a learning disability, had psychological testing, was on probation, was on leave of absence or was dismissed from the residency program. Specifically, Dr. Snyder alleges that in July 2014, Dr. Cotton called Dr. Howell, an upper level resident, and told him that Dr. Snyder would not be finishing out the month and he was no longer in the residency program. Dr. Snyder additionally asserts that Dr. Thompson, another upper level resident, knew that Dr. Snyder was receiving counseling. He further asserts that Dr. Cotton told the Oklahoma State Board of Osteopathic Examiners that Dr. Snyder did not successfully complete his first year. By denying him the right to rebut the statements made to residents and to the Oklahoma State Board of Osteopathic Examiners, at a name-clearing hearing, Dr. Snyder asserts that Dr. Cotton and Dr. Alexopulos deprived him of a liberty interest without due process in violation of the Fourteenth Amendment.

To make a successful liberty-interest deprivation claim, Dr. Snyder must show that (1) defendants made a statement impugning his good name, reputation, honor or integrity; (2) the statement was false; (3) the statement was made during the course of termination and foreclosed other employment opportunities; and (4) the statement was disclosed publicly. McDonald v. Wise, 769 F.3d 1202, 1210 (10th Cir. 2014). "A person who establishes a liberty-interest deprivation is entitled to a name-clearing hearing." Evers v. Regents of University of Colorado, 509 F.3d 1304, 1308 (10th Cir. 2007). Upon review, the court concludes that Dr. Snyder has failed to establish a viable liberty-interest deprivation claim against Dr. Cotton and Dr. Alexopulos, in their official capacities, and summary judgment is appropriate.

As to the statements made to residents, including Dr. Howell and Dr. Thompson, the court concludes that Dr. Snyder has failed to show that the statements were disclosed publicly. "[I]ntra-government dissemination, by itself, falls short of the Supreme Court's notion of publication: 'to be made public.'" Asbill v. Housing Auth. of Choctaw Nation of Okla., 726 F.2d 1499, 1503 (10th Cir. 1984) (quoting Bishop v. Wood, 426 U.S. 341, 348 (1976)); *see also*, Harris v. Blake, 798 F.2d 419, 422 n. 2 (10th Cir. 1986) (relying on Asbill in determining letter not published when disseminated to some college instructors and personnel). Here, the alleged statements were made to residents who were academically sponsored by OSU-CHS, supervised by Dr. Cotton and Dr. Alexopulos, and co-employees with Dr. Snyder.

The court additionally concludes that Dr. Snyder has failed to proffer evidence sufficient to show that the alleged statements were made during the course of termination of his residency and that they foreclosed other employment opportunities.[10] Finally, the court concludes that Dr. Snyder has failed to show that the alleged statements regarding Dr. Snyder of which the upper level residents, Dr. Brewer, Dr. Fowler, Dr. Miles, Dr. Hill, and Dr. Maxey, were aware, were in fact communicated to them by Dr. Cotton or Dr. Alexopulos.

With respect to Dr. Cotton's statement to the Oklahoma State Board of Osteopathic Examiners, the court finds that the statement does not address Dr. Snyder's good name, reputation, honor or integrity. A showing of stigmatization is essential for a liberty interest claim. *See*, Roth, 408 U.S. at 573. According to Dr. Snyder, Dr. Cotton accused him of not successfully finishing his first year of

---

[10] Dr. Snyder's probation and leave of absence with pay do not equate with termination or dismissal. *See*, Brokaw v. Dallas Independent School Dist., 2008 WL 4355392, *4 (N.D. Tex. Sept. 24, 2008) (allegations of administrative leave with pay do not equate to termination of employment for purposes of a deprivation of liberty interest claim).

residency. This accusation does not implicate a protected liberty interest. *See*, Fox-Rivera v. Colorado Dept. of Public Health & Environment, 610 Fed. Appx. 745, 748 (10th Cir. 2015) ("statements involving unsatisfactory performance are not sufficiently stigmatizing for a protected liberty interest") (unpublished decision cited as persuasive pursuant to 10th Cir. R. 32.1(A)); Southeast Kansas Community Action Program Inc. v. Secretary of Agriculture of U.S., 967 F.2d 1452, 1458 (10th Cir. 1992) ("allegations of misspending of federal funds and incompetence" insufficient to establish a liberty interest deprivation) (quotations omitted); Hicks v. City of Watonga, 942 F.2d 737, 746 (10th Cir. 1991) (stating that charges "of poor work habits or failure to follow instructions . . . do not violate a liberty interest."). Therefore, the court concludes that Dr. Snyder cannot establish his liberty-interest deprivation claim based upon Dr. Cotton's statement to the Oklahoma State Board of Osteopathic Examiners.

Because Dr. Snyder has failed to establish a cognizable liberty-interest deprivation, the court also finds that Dr. Cotton and Dr. Alexopulos, in their individual capacities, are entitled to qualified immunity and summary judgment is appropriate on that basis.

42 U.S.C. § 1983 – Equal Protection

Dr. Snyder additionally alleges that Dr. Cotton and Dr. Alexopulos are liable in their individual and official capacities under § 1983 for violating his constitutional right to equal protection under the Fourteenth Amendment. The Equal Protection Clause of the Fourteenth Amendment prohibits a state from "deny[ing] to any person within its jurisdiction equal protection of the laws." U.S. Const. Amend. XIV. Dr. Snyder claims that Dr. Cotton and Dr. Alexopulos

violated the Equal Protection Clause by discriminating against him because he is a male.[11]

To prove an equal-protection claim based on disparate treatment, a plaintiff must provide either direct evidence of discrimination or prevail under the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). In the case at bar, Dr. Snyder relies upon the McDonnell Douglas analysis. Under McDonnell Douglas, the plaintiff must first prove a prima facie case of sex discrimination. Id. at 802. If he does so, then the burden "shift[s] to the [defendant] to articulate some legitimate, non-discriminatory reason" for taking an adverse employment action against the plaintiff. Id. at 802. If the defendant successfully satisfies its burden of production, the burden then shifts back to the plaintiff to put forth evidence sufficient to allow a jury to find that the defendant's reason is pretextual, e.g. that is unworthy of belief. See, id. at 804.

Under the traditional analysis, the first element of a prima facie case requires proof that the plaintiff is a member of a protected class. See McDonnell Douglas, 411 U.S. at 802. However, in a case, such as this, where plaintiff, who is male, is alleging sex discrimination, he "must, in lieu of showing that he belongs to a protected group, establish background circumstances that support an inference that the [defendants are] one of those unusual employers who discriminates against the majority." Notari v. Denver Water Dep't, 971 F.2d 585, 589 (10th Cir. 1992). Alternatively, a plaintiff may produce facts "sufficient to support a reasonable inference that but for plaintiff's status the challenged decision would not have

---

[11] As with the § 1983 procedural due process claims, the court finds that the Eleventh Amendment bars the equal protection claim to the extent Dr. Snyder seeks monetary relief against Dr. Cotton and Dr. Alexopulos, in their official capacities. It does not bar prospective relief.

occurred." <u>Argo v. Blue Cross & Blue Shield of Kan., Inc.</u>, 452 F.3d 1193, 1201 (10th Cir. 2006).

Dr. Snyder has failed to provide sufficient background evidence to demonstrate that Dr. Cotton and Dr. Alexopulos (either or both) were in the category of those unusual employers who discriminate against males. He has also failed to provide evidence sufficient to support an inference that the challenged actions against him would not have occurred "but for" his male status. It is not enough for Dr. Snyder to show that he was treated differently than another similarly situated employee. <u>Notari</u>, 971 F.2d at 590.[12] He must produce evidence sufficient to support a reasonable inference that "but for" his male status the challenged actions would not have occurred. *Id*. He has not done this. Dr. Snyder has not submitted specific facts to show that but for his sex he would not have suffered the adverse action. Consequently, Dr. Snyder has failed to establish a prima facie case of reverse discrimination. Therefore, because plaintiff cannot establish an equal protection violation against Dr. Cotton and Dr. Alexopulos, the court finds that they are entitled to qualified immunity as to that claim to the extent that they have been sued in their individual capacities.

---

[12] In his briefing, Dr. Snyder points to four female residents, MS, SVC. SH, and LF, who were treated differently than him by Dr. Cotton and Dr. Alexopulos. The court, however, notes that MS, SVC and LF were not residents in the OSU-CHS Family Medicine Residency Program. They were residents in the OMECO Teaching Health Center Family Medicine Program. Dr. Cotton was not the program director for that program and did not have authority to take adverse action against them. That leaves SH. However, the court need not decide whether Dr. Snyder has presented evidence sufficient to show that SH was similarly situated to him and was treated differently by Dr. Cotton and Dr. Alexopulos. Even if that were the case, that fact is not enough to support a reasonable inference that the challenged action would not have occurred but for Dr. Snyder's male status. The Tenth Circuit has determined that disparate treatment of two individuals alone is not sufficient to establish "but for" causation. <u>Notari</u>, 971 F.2d at 590.

Although Dr. Cotton and Dr. Alexopulos, in their official capacities, have not appropriately moved for summary judgment on the equal protection claim,[13] the court finds, based upon the reasons just discussed, that summary judgment is warranted. Therefore, the court *sua sponte* grants summary judgment on the § 1983 equal protection claim against Dr. Cotton and Dr. Alexopulos, in their official capacities.

42 U.S.C. § 1985(3)

In the Third Amended Complaint, Dr. Snyder alleges that Dr. Cotton and Dr. Alexopulos, in their individual capacities, OSUMC, Dr. Barnes and CommunityCare, conspired to deprive him of his rights under the Equal Protection Clause in violation of 42 U.S.C. § 1985(3). Specifically, he alleges that defendants acted in agreement to deprive him of his equal protection rights based on a perceived disability and in retaliation of his complaints of gender and disability discrimination.

These defendants have moved for summary judgment on the § 1985(3) claim. Other than briefly addressing the claim in response to CommunityCare's motion, Dr. Snyder has not responded to the merits of defendants' arguments challenging the validity of this claim. Upon independent review of the confessed arguments, the court finds that summary judgment is appropriate on the § 1985(3) claim because Dr. Snyder cannot establish the essential elements of the claim.

Civil conspiracy claims under § 1985(3) require some type of class-based animus. *See*, Griffin v. Breckenridge, 403 U.S. 88, 102 (1971). The Tenth Circuit has expressly held that disabled persons do not constitute a class of persons entitled

---

[13] In the body of the motion filed by Dr. Cotton and Dr. Alexopulos, in their official capacities, they adopt the motion filed in their individual capacities. Doc. no. 324, ECF pp. 1-2. The court finds that this adoption is not a proper motion.

to protection under § 1985(3). *See*, Wilhelm v. Cont'l Title Co., 720 F.2d 1173, 1176-1177 (10th Cir. 1983). The court concludes that this decision would also apply to persons, such as Dr. Snyder, claiming to be perceived as disabled. Thus, Dr. Snyder cannot base his § 1985(3) conspiracy claim on alleged disability discrimination.

Dr. Snyder also alleges that defendants conspired to deprive him of his rights under the Equal Protection Clause by retaliating against him for filing complaints of gender and disability discrimination. One of the essential elements of a § 1985(3) claim is deprivation "of equal protection or equal privileges and immunities." Tilton v. Richardson, 6 F.3d 683, 686 (10th Cir. 1993). Under Tenth Circuit law, retaliatory conduct cannot form the basis for an equal protection violation. *See*, Teigen v. Renfrow, 511 F.3d 1072, 1086 (10th Cir. 2007). Consequently, Dr. Snyder's § 1985(3) conspiracy claim based upon defendants' alleged retaliation is not cognizable. Summary judgment is therefore appropriate on the § 1985(3) claim based on qualified immunity as to Dr. Cotton and Dr. Alexopulos, in their individual capacities,[14] and based on the merits as to OSUMC, Dr. Barnes and CommunityCare.

In response to Dr. Barnes' and CommunityCare's summary judgment motions with respect to the § 1985(3) claim, Dr. Snyder raises allegations of a conspiracy under 42 U.S.C. § 1983 and a civil conspiracy under Oklahoma law. The court concludes that Dr. Snyder's new allegations constitute a request to amend his complaint. *See*, Martinez v. Potter, 347 F.3d 1208, 1211 (10th Cir. 2003) ("[O]ur cases interpret the inclusion of new allegations in a response to a motion

---

[14] Qualified immunity applies to claims under 42 U.S.C. § 1985(3). *See*, Bisbee v. Bey, 39 F.3d 1096, 1101 (10th Cir. 1994).

for summary judgment, as a potential request to amend the complaint."). However, upon review, the court concludes that the request to amend should be denied.

After a scheduling order deadline, a party seeking leave to amend must demonstrate (1) good cause for seeking modification under Rule 16(b)(4), Fed. R. Civ. P., and (2) satisfaction of the standard under Rule 15(a), Fed. R. Civ. P. Gorsuch, Ltd., B.C. v. Wells Fargo Nat'l Bank Ass'n, 771 F.3d 1230, 1241 (10th Cir. 2014).

Rule 16(b)(4) provides that scheduling orders "may be modified only for good cause and with the judge's consent." "In practice, this standard requires the movant to show the scheduling deadlines cannot be met despite the movant's diligent efforts." Gorsuch, 771 F.3d at 1240 (quotations and alterations omitted). "Good cause" also "obligates the moving party to provide an adequate explanation for any delay." Husky Ventures, Inc. v. B55 Invs., Ltd., 911 F.3d 1000, 1020 (10th Cir. 2018) (quotations omitted).

The court concludes that Dr. Snyder has not made a "good cause" showing required under Rule 16(b)(4). He has failed to "show the scheduling deadlines [could not] be met despite [his] diligent efforts." Gorsuch, 771 F.3d at 1241 (quotations omitted). In addition, Dr. Snyder has not provided any explanation for his delay in seeking to amend the complaint through his response in opposition to summary judgment. Therefore, the court concludes that Dr. Snyder's request to amend his complaint to add the conspiracy claims should be denied.

ADA Discrimination Claims Against OSUMC

In his response to OSUMC's summary judgment motion, Dr. Snyder has admitted that he was employed by OSUMC and was a student at OSU-CHS for his postgraduate medical education. Doc. no. 371, ¶ 2. The record before the court relating to the motion confirms the accuracy of the admission. Dr. Snyder, through

counsel, had represented in addressing a previous dismissal motion that he was bringing a Title II claim against OSUMC as a student-resident. And the court construed Dr. Snyder's complaint as alleging a claim against OSUMC under Title II of the ADA based upon the termination of his residency and not the termination of his employment. *See*, doc. no. 167. In addition, the court concluded that with respect to the Title II claim, the Eleventh Amendment, raised by OSUMC in its dismissal papers, did not provide a defense. *Id.*[15]

However, after the completion of extensive discovery in this case, Dr. Snyder has admitted that OSUMC was his employer and he was a student of OSU-CHS. The Tenth Circuit has held that claims of employment discrimination cannot be made under Title II of the ADA. Elwell v. Okla. ex rel. Bd. of Regents of Univ. of Okla., 693 F.3d 1303, 1309 (10th Cir. 2012). Those claims must be made under Title I of the ADA. *Id.* However, a state entity enjoys Eleventh Amendment immunity from suit under Title I. *See*, Board of Trustees of the Univ. of Ala. v. Garrett, 531 U.S. 356 (2001).[16] Consequently, because (i) Dr. Snyder has admitted that OSUMC was his employer and (ii) he is not entitled to bring claims for employment discrimination under Title II of the ADA and (iii) OSUMC has Eleventh Amendment immunity for employment discrimination claims under Title I, the court finds that OSUMC is entitled to summary judgment on Dr. Snyder's ADA claim.

---

[15] OSUMC attempted to present evidence to factually attack whether Dr. Snyder was its student, but the court declined to consider the evidence. *See*, doc. no. 167.

[16] OSUMC is a public trust of which the State of Oklahoma is a beneficiary. Under the Oklahoma Governmental Tort Claims Act, Oklahoma considers public trusts created pursuant to Title 60 of the Oklahoma Statutes of which the State of Oklahoma is a beneficiary to be the "State." 51 O.S. 2011 § 152(13).

Rehabilitation Act Employment Discrimination Claim Against OSUMC

Dr. Snyder has alleged an employment discrimination claim against OSUMC under Section 504 of the Rehabilitation Act.[17] That statute mandates that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

The Rehabilitation Act incorporates and adopts the employment discrimination standards contained in Title I of the Americans with Disabilities Act, 42 U.S.C. § 12211, *et seq.* (ADA). *See*, 29 U.S.C. § 794(d); Jarvis v. Potter, 500 F.3d 1113, 1121 (10th Cir. 2007). Thus, in the absence of direct evidence of employment discrimination, a Rehabilitation Act claim, like an ADA Title I claim, is analyzed under the burden-shifting framework established in McDonnell Douglas. First, a plaintiff must establish a *prima facie* case of employment discrimination by showing that (1) he is disabled under the Act; (2) he would be "otherwise qualified" to participate in the program or activity; (3) the program or activity receives federal financial assistance; and (4) the program or activity has discriminated against him. McGeshick v. Principi, 357 F.3d 1146, 1149 (10th Cir. 2004). Once the plaintiff successfully establishes his prima facie case of discrimination, the burden shifts to the defendant-employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. Cummings v. Norton, 393 F.3d 1186, 1189 (10th Cir. 2005). After the defendant-employer fulfills that burden, the burden shifts back to the plaintiff to show that the

---

[17] "[B]y accepting federal financial assistance as specified in 42 U.S.C. § 2000d-7, states and state entities waive sovereign immunity from suit under the Rehabilitation Act." Arbogast v. Kansas, Dept. of Labor, 789 F.3d 1174, 1182 (10th Cir. 2015).

legitimate, non-discriminatory reason offered by the defendant-employer is merely pretextual. *Id*.

OSUMC does not dispute that it received federal financial assistance with respect to Dr. Snyder's medical residency. Instead, it argues that Dr. Snyder cannot establish that he was disabled under the Act; that he was "otherwise qualified" to participate in the residency; and that he was discriminated against by OSUMC.

"The Rehabilitation Act defines 'disability'" in the same way as the ADA. McGuinness v. University of New Mexico School of Medicine, 170 F.3d 974, 979 (10th Cir. 1998). Thus, a plaintiff is disabled under the Rehabilitation Act if he (1) has "a physical or mental impairment that substantially limits one or more major life activities of such individual;" (2) has "a record of such an impairment;" or (3) is "regarded as having such an impairment." 42 U.S.C. § 12102(1). For his claim, Dr. Snyder relies upon the "regarded as" prong. Under the ADA, a plaintiff meets the requirement of the "regarded as" prong if the plaintiff establishes that he has been subjected to an action prohibited by the Act "because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity" and the impairment is not "transitory and minor." 42 U.S.C. § 12102(3); *see also*, Adair v. City of Muskogee, 823 F.3d 1297, 1305-1306 (10th Cir. 2016). A transitory impairment is one "with an actual or expected duration of [six] motions or less." *Id*. at § 12102(3)(B).

Thus, a plaintiff bringing a "regarded as" claim need only establish that he was "regarded as having a physical or mental impairment." Adair, 823 F.3d at 1306.[18] To do this, the plaintiff must show "(1) he has an actual or perceived

---

[18] "[C]ourts have held that 'even an innocent misperception based on nothing more than a simple mistake of fact as to the severity, or even the very existence, of an individual's impairment can

impairment; (2) that impairment is neither transitory nor minor, and (3) the employer was aware of and therefore perceived the impairment at the time of the alleged discriminatory action." *Id*.

In its papers, OSUMC contends that Dr. Snyder cannot show that Dr. Cotton perceived that he had a mental impairment at the time of the alleged adverse actions. OSUMC asserts that Title I of the ADA, and thus the Rehabilitation Act, permits medical exams and inquiries where they are "job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A). OSUMC cites cases, including Lanman v. Johnson County, Kansas, 393 F.3d 1151, 1157 (10th Cir. 2004), in which courts have ruled that an employer's requirement that an employee undergo mental health evaluation and counseling, after engaging in troubling or unusual behavior, does not demonstrate that the employer perceived the employee as mentally impaired. Since the enactment of the ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553,[19] the Tenth Circuit has not determined the same rule would apply. However, even if an employer were permitted, without ADA and Rehabilitation Act consequences, to ask an employee to undergo a mental evaluation to determine his fitness following exhibiting troubling or unusual behavior, Dr. Snyder has proffered other evidence which, viewed in Dr. Snyder's favor, raises a genuine issue of material fact as to whether Dr. Cotton regarded Dr. Snyder as having a mental impairment.

---

be sufficient to satisfy the statutory definition of a perceived disability.'" Nelson v. City of New York, 2013 WL 4437224, * 7 (S.D.N.Y. Aug. 19, 2013) (quoting Deane v. Pocono Med. Ctr., 142 F.3d 138, 144 (3d Cir. 1998)).

[19] Prior to the ADA Amendments Act of 2008, a plaintiff alleging he was "regarded as" disabled by his employer had to demonstrate that his disability "was one that substantially limited a major life activity." Nelson, 2013 WL 44337224,*6 (quotations omitted). The Act now only requires the plaintiff to establish that he was subjected to an action because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity. *Id*.

On this issue, a review of the relevant facts, pro and con, in the summary judgment record reflects that:

In January of 2014, Dr. McEachern raised concerns to Dr. Cotton that Dr. Snyder could have a learning disability or psychiatric condition or behavioral issue, based on behavior observed during the Family Medicine Teaching Service rotation that month. Dr. Cotton asked Dr. McEachern to email her with the concerns and said that she "had observed similar and that it was possible." Dr. Cotton gave Dr. Snyder a score of "2" for general psychosocial skills in her evaluation for the January rotation and stated that she had concerns that Dr. Snyder was struggling with social anxiety and obsessive-compulsive tendencies and suggested that he seek help, but she did not take any action.

Dr. Cotton at some point inquired of Dr. Snyder as to whether he had a learning disability in his previous educational experiences (which he denied). Dr. Cotton advised the faculty in January or February of concerns about Dr. Snyder's performance and the faculty recommended one additional month of the Family Medicine Teaching Service rotation (albeit with no mention of a need for mental evaluation). After observing alleged errors of Dr. Snyder from March 17, 2014 to March 20, 2014, Dr. Cotton did not place him on immediate probation. In mid-March or early April, she told Dr. Alexopulos that she thought Dr. Snyder should be referred to neurological or psychological testing and Dr. Alexopulos was supportive of that. Dr. Cotton emailed faculty asking for examples of specific concerns about Dr. Snyder's performance and she received only one example from Dr. McEachern. which was received after she placed Dr. Snyder on probation. On April 22, 2014, more than a month after Dr. Cotton had observed Dr. Snyder's performance, Dr. Cotton placed him on "immediate probation." Dr. Cotton cited the specific examples of Dr. Snyder's performance in March and stated that those

examples revealed patterns of behavior that placed patients at risk, but Dr. Cotton delayed the start of Dr. Snyder's probation until May 1, 2014, thereby allowing him to continue his normal patient care for nine days.

As part of Dr. Snyder's probation, Dr. Cotton required Dr. Snyder to voluntarily undergo neuropsychiatric testing. Dr. Snyder requested Dr. Cotton to reconsider the requirement due to its expense and his belief that his doctor would not find it to be a medical necessity for insurance purposes. Dr. Cotton advised Dr. Alexopulos and Dr. Stewart about the requirement, Dr. Snyder's desire to cancel the requirement, her belief that the requirement was a "critical and key" element of the probation plan and that she and other attending physicians noticed patterns of behavior that "seem[ed] to point toward cognitive and/or emotional barriers," doc. no. 341-39. After discussions with Benjamin, which included her concern that the neuropsychiatric testing would violate the ADA, Dr. Cotton agreed to amend the probation plan to require Dr. Snyder's participation in the EAP.

After referral to EAP, Heavin advised OSUMC's human resources that she was referring Dr. Snyder for a fitness-for-duty examination and subsequent to speaking with Nottingham and Benjamin by phone, Heavin inquired of her supervisor whether EAP ever recommended neurological testing and advised that the attending physicians were pushing for a neurological evaluation. Heavin and Stewart discussed with Benjamin and Nottingham the possibility that the fitness-for-duty evaluation could possibly indicate a need for further evaluation and that if neurological testing was recommended it might be covered by insurance if the provider could prove medical necessity.

Dr. Barnes issued her June 24, 2014 report, recommending mental counseling but no additional testing, including neurological testing. The report made no mention of whether Dr. Snyder was fit or not fit for duty; after discussions

with Dr. Cotton, Nottingham asked Heavin whether Dr. Cotton's letter and details relating to Dr. Snyder's probation had been given to Dr. Barnes. Benjamin then asked Heavin to give those documents to her. Heavin told Dr. Barnes that human resources felt those facts may change her recommendations.

Dr. Barnes, after reviewing the information, issued a letter which recommended that Dr. Snyder receive mental counseling, elaborating that if he continued to have similar problems, he should be removed from patient care until he completed mental counseling (but not stating whether he was fit or not fit for duty). After discussions with Dr. Cotton as well as Dr. Alexopulos, Nottingham requested Heavin to ask Dr. Barnes for a written fitness determination. Dr. Cotton provided an additional list of concerns about Dr. Snyder's performance from June 24, 2014 to June 29, 2014, even though she told Dr. Snyder she did not want to be involved in the evaluation. Dr. Barnes, without having further discussions with Dr. Snyder, issued a letter stating that Dr. Snyder was not fit to provide medical treatment to patients. Dr. Cotton advised Dr. Snyder in person and by letter that he was being placed on a three-month paid leave of absence.

Dr. Cotton testified she put Dr. Snyder on leave of absence solely because of the not-fit determination, Dr. Snyder inquired as to the reasoning behind the evaluation and was told he had "barriers." Neither OSUMC or Dr. Barnes gave him access to Dr. Barnes' report. Dr. Snyder, through counsel, attempted to appeal his probation and his leave of absence via neutral evaluators but that was denied by Dr. Cotton.

While Dr. Cotton's requirement that Dr. Snyder was to undergo mental examination may not be sufficient, in and of itself, to raise a genuine issue of material fact as to whether OSUMC regarded Dr. Snyder as having a mental impairment, the court concludes that a rational jury could conclude that from Dr.

Cotton's actions and conduct from January to July of 2014, in addition to requiring a fitness-for-duty evaluation, indicated that she perceived him as having a mental impairment.[20] The court therefore concludes that Dr. Snyder has proffered evidence sufficient to establish a genuine issue of material fact as to the disability element of his prima facie case.

Next, the ADA defines a qualified individual with a disability as one who "with or without reasonable accommodation, can perform the essential functions of the employment position." 42 U.S.C. § 12111(8). In other words, one who cannot perform the essential functions of the job, even with a reasonable accommodation, is not an "otherwise qualified" individual. Jarvis, 500 F.3d at 1121. Upon review, the court concludes that Dr. Snyder has submitted evidence sufficient to raise a genuine issue of material fact as to whether Dr. Snyder was qualified to participate in the residency program. This includes evidence that Dr. Snyder did not receive an "unsatisfactory" evaluation in any of his clinical rotations. Dr. Cotton testified that the only rotation Dr. Snyder did not complete satisfactorily was the March rotation, but Dr. McEachern rated him "Competent" or above in all categories except for general psychosocial skills and gave him an overall rating of average for the monthly rotation. Dr. Cotton was willing to allow Dr. Snyder to return to the residency if he had informed her that he wanted to return

---

[20] As stated, Title I of the ADA permits medical exams and inquiries where they are "job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A). OSUMC argues the medical evaluation was necessary. Dr. Snyder has proffered evidence to raise a genuine issue of material fact whether the voluntary neurological testing or the fitness-for-duty evaluation was job-related and consistent with business necessity in that Dr. Cotton determined that Dr. Snyder's alleged deficiencies in March were detrimental to patient care, but she did not place him on "immediate probation" until April 22, 2014 and delayed the actual start of the probation until May 1, 2014. Also, according to Dr. Cotton, the only rotation Dr. Snyder did not satisfactorily complete was the March rotation. He satisfactorily completed rotations in April, May and June. Dr. McEachern also gave him an overall evaluation of average for March.

to the residency. If Dr. Snyder resigned or was dismissed from the program, Dr. Cotton promised to advise others that Dr. Snyder had successfully completed all twelve of his rotations and would submit the postgraduate training verification form. Dr. Alexopulos testified that Dr. Allbright's letter satisfied the counseling requirement with regard to his leave of absence. Dr. Snyder submitted a fit-for-duty letter from Dr. Allbright which was not rejected by Dr. Cotton. The court concludes, based upon this evidence, viewed in a light favorable to Dr. Snyder, that Dr. Snyder has demonstrated that there is a genuine issue of material fact as to the otherwise qualified element of the prima facie case.

OSUMC additionally contends that Dr. Snyder cannot show that the alleged adverse employment actions were taken because of his disability. To proceed with his Rehabilitation Act employment claim, Dr. Snyder must show that his perceived disability was the but-for cause for the alleged adverse actions. *See*, Natofsky v. City of New York, 921 F.3d 337, 347-350 (2nd Cir. 2019) (applying but-for causation standard to Rehabilitation Act discrimination claim); *see also*, Murray v. Mayo Clinic, 934 F.3d 1101, 1107 (9th Cir. 2019) (joining Second, Fourth, Sixth and Seventh Circuits that ADA discrimination claims under Title I must be evaluated under a but-for causation standard). Based upon evidence previously discussed and viewed in a light most favorable to Dr. Snyder, the court concludes that Dr. Snyder has presented evidence sufficient to raise a genuine issue of material fact as to whether his perceived mental impairment was the but-for cause of the probation, the leave of absence, the return to training (or employment) with conditions, and withholding of the postgraduate training verification form

(assuming without deciding that that was an adverse employment action).[21] Further, the court finds that Dr. Snyder has presented evidence sufficient to raise a genuine issue of material fact as to whether the reasons stated for the probation, leave of absence, return to training with conditions and withholding of the postgraduate training verification form were pretextual. Thus, the court concludes that summary judgment is not appropriate as to Dr. Snyder's Rehabilitation Act discrimination claim against OSUMC with respect to the probation, leave of absence, return to training with conditions and withholding of postgraduate training verification form.

As to the adverse actions consisting of the placement on inactive status and termination of residency agreement (to the extent it is alleged as an adverse employment action), the court concludes that Dr. Snyder has failed to submit evidence sufficient to raise a genuine issue of material fact that those actions were taken because of his perceived disability. As to his placement on "inactive" status, OSUMC informed Dr. Snyder that his placement on inactive status occurred because "no resolution [had] been reached" with respect to his "compliance with the conditions of the leave." Doc. no. 341-81. Dr. Snyder claims this reason was pretextual. Dr. Snyder asserts that prior to being placed on inactive status, he had submitted the January 6, 2015 fit-for-duty letter from Dr. Allbright and Dr. Alexopulos testified that the letter met the requirement stated in the November 13th letter. However, there is no showing in the record that Dr. Snyder had committed to return to his training. The record reflects that counsel were in negotiations with respect to his situation. The evidence does not show that there had been any

_____

[21] In their papers, the parties have not adequately addressed whether Dr. Cotton's failure to submit the postgraduate training verification form was an adverse employment action. The court therefore assumes without deciding that the alleged failure was an adverse employment action.

resolution between the parties at the time of OSUMC's decision to place Dr. Snyder on inactive status. The court concludes that the mere submission of the fit-for-duty letter does not raise a genuine issue of material fact as to whether OSUMC's decision to place Dr. Snyder on inactive status was pretextual. And it does not raise a genuine issue of material fact as to whether his perceived disability was the but-for cause of his placement on inactive status. Dr. Snyder has not presented any other evidence to show that his perceived disability was the but-for cause of his inactive status placement. Summary judgment is therefore warranted on Dr. Snyder's Rehabilitation Act claim against OSUMC to the extent it is based on his placement on inactive status.

With respect to the termination of Dr. Snyder's employment, OSUMC proffered evidence that it terminated him because he was dismissed from the residency program. Dr. Snyder again asserts that the reason given for his termination was pretextual. However, there is no doubt about the fact that he was dismissed from his residency. While Dr. Snyder argues that an inference of retaliatory motive is warranted because OSUMC failed to follow its residency agreement which required sixty-day notice prior to termination or written notice and thirty days to cure if the resident violated the terms of the residency agreement or rules, policies, or procedures of OSUMC, the record evidence demonstrates that OSUMC was no longer bound by the residency agreement. In addition, OSUMC's house policies did not contain those notice requirements. Dr. Snyder fails to submit any additional evidence to raise a genuine issue of material fact as to whether he would have been terminated from his employment but for his perceived disability. The court concludes that summary judgment is also appropriate on the Rehabilitation Act discrimination claim against OSUMC to the extent that it is based on the termination of his employment.

Rehabilitation Act and Title II ADA Discrimination Claims Against OSU-CHS

Dr. Snyder moves for partial summary judgment in his favor on his claims under the Rehabilitation Act and Title II of the ADA against OSU-CHS.

To state a claim under Section 504 of the Rehabilitation Act, "a plaintiff must prove (1) that he is a 'handicapped individual' under the Act, (2) that he is 'otherwise qualified' for the [benefit] sought, (3) that he was [discriminated against] solely by reason of his handicap, and (4) that the program or activity in question receives federal financial assistance." Cohon ex rel. Bass v. New Mexico Dept. of Health, 646 F.3d 717, 725 (10th Cir. 2011).

To state a claim under Title II of the ADA, the plaintiff must allege "(1) [he] is a qualified individual with a disability, (2) who was excluded from participation in or denied the benefits of a public entity's services, programs, or activities, and (3) such exclusion, denial of benefits, or discrimination was by reason of a disability." Cohon, 646 F.3d at 725 (quotation omitted).

For purposes of the Rehabilitation Act discrimination claim, OSU-CHS does not dispute that it received federal financial assistance with respect to the residency program. In his motion, Dr. Snyder argues that he is entitled to summary judgment on the Rehabilitation Act and ADA claims because the evidence shows that Dr. Cotton perceived him as having a mental impairment and excluded him from participation in the residency program (by placing him on probation and involuntary leave and by refusing to submit his postgraduate training verification form) because of the perceived mental impairment.

Taking the evidence (including Dr. Cotton's own testimony) with respect to Snyder's motion in a light most favorable to OSU-CHS, the court concludes that

genuine issues of material fact exist as to whether Dr. Cotton perceived Dr. Snyder as having a mental impairment and as to whether she excluded him from participation in the residency program because of the perceived mental impairment. Accordingly, summary judgment is not warranted with respect to Dr. Snyder's Rehabilitation Act and ADA Title II claims against OSU-CHS.

Retaliation Claims

Dr. Snyder alleges that he was subjected to improper retaliation for filing gender and disability discrimination complaints. He alleges various acts of retaliation. The Rehabilitation Act, the ADA and Title VII prohibit retaliation against individuals engaging in statutorily protected activity. Jarvis v. Potter, 500 F.3d 1113, 1125 (10th Cir. 2007); Stover v. Martinez, 382 F.3d 1064, 1070 (10th Cir. 2004). OSUMC has moved for summary judgment on the retaliation claims against it.[22]

The standard for retaliation claims under the Rehabilitation Act, the ADA and Title VII is the same. Reinhardt v. Albuquerque Public Schools Bd. of Educ., 595 F.3d 1126, 1131 (10th Cir. 2010) (citing Jarvis, 500 F.3d at 1125); Doebele v. Sprint/United Management Co., 342 F.3d 1117, 1135 (10th Cir. 2003). Because Dr. Snyder does not rely on direct evidence of retaliation, the court analyzes the claims under the McDonnell Douglas burden-shifting framework. To establish a prima facie case of retaliation, Dr. Snyder must show that (1) he engaged in protected activity; (2) he suffered a materially adverse action either after or contemporaneous with his protected activity; and (3) a causal connection between

_____

[22] Count III of the Third Amended Complaint also alleges a Title VII retaliation claim against OSU-CHS. In its motion addressing Counts IV and V, OSU-CHS adopts the motion of OSUMC to the extent it is applicable to any claims asserted against it. The court finds that this adoption is not a proper motion as to the retaliation claim asserted against OSU-CHS. Consequently, the court does not address the Title VII retaliation claim against OSU-CHS.

the protected activity and the adverse action.  Reinhart, 595 F.3d at 1131; Doebele, 342 F.3d at 1135.  Once a prima facie case is established, defendants have the burden of producing evidence of a legitimate, nonretaliatory reason for the adverse action.  *Id*.  If defendants satisfy their burden of production, Dr. Snyder must show that the proffered reason was pretextual.  *Id*.

In his briefing, Dr. Snyder claims that he suffered materially adverse actions after he filed his internal complaints of discrimination with officers at OSU-Stillwater and OSU-Tulsa.  The materially adverse actions include (1) the denial of a right to appeal Dr. Cotton's decision to place him on probation and leave of absence; (2) the conditioning of his return to the residency program on his waiver of complaints and appeals; (3) his placement on inactive status; (4) his dismissal from the residency program; and (5) Dr. Cotton's failure to submit Dr. Snyder's postgraduate training verification form.

Initially, the court concludes that Dr. Snyder cannot pursue a retaliation claim under Title V of the ADA against OSUMC as to the alleged adverse actions of denying him a right to appeal Dr. Cotton's decision to place him on probation and leave of absence, conditioning his return to the residency program (which would include his employment) on his waiver of complaints and appeals, placing him on inactive status, and terminating his residency agreement (to the extent that is included as a materially adverse action).  These actions concern his employment with OSUMC.  As has been noted, Dr. Snyder has admitted that OSUMC was his employer and that he was a student at OSU-CHS.  And the record does establish that OSUMC was his employer.  Eleventh Amendment immunity, which OSUMC has previously raised in this action and which has not been waived or abrogated, precludes Dr. Snyder from recovering under Title V of the ADA against OSUMC when the alleged retaliation is tied to actions based upon his employment.  *See*, *e.g.*

Demshki v. Monteith, 255 F.3d 986, 988-89 (9th Cir. 2001); Umholtz v. Kansas, Dep't of Social and Rehab. Serv., 926 F.Supp.2d 1222, 1227-1228 (D. Kan. 2013); Cisnero v. Colorado, 2005 WL 1719755 *6 (D. Colo. July 22, 2005).

Dr. Snyder is, however, permitted to pursue retaliation claims under the Rehabilitation Act and Title VII based upon the adverse actions which relate to his employment. In its papers with respect to the retaliation claims, OSUMC has not specifically addressed the adverse action regarding the denial of the right to appeal the probation and leave of absence. The court thus concludes that OSUMC has not demonstrated as a matter of law that it is entitled to summary judgment on the retaliation claim based upon this adverse action.

With respect to the adverse action relating to the conditioning of Dr. Snyder's return to his residency program (which would include employment) based upon the waiver of complaints and appeals, the court concludes that Dr. Snyder has proffered evidence sufficient to raise genuine issues of material fact as to each element of the prima facie case and as to whether the articulated non-retaliatory reason for the decision is pretextual. OSUMC, in its motion, argues that Dr. Snyder never made any internal complaint of discrimination to OSUMC. The record reflects that Dr. Snyder submitted an internal complaint of sex and disability discrimination to officials with OSU-Stillwater and OSU-Tulsa after he was placed on leave of absence. The complaints named Dr. Cotton and Dr. Alexopulos as well as Benjamin and Nottingham (OSUMC's human resources officers). The record also indicates that Dr. Cotton was aware of the complaints prior to sending the November 13th letter. Under the provisions of the residency agreement between OSUMC and Dr. Snyder, Dr. Cotton was to serve as the person responsible for implementation of the agreement between the parties and for his overall supervision. The court concludes that the notice of the filing of the internal

complaints to Dr. Cotton is adequate to get Dr. Snyder past summary judgment on the issue of a causal connection between the protected activity and the adverse action.[23]  Dr. Snyder also proffered evidence that the November 13th letter was sent less than three months after the complaint was submitted to OSU-Tulsa employee, Cooper.  *See,* Foster v. Mountain Coal Company, LLC, 830 F.3d 1178, 1191 (10th Cir. 2016) (plaintiff may rely solely on temporal proximity to show causation during the prima facie stage of McDonnell Douglas framework where his protected activity is closely followed by an adverse employment action).  With respect to pretext, even though the November 13th letter stated that by returning to duty, Dr. Snyder "waive[s] any complaints or appeals you may have regarding *your status as an OGME 1,*" doc. no. 379-53 (emphasis added), Dr. Snyder has proffered evidence which raises a genuine issue of material fact as to whether Dr. Cotton's letter conditioned Dr. Snyder's return to duty on a waiver of his "complaints" of sex and disability discrimination.  The court thus concludes that summary judgment is not appropriate on the retaliation claim to the extent that it is based upon the adverse action of conditioning the return to training on a waiver of complaints and appeals.

As to the alleged adverse actions of placement on inactive status and the termination of his residency agreement, the court concludes that Dr. Snyder has failed to proffer evidence to raise a genuine issue of material fact as to the existence of a causal connection between the protected activity and the adverse actions.  To establish a causal connection, Dr. Snyder must present "evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely

---

[23] In its papers, OSUMC does not challenge whether conditioning of Dr. Snyder's return to his residency program based upon the waiver of complaints and appeals is a materially adverse action.

followed by adverse action." Proctor v. United Parcel Service, 502 F.3d 1200, 1208 (10th Cir. 2007). The internal complaints were filed more than three months prior to Dr. Snyder being placed on "inactive" status. Anderson v. Coors Brewing Co., 181 F.3d 1171, 1179 (10th Cir. 1999). And the complaint filed against OSUMC with the Office of Civil Rights Enforcement was also filed more than three months prior to Dr. Snyder's termination. *Id*.

Because the time between his protected activity and the adverse action does not support an inference of retaliatory motive, Dr. Snyder must present other evidence—more than mere speculation, conjecture, or surmise—to establish that his protected activity was the but-for cause of the adverse employment action. Lincoln v. BNSF Railway Company, 900 F.3d 1166, 1209 (10th Cir. 2018); Ward v. Jewell, 772 F.3d 1199, 1203 (10th Cir. 2014). Evidence of pretext may be sufficient to establish the causal connection. Proctor, 502 F.3d at 1209. With respect to his "inactive" status, OSUMC informed Dr. Snyder and placed him on inactive status because "no resolution [had] been reached" with respect to his compliance with the conditions of the leave. Doc. no. 341-81. Dr. Snyder points out that prior to being placed on inactive status, he had submitted the January 6, 2015 fit-for-duty letter from Dr. Allbright and Dr. Alexopulos testified that that complied with the requirement stated in the November 13th letter. However, there is no showing in the record that Dr. Snyder had committed to return to his training. The record reflects that counsel were in negotiations with respect to his situation. The evidence does not support that there had been any resolution between the parties at the time of OSUMC's actions. The court concludes that the mere submission of the fit-for-duty letter does not raise a genuine issue of material fact on the issue of whether OSUMC's decision to place Dr. Snyder on inactive status was pretextual. And it does not raise a genuine issue of material fact as to whether

his protected activity was the but-for cause of his placement on inactive status.[24] The court therefore concludes that Dr. Snyder has failed to raise a genuine issue of material fact as to the causal connection element of his prima facie case for retaliation with respect to the inactive status, Summary judgment is appropriate on the retaliation claim premised on placement on inactive status.

With respect to the termination of Dr. Snyder's employment, the court likewise finds that Dr. Snyder has failed to raise a genuine issue of material fact as to whether OSUMC's decision to terminate his employment was pretextual and whether his protected activity was the but-for cause of the termination. The reason given by OSUMC for the termination was the dismissal from his residency program. The court concludes that Dr. Snyder has failed to raise a genuine issue of material fact as to whether this reason was pretextual. The record reflects, without question, that Dr. Snyder was dismissed from his residency. Dr. Snyder argues that an inference of retaliatory motive is warranted because OSUMC failed to follow its residency agreement which required sixty-day notice prior to termination or written notice and thirty days to cure if the resident violated the terms of the residency agreement or rules, policies, or procedures of OSUMC. However, as has been noted, at the time of termination, OSUMC was no longer bound by the residency agreement. And OSUMC's house policies did not contain those notice requirements. The record reflects that Mercy's counsel, Vi Le, was present at the August 5, 2015 meeting. She was there because of the complaint Dr.

---

[24] In addition, Dr. Snyder was advised by Benjamin, OSUMC's Chief Human Resources Officer, that he was being placed on inactive status. The court notes that the record does not reveal that Benjamin was aware of any of Dr. Snyder's internal complaints of discrimination at the time she sent the February 2, 2015 letter. *See*, <u>Montes v. Vail Clinic, Inc.</u>, 497 F.3d 1160, 1176 (10th Cir. 2007) (to establish causal connection, plaintiff must show that the individual who took adverse action knew of the protected activity).

Snyder had filed against OSUMC and Godfrey, who advised Dr. Snyder of his termination. As would naturally be the case in a (to put it mildly) highly fraught situation, Ms. Le's advice was sought. This is not enough to raise a genuine issue of material fact on the question of whether the reason for Dr. Snyder's termination from employment was pretextual. As a result, the court concludes that Dr. Snyder cannot raise a genuine issue of material fact as to the causal connection element of his prima facie case for retaliation with respect to his termination in employment and summary judgment is appropriate on the retaliation based upon termination of employment.[25]

Damages and Reinstatement

OSUMC seeks summary judgment in its favor, determining that Dr. Snyder cannot recover any back pay or front pay as a remedy for the alleged violations of the federal statutes. OSUMC argues that Dr. Snyder has wholly failed to mitigate his damages. OSUMC also seeks to eliminate reinstatement to the residency program as a potential remedy.

Upon review, the court is not satisfied that OSUMC has established that it is entitled to judgment as a matter of law on the issues of damages and reinstatement. To be sure, reinstatement in this medical and academic setting would likely be problematic (both for the institution and for the student), for several reasons, as

---

[25] To the extent that Dr. Snyder claims that the failure to submit the postgraduate training verification form is a materially adverse employment action, the court finds that Dr. Snyder cannot establish a causal connection between the protected activity and the adverse employment action. The evidence in the record reveals that Dr. Cotton had made the decision and had advised Shontay Patterson to hold off on sending the postverification form in April of 2014, before Dr. Snyder filed his internal complaints of discrimination in July of 2014. Thus, the court concludes that summary judgment is appropriate on the retaliation claim to the extent it is based upon the failure to submit the postgraduate training verification form.

OSUMC has pointed out. Doc. no. 324, at 25-26. But the court is not, at this point, satisfied that it is appropriate to rule on this issue as a matter of law. OSUMC may raise these issues again at trial, if appropriate.

Breach of Contract Against OSUMC[26]

In Count VII of the Third Amended Complaint, Dr. Snyder alleges a breach of contract claim against OSUMC. Both OSUMC and Dr. Snyder have moved for summary judgment on the claim.

Dr. Snyder alleges that OSUMC breached the residency agreement and the academic agreements (OSUMC's House Staff Policies & NonCognitive Academic Standards [policies and standards] and Oklahoma State University Family Medicine Residency Handbook [handbook]) by:

(1) placing Dr. Snyder on probation;

(2) denying Dr. Snyder's request for appeal of the probation decision;

(3) placing Dr. Snyder on inactive status;

(4) dismissing Dr. Snyder from the residency program and terminating his employment; and

(5) by disclosing the June 30th incident letter to Heavin.

*Probation*

According to Dr. Snyder, OSUMC violated the terms of the residency agreement, its policies and standards and the handbook when it placed him on probation.

---

[26] Dr. Snyder has moved for partial summary judgment on a breach of an implied contract claim against OSU-CHS. For the same reasons previously noted with respect to OSUMA and Mercy, the court does not construe Count VII of Dr. Snyder's Third Amended Complaint as alleging a breach of implied contract against OSU-CHS. Dr. Snyder's counsel previously represented that it was only pursuing a breach of contract claim against OSUMC. The court permitted the Third Amended Complaint for the purpose of adding retaliation claims under the Rehabilitation Act and a breach of contract/breach of professional duty claim against CommunityCare.

Initially, the court finds that Dr. Snyder has failed to demonstrate that the handbook was a contract between him and OSUMC. The handbook was issued by OSU-CHS. The residency agreement does not make any reference to the handbook. Dr. Snyder has not provided facts sufficient to establish that OSUMC consented to the handbook being an implied contract. Even though the handbook and OSUMC's policies contain similar provisions, the court cannot conclude that this fact adequately demonstrates that OSUMC was contractually bound by the handbook.[27]

The court is satisfied that OSUMC's policies and standards were incorporated into the residency agreement. A separate document "is properly incorporated when the underlying contract makes clear reference to the separate document, the identity of the separate document may be ascertained beyond doubt, and the parties to the agreement had knowledge of and assented to the incorporation." Walker v. Builddirect.Com Technologies, Inc., 349 P.3d 549, 553 (Okla. 2015). "When incorporated material is properly referenced, that other document, or portions to which reference is made, becomes constructively a part of the writing, forming a single instrument." *Id.* (internal quotations omitted). The residency agreement specifically referred to the policies and standards by name and stated that receipt of the policies and standards were acknowledged by the execution of the residency agreement. Doc. no. 335-2, ¶ 3.1. The agreement provided that OSUMC had a grievance procedure under which the resident may

---

[27] In his reply brief in support of partial summary judgment, Dr. Snyder argues that the AOA guidelines, or Basic Documents, were also referenced and incorporated into the residency agreement and OSUMC breached the residency agreement by not providing timely evaluations after rotations, quarterly evaluations by the Director of Medical Education and the education committee, and the 360 Degree evaluation. The court declines to address that issue as it was raised for the first time in reply.

resolve, in a fair and equitable manner, a dispute or disagreement with OSUMC as provided for in the policies and standards. Id. at ¶ 7.4. The agreement further provided that its terms controlled or took precedence if the policies and standards differed from the terms of the agreement. *Id*. at ¶¶ 3.11, 8.11. The procedure regarding probation does not differ from any of the terms of the residency agreement in any respect material to this case.

In his motion, Dr. Snyder contends that under the residency agreement, which incorporates the policies and standards, Dr. Cotton was required, prior to placing him on probation, to inform him "orally and in writing of the specific [academic] deficiencies;" to provide him with a "specified period of time" to resolve the deficiencies and to provide him with the "specified actions required to resolve the academic deficiencies." Doc. no. 335-4, ECF p. 3. According to Dr. Snyder, if he could not resolve the academic deficiencies within the specified period of time, then Dr. Cotton could place him on probation. Dr. Snyder contends that while the specified period of time for resolution of the deficiencies "may" be waived, resulting in placement on "immediate probation" if those deficiencies were felt to be detrimental to patient care, he was not placed on immediate probation by Dr. Cotton. Dr. Snyder contends that the contractual language is not ambiguous and that "immediate" means without delay or instant. He argues, in substance, that the delay in imposing probation precludes treating the probation as "immediate probation" under a reasonable interpretation of the residency agreement. Thus, Dr. Snyder contends that Dr. Cotton was required to provide him written notice of the deficiencies, and time to correct them before she placed him on probation.

OSUMC argues that it did not breach any contractual obligations by failing to immediately place Dr. Snyder on probation after Dr. Cotton observed patient safety issues. According to OSUMC, the word "immediate" clearly modifies the

"*type* of probation allowed (i.e. probation without notice)" and "does not modify or involve the *timing* of probation that must be provided to the resident." Doc. no. 367, ECF p. 32. OSUMC contends that Dr. Snyder's reading of the contractual language ignores the context of the provision. Dr. Cotton, OSUMC argues, followed the contractual language because she placed him on probation without written notice beforehand. OSUMC asserts that there was no violation of the residency agreement because Dr. Cotton explained that the delay between observing him in March and placing him on probation in April was the result of her review of his performance with other supervising physicians and she thought he was not ready to practice medicine independently yet as an OGME 2. OSUMC also argues that Dr. Snyder was still being evaluated in his residency during that month-long period, which gave him additional time to adequately perform while Dr. Cotton was carefully deliberating probation.

The residency agreement provided in pertinent part:

> When academic deficiencies are identified, the Program Director will inform the resident orally and in writing of the specific deficiencies. The trainee will be provided a specified period of time in which to implement specified actions required to resolve the academic deficiencies. This period of time to resolve the deficiencies *may be waived and the trainee may be placed on immediate probation* if the deficiencies are felt by the Program Director to be detrimental to patient care.

Doc. no. 335-4, ECF p. 3 (emphasis added).

Upon review, the court rejects OSUMC's interpretation of the agreement. The argument that "immediate" relates to the *type* of probation and not to the *timing* of imposition of probationary status is unpersuasive. The court agrees with Dr. Snyder that Dr. Cotton could waive the specified period of time to resolve academic

deficiencies if he was immediately placed on probation. The court concludes that the month-long deliberation precludes treating this probation as an "immediate" probation.

The court also rejects OSUMC's argument that Dr. Snyder had written notice of his deficiencies from the performance evaluations, issued prior to the probation, containing negative comments. The residency agreement requires Dr. Cotton to inform the resident of the academic deficiencies. Moreover, while Dr. Cotton gave evaluations of Dr. Snyder prior to placing him on probation, the evaluations gave no specified period of time within which to resolve any alleged academic deficiencies or the specified actions to resolve them. The court cannot conclude that the evaluations satisfy the requirements of the agreement.

Although Dr. Snyder has demonstrated a technical violation of the residency agreement by Dr. Cotton's placement of Dr. Snyder on probation without giving him notice of the academic deficiencies and a specified time to resolve those deficiencies with specified actions, the court concludes that Dr. Snyder is not entitled to summary judgment on his breach of contract claim as requested. The elements of a breach of contract claim are formation of a contract between Dr. Snyder and OSUMC, breach of the contract and damages suffered by Dr. Snyder as a direct result of the breach. OUJI No. 23.1 (stating the elements of a breach of contract claim under Oklahoma law). In his motion, Dr. Snyder has not proffered any evidence of damages in support of his claim. Therefore, the court concludes that Dr. Snyder is not entitled to judgment as a matter of law on his breach of contract claim (and it is not at all clear, all things considered, that this procedural violation carries the potential for anything more than a minimal recovery).

*Denial of Request for Appeal*

Additionally, Dr. Snyder alleges that OSUMC breached the residency agreement and policies and standards with respect to the denial of the request for appeal of the probation decision. With respect to the alleged breach, the court concludes that the residency agreement was not in effect at the time of the request or the denial. The residency agreement provided for a duration of twelve months. Doc. no. 335-2, ¶ 1.1. Although OSUMC's policies and standards stated that salary and benefits remained in full force during the probationary period, the residency agreement, as stated, provided that to the extent the policies and procedures set forth in those policies and standards differed from the terms of the agreement, the terms of the agreement controlled. Doc. no. 335-2, ¶ 3.1. It also stated that the terms of the agreement took precedence over any inconsistent terms found in the policies and standards. *Id*. at ¶ 8.11. When Dr. Cotton denied Dr. Snyder's request for appeal, the residency agreement had expired. Therefore, the court concludes that OSUMC was not in breach of the residency agreement as a result of denial of the request for appeal of the probation decision.

However, even if the residency agreement had expired, the court concludes that Dr. Snyder has proffered evidence to raise a genuine issue of material fact as to whether OSUMC's policies and standards then constituted an implied contract governing his employment. The court concludes that there is a genuine issue of material fact as to whether OSUMC breached the policies and standards by not allowing an appeal of the probation decision. The policies and standards do not provide for a time limit for an appeal of a decision regarding probation. Under 15 O.S. 2011 § 173, if no time is specified for the performance of an act required to be performed, a reasonable time is allowed. A reasonable time is to be determined from consideration of all facts and circumstances. *See*, Grayson v. Crawford, 119

P.2d 42, 45-46 (Okla. 1941). The parties do not address what would be a reasonable time with respect to appealing the initial decision regarding probation. The court declines to advocate on either party's behalf. Even if the appeal of the initial probation decision was lodged within a reasonable time, OSUMC has nonetheless proffered evidence sufficient to raise a genuine issue of material fact as to whether Dr. Cotton's denial of an appeal of the initial probation decision constituted breach given that Dr. Snyder had been performing the requirements of the probation plan since May 1, 2014.

Furthermore, Dr. Snyder has proffered evidence to raise a genuine issue of material fact as to whether his request for an appeal of the probation decision also included a request for an appeal of the decision to place him on leave of absence. Dr. Snyder's counsel's July 30th letter to Dr. Cotton was sent shortly after the decision to place Dr. Snyder on a leave of absence. Counsel's letter referenced the leave of absence and stated that one of the reasons for appealing the probation decision was "the mischaracterization of the assessment conduct on Dr. Snyder." Doc. no. 341-73. In addition, the court notes that the July 3rd letter advising Dr. Snyder of his leave of absence was referred to as an "academic probation letter" and purported to give an "update on the status of [his] Academic Probation." Doc. no. 335-26. Based upon evidence in the record, the court concludes that a genuine issue of material fact exists as to whether OSUMC breached the policies and standards by denying Dr. Snyder a right to appeal the decision involving the leave of absence. Summary judgment is therefore not appropriate on Dr. Snyder's breach of contract claim based upon the denial of a right to appeal the probation decision.

*Inactive Status and Termination of Employment*

Next, Dr. Snyder asserts that OSUMC breached the residency agreement by placing him on inactive status while he was on probation and by terminating his

employment without giving him sixty days' notice of outright termination or a thirty-day period to cure any deficiency.

Upon review, the court concludes that OSUMC is entitled to summary judgment on Dr. Snyder's breach of contract claim based upon these adverse employment actions. As previously discussed, the residency agreement had a duration of twelve months. Even though OSUMC's policies and standards stated that salary and benefits remain in full force during the probationary period, the residency agreement provided that to the extent the policies and procedures set forth in those policies and standards differed from the terms of the agreement, the terms of the agreement controlled. Doc. no. 335-2, ¶ 3.1. It also stated that the terms of the agreement would take precedence over any inconsistent terms found in the policies and standards. *Id*. at ¶ 8.11. At the time Dr. Snyder was placed on inactive status and terminated from his employment, the term of the residency agreement had expired. Dr. Snyder had been paid all he was due under the agreement. OSUMC was not bound by the residency agreement. Therefore, OSUMC was not in breach of the residency agreement when it placed Dr. Snyder on inactive status or when it terminated his employment.

To the extent that OSUMC's policies and standards amounted to an implied contract governing Dr. Snyder's employment after expiration of the residency agreement, the court concludes that neither the inactive status designation nor the termination of employment breached the implied contract. The policies and standards did not preclude OSUMC from placing Dr. Snyder on inactive status. Further, the policies and standards did not require OSUMC to give Dr. Snyder thirty days to cure any deficiency or require sixty days' written notice prior to termination of Dr. Snyder's employment.

*Disclosure of the June 30th Incident Letter*

Lastly, Dr. Snyder alleges OSUMC breached the residency agreement by disclosing to Heavin with CommunityCare the June 30th incident letter, which she then disclosed to Dr. Barnes. The letter provided examples of issues which Dr. Cotton observed regarding Dr. Snyder's performance during the week of June 24, 2014. Dr. Snyder points out that the residency agreement provided for the Employee Assistance Program and that access to services were to be on a "confidential basis." Doc. no. 335-2, ¶ 5.7.

The court finds that OSUMC is entitled to summary judgment on the breach of contract claim to the extent it is based upon disclosure of the June 30th letter. At the time of the disclosure, July 1, 2014, the residency agreement had not yet expired. However, the court concludes that, even if paragraph 5.7 were to apply to Dr. Snyder's supervisory referral as part of his probation, neither paragraph 5.7 of the residency agreement nor OSUMC's policies and standards precluded OSUMC providing information to Heavin relating to Dr. Snyder's job performance.

In his papers, Dr. Snyder argues that OSUMC's disclosure of the June 30th incident letter also breached the express contract between OSUMC and CommunityCare, providing for the implementation and management of the Employee Assistance Program, to which he was a third-party beneficiary, as well as the Consent for Disclosure of Information between CommunityCare EAP and Company Contract Personnel for Supervisory Referral. However, Count VII of the Third Amended Complaint does not allege that OSUMC breached the contract with CommunityCare or the consent form. The court declines to permit Dr. Snyder leave to amend his complaint yet again to allege a breach of contract claim based upon the contract with CommunityCare and the consent form.

In sum, the court finds that summary judgment in favor of OSUMC is appropriate on Dr. Snyder's breach of contract claim based upon his placement on inactive status, the termination of his employment, and the disclosure of the June 30th incident letter. The court finds that summary judgment in favor of OSUMC and Dr. Snyder is not appropriate on Dr. Snyder's breach of contract based upon being placed on probation and being denied a right to appeal the probation decision.

Breach of Professional Duty Against Dr. Barnes

Dr. Snyder alleges that Dr. Barnes breached her professional duty to him in the fitness-for-duty evaluation. Dr. Barnes seeks summary judgment on the breach of professional duty claim (Count IX of the Third Amended Complaint), arguing that she did not owe any professional duty to Dr. Snyder because he was not her patient. Although Dr. Snyder alleges a psychotherapist/patient relationship existed between them, Dr. Barnes asserts that their relationship was governed by the Informed Consent executed by Dr. Snyder. Dr. Barnes contends that that document explained to Dr. Snyder that she was performing the evaluation for the OSU medical school and the human resources department. Dr. Barnes asserts that Dr. Snyder did not seek treatment from her, rather, he was required to undergo the evaluation. She also asserts that she did not consent to treat him. Dr. Barnes maintains that courts addressing the issue have ruled that no physician-patient relationship exists when an actual or prospective employee is referred by the employer to a physician for a fitness-for-duty evaluation.

Dr. Snyder contends that the court should conclude that Dr. Barnes owed a duty of care to him. He points out that she testified in deposition that she had a relationship of trust with those she evaluates for fitness-for-duty. He also contends that some courts have concluded that a professional relationship is formed when an individual submits to a fitness-for-duty evaluation. In addition, Dr. Snyder

maintains that Dr. Barnes had ethical obligations which broadened her responsibility to individuals other than contractual clients. Dr. Snyder further contends that the court should allow the jury to decide whether Dr. Barnes owed Dr. Snyder a professional duty because the question of the formation of a physician-patient relationship is one of fact. He argues that while Dr. Barnes' contract was with OSU medical school, the purpose of that contract was to obtain an examination of Dr. Snyder, and as such, a jury could reasonably find she owed him a professional duty. Further, Dr. Snyder asserts that based upon the evidence in the record, a reasonable jury could find that Dr. Barnes breached her professional duty.

In reply, Dr. Barnes argues that the facts regarding her relationship with Dr. Snyder are undisputed and whether that relationship creates a professional duty is a question of law. Dr. Barnes also asserts that the cases cited by Dr. Snyder do not support the existence of a professional duty owed to Dr. Snyder.

Upon review, the court concludes that Dr. Barnes is entitled to summary judgment on the breach of professional duty claim. The Oklahoma Supreme Court has ruled that "the element of duty in a medical malpractice action requires a physician-patient relationship." Jennings v. Badgett, 230 P.3d 861, 866 (Okla. 2010). Although "the question of the formation of a physician-patient relationship is a question of fact, turning upon a determination of whether the patient entrusted his treatment to the physician and the physician accepted the case," *id*. at 866-867 (quotation omitted), the court agrees with Dr. Barnes that the facts relating to the nature of the relationship between Dr. Barnes and Dr. Snyder are not disputed. Thus, the court can decide whether a psychotherapist/patient relationship in fact existed between Dr. Barnes and Dr. Snyder. *Id*. at 867.

Based upon the undisputed facts, the court concludes, quite easily, that no psychotherapist/patient relationship existed. Dr. Barnes evaluated Dr. Snyder for the purpose of determining whether he was fit for duty. Everyone involved was well aware that that was what was afoot. This was not about therapy or treatment. The evaluation was conducted at the request of, and was paid for by, OSUMC. The Informed Consent executed by Dr. Snyder specifically advised him that Dr. Barnes had been retained at OSUMC's request to conduct the evaluation. Dr. Snyder did not seek treatment or advice from Dr. Barnes. And the evaluation report prepared by Dr. Barnes was not rendered for the purpose of care or treatment of Dr. Snyder.

Courts have held that when a psychologist or physician is hired to perform an examination of an individual for a third party, the psychologist or physician does not have a doctor-patient relationship with the individual and does not owe a professional duty of care to that individual. Comuso v. Supnick, 156 A.D.3d 1391, 1391-1392, 65 N.Y.S.3d 856 (2017); Hafner v. Beck, 185 Ariz. 389, 916 P.2d 1105, 1107 (Ct. App. Div. 2 1995); Felton v. Schaeffer, 229 Cal. App. 3d 229, 235, 279 Cal. Rptr. 713 (1991); Johnston v. Sibley, 558 S.W.2d 135, 137 (Tex. Civ. App. 1977) Keene v. Wiggins, 69 Cal.App.3d 308, 313-314, 138 Cal. Rptr. 3 (1977). The court is persuaded that the Oklahoma Supreme Court would elect to follow the reasonings and conclusions of those decisions.[28] Given the legal and other risks present in the typical twenty-first century workplace, extensive elaboration is not necessary to demonstrate the compelling rationale for the cases cited above.

Because no psychotherapist/patient relationship existed, Dr. Barnes owed no professional duty of care to Dr. Snyder. Jennings, 230 P.3d at 868 ("In a medical malpractice action, the plaintiff must prove a physician-patient relationship in order

---

[28] The court specifically finds that the cases cited by Dr. Snyder, in response to Dr. Barnes' motion, do not support the existence of a duty owed by Dr. Barnes to Dr. Snyder.

to establish a duty owed by defendant."); *see also*, <u>Lowery v. Echostar Satellite Corp.</u>, 160 P.3d 959, 964 (Okla. 2007) (existence of duty is a question of law for the court). Consequently, the court finds that Dr. Barnes is entitled to summary judgment on Dr. Snyder's breach of professional duty claim.

<u>Breach of Contract/Breach of Professional Duty by CommunityCare</u>

Dr. Snyder alleges, in Count XI of the Third Amended Complaint, that he entered into valid contracts with CommunityCare and that CommunityCare breached those contracts. According to Dr. Snyder, CommunityCare's "breach, in addition or alternatively, [] gives rise to a claim for breach of contract and/or of professional duty." Doc. no. 197, ¶ 146. Dr. Snyder has moved for partial summary judgment with respect to the breach of contract claim and CommunityCare has moved for summary judgment with respect to both claims.

<u>Breach of Contract</u>

Incident to the supervisory referral to the Employee Assistance Program ran by CommunityCare, Dr. Snyder executed three documents. The first document, the Consent for Disclosure of Information between CommunityCare EAP and Company Contact Personnel for Supervisory Referral (Consent), was presented to Dr. Snyder when he met with Deborah Nottingham, OSUMC's human resources officer, and Dr. Cotton. Nottingham also signed the document as a witness. The other two documents, the Confidentiality Statement of Understanding and Program Description (Confidentiality Statement) and the Authorization to Obtain, Use or Disclose Protected Health Information (Authorization), were presented to Dr. Snyder by CommunityCare.

Dr. Snyder asserts that CommunityCare breached the Confidentiality Statement and Authorization by disclosing the June 30th incident letter to Dr. Barnes. He also asserts that CommunityCare breached the Confidentiality

Statement and Consent by communicating with Sunny Benjamin, OSUMC's human resources officer, instead of or in addition to Nottingham, relating to his fitness-for-duty evaluation. In addition, Dr. Snyder asserts that CommunityCare breached the Authorization by when it passed on requests to Dr. Barnes to amend her initial report and conclusions. Dr. Snyder further asserts that CommunityCare breached the Consent by refusing to give Dr. Snyder the documents in his EAP file, specifically, Dr. Barnes' report.[29]

CommunityCare argues that the Consent, the Confidentiality Statement and Authorization are not contracts binding on CommunityCare. Alternatively, it argues that even if the documents are contracts, they allowed its employees to disclose the challenged information or communicate with Benjamin without authorization from Dr. Snyder. CommunityCare also contends that Dr. Snyder cannot show the information and communications resulted in his damages. Further, it contends that Dr. Snyder is not entitled to any damages for the breach of contract claim because he failed to mitigate his damages.

*June 30th Incident Letter*

For purposes of summary judgment, the court assumes, without deciding, that the Confidentiality Statement, Consent and Authorization are valid contracts binding CommunityCare. Under Oklahoma law, separate documents executed as

---

[29] In response to CommunityCare's summary judgment motion, Dr. Snyder asserts that CommunityCare committed a breach of contract when it failed to timely assign him a suitable counselor after he was placed on leave of absence. He does not cite the Confidentiality Statement, the Consent or the Authorization as a basis for the claim. Although he also asserts an implied contract existed between the parties and that he was a third-party beneficiary under the contract between CommunityCare and OSUMC, the Third Amended Complaint did not contain any allegation of breach of an implied contract or third-party contract and the court denies leave to amend the complaint to assert a such a claim. Further, the court notes that Dr. Snyder has not proffered any evidence to raise a genuine issue of material fact as to whether CommunityCare failed to timely assign him a suitable counselor.

part of the same transaction may be read together as a single agreement. 15 O.S. 2011 § 158 ("Several contracts relating to the same matters, between the same parties and made as parts of substantially one transaction, are to be taken together."). All the documents were executed by Dr. Snyder for purposes of the supervisory referral to the Employee Assistance Program. The Confidentiality Statement and the Consent were executed on the same day and the Authorization was executed six days later, after the referral to Dr. Barnes for a fitness-for-duty evaluation.

Based upon the evidence in the record, the court concludes that Dr. Snyder cannot establish that CommunityCare breached the Confidentiality Statement and Authorization by disclosing the June 30th incident letter to Dr. Barnes. The Confidentiality Statement provided that CommunityCare "will not share information about [Dr. Snyder] with any person without [Dr. Snyder's] written authorization except to the extent permitted or required by law." Doc. no. 335-16. The Authorization related to obtaining, using or disclosing "Protected Health Information." Doc. no. 335-19. The June 30th incident letter set forth matters relating to Dr. Snyder's job performance during the week of June 24, 2014. Dr. Snyder contends that the letter's narrative of alleged errors was not personal healthcare information. Doc. no. 378, ECF p. 30. As such, the Authorization would not prohibit its disclosure. The Authorization only concerned disclosure of protected health information. Furthermore, the Confidentiality Statement allowed disclosure of information about Dr. Snyder if permitted by law. Dr. Snyder has not cited any law which would preclude the disclosure of the June 30th letter without his authorization. Therefore, the court concludes that summary judgment is appropriate on the breach of contract claim premised upon the disclosure of the June 30th incident letter to Dr. Barnes.

*Requests to Dr. Barnes*

Dr. Snyder contends that CommunityCare breached the Authorization when "Heavin passed on requests to Dr. Barnes from Ms. Nottingham and others at OSUMC, essentially asking that Dr. Barnes amend her original report and conclusions about Dr. Snyder." Doc. no. 335, ECF p. 61. The court, however, concludes that Dr. Snyder has failed to establish that Heavin's acts breached the Authorization. The Authorization related to disclosure of protected health information. The requests to Dr. Barnes were not disclosures of protected health information. Even if they constituted protected health information, the requests were within the scope of the Authorization as they constituted "EAP assessment and referral information" and were made for purposes of the "EAP supervisory referral." Thus, the court concludes that summary judgment is appropriate on the breach of contract claim based upon the requests to Dr. Barnes.

*Failure to Provide Documents in EAP File*

Next, Dr. Snyder asserts that CommunityCare breached the Consent by refusing to give him the documents that were in his EAP file, particularly Dr. Barnes' report. The Consent permitted Dr. Snyder to "see and have a copy of any written information disclosed by the EAP to my employer, unless by federal law or EAP believes that my access to that information could result in mental or emotional suffering and/or damage to me or jeopardize and/or compromise my treatment or counseling." Doc. no. 335-17. In his papers, Dr. Snyder has not specifically identified documents in his EAP file that CommunityCare refused to provide other than Dr. Barnes' report. The evidence reveals that Dr. Barnes' report and letters supplementing the report were sent to Nottingham (and not CommunityCare) by Dr. Barnes. Nottingham sent the documents to CommunityCare. Thus, the documents were not ones disclosed by CommunityCare to OUSMC. Hence,

CommunityCare was not obligated under the language of the Consent to provide the report and letters to Dr. Snyder. The evidence also shows that the report and letters were ultimately given to Dr. Snyder by CommunityCare. Summary judgment is therefore appropriate on the breach of contract claim relating to a failure to give documents in the EAP file to Dr. Snyder.

*Communications with Benjamin*

Further, Dr. Snyder alleges that CommunityCare's communications with Sunny Benjamin violated the Consent and Confidentiality Statement. The Consent authorized CommunityCare to disclose certain information to "EAP contact Deby Nottingham, or his or her successor." Doc.no. 335-17. Dr. Snyder has not established that the communications between Jessica Heavin and Sunny Benjamin contained information that fell within the scope of the information covered by the Consent. In addition, the court also agrees that the phrase "EAP contact Deby Nottingham, or his or her successor" is ambiguous as it can be interpreted as having two or more meanings. *See*, Ahlschlager v. Lawton School Dist., 242 P.3d 509, 515 (Okla. 2010) ("Whether a contract term is ambiguous so as to require extrinsic evidence to determine the intent of the parties is purely a question of law for the court."); *see also*, California National Bank v. Woodbridge Plaza LLC, 164 Cal.App.4th 137, 78 Cal.Rptr.3d 561, 566 (2008) (finding the term successor in a lease ambiguous). Since the contractual term is ambiguous, the court may admit parol evidence to aid in its interpretation. Fowler v. Lincoln County Conservation Dist., 15 P.3d 502, 507 (Okla. 2000). CommunityCare has presented parol or extrinsic evidence demonstrating that the Consent was intended to authorize release of information to Sunny Benjamin, OSUMC's human resources officer, and there is no evidence proffered by Dr. Snyder to raise a genuine issue of material fact on that point.

As to the Confidentiality Statement, the document permits disclosure of information as permitted by law. Dr. Snyder has not demonstrated that the information shared with Sunny Benjamin was not permitted under any law. The court therefore concludes that summary judgment is appropriate on the breach of contract claim premised upon CommunityCare's communications with Sunny Benjamin.[30]

In sum, the court finds that CommunityCare is entitled to summary judgment with respect to Dr. Snyder's breach of contract claim.

Breach of Professional Duty

Even though none of the challenged disclosures made by CommunityCare to Dr. Barnes or to Sunny Benjamin constituted a breach of contract, Dr. Snyder alternatively alleges in his pleading that they constitute a breach of CommunityCare's professional duty to him. He also alleges that CommunityCare's conduct after the not fit-for-duty determination also constituted a breach of CommunityCare's professional duty.

CommunityCare has moved for summary judgment on the breach of professional duty claim. According to CommunityCare, the claim requires expert testimony to explain the applicable standard of care and the deviation therefrom causing injury. Although CommunityCare acknowledges that that expert testimony is not required when professional negligence is "grossly apparent," *see*, Turney v. Anspaugh, 581 P.2d 1301, 1307 (Okla. 1978), it argues that this is not

---

[30] The court notes that the Health Insurance Portability and Accountability Act (HIPAA), "does not create a private right of action for alleged disclosures of confidential medical information." Wilkerson v. Shinseki, 606 F.3d 1256, 1267 n. 4 (10th Cir. 2010). Courts have also held that a breach of contract claim cannot be based upon a HIPAA violation. Trone Health Services, Inc. v. Express Scripts Holding Company, 2019 WL 1207866, *3 (E.D. Miss. March 14, 2019); Cairel v. Jessamine Cty. Fiscal Court, 2015 WL 8967884, at *4 (E.D. Ky. Dec. 15, 2015).

one of those situations. Because Dr. Snyder has not proffered any expert testimony in support of his claim, CommunityCare argues that summary judgment is appropriate.

Under Oklahoma law, "[t]he general rule is expert testimony is ordinarily necessary to establish causation in professional liability cases." Boxberger v. Martin, 552 P.2d 370, 373 (Okla. 1976). However, "when a [professional]'s lack of care has been such as to require only common knowledge and experience to understand and judge it, expert . . . testimony is not required to establish that care." Id.; Turney, 581 P.2d 1301, 1307 (Okla. 1978) ("[E]xpert testimony is not required where negligence is so grossly apparent that laymen would have no difficulty in recognizing it."). Amputation of the wrong limb by a surgeon comes to mind.

The court concludes that ascertainment of the standard of care and of a deviation from that standard with respect to an EAP supervisory referral with a fitness-for-duty evaluation requires specialized knowledge that falls outside the common knowledge and experience of a lay person. The court is not persuaded that the Employee Assistance Law Desk Book or the Employee Assistance Program Training Manual, proffered by Dr. Snyder, are an acceptable substitute. As the evidence reveals, the supervisory referral with a fitness-for-duty evaluation is a rare circumstance and involves the EAP's relationship with the employer, with the outside evaluator and with the employee. In the court's view, expert testimony is required to assist the jury in determining the applicable standard of care for the EAP professional regarding the disclosures and communications that may appropriately be made during the process as well as the assistance to be given to the employee. Expert testimony is also necessary to assist the jury in evaluating any alleged breach or deviation of the standard of care. A fitness-for-duty evaluation, especially one requiring attention to possible psychiatric issues,

implicates a combination of potentially competing professional, ethical and practical considerations which are decidedly beyond the ken of the average juror (or judge). Because no expert has been identified by Dr. Snyder to address the applicable standard of care and any breach, the court concludes that summary judgment on the breach of professional duty claim is warranted.

Wrongful Denial of Personal Health Information Against OSUMC, Community Care and Dr. Barnes

In Count X of the Third Amended Complaint, Dr. Snyder alleges a claim for wrongful denial of personal health information. However, the court deemed the Second Amended Complaint to state a claim for recovery of health information by way of a court order against CommunityCare and Dr. Barnes. And it deemed the Second Amended Complaint to drop the wrongful denial of personal health information claim against OSUMC. *See*, doc. no. 125. The court did not grant leave to Dr. Snyder to add a different claim in granting leave to file a Third Amended Complaint.

In accordance with its prior ruling, the court considers the claim as a claim against CommunityCare and Dr. Barnes for recovery of the health information by way of a court order. As to OSUMC, the court construes the Third Amended Complaint as not alleging any such claim against it.

CommunityCare and Dr. Barnes have moved for summary judgment on claim for recovery of health information by way of court order. They represent that the health information has been produced to Dr. Snyder and the request for relief is moot.

Dr. Snyder has not addressed the claim in response to defendants' motions. The court deems the motions as confessed, and upon independent review of the motions, concludes that the health information sought by Dr. Snyder has been

produced by defendants, with the result that no court order is required. The request is moot. Consequently, the court finds that defendants, CommunityCare and Dr. Barnes, are entitled to summary judgment in their favor on that claim.

VI.

*Conclusion*

Based upon the foregoing, the court **ORDERS** as follows:

(1) Defendant Oklahoma State University Medical Authority's Motion for Summary Judgment (doc. no. 323) is **GRANTED**;

(2) The Motion for Summary Judgment on Counts Four and Five of Plaintiff's Third Amended Complaint, filed by defendants, Board of Regents for the Oklahoma Agricultural and Mechanical Colleges, ex rel. Oklahoma State University Center for Health Sciences, Dr. Lora Cotton, in her official capacity, and Dr. Jenny Alexopulos, in her official capacity (doc. no. 324), is **GRANTED** and summary judgment is **GRANTED** *sua sponte* on Count Six of Plaintiff's Third Amended Complaint against Dr. Lora Cotton, in her official capacity, and Dr. Jenny Alexopulos, in her official capacity;

(3) The Motion of the Defendant, Leslie Barnes, Ph.D., for Summary Judgment (doc. no. 325) is **GRANTED**;

(4) Defendant Mercy Health's and Mercy Health Oklahoma Communities, Inc.'s Motion for Summary Judgment (doc. no. 327) is **GRANTED**;

(5) Defendant CommunityCare's Motion for Summary Judgment (doc. no. 328) is **GRANTED**;

(6) Defendant Oklahoma State University Medical Center's Motion for Summary Judgment (doc. no. 333) is **GRANTED in part** and **DENIED in part**;

(7) Plaintiff's Motion for Partial Summary Judgment (doc. no. 335) is **DENIED**; and

(8) Defendants Lora Cotton and Jenny Alexopulos' Motion for Summary Judgment (doc. no. 336) is **GRANTED**.

This matter shall proceed to trial on Dr. Jeffrey Snyder's claims against defendant, Board of Regents for the Oklahoma Agricultural and Mechanical Colleges, *ex rel*. Oklahoma State University Center for Health Sciences, for discrimination under the Rehabilitation Act and the Americans with Disabilities Act and for retaliation under the Rehabilitation Act, the Americans with Disabilities Act and Title VII of the Civil Rights Act.

This matter will also proceed to trial on Dr. Jeffrey Snyder's claims against defendant, Oklahoma State University Medical Trust d/b/a OSU Medical Center for discrimination under the Rehabilitation Act and for retaliation under the Rehabilitation Act and Title VII of the Civil Rights Act and for breach of contract under Oklahoma law.

IT IS SO ORDERED this 19th day of February, 2020.

STEPHEN P. FRIOT
UNITED STATES DISTRICT JUDGE

16-0384p089.rev.docx

121